IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:12CR170 |
| | ) | |
| MICHAEL F. HARRIS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION
(Granting Defendant's Motion to Dismiss)

This matter is before the Court on Defendant's Motion to Dismiss (ECF No. 22), filed on December 12, 2012. Both parties have filed detailed memoranda supporting their respective positions. The Court heard argument and orally issued its ruling on the Motion on January 15, 2013. For the reasons stated below, the Motion was granted.

## I. BACKGROUND

On October 15, 2012, an indictment was returned charging Michael F. Harris ("Harris") with: four counts of securities fraud, in violation of 15 U.S.C. § 77q(a); three counts of wire fraud, in violation of 18 U.S.C. § 1343; and one count of mail fraud, in violation of 18 U.S.C. § 1341. All of these charges arise from the alleged fraudulent investment scheme outlined below.[1]

Harris was the President and majority shareholder of M.F. Harris Research, Inc. ("MFH"). Harris purportedly formed MFH to develop a treatment for HIV/AIDS. The

---

[1] All "facts" referenced by the Court in the Background section are allegations taken from the Indictment (ECF No. 3). For ease of reading, the Court has not added any modifying language to indicate that the statements are allegations and not factual findings.

proposed treatment involved the use of hyperbaric chambers to inhibit the virus.

Over a six-year period, ending in July 2011, Harris made several misrepresentations to potential investors to induce them to purchase MFH stock. Harris told investors that he would use the solicited funds to develop patents and to conduct human trials. Harris sold the shares at a price of one dollar per share, promising potential returns of 10 to 20 times the investment. While Harris represented to his investors that he was using their funds for legitimate purposes, Harris diverted the majority of the funds to his own use.

The instant Motion to Dismiss only concerns Counts One and Two, both of which allege securities fraud violations. Count One pertains to conduct beginning around August 2006. At that time, Harris made material false representations and omissions in the offer and sale of MFH stock to T.M.[2] On October 3, 2006, T.M. wire transferred $200,000 to MFH to purchase MFH stock. No stock certificates were delivered, but Harris did use $85,000 toward the purchase of a house in Luray, Virginia. T.M. passed away, and his brother, J.M., became the executor of T.M.'s estate. Unable to locate the MFH stock certificates, in late 2007 and early 2008, J.M. attempted to obtain the certificates and information about the investment. On March 12, 2008, Harris responded by email that the shares were nontransferable and failed to provide the requested information. Only after J.M. filed a lawsuit did Harris finally deliver the MFH stock on February 4, 2010.

Count Two addresses similar conduct affecting a second victim. Around June 20,

---

[2] The Indictment only identifies the alleged victims by their initials.

2007, Harris made material false representations and omissions which induced D.W. to purchase $10,000 of MFH stock by personal check. On September 27, 2007, D.W. wire transferred another $10,000 to purchase additional MFH shares. Harris issued a portion of the shares for the second sale on the date of purchase and then issued the balance of the shares on October 15, 2007.[3]

## II. DISCUSSION

Harris seeks dismissal of Counts One and Two on the same grounds, asserting that the five-year statute of limitations set forth in 18 U.S.C. § 3282 has run. His argument begins by restating the time-honored maxim that "criminal limitations statutes are to be liberally interpreted in favor of repose . . . ." *Toussie v. United States*, 397 U.S. 112, 115 (1970) (citations omitted) (internal quotation marks omitted). Armed with this guiding principle, Harris asserts that securities fraud, as codified in 15 U.S.C. § 77q(a), is complete at the time of the offer or sale of a security and does not include delivery of the security or post-sale misrepresentations or omissions made. Because the offense was complete at the time of sale, Harris argues, the limitations period in the immediate case began to run when the victims paid for the securities.

The Government advances two arguments in response. The Government urges the Court to adopt a broad construction of sale, extending the term to encompass the alleged

---

[3] In its Response to Defendant's Motion to Dismiss (ECF No. 23), the Government made additional factual allegations supplementing those in Count Two of the Indictment, and Harris has not objected to them. According to the additional allegations, D.W. had a co-investor, M.S., for the June investment. Harris believed that the September investment was a joint investment and issued stock certificates to both investors. D.W. later clarified that only he was making the additional investment, and Harris reissued the shares accordingly on October 15, 2007.

3

post-sale conduct. In the alternative, the Government contends that the post-sale conduct is included because the offense described in § 77q(a) constitutes a continuing offense. For the reasons set forth below, the Court agrees with Harris.

### A. The Completion of a Sale Does Not Require Delivery

Harris is charged under 15 U.S.C. § 77q(a), which provides:

(a) It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

Three basic elements comprise the offense: (1) fraud by any of the means identified in subsections (a)(1)–(3), (2) using any means or instruments of interstate commerce or the mails, and (3) occurring in the offer or sale of a security.

"To satisfy the statute of limitations, an indictment for ... securities fraud must be brought within five years of the crime," and "[t]he limitations period begins to run when the crime is complete." *United States v. United Medical & Surgical Supply Corp.*, 989 F.2d 1390, 1398 (4th Cir. 1993) (citations omitted). A crime is complete when each element of the crime has occurred. Accordingly, the Fourth Circuit held that "securities fraud is not complete, and the statute of limitations does not begin to run, until the sale of

4

the security . . . ." *Id.* However, *United Medical* did not specify the requirements for a completed sale. For the purposes of § 77q(a), "[t]he term sale . . . include[s] every contract of sale or disposition of a security or interest in a security, for value," 15 U.S.C. § 77b(a)(3), but this statutory definition is frustratingly broad and lacking in specificity.

Harris argues that a sale, as defined in § 77b(a)(3) and as that term is used in § 77q(a), is complete at the time of offer, acceptance, and payment. *See United States v. Carroll*, 326 F.2d 72, 86 (9th Cir. 1963). Under this analysis, delivery of the stock certificates is "merely incidental" to the offense. *Id.* Harris contends that the Fourth Circuit embraced similar logic in the context of a civil suit under § 10(b) of the Securities and Exchange Act of 1934 in *Hunt v. Robinson*, 852 F.2d 786 (4th Cir. 1988). Harris asserts that *Hunt* "rejected the notion that [the] failure to deliver stock was part of the sale" and that the failure to deliver stock only gives rise to a breach of contract claim. (Mot. to Dismiss at 9.) Finally, Harris maintains that construing sale to include delivery renders a related prohibition in 15 U.S.C. § 77e(a)(2), which distinguishes the sale of a security from the delivery after the sale of a security, superfluous and nonsensical.[4]

Relying on the broad definition provided in § 77b(a)(3), specifically the inclusion of "every . . . disposition of a security," the Government contends that the sales alleged in Counts One and Two "were not concluded until the dispositions of stock occurred." (Surreply to Mot. to Dismiss at 1–2.) The Government cites *Schillner v. H. Vaughan Clarke & Co.*, 134 F.2d 875, 877 (2d Cir. 1943), for the proposition that the disposition

---

[4] 15 U.S.C. § 77e(a)(2) makes it unlawful "to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any [unregistered] security for the purpose of sale or for delivery after sale."

5

of a security under § 77b(a)(3) includes delivery of the certificate pursuant to a contract of sale. Thus, the Government concludes, the sales could not be completed until the certificates were issued and delivered.

The Court recognizes that there is conflicting authority on the issue. The Government's key case, *Schillner*, held that the "[d]elivery of the stock certificate pursuant to a contract of sale would seem to be a 'disposition of * * * a security' within" the definition in § 77b(a)(3). 134 F.2d at 877. Albeit in a slightly different context, the Fifth Circuit reached the same basic conclusion in *Blackwell v. Bentsen*, 203 F.2d 690, 693 (5th Cir. 1953) (holding that land sales made by oral communication "were consummated" by delivery of the deeds and contracts). Citing *Schillner* with approval, the Eighth Circuit found that "payment of the consideration for the sale of a security is as much a part of the sale as the delivery of the security." *Creswell-Keith, Inc. v. B.F. Willingham*, 264 F.2d 76, 80–81 (8th Cir. 1959).

However, the broad construction of sale adopted in these cases is inapt for a number of reasons. First, several more recent Circuit Court decisions have rejected the inclusion of any delivery requirement for a completed sale. Second, such a construction renders 15 U.S.C. § 77e(a)(2) incoherent. Third, this broad concept of sale runs counter to the manner in which stocks are bought and sold in the contemporary market. Fourth, the Government's construction is inconsistent with the Congressional policy that criminal limitations statutes are to be interpreted in favor of repose.

"Sale" is a term of art. As defined in § 77b(a)(3), sale is a broad concept, including both contracts of sale and dispositions of securities. However, the statute fails

6

to identify the elements comprising a sale. As the case law below shows, the following elements, as detailed in Black's Law Dictionary, are all that is necessary to complete a sale: (1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised. Black's Law Dictionary (9th ed. 2009), sale. In short, offer, acceptance, and promise of or actual payment are all that is required.

The Second Circuit has implicitly abandoned the construction of sale articulated in *Schillner*. In *Finkel v. Stratton Corporation*, that Court affirmed a district court holding that a sale occurs at "the moment that the parties become contractually bound to the deal" and that the statute of limitations runs from that moment. 962 F.2d 169, 173 (2d Cir. 1992). Moreover, in *United States v. Gentile*, the Second Circuit concluded that "[t]here is no requirement that title pass to constitute a 'sale' within the meaning of [§ 77(b)(a)(3)]." 530 F.2d 461, 466 (2d Cir. 1976) (finding pledge of securities as collateral for loan constituted sale). Thus, the Second Circuit has implicitly determined that consummation of a sale, as defined in § 77b(a)(3), does not require delivery of the security.

Several other courts have reached the same conclusion. In 1963, the Ninth Circuit did so in *Carroll*. 326 F.2d at 86 (a sale "is made and completed by offer, acceptance, and payment").[5] Similarly, the Seventh Circuit determined that "[n]either delivery of nor

---

[5] The Government cites *United States v. Brown*, 578 F.2d 1280 (9th Cir. 1978), to distinguish *Carroll* and to show that securities fraud can be a continuing offense. While *Brown* held that securities fraud could constitute a continuing offense, *Brown* did not redefine sale. Accordingly, the Court will discuss *Brown* in its analysis of the continuing offense doctrine.

7

the passing of title to the contracted-for security is required for the transaction to be considered a 'sale' for purposes of the antifraud provisions of the securities laws." *Abrams v. Oppenheimer Government Secur., Inc.*, 737 F.2d 582, 587 (7th Cir. 1984) (citations omitted). And although the Tenth Circuit declined to "decide the perimeters of 'sale' for securities law purposes," the Court did conclude that in the context of the Interstate Land Sales Full Disclosure Act ("ILSFDA"),[6] a sale under a real estate contract is complete "at the time of signing the initial contract." *Aldrich v. McCulloch Properties, Inc.*, 627 F.2d 1036, 1044 (10th Cir. 1980). Thus, the more recent Circuit Court decisions have rejected delivery as a requirement of a sale.

As well, the argument that the inclusion of "disposition" in § 77b(a)(3)'s definition of sale incorporates delivery as a required element of a sale is unavailing. As discussed below, such a construction could result in an open-ended period in which to bring charges, undermining the Congressional policy in favor of repose. *See Finkel*, 962 F.2d at 172–73. Rather, as used in § 77b(a)(3), disposition is a catchall for unconventional transactions in which a security or rights in a security are transferred for value—for example, pledging securities as collateral. *See Gentile*, 530 F.2d at 466.

Not only are these more recent opinions more persuasive, but also the inclusion of a delivery requirement to complete a sale renders the final portion of § 77e(a)(2) superfluous. The statute, which prohibits carrying by mail or in interstate commerce "any [unregistered] security for the purpose of sale or for delivery after sale," plainly

---

[6] *Aldrich* clarifies that the Securities Act of 1933 was "the general model for ILSFDA." 627 F.2d at 1044 n.9. Accordingly, the Tenth Circuit's interpretation of the ILSFDA and its terms is of particular relevance in determining the meaning of sale in the context of the Securities Act.

distinguishes between the sale of a security and the subsequent delivery. Thus, construing sale to include delivery would contradict Congress's decision to distinguish between sale and delivery in that related context.

While some companies still issue and deliver physical stock certificates, delivery of a certificate is not a necessary component of a sale in practice. Records of ownership are kept by the issuer, and such records can be kept digitally with ease, rendering issuance and delivery of a physical certificate unnecessary. Physical possession of the certificate may give the holder a claim to ownership or to exercise certain rights, but the sale is complete at the time of offer, acceptance, and promise of or actual payment. The rights contracted for will either transfer at the completion of the sale or by the manner provided in the contract. To hold that a sale requires delivery would suggest that those whose shares exist only in electronic form will never be able to complete their purchase and, thus, will never be able to exercise the rights for which they contracted.

Finally, the Congressional policy that criminal limitations statutes are to be interpreted in favor of repose supports a narrow construction of sale. Adding a delivery requirement has the potential to extend the limitations period indefinitely in instances where the issuer or seller never delivers the stock certificates. *See Finkel*, 962 F.2d at 172–73 (finding, in civil context, that "open ended liability would frustrate the repose provided in § 13" of Securities Act of 1933). The Fourth Circuit declined to adopt a statutory interpretation with such an effect in *United States v. Hare*, 618 F.2d 1085 (4th Cir. 1980). At issue in *Hare* was when the limitations period began for a violation of 18 U.S.C. § 201(g), which made "it unlawful for a public official to receive 'anything of

value' because of the performance of an official act." *Id.* at 1086. The Government argued that the defendant continued to receive benefits from the loan until it was paid off and that the limitations period began to run only upon full repayment. *Hare* held, however, that "[s]uch a result would be contrary to the . . . admonition in [*Toussie*] that federal statutes of limitations should be applied strictly in order to further the [C]ongressional policy favoring repose." *Id.* at 1086–87. The Fourth Circuit's analysis, though not factually analogous, supports defining sale narrowly to require only offer, acceptance, and promise of or actual payment. Accordingly, this Court concludes that a consummated sale, as defined in § 77b(a)(3) and used in § 77q(a), is not dependent on the actual delivery of the security instrument.

### B. *Toussie* and the Continuing Offense Doctrine

The Government contends, in the alternative, that even if a sale is completed prior to delivery, the offense prohibited by 15 U.S.C. § 77q(a) is a continuing offense under *Toussie*. According to the Government, the statute covers conduct occurring before and after the sale is completed, if the conduct was part of a scheme to defraud. Thus, the Government argues, the limitations period for Counts One and Two is extended and runs from the completion of any relevant post-sale acts in furtherance of the scheme.

Before proceeding to the analysis, a quick review of the continuing offense doctrine is appropriate. Typically, the statute of limitations begins to run when an act is complete. However, "[t]he time at which a crime is 'complete' depends largely on the nature of the crime." *United States v. Eppolito*, 543 F.3d 25, 46 (2d Cir. 2008) (citations omitted). Certain offenses involving prolonged courses of conduct, deemed continuing

10

offenses, are "not complete until the conduct has run its course." *Id.* Thus, the statute of limitations for a continuing offense commences once the conduct has run its course.

The Supreme Court discussed the continuing offense doctrine in *Toussie*, 397 U.S. at 123 (holding that failure to register for the draft is not a continuing offense). Under *Toussie*, "[c]riminal acts over an extended period of time . . . may be treated as a continuing offense for limitations purposes when a criminal statute explicitly compels that result, or if the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *United States v. Smith*, 373 F.3d 561, 563–64 (4th Cir. 2004) (citation omitted) (internal quotation marks omitted). Therefore, to find that the conduct prohibited by § 77q(a) constitutes a continuing offense, the Court must determine either that the plain language of the statute contemplates a prolonged course of conduct or that the prohibited conduct is inherently continuous.

### 1. The Language of 15 U.S.C. § 77q(a) Does Not Expressly Indicate Congressional Intent to Create a Continuing Offense

The Government argues that the plain language of the statute indicates that Congress sought to create a continuing offense. To support its position, the Government cites a series of cases in which bank fraud, defined in 18 U.S.C. § 1344,[7] was found to be

---

[7] 18 U.S.C. § 1344 provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice--
> (1) to defraud a financial institution; or
> (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises;
> shall be fined not more than $1,000,000 or imprisoned not more than 30 years. . . .

11

a continuing violation. *See, e.g., United States v. Nash*, 115 F.3d 1431 (9th Cir. 1997). Drawing an analogy to the bank fraud statute, the Government argues that the plain meaning of 15 U.S.C. § 77q(a)(3), which makes it unlawful "to engage in any . . . course of business which operates . . . as a fraud or deceit upon the purchaser," contemplates continuous criminal conduct.

The Court is not persuaded by the Government's reasoning. A close reading of the statute reveals that Congress declined to insert any language stating that § 77q(a) is a continuing offense. *See United States v. Reitmeyer*, 356 F.3d 1313, 1322 (10th Cir. 2004) ("If Congress intended the execution of a scheme [under the Major Fraud Act] to be a continuing offense, it could have clearly stated so.") (internal quotations omitted) (citation omitted). Moreover, unlike the bank fraud statute, § 77q(a) contains language limiting the offense to fraud "in the offer or sale" of a security. This limitation suggests that the offense does not continue past the point of offer or sale. The Court also finds the assertion that the plain meaning of the "course of business" provision in § 77q(a)(3) necessarily implies a continuing offense unpersuasive. This provision is still limited to actions taken in the offer or sale of a security and does not include post-sale conduct. Thus, the language of the statute does not compel the conclusion that the offense is continuing.

### 2. The Nature of the Conduct Prohibited by 15 U.S.C. § 77q(a) Does Not Evince Congressional Intent to Create a Continuing Offense

Alternatively, the Government asserts that "the nature of the misconduct involved in a 15 U.S.C. § 77q(a) violation is such that Congress must have intended it to be a

continuing offense." (Surreply to Mot. to Dismiss at 4.) According to the Government, the prohibitions against "employ[ing] any device, scheme, or artifice to defraud" and "engag[ing] in any transaction, practice, or course of business which operates . . . as a fraud" evince a Congressional intention to create a continuing offense.

Employing this construction, the Government contends that the conduct prohibited by § 77q(a) includes post-sale acts designed to lull investors. Primarily, the Government relies on *United States v. Brown*, 578 F.2d 1280, 1285 (9th Cir. 1978), in which the Ninth Circuit distinguished *Carroll*. Analogizing between fraud in the sale of a security and mail fraud, *Brown* can be read to have held that § 77q(a) constituted a continuing offense because "the mailings of purported monthly payments to the purchasers of the land contracts . . . constitute[d] an integral part of the [fraudulent] transaction . . . ."[8] 578 F.2d at 1285. The Government supplements *Brown* with a few district court opinions holding that other securities fraud statutes punish continuing courses of conduct. *See, e.g., United States v. Hickey*, No. CR 97-0218 WHA, 2006 U.S. Dist. LEXIS 55116, at *26 (N.D. Cal. Jul. 6, 2006) (finding lulling payments allowed defendant to prevent Ponzi scheme from imploding and to continue soliciting funds from new investors); *United States v. Hatfield*, No. 06-CR-0550 (JS), 2009 U.S. Dist. LEXIS 63108, at *17 (E.D.N.Y. Jul. 22, 2009) (holding securities fraud is analogous to bank fraud and, thus, is a continuing offense).

The Court acknowledges that the law on this issue is not well-settled. However,

---

[8] *Brown* did not expressly conclude that § 77q(a) was a continuing offense, but the Ninth Circuit's analysis yields the same result—§ 77q(a) contemplates a continuing course of conduct.

there are several cases, including Fourth Circuit opinions, supporting the conclusion that the conduct prohibited by § 77q(a) is not by its nature a continuing offense. The logic of these authorities is more compelling than those offered by the Government.

To determine whether a crime is a continuing offense by its nature, it is useful to ask whether the crime concerns a discrete act or a course of conduct. *See Reitmeyer*, 356 F.3d at 1322. "If a crime is discrete, it is less likely Congress 'assuredly intended' the crime to be a 'continuing offense.'" *Id.* (citing *Toussie*, 397 U.S. at 122–23).

Conspiracy, escape, kidnapping, and crimes of possession are traditional examples of continuing offenses. *See United States v. Motz*, 652 F. Supp. 284, 293 (E.D.N.Y. 2009) (citations omitted). By their nature, these crimes "continue after the offense is initially committed." *Id.* at 294. For example, crimes of possession can be completed at the time the illegal substance or item is acquired, but can continue until the defendant no longer possesses the material. As well, continuing offenses may involve conduct that Congress has determined poses a continuing "threat." *See United States v. Perry*, No. RDB-12-0173, 2012 U.S. Dist. LEXIS 135417, at *8 (D. Md. Sept. 21, 2012) (finding defendant's concealment of facts disqualifying him from receiving disability benefits posed continuing risk of loss because he received benefits for duration of concealment). Similarly, the Fourth Circuit has found that "at least in those cases where the defendant created a recurring, automatic payment scheme," embezzlement constitutes a continuing offense. *Smith*, 373 F.3d at 567–68 (after failing to report mother's death to Social Security Administration, defendant continued to collect and use Social Security funds deposited into joint account). In light of these examples, fraud in the sale of a security is

far closer to a discrete offense addressing a singular act than to a continuing offense addressing a persistent risk of loss.

The offense, by its own language, is contained to the sale of a security, meaning it does not persist past the actual sale. Each separate offer or sale is understood to be a distinct chargeable offense under § 77q(a). *See, e.g., United States v. Schlei*, 122 F.3d 944, 978 (11th Cir. 1997) (citations omitted). Although *Schlei* interprets § 77q(a) in the context of a duplicity analysis, the focus on distinct transactions favors the conclusion that the statute, as written, does not contemplate a continuing course of conduct.

Moreover, the conduct prohibited by § 77q(a) is inherently different from the schemes in *Smith* and *Perry*. Contrary to the embezzlement in *Smith*, Harris's fraud was not automatically recurring—each sale was a deliberately undertaken and discrete act. Unlike the scheme in *Perry*, in which the concealment was continuous, Harris's post-sale conduct did not necessarily yield additional ill-gotten gains. Such actions arguably were for the purpose of covering up the prior fraudulent sale to protect those prior gains.

Similarly, the lulling argument central to the holding in *Brown* is unconvincing in light of the limiting language in § 77q(a). The "offer or sale" limitation distinguishes § 77q(a) from other fraud offenses, which lack such limitations. *See, e.g.*, 18 U.S.C. § 1341 (Mail Fraud); 18 U.S.C. § 1344 (Bank Fraud). *Brown* found that payments made to placate early investors were designed to protect the fraudulent scheme so that the defendant could continue to draw in new investors. Holding that these payments were integral to the violation, *Brown* construed § 77q(a) to cover acts in furtherance of a continuing fraud. However, *Brown* downplayed the limiting language in § 77q(a),

relying on a flawed analogy to mail fraud. The lack of such limitation in the mail fraud provision is critical because the language of § 77q(a) suggests that the statute only concerns conduct up to and including the sale, while the mail fraud provision addresses conduct occurring over the life of a fraudulent scheme.

The Court's conclusion regarding the scope of the conduct covered by § 77q(a) is reinforced by several Circuit Court decisions requiring that there be a causal connection between the fraudulent conduct and the sale of a security in the civil fraud context. Rule 10b-5, promulgated under § 10(b) of the Securities Exchange Act of 1934, prohibits fraud "in connection with the purchase or sale of a security." 17 C.F.R. § 240.10b-5. In *Tully v. Mott Supermarkets, Inc.*, the Third Circuit held that the "'sale' requirement . . . contemplates a causal connection between the alleged fraud and the . . . sale of stock." 540 F.2d 187, 194 (3d Cir. 1976) (citation omitted). The Court found that "the requisite causal connection [was] lacking" because the alleged fraud arose "not in the actual sale of stock, but rather in the refusal to sell" additional shares in accordance with the parties' prior agreement. *Id.* Embracing this construction of Rule 10b-5's sale requirement, the Fourth Circuit held that there was no causal connection where the defendant refused to transfer stock pursuant to the terms of the plaintiff's employment contract. *Hunt*, 852 F.2d at 787. The Fourth Circuit reached a similar conclusion in *Taylor v. First Union Corp. of South Carolina*, 857 F.2d 240 (4th Cir. 1988) (finding requisite nexus between sale and fraud lacking because relevant acts of deception "most directly involve[d] the circumstances of [plaintiff's husband's] termination"). The Fourth Circuit's construction of the limiting language in Rule 10b-5 is instructive and suggests that the similar

language in § 77q(a) should be construed to require a causal link between the fraud and the sale of a security. Accordingly, where fraud in the sale of a security is alleged, the fraud must facilitate the sale of that security. Under this logic, any acts occurring post-sale would fall outside the scope of § 77q(a).

In short, the nature of the offense described in § 77q(a) does not "assuredly" indicate that Congress intended it to be a "continuing offense." *Toussie*, 397 U.S. at 115. Rather, the crime, as defined in § 77q(a), is discrete in nature and limited in scope to the offer or sale of securities. The conduct covered does not extend to post-sale acts. Such a restrictive reading of the statute is in keeping with "the Supreme Court's admonition in [*Toussie*] that federal statutes of limitations should be applied strictly in order to further the [C]ongressional policy favoring repose." *Hare*, 618 F.2d at 1086–87. Accordingly, the Court must conclude that the limitations period starts to run once the sale is complete, as explained in Section II.A.

### C. Application to Counts One and Two

The sale at issue in Count One was completed on October 3, 2006, when T.M. transferred $200,000 to MFH to purchase MFH stock. In Count Two, the alleged sale was completed no later than September 27, 2007, when D.W. transferred $10,000 to purchase additional MFH shares. Since the offense prohibited by § 77q(a) is not a continuing offense, the five-year statute of limitations for the violations alleged in Counts One and Two started to run when the sales were complete—October 3, 2006 and September 27, 2007. None of the subsequent acts can be used to extend the limitations period, and consequently, Counts One and Two are time-barred. Accordingly, the Court

language in § 77q(a) should be construed to require a causal link between the fraud and the sale of a security. Accordingly, where fraud in the sale of a security is alleged, the fraud must facilitate the sale of that security. Under this logic, any acts occurring post-sale would fall outside the scope of § 77q(a).

In short, the nature of the offense described in § 77q(a) does not "assuredly" indicate that Congress intended it to be a "continuing offense." *Toussie*, 397 U.S. at 115. Rather, the crime, as defined in § 77q(a), is discrete in nature and limited in scope to the offer or sale of securities. The conduct covered does not extend to post-sale acts. Such a restrictive reading of the statute is in keeping with "the Supreme Court's admonition in [*Toussie*] that federal statutes of limitations should be applied strictly in order to further the [C]ongressional policy favoring repose." *Hare*, 618 F.2d at 1086–87. Accordingly, the Court must conclude that the limitations period starts to run once the sale is complete, as explained in Section II.A.

### C. Application to Counts One and Two

The sale at issue in Count One was completed on October 3, 2006, when T.M. transferred $200,000 to MFH to purchase MFH stock. In Count Two, the alleged sale was completed no later than September 27, 2007, when D.W. transferred $10,000 to purchase additional MFH shares. Since the offense prohibited by § 77q(a) is not a continuing offense, the five-year statute of limitations for the violations alleged in Counts One and Two started to run when the sales were complete—October 3, 2006 and September 27, 2007. None of the subsequent acts can be used to extend the limitations period, and consequently, Counts One and Two are time-barred. Accordingly, the Court

language in § 77q(a) should be construed to require a causal link between the fraud and the sale of a security. Accordingly, where fraud in the sale of a security is alleged, the fraud must facilitate the sale of that security. Under this logic, any acts occurring post-sale would fall outside the scope of § 77q(a).

In short, the nature of the offense described in § 77q(a) does not "assuredly" indicate that Congress intended it to be a "continuing offense." *Toussie*, 397 U.S. at 115. Rather, the crime, as defined in § 77q(a), is discrete in nature and limited in scope to the offer or sale of securities. The conduct covered does not extend to post-sale acts. Such a restrictive reading of the statute is in keeping with "the Supreme Court's admonition in [*Toussie*] that federal statutes of limitations should be applied strictly in order to further the [C]ongressional policy favoring repose." *Hare*, 618 F.2d at 1086–87. Accordingly, the Court must conclude that the limitations period starts to run once the sale is complete, as explained in Section II.A.

### C. Application to Counts One and Two

The sale at issue in Count One was completed on October 3, 2006, when T.M. transferred $200,000 to MFH to purchase MFH stock. In Count Two, the alleged sale was completed no later than September 27, 2007, when D.W. transferred $10,000 to purchase additional MFH shares. Since the offense prohibited by § 77q(a) is not a continuing offense, the five-year statute of limitations for the violations alleged in Counts One and Two started to run when the sales were complete—October 3, 2006 and September 27, 2007. None of the subsequent acts can be used to extend the limitations period, and consequently, Counts One and Two are time-barred. Accordingly, the Court

dismissed Counts One and Two.[9]

## III. CONCLUSION

For the reasons stated above, Harris's Motion to Dismiss was granted at oral argument. Both Counts One and Two were dismissed.

An appropriate Order will accompany this Memorandum Opinion.

/s/
Henry E. Hudson
United States District Judge

Date: Jan. 29, 2013
Richmond, Virginia

---

[9] The Court offers no opinion as to whether the Government may be able to prosecute Harris for the conduct alleged in Counts One and Two by bringing charges under other criminal statutes.