UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA      }
                            }
v.                        }    Criminal Case No.:
                            }    3:12 CR 170
MICHAEL F. HARRIS          }

February 25, 2013

**COMPLETE TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE HENRY E. HUDSON
UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

Michael R. Gill, Esquire
Gauhar Naseem, Esquire
OFFICE OF THE UNITED STATES ATTORNEY
600 East Main Street
Suite 1800
Richmond, Virginia  23219
    Counsel on behalf of the United States


Robert J. Wagner, Esquire
OFFICE OF THE FEDERAL PUBLIC DEFENDER
701 East Broad Street
Suite 3600
Richmond, Virginia  23219

Nicholas R. Klaiber, Esquire
TROUTMAN SANDERS LLP
1001 Haxall Point
P.O. Box 1122
Richmond, Virginia  23219
    Counsel on behalf of the Defendant



KRISTA M. LISCIO, RMR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT

1                       **E X A M I N A T I O N S**

2                    **DIRECT      CROSS      REDIRECT      RECROSS**

3   David Evans      122        152        172        ---

4   Diane Desch      175        210        226        ---

5   Nicole Gentry    227        251        264        ---

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (The proceeding commenced at 9:14 a.m.)

 2        THE COURT:  Good morning.

 3        MR. GILL:  Good morning.

 4        MR. WAGNER:  Good morning, Your Honor.

 5        THE COURT:  All right, Ms. Pizzini, call our case for

 6   trial today.

 7        THE CLERK:  Case 12 CR 170.  United States of America

 8   v. Michael F. Harris.

 9        Mr. Michael R. Gill and Mr. Gauhar Naseem represent

10   the United States.

11        Mr. Robert J. Wagner and Mr. Nicholas R. Klaiber

12   represent the defendant.

13        Are counsel ready to proceed?

14        MR. GILL:  The United States is ready, Your Honor.

15        MR. WAGNER:  Michael Harris is ready, Judge.

16        THE COURT:  Ladies and gentlemen, good morning once

17   again.  My name is Henry Hudson, and I'm the United States

18   District Judge that will be trying this case today.  The

19   case for your consideration is a criminal case.  It's the

20   case of United States of America v. Michael F. Harris.

21        Mr. Harris, if you would stand, sir.

22        This is Mr. Harris.  He is the defendant in the case.

23   And he's represented by his attorneys, Mr. Robert J.

24   Wagner and Mr. Nicholas R. Klaiber.

25        Gentlemen, you may be seated.
```

1    The United States of America is represented by the

2  Assistant United States Attorneys, Mr. Michael Gill and

3  Mr. Gauher Naseem.

4    Gentlemen, you may be seated.

5    Ladies and gentlemen, I'll be assisted in this trial

6  by my staff.  My law clerk is Mr. Staley.  My court

7  reporter is Ms. Liscio.  She takes down everything that

8  occurs in the courtroom.  My courtroom deputy is

9  Ms. Pizzini.  And our bailiff is Deputy Marshal Wray.

10    Now, the case for your consideration, and you will

11  hear a lot more about it during the opening statements, is

12  the case of *United States of America v. Michael F. Harris*.

13  And as will be explained to you during the course of the

14  opening statements, this is a 6-count indictment charging

15  securities fraud, wire fraud, and mail fraud.

16    It is alleged that Mr. Harris offered and sold stock

17  in the research firm, M.F. Harris Research, Incorporated,

18  based on false or untrue representations.  Mr. Harris'

19  firm was reportedly engaged in HIV/AIDS research.

20    Now, Mr. Harris has entered a plea of not guilty.

21  He's denied the charges, and 12 of you here today will

22  hear and decide this case.

23    Now, ladies and gentlemen, before we begin the trial

24  itself, our first order of business is what is known as

25  voir dire.  That's where I'll ask you a series of

1  questions to make sure there are no conflicts, nothing in

2  your background, no views that you have that would

3  interfere with your ability to be fully fair and impartial

4  in this case.   Before I begin with the voir dire, I'm

5  going to ask our Clerk of the Court, Ms. Pizzini, to take

6  the roll and to swear you on your voir dire.

7       Ms. Pizzini.

8       THE CLERK:  Jurors, as I call your name, please

9  stand, answer present, and then be seated.

10      Juror Number 1, Marcia Ann Tatum Adams.

11      JUROR NUMBER 1:  Present.

12      THE CLERK:  Juror Number 2, Carroll Linwood Allen.

13      JUROR NUMBER 2:  Present.

14      THE CLERK:  Juror Number 3, Nancy Ann Andolina.

15      JUROR NUMBER 3:  Present.

16      THE CLERK:  Juror Number 4, Angela Sorbert Arrington.

17      JUROR NUMBER 4:  Present.

18      THE CLERK:  Juror Number 5, Carolyn Jean Blakelock.

19      JUROR NUMBER 5:  Present.

20      THE CLERK:  Juror Number 6, Rachel Weber Bondurant.

21      JUROR NUMBER 6:  Present.

22      THE CLERK:  Juror Number 7, Leslie Dawn Boughman.

23      JUROR NUMBER 7:  Present.

24      THE CLERK:  Juror Number 8, Victoria Lynn Bragunier.

25      JUROR NUMBER 8:  Present.

```
 1          THE CLERK:  Juror Number 9, Celia Louise Broadus.

 2          JUROR NUMBER 9:  Present.

 3          THE CLERK:  Juror Number 10, Valerie Elizabeth Casey.

 4          JUROR NUMBER 10:  Present.

 5          THE CLERK:  Juror Number 11, Joseph Anthony Crute.

 6          JUROR NUMBER 11:  Present.

 7          THE CLERK:  Juror Number 12, Lori Ann Dameron.

 8          JUROR NUMBER 12:  Present.

 9          THE CLERK:  Juror Number 13, Sharon Hinton Dickens.

10          JUROR NUMBER 13:  Present.

11          THE CLERK:  Juror Number 14, Charles Ryan Fanelli.

12          JUROR NUMBER 14:  Present.

13          THE CLERK:  Juror Number 15, Kevin Joseph Faubion.

14          JUROR NUMBER 15:  Present.

15          THE CLERK:  Juror Number 16, James Bradley Folk.

16          JUROR NUMBER 16:  Present.

17          THE CLERK:  Juror Number 17, Todd Everett Foster.

18          JUROR NUMBER 17:  Present.

19          THE CLERK:  Juror Number 18, Kevin Thomas Goldsmith.

20          JUROR NUMBER 18:  Present.

21          THE CLERK:  Juror Number 20, Tanicka Heiskell-Stokes.

22          JUROR NUMBER 20:  Present.

23          THE CLERK:  Juror Number 22, Thomas John Izzo.

24          JUROR NUMBER 22:  Present.

25          THE CLERK:  Juror Number 23, Claibourne Jeremy
```

```
1   Jackson.

2        JUROR NUMBER 23:  Present.

3        THE CLERK:  Juror Number 24, Kimberly Lange Jones.

4        JUROR NUMBER 24:  Present.

5        THE CLERK:  Juror Number 26, Thomas Lee Kirk.

6        JUROR NUMBER 26:  Present.

7        THE CLERK:  Juror Number 27, Robert Anthony Kitusky.

8        JUROR NUMBER 27:  Present.

9        THE CLERK:  Juror Number 28, Samuel Frank Kothman.

10       JUROR NUMBER 28:  Present.

11       THE CLERK:  Juror Number 30, Khawarz Mian.

12       JUROR NUMBER 30:  Present.

13       THE CLERK:  Juror Number 31, Martha Pratt.

14       JUROR NUMBER 31:  Present.

15       THE CLERK:  Juror Number 32, Randolph John Rowekamp.

16       JUROR NUMBER 32:  Present.

17       THE CLERK:  Juror Number 33, Edward Stuart Ruffner.

18       JUROR NUMBER 33:  Present.

19       THE CLERK:  Juror Number 34, Logan Sale Ryan.

20       JUROR NUMBER 34:  Present.

21       THE CLERK:  Juror Number 35, Paul Jay Sixt.

22       JUROR NUMBER 35:  Present.

23       THE CLERK:  Juror Number 36, Lasonya Rene Slade.

24       JUROR NUMBER 36:  Present.

25       THE CLERK:  Juror Number 37, Stacy Jones Slusser.
```

```
1          JUROR NUMBER 37:  Present.

2          THE CLERK:  Juror Number 38, Carol Schumacher Smith.

3          JUROR NUMBER 38:  Present.

4          THE CLERK:  Juror Number 39, Douglas Harry Snell.

5          JUROR NUMBER 39:  Present.

6          THE CLERK:  Juror Number 40, Laverna Noel Stallard.

7          JUROR NUMBER 40:  Present.

8          THE CLERK:  Juror Number 41, Temple Rene Stewart.

9          JUROR NUMBER 41:  Present.

10         THE CLERK:  Juror Number 42, Edwinna B. Stinnett.

11         JUROR NUMBER 42:  Present.

12         THE CLERK:  Juror Number 43, Stuart Philip Webel.

13         JUROR NUMBER 43:  Present.

14         THE CLERK:  Juror Number 44, Brian Scott Wickline.

15         JUROR NUMBER 44:  Present.

16         THE CLERK:  Juror Number 45, Diamond Lakesha Wiggins.

17         JUROR NUMBER 45:  Present.

18         THE CLERK:  Juror Number 46, Richard Paul Williams,

19 Jr.

20         JUROR NUMBER 46:  Present.

21         THE CLERK:  Juror Number 47, Andrea Davis

22 Winebrenner.

23         JUROR NUMBER 47:  Present.

24         THE CLERK:  Juror Number 48, Shanna Marie Wiseman.

25         JUROR NUMBER 48:  Present.
```

1      THE CLERK:  Juror Number 49, Russell Leroy Wood, Jr.

2      JUROR NUMBER 49:  Present.

3      THE CLERK:  Juror Number 50, Deborah Mayo Worten.

4      JUROR NUMBER 50:  Present.

5      THE CLERK:  Juror Number 51, Alberta Christophersen.

6      JUROR NUMBER 51:  Present.

7      THE CLERK:  Juror Number 52, Virginia Kent Dunn

8  James.

9      JUROR NUMBER 52:  Present.

10      THE CLERK:  Juror Number 53, Roxanne Briggs Lawrence.

11      JUROR NUMBER 53:  Present.

12      THE CLERK:  Juror Number 54, Andrea Crockett Rich.

13      JUROR NUMBER 54:  Present.

14      THE CLERK:  Are there any jurors present in the

15  courtroom whose name I did not call?

16      Jurors, if you would please stand, raise your right

17  hand, and answer I shall to the oath about to be given.

18      You shall true and perfect answer make to those

19  questions which may be propounded to you by the Court or

20  by counsel, so help you God?

21      JURORS:  I shall.

22      THE CLERK:  Thank you.

23      THE COURT:  Ladies and gentlemen, before I begin

24  going through a series of questions, there is one

25  principle of law that I want to underscore because we'll

1  be discussing perhaps elements of the charge during the

2  voir dire.  Mr. Harris has been indicted by a grand jury

3  as I mentioned, a 6-count indictment; however, keep in

4  mind that an indictment is not evidence against

5  Mr. Harris.  It is the legal vehicle that the government

6  uses to bring forth criminal charges.  No inference should

7  be drawn from you whatsoever, nor is it evidence the fact

8  that he was indicted by a grand jury.

9      Now, ladies and gentlemen, we're going to select 14

10  jurors today.  Twelve of them will be active jurors, and

11  two will be alternates.  Only 12 jurors, though, will

12  actually engage in deliberations in the case.

13      I'm going to ask you a series of questions, and if

14  you have an affirmative answer, I want you to raise your

15  hand.  When I call upon you, if you will be kind enough to

16  give your name and your number before you respond.  And

17  the reason for that is simply Ms. Liscio has got to take

18  down everything that occurs in the courtroom, and the only

19  way she can identify who is speaking is if you identify

20  yourself.

21      Are there any members of the jury panel who are

22  acquainted with the defendant in this case, Mr. Michael F.

23  Harris?  Anyone here know Mr. Harris?

24      Is there any member of the jury panel who has been

25  employed by, or holds stock in M.F. Harris Research,

1  Incorporated?

2      Is there any member of the jury panel who has been

3  represented either in their personal or professional

4  business by any of the attorneys in this case, Mr. Robert

5  J. Wagner, Mr. Nicholas R. Klaiber, Mr. Michael Gill, or

6  Mr. Gauhar Naseem?

7      Ladies and gentlemen, this is a case that will

8  probably require at least a week to try.  I'm going to try

9  my very, very best to complete this case in a week.  It

10 could go over into Monday.  I'll do my best, but I can't

11 always deliver on that because there are a lot of

12 variables here.  So, is there anyone here -- and I know

13 everyone present with the daily lifestyle we lead here in

14 the City of Richmond is busy with their personal,

15 professional, business, and family obligations, but is

16 there anyone here who could not serve for a week if this

17 case required it?  I mean, either you've got to do it, or

18 one of your neighbors has got to serve, so I would ask you

19 to search your conscious a bit.  But is there anyone in

20 the jury panel who just simply could not serve for a week?

21     Yes, sir.  Gentleman in the first row.

22     JUROR NUMBER 2:  Carroll Allen.  Juror Number 2.  My

23 wife has become ill and she has an appointment with her

24 doctor in Chapel Hill, North Carolina tomorrow.

25     THE COURT:  All right.  I'll do my best to try to

1   accommodate you, Mr. Allen.  Thank you, sir.

2       Yes, ma'am.  The lady on the front row.

3       JUROR NUMBER 5:  Number 5.  Carolyn Blakelock.  I'm a

4   principal for a program that's trying to do a test next

5   Tuesday, and I have several meetings I'm supposed to be

6   attending this week.

7       THE COURT:  Well, we'll do our best to try to

8   accommodate you.  I can't promise you, but I'll do my

9   best.

10      JUROR NUMBER 5:  I appreciate it.  I understand.

11      THE COURT:  Yes, ma'am.  I'll do my best.

12      All right.  The lady in the back.  Yes, ma'am.

13      JUROR NUMBER 37:  Stacy Jones Slusser.  Number 37.

14      THE COURT:  Number 37.  Okay.

15      JUROR NUMBER 37:  I currently have a respiratory

16  illness right now and I don't know if I'll be able to

17  tolerate it or the Court would tolerate it.

18      THE COURT:  All right.  Well, I'm going to do my

19  very, very best to accommodate you.

20      JUROR NUMBER 37:  Thank you.  Sorry.

21      THE COURT:  That's okay.  Happens to all of us.

22      Anyone else on this side?

23      Anyone on this side?  Yes, ma'am.

24      JUROR NUMBER 34:  Number 34.  Logan Ryan.  I have

25  plans to go out of town Thursday and Friday.

1        THE COURT:   All right.   I assume it's something that

2   simply cannot be canceled even if your civic duty requires

3   it?

4        JUROR NUMBER 34:   Well, it was booked about two

5   months ago.

6        THE COURT:   Number 34.   Ms. Ryan.   I'll do my best to

7   accommodate you, okay?

8        JUROR NUMBER 34:   Thank you.

9        THE COURT:   All right.   Anyone else on this side?

10   Yes, ma'am.

11        JUROR NUMBER 45:   Number 45.   Diamond Wiggins.

12        THE COURT:   Number 45.   Yes, ma'am, Ms. Wiggins.

13        JUROR NUMBER 45:   In the evening time I have no one

14   to get my kids off the bus so I have to be home.

15        THE COURT:   What time do you have to be there?

16        JUROR NUMBER 45:   My first son gets out of school and

17   he is to be home by 3:15.

18        THE COURT:   3:15.   I'll try to make it a priority to

19   accommodate you.   I understand your obligations.

20        JUROR NUMBER 45:   Thank you.

21        THE COURT:   Anyone else?

22        Excuse me just one second.

23        Anyone else on this side?

24        Yes, ma'am.

25        JUROR NUMBER 3:   Number 3.   Nancy Andolina.   I'm a

1    diabetic, and I cannot go through a day without eating.

2        THE COURT:  I understand.  My son is a diabetic.  I'm

3    familiar with the problem.  If you need a recess you can

4    just raise your hand and we'll give you a recess, we'll

5    accommodate you fully.

6        JUROR NUMBER 3:  Okay.

7        THE COURT:  Yes, ma'am.  And don't be at all shy

8    about raising your hand.  We're glad to do it.

9        Yes, ma'am.

10       JUROR NUMBER 53:  Roxanne Lawrence.  Number 53.

11       THE COURT:  Yes, ma'am.

12       JUROR NUMBER 53:  I'm the only one that works in my

13   home, and --

14       THE COURT:  I'm sorry.  I can't hear you.  I

15   apologize to you.

16       JUROR NUMBER 53:  I'm the only one that works in my

17   home, and I would be missing work and not getting paid.

18       THE COURT:  All right.  You're Juror Number 53,

19   Ms. Lawrence, is that correct?

20       JUROR NUMBER 53:  Yes, sir.

21       THE COURT:  All right.  I'll see what I can do to

22   help you if possible.

23       Anyone else?  All right.

24       Is there any member of the jury panel who feels they

25   have a physical disability that would prevent you from

1   sitting through a 5-day jury trial?  Now as I mentioned in

2   response to one of the other juror's comments, if you need

3   a recess, need a break, just raise your hand and you'll

4   receive it.  We'll do everything we can to accommodate

5   your personal needs.  Is there anyone who feels they have

6   such a disability?

7        Is there anyone here who feels they would have a

8   problem seeing or hearing the evidence as it's presented

9   in this case?

10       Anyone here feel they would have a problem

11  understanding the English language that would make you

12  uncomfortable in sitting as a juror in the case?

13       Now, ladies and gentlemen, is there any member of the

14  jury panel who has any interest to the outcome of this

15  case other than making sure that justice is done and that

16  the verdict is consistent with the law and the evidence?

17       Is there any member of the jury panel who has ever

18  served as a juror in a state or federal court, criminal or

19  civil case, in Virginia or elsewhere?  In other words,

20  bottom line, have you ever served as a juror in any case?

21       All right.  Yes, ma'am.  Juror Number 1.

22       JUROR NUMBER 1:  Marcia Adams.  Number 1.  It was in

23  (inaudible).

24       THE COURT:  I can't hear you.

25       JUROR NUMBER 1:  Marcia Adams.  And I served in

1    Colonial Heights.

2         THE COURT:  Was that a criminal or civil case,

3    Ms. Adams?

4         JUROR NUMBER 1:  It was a criminal case.

5         THE COURT:  All right.  Ms. Adams, anything about

6    that experience that would affect your ability to be fair

7    and impartial in this case, ma'am?

8         JUROR NUMBER 1:  No.

9         THE COURT:  All right.  Very well.

10        Anyone else on that same row?

11        Lady in the next row.  Yes, ma'am.

12        JUROR NUMBER 24:  Number 24.  Kim Jones.

13        THE COURT:  All right.  Ms. Jones, where did you

14   serve?

15        JUROR NUMBER 24:  I served in Richmond.

16        THE COURT:  Here in the City?  City of Richmond?

17        JUROR NUMBER 24:  It was.

18        THE COURT:  All right.  How long ago was that?

19        JUROR NUMBER 24:  Fifteen years ago.

20        THE COURT:  Civil or criminal case, if you remember?

21        JUROR NUMBER 24:  I'm going to say it was a criminal

22   case.

23        THE COURT:  Anything about that experience,

24   Ms. Jones, that would affect your ability to be fair and

25   impartial here?

1          JUROR NUMBER 24:  No, sir.

2          THE COURT:  Thank you very much.

3          Anyone else on this side?  Yes, ma'am.  Lady in the

4  next row.

5          JUROR NUMBER 41:  Temple Stewart.  Number 41.  And I

6  served as a juror in Chesterfield.

7          THE COURT:  How long ago was that, Ms. Stewart?

8          JUROR NUMBER 41:  I believe it was in '94 or '95.

9  And it was a criminal case.

10          THE COURT:  Anything about that experience that would

11  affect your ability to be fair and impartial today?

12          JUROR NUMBER 41:  No, sir.

13          THE COURT:  All right.

14          Anyone else on this side?  The gentleman.  Yes, sir.

15          JUROR NUMBER 39:  Number 39.  Doug Snell.  I served

16  on a jury in Florida 20 years ago, and on a jury in

17  Colorado Springs 15 years ago.

18          THE COURT:  Were they civil or criminal cases, if you

19  can recall, Mr. Snell?

20          JUROR NUMBER 39:  Both of them were criminal.  One

21  was drunk driving, and a theft.

22          THE COURT:  Anything about those experiences that

23  would affect your ability to be fair and impartial today?

24          JUROR NUMBER 39:  No.

25          THE COURT:  Okay.  Thank you very much.

1      Anyone else on this side over here?

2      All right.  On this side.  Gentleman on the front

3  row.

4      JUROR NUMBER 16:  Number 16.  James Folk.  I served

5  as a juror 40 years ago in a criminal case in Texas

6  District Court.

7      THE COURT:  In a District Court in Texas?

8      JUROR NUMBER 16:  Yes.

9      THE COURT:  And you say it was a criminal case?

10      JUROR NUMBER 16:  Criminal case.

11      THE COURT:  Anything about that experience, sir, that

12  would affect your ability to be fair and impartial?

13      JUROR NUMBER 16:  Not at all.

14      THE COURT:  All right.  Very well.

15      Lady on the next row.  Yes, ma'am.

16      JUROR NUMBER 31:  My name is Martha Pratt.  Juror

17  Number 31.  I served on a jury 10 years ago in

18  Fredericksburg, Virginia.

19      THE COURT:  In Fredericksburg, Virginia.  Was that

20  criminal or civil?

21      JUROR NUMBER 31:  It was civil.

22      THE COURT:  Anything about that experience that would

23  affect your ability to be fair and impartial today?

24      JUROR NUMBER 31:  No.

25      THE COURT:  Okay.  Thank you.

1          Yes, ma'am.  Lady on the front row.

2          JUROR NUMBER 13:  Sharon Dickens.  Juror Number 13.

3   It was about 20 years ago, and it was criminal.

4          THE COURT:  What jurisdiction was that?

5          JUROR NUMBER 13:  It was Richmond.

6          THE COURT:  Here in the City of Richmond?

7          JUROR NUMBER 13:  Yes, sir.

8          THE COURT:  Anything about that experience,

9   Ms. Dickens, that would affect your ability to be fair and

10  impartial today?

11         JUROR NUMBER 13:  No, sir.

12         THE COURT:  Okay.  Thank you very much.

13         Anyone else?  The gentleman on the third row.

14         JUROR NUMBER 44:  Number 44.  Brian Wickline.  I

15  served as a juror last year or the year before for the

16  City of Hopewell, criminal case.

17         THE COURT:  City of Hopewell.  Did you say it was a

18  criminal case?

19         JUROR NUMBER 44:  Yes, sir.

20         THE COURT:  Anything about that experience that would

21  affect your ability to be fair and impartial today?

22         JUROR NUMBER 44:  No, sir.

23         THE COURT:  All right.

24         Anyone else?  Yes, sir.  Gentleman next to you.

25         JUROR NUMBER 46:  Number 46.  Richard Williams.  New

 1  Kent County, grand jury, 11 years ago, civil case.

 2       THE COURT:  All right.  I was going to ask a separate

 3  question about grand jurors, but since you're on your feet

 4  I'll ask you the question now.  Obviously that is a

 5  criminal proceeding and it is not one that indicts.  It

 6  just simply determines whether there is sufficient

 7  evidence to bring forth a charge.  Is there anything about

 8  that experience that would affect your ability,

 9  Mr. Williams, to be fair and impartial in this case?

10       JUROR NUMBER 46:  No, sir.

11       THE COURT:  All right.  Thank you very much.

12       Anyone else?  Did I miss somebody?

13       Speaking of grand juries, is there anyone else

14  besides Mr. Williams who has served on a grand jury?  A

15  grand jury is an investigative body that hears the

16  government's side of the case to see whether or not the

17  evidence is sufficient to bring forth an indictment in the

18  case.  Anybody serve as a grand juror?

19       Yes, ma'am.

20       JUROR NUMBER 12:  Lori Dameron.  Number 12.  Probably

21  six years ago in Middlesex County.

22       THE COURT:  Middlesex County, Virginia.  Anything

23  about that experience, Ms. Dameron, that would affect your

24  ability to be fair and impartial today?

25       JUROR NUMBER 12:  No, sir.

1          THE COURT:  All right.  Thank you.

2          Is there any member of the jury panel who themselves,

3  or an immediate member of their family, have served as a

4  law enforcement officer, deputy sheriff, state trooper,

5  FBI, DEA agent, U.S. Marshal?

6          All right.  Yes, ma'am.

7          JUROR NUMBER 42:  Edwinna Stinnett.  My husband --

8          THE COURT:  Your number?

9          JUROR NUMBER 42:  Number 42.

10         THE COURT:  Okay.  Yes, ma'am.

11         JUROR NUMBER 42:  He's been with the State Police for

12  42 years.

13         THE COURT:  He's been with the State Police for 42

14  years?

15         JUROR NUMBER 42:  Uh-huh.

16         THE COURT:  Do you have occasion, Ms. Stinnett, to

17  talk to your husband about law enforcement issues, or the

18  law, or issues like that?

19         JUROR NUMBER 42:  I do.

20         THE COURT:  I'm sure you do.  Just wanted to inquire.

21  Nothing wrong with that.  Just want to know whether or not

22  any of those conversations, or your relationship with your

23  husband, would affect your ability to be fair and

24  impartial in this case?

25         JUROR NUMBER 42:  I don't know.  I probably am

1   programmed a little bit towards not being so objective.

2       THE COURT:  Well, I want you to be.  This is an

3   important case, and if you feel uncomfortable because of

4   your relationship with your husband's service with the

5   State Police or your conversations, just say so.

6       JUROR NUMBER 42:  Okay.  I probably do.

7       THE COURT:  Okay.  That's fair.  Thank you,

8   Ms. Stinnett.

9       Anyone else?  Yes, ma'am.

10      JUROR NUMBER 5:  Number 5.  Carolyn Blakelock.  My

11  brother-in-law is chief of police in my home town in Ohio.

12      THE COURT:  All right.  Do you have any discussions

13  with him about law enforcement or legal issues?

14      JUROR NUMBER 5:  Not regularly.  No.

15      THE COURT:  Anything about that relationship, or your

16  conversations with him, that would affect your ability to

17  be fair and impartial today?

18      JUROR NUMBER 5:  No.  I don't think so.

19      THE COURT:  Thank you very much.

20      Another lady.  I'll take the lady in the -- go ahead.

21  You're up.

22      JUROR NUMBER 37:  Stacy Jones Slusser.  Number 37.

23      THE COURT:  Number 37.  Okay.

24      JUROR NUMBER 37:  My brother has been a lieutenant in

25  the Henrico County Police for the last 24 years.

1        THE COURT:  Okay.  Have you discussed law

2   enforcement, police issues, legal issues with him?

3        JUROR NUMBER 37:  Not in depth.

4        THE COURT:  Anything about that relationship, or any

5   of your conversations with him, that you feel would affect

6   your ability to be fair and impartial in this case?

7        JUROR NUMBER 37:  No.

8        THE COURT:  Thank you, Ms. Slusser.

9        All right.  There was another lady.  Yes, ma'am.  On

10  the second row.  Excuse me.  First row.  I need stronger

11  glasses.

12        JUROR NUMBER 6:  Jury Number 6.  Rachel Bondurant.

13  My brother-in-law was a City of Richmond police officer.

14        THE COURT:  Is he still with that police department?

15        JUROR NUMBER 6:  No.  He had an accident which didn't

16  allow him to do his job anymore.

17        THE COURT:  All right.  Did you discuss law

18  enforcement, police issues with him?

19        JUROR NUMBER 6:  No.

20        THE COURT:  Anything about that relationship with him

21  that would affect your ability to be fair and impartial?

22        JUROR NUMBER 6:  No.

23        THE COURT:  All right.  Thank you very much.

24        Anyone else on this side?  Yes, sir.

25        JUROR NUMBER 28:  Number 28.  Sam Kothman.  My

1   brother-in-law was a Baltimore County police detective.

2       THE COURT:  Did you discuss police issues with him,

3   law enforcement, legal issues?

4       JUROR NUMBER 28:  No.

5       THE COURT:  Anything about that relationship that

6   would in any way affect your ability to be fair and

7   impartial today?

8       JUROR NUMBER 28:  No, sir.

9       THE COURT:  Thank you.

10      Anybody else on this side?  All right.

11      Switching to this side.  Gentleman on the front row.

12      JUROR NUMBER 15:  Kevin Faubion.  Juror 15.  My

13  brother is a police officer in Suffolk County.

14      THE COURT:  Suffolk County, Virginia?

15      JUROR NUMBER 15:  Yes, sir.

16      THE COURT:  Anything about -- well, do you discuss

17  law enforcement and police issues with him?

18      JUROR NUMBER 15:  Occasionally.  But not in depth.

19      THE COURT:  Anything about those conversations, or

20  your relationship with him, that would affect your ability

21  to be fair and impartial?

22      JUROR NUMBER 15:  No, sir.

23      THE COURT:  Thank you very much.

24      Anyone else on that row?  Yes, sir.  Gentleman on the

25  end of the row.

1    JUROR NUMBER 18:  Juror 18.  Kevin Goldsmith.  I have

2  a brother-in-law that is a police officer in Prince George

3  County, Virginia, and a brother-in-law that is a police

4  officer in Las Vegas Metro Police in Las Vegas, Nevada.

5    THE COURT:  All right.  Same questions I've asked the

6  other folks.  Do you have occasion to discuss law

7  enforcement and legal issues with them?

8    JUROR NUMBER 18:  Nothing past casual.

9    THE COURT:  Is there anything about those

10  relationships that you feel would make you less than

11  completely fair and impartial in this case?

12    JUROR NUMBER 18:  No, sir.

13    THE COURT:  All right.  Thank you.

14    Yes, sir.  The gentleman.

15    JUROR NUMBER 43:  Juror Number 43.  Stuart Webel.  I

16  have a brother who's a captain at the Pamunkey Regional

17  Jail.  And I have a brother-in-law who's an investigator

18  with the State Police.

19    THE COURT:  All right.  Well, I was going to ask

20  separately about correctional officers, but since you've

21  responded, is it your brother-in-law that is a

22  correctional officer?

23    JUROR NUMBER 43:  My brother.

24    THE COURT:  Your brother is a correctional officer.

25  Do you discuss legal issues with him?

1          JUROR NUMBER 43:  Goings on at the jail sometimes.

2          THE COURT:  All right.  And is it your brother who's

3    a State Trooper?

4          JUROR NUMBER 43:  Brother-in-law.

5          THE COURT:  Your brother-in-law.  Do you have

6    occasion to discuss with him criminal justice type of

7    issues, or legal issues?

8          JUROR NUMBER 43:  On occasion.

9          THE COURT:  Anything about those conversations with

10   either of those gentlemen that would affect your ability

11   to be fair and impartial today?

12         JUROR NUMBER 43:  I don't think so.

13         THE COURT:  Well, I want you to search your soul to

14   make sure.

15         JUROR NUMBER 43:  No.

16         THE COURT:  Okay.  Very good.  Thank you, sir.

17         Yes, ma'am.

18         JUROR NUMBER 48:  Juror Number 48.  Shanna Wiseman.

19   I don't know if this applies or not.  My mom is an animal

20   control warden in Dinwiddie County.

21         THE COURT:  All right.

22         JUROR NUMBER 48:  But the answers are no, sir.  But

23   she's law enforcement.

24         THE COURT:  Well, at least you're paying attention.

25   I'll give you credit for that.  All right.  Very well.

1   Anybody else?  All right.  Yes, ma'am.

2   JUROR NUMBER 41:  Temple Stewart.  Number 41.  My

3 sister just retired from the federal prison as a

4 correctional officer for 30 years.

5   THE COURT:  All right.  And do you have occasion to

6 discuss any legal or law enforcement issues with her?

7   JUROR NUMBER 41:  Rarely.  And I don't think it

8 would.

9   THE COURT:  It would not affect your ability to be

10 fair and impartial?

11   JUROR NUMBER 41:  No, sir.

12   THE COURT:  Okay.  Very well.  Thank you very much.

13   Since a number of people have already responded, you

14 need not respond again.  Is there anyone here who has not

15 responded who has a member of their family who is involved

16 in the correctional field either as a deputy sheriff, as a

17 correctional officer with the United States Bureau of

18 Prisons, or any kind of lockup or correctional facility

19 that has not responded?

20   Yes, sir.  Number 2.

21   JUROR NUMBER 2:  Juror Number 2.  Carroll Skipwith.

22 I have a cousin that's a deputy sheriff in Mecklenburg

23 County.

24   THE COURT:  Do you discuss law enforcement or

25 criminal justice or correctional issues with him?

1          JUROR NUMBER 2:  No, sir.

2          THE COURT:  Anything about that relationship that you

3    think would affect your ability to be fair and impartial?

4          JUROR NUMBER 2:  No, sir.

5          THE COURT:  All right.

6          Anyone else on this side?  Yes, sir.  Gentleman in

7    the back.

8          JUROR NUMBER 46:  Number 46.  Richard Williams.  I

9    guess it would be my niece's fiance.  To the best of my

10   knowledge, a contractor to the government as far as

11   illegal aliens, detainment.  He's a guard there.

12         THE COURT:  Okay.  Anything about -- do you discuss

13   law -- this obviously is not an immigration case.  Do you

14   discuss any other law enforcement issues with him?

15         JUROR NUMBER 46:  No, sir.  Rarely see them.

16         THE COURT:  Would that relationship affect your

17   ability to be fair and impartial in any way in this case,

18   Mr. Williams?

19         JUROR NUMBER 46:  No, sir.

20         THE COURT:  Thank you.

21         Anyone else?

22         Is there any member of the jury panel who themselves,

23   or an immediate member of their family, is a prosecutor

24   very much like Mr. Gill here who presents the government's

25   side of the case in court?

1    Is there any member of the jury panel who themselves,

2 or an immediate member of their family, works for the

3 United States Department of Justice in any capacity?

4    Yes, sir.

5    JUROR NUMBER 12:  Juror Number 16.  James Folk.  My

6 daughter is a lawyer for the Office of the Controller in

7 Denver, Colorado.

8    THE COURT:  All right.  I don't know that that's with

9 the Department of Justice, but it's close enough.  Do you

10 ever discuss law or legal issues with her, Mr. Folk?

11    JUROR NUMBER 12:  I do not.

12    THE COURT:  Anything about that relationship that

13 would affect your ability to be fair and impartial today?

14    JUROR NUMBER 12:  No.  Not at all.

15    THE COURT:  Thank you.

16    Is there any member of the jury panel who themselves,

17 or an immediate member of their family, is a forensic

18 scientist?  Someone who examines evidence for the purpose

19 of giving expert testimony in criminal cases?

20    Is there any member of the jury panel who themselves,

21 or an immediate member of their family, serves in any

22 office of the inspector general, someone that conducts

23 internal investigations within agencies for violations of

24 the law or ethical violations?

25    Is there any member of the jury panel, or member of

 1   their immediate family, who is involved in the publication

 2   of any kind of legal journal?

 3        Is there any member of the jury panel who themselves,

 4   or an immediate member of their family, is employed as a

 5   security officer or in the field of security?

 6        Yes, ma'am.

 7        JUROR NUMBER 6:  My husband -- oh, Rachel Bondurant.

 8   Juror Number 6.  My husband is a nuclear security officer.

 9        THE COURT:  Okay.  Obviously that is a law

10   enforcement type of position.

11        JUROR NUMBER 6:  Okay.

12        THE COURT:  So have you discussed any criminal

13   justice or law enforcement issues with him?

14        JUROR NUMBER 6:  No.

15        THE COURT:  Anything about his job that would affect

16   your ability to be fair and impartial today?

17        JUROR NUMBER 6:  No, sir.

18        THE COURT:  Thank you.

19        JUROR NUMBER 6:  Uh-huh.

20        THE COURT:  Anyone else?

21        Ladies and gentlemen, I'd ask you to listen to the

22   entire question before you respond.  Is there anyone here

23   who feels they would give the testimony of a law

24   enforcement officer more weight and more value than any

25   other witness not because you've listened to all the

1 testimony and feel that the testimony is more believable,

2 but simply because they're a law enforcement officer you

3 feel they're entitled to more weight and credibility than

4 any other witness?  Anyone have that viewpoint?

5      Is there any member of the jury panel who themselves,

6 or an immediate member of their family, have any kind of

7 legal training as a lawyer, paralegal, secretary?

8      I know Mr. Folk you've already responded, so you need

9 not again.

10      Juror Number 1.  Yes, ma'am.

11      JUROR NUMBER 1:  Juror Number 1.  Marcia Adams.  My

12 son and daughter-in-law are both attorneys in

13 Massachusetts.

14      THE COURT:  Do they do criminal law?

15      JUROR NUMBER 1:  No.  My son does not work in the

16 legal field, but my daughter-in-law does.  She does

17 bankruptcy, and other stuff like that.

18      THE COURT:  Okay.  Ms. Adams, anything about that

19 relationship that would affect your ability to be fair and

20 impartial in this case?

21      JUROR NUMBER 1:  No.

22      THE COURT:  Do you discuss legal type issues with

23 them?

24      JUROR NUMBER 1:  No.

25      THE COURT:  Okay.  Thank you.

```
 1          JUROR NUMBER 1:  Thank you.

 2          THE COURT:  Anybody else on that front row?

 3          Yes, ma'am.

 4          JUROR NUMBER 8:  Victoria Bragunier.  Juror Number 8.

 5   I'm an attorney.

 6          THE COURT:  Could I ask you where you practice?

 7          JUROR NUMBER 8:  I practice in Maryland and here in

 8   Virginia.

 9          THE COURT:  All right.  Do you have a criminal

10   practice?

11          JUROR NUMBER 8:  Not predominantly.  No.  I've

12   done -- in Maryland I did small criminal matters.  Here in

13   Virginia it's been corporate law.

14          THE COURT:  A couple of questions.  Do you feel that

15   there's anything about your occupation, or the criminal

16   cases that you have handled in the past, that would affect

17   your ability to be fair and impartial in this case?

18          JUROR NUMBER 8:  No.

19          THE COURT:  Obviously you are schooled in the law and

20   you have had extensive legal training.  You understand

21   that you must base your verdict on the law as I give to

22   you in the instructions.  That's what governs the case.

23   Not what you have learned about the law externally.  Can

24   you abide by that?

25          JUROR NUMBER 8:  Yes.
```

1          THE COURT:  Okay.  I'm going to hold you to it.

2          JUROR NUMBER 8:  Yes, sir.

3          THE COURT:  Thank you, now.

4          Anybody else on this side?  Yes, ma'am.

5          JUROR NUMBER 52:  Virginia James.  Number 52.  My son

6     is a lawyer here in Richmond, Virginia.

7          THE COURT:  All right.  Does he do criminal work?

8          JUROR NUMBER 52:  No.  He does primarily securities,

9     mergers and acquisitions.

10         THE COURT:  Do you have occasion to discuss with him

11    legal issues?

12         JUROR NUMBER 52:  He does not discuss his legal

13    issues with me.

14         THE COURT:  All right.  Is there anything about that

15    relationship that would affect your ability to be fair and

16    impartial?

17         JUROR NUMBER 52:  No.

18         THE COURT:  Thank you very much.

19         The gentleman.  Yes, sir.

20         JUROR NUMBER 28:  Number 28.  Sam Kothman.  My

21    brother-in-law is a judge in Chesapeake, Virginia.

22         THE COURT:  Circuit judge or general district court

23    judge, or do you know?

24         JUROR NUMBER 28:  I think a circuit court judge.

25         THE COURT:  Do you have occasion to discuss legal

34

1    type issues with him from time to time?

2         JUROR NUMBER 28:  No, sir.

3         THE COURT:  Anything about that relationship that

4    would in any way affect your ability to be fair and

5    impartial here today?

6         JUROR NUMBER 28:  No, sir.

7         THE COURT:  Thank you very much.  You may be seated.

8         Anyone else on this side?  All right.

9         On this side over here?  Yes, sir.

10        JUROR NUMBER 35:  Juror Number 35.  Paul Sixt.  My

11   wife has worked as a paralegal and is currently going to

12   school to get --

13        THE COURT:  I couldn't hear the latter part of your

14   answer.

15        JUROR NUMBER 35:  She's worked as a paralegal, and is

16   currently enrolled in college to get her certificate as

17   well.

18        THE COURT:  Do you discuss law and legal issues with

19   her from time to time?

20        JUROR NUMBER 35:  Not in depth.

21        THE COURT:  All right.  Anything about that

22   relationship, or any conversations you've had with her,

23   that you feel would affect your ability to be fair and

24   impartial in this case?

25        JUROR NUMBER 35:  No, sir.

1    THE COURT:  All right.  Thank you very much.  You can

2  have a seat.

3    Anybody else?  Yes, sir.  Gentleman in the front,

4  Mr. Folk.

5    JUROR NUMBER 16:  Number 16.  I should say that my

6  son-in-law is also a practicing -- in private practice in

7  Colorado.

8    THE COURT:  In Colorado.  Does he do criminal work,

9  Mr. Folk, do you know?

10    JUROR NUMBER 16:  Not that I'm aware of.

11    THE COURT:  Have you discussed any criminal issues

12  with him?

13    JUROR NUMBER 16:  No.

14    THE COURT:  Anything about that relationship that you

15  feel would affect your ability to be fair and impartial

16  today?

17    JUROR NUMBER 16:  Not at all.

18    THE COURT:  All right.

19    Ladies and gentlemen, as I mentioned to you, this is

20  basically an alleged fraud case.  Is there any member of

21  the jury panel who has been the victim of fraudulent

22  activity, either yourself or a member of your family?

23    Yes, ma'am.

24    JUROR NUMBER 51:  Alberta Christopherson.  Number 51.

25  My husband had his identity stolen.

1          THE COURT:  And where did that occur?

2          JUROR NUMBER 51:  It occurred in Florida and

3    Tennessee.  And it took an act of Congress trying to get

4    it straight.

5          THE COURT:  I understand.  Believe me.  Was there a

6    prosecution in that case?

7          JUROR NUMBER 51:  No, because the person is currently

8    incarcerated.  But I don't know if they'll prosecute when

9    he comes out.

10         THE COURT:  Is there anything about that experience

11   that would affect your ability to be fair and impartial in

12   this case?

13         JUROR NUMBER 51:  Possibly.  Because, like I said, I

14   was the one that had to do all the leg work.

15         THE COURT:  I fully understand.  Thank you very much.

16         JUROR NUMBER 51:  Thank you.

17         THE COURT:  Anyone else?

18         Is there any member of the jury panel who themselves,

19   or an immediate member of their family, have been the

20   victim of any other type of criminal activity that you

21   feel might affect your ability to be fair and impartial in

22   this case?

23         Is there any member of the jury panel who themselves,

24   or an immediate of their family, have been either a victim

25   or a witness, or in any capacity involved in any kind of

```
 1   criminal litigation?
 2        Yes, ma'am.  Ms. Adams.  I don't need to know the
 3   details.
 4        JUROR NUMBER 1:  I have a son who had a problem.
 5        THE COURT:  Okay.  Would that affect your ability to
 6   be fair and impartial in this case?
 7        JUROR NUMBER 1:  No.
 8        THE COURT:  All right.  Thank you very much.
 9        Yes, ma'am.
10        JUROR NUMBER 51:  Juror 51.  Alberta Christophersen.
11   I have a son that had a problem.
12        THE COURT:  Anything about that experience that would
13   affect your ability to be fair and impartial today?
14        JUROR NUMBER 51:  No.
15        THE COURT:  Okay.  Thank you very much.
16        Yes, ma'am.  Lady on the second row.
17        JUROR NUMBER 20:  Juror Number 20.  Tanicka
18   Heiskell-Stokes.  I had a husband who had a problem.
19        THE COURT:  All right.  Would that affect your
20   ability to be fair and impartial in this case?
21        JUROR NUMBER 20:  No.
22        THE COURT:  Thank you very much.
23        Anyone else?  Gentleman next to you.
24        JUROR NUMBER 22:  Number 22.  Thomas Izzo.  Do I say
25   I had a problem?
```

1       THE COURT:  I don't need to know the details.  Would

2  it affect your ability to be fair and impartial in this

3  case?

4       JUROR NUMBER 22:  No.

5       THE COURT:  All right.  Thank you.

6       Yes, sir.

7       JUROR NUMBER 39:  Number 39.  Doug Snell.  I was a

8  witness in a property damage case.

9       THE COURT:  Anything about that experience that would

10 affect your ability to be fair and impartial today?

11      JUROR NUMBER 39:  No, sir.

12      THE COURT:  Okay.

13      Anybody else on this side?  Yes, ma'am.

14      JUROR NUMBER 38:  Number 38.  Carol Schumacher Smith.

15 My student has an issue ongoing right now.

16      THE COURT:  You're a student?

17      JUROR NUMBER 38:  Yes.  My student.  I work with

18 special ed at Varina High School.

19      THE COURT:  I see.  Anything about that situation

20 that would affect your ability to be fair and impartial

21 today in this case?

22      JUROR NUMBER 38:  No, sir.  It shouldn't.

23      THE COURT:  Thank you.

24      This side over here.  Mr. Folk.

25      JUROR NUMBER 16:  James Folk.  Number 16.  When I was

1  employed in the corporation there was a theft of some

2  monies associated with a department that I managed.  They

3  were prosecuted.

4      THE COURT:  They were prosecuted?

5      JUROR NUMBER 16:  Yes.

6      THE COURT:  And were you a witness in that case?

7      JUROR NUMBER 16:  By deposition.  Not on the stand.

8      THE COURT:  Anything about that experience, Mr. Folk,

9  that would affect your ability to be fair and impartial in

10  this case?

11      JUROR NUMBER 16:  Not at all.

12      THE COURT:  Thank you, sir.

13      Gentleman in the back.

14      JUROR NUMBER 46:  Number 46.  Richard Williams.  My

15  wife had a minor altercation.

16      THE COURT:  Anything about that experience that would

17  affect your ability to be fair and impartial here today?

18      JUROR NUMBER 46:  No, sir.

19      THE COURT:  All right.  Thank you.

20      Anyone else?

21      Ladies and gentlemen, there may be some evidence in

22  this case involving firearms.  Not that the crime was

23  committed with a firearm, but there is going to perhaps be

24  some evidence concerning firearms in the case.  Firearms

25  have had various affects on various individuals during the

1  course of our society, and people have different views.

2  And my question of you is this: Is there anyone here who

3  has such strong views about firearms that they could not

4  be fair and impartial in this case?

5      Is there any member of the jury panel who is a member

6  of any kind of organization that either supports or

7  opposes firearms that you think would affect your ability

8  to be fair and impartial just by virtue of you being a

9  member?

10     Excuse me. Yes, ma'am.

11     JUROR NUMBER 51: Juror 51. My husband is a member

12  of the NRA.

13     THE COURT: Well, that's fine. But the question is

14  whether or not that would affect your ability to be fair

15  and impartial today?

16     JUROR NUMBER 51: No, I don't think so.

17     THE COURT: All right. Thank you for your very

18  candid response.

19     Is there anyone else?

20     Is there any member of the jury panel who themselves,

21  or immediate member of their family, have any training in

22  the field of medicine or pharmacy such as an M.D., R.N.,

23  licensed practical nurse, doctor of pharmacy? Any of

24  those.

25     All right, we'll start with you, Ms. Adams. You're

1  an R.N., right?

2       JUROR NUMBER 1:  I'm an R.N.

3       THE COURT:  This evidence will discuss some research

4  in the area of AIDS and HIV.  And I'm going to talk about

5  that in more detail in just a moment.  But having been a

6  registered nurse, do you think you could be fair and

7  impartial?

8       JUROR NUMBER 1:  Yes, I can.

9       THE COURT:  All right.

10      Yes, ma'am.

11      JUROR NUMBER 6:  Juror Number 6.  Rachel Bondurant.

12  My mother is an R.N.

13      THE COURT:  Same question.  Would you be able to be

14  fair and impartial in this case?

15      JUROR NUMBER 6:  Yes, sir.

16      THE COURT:  Okay.  Very good.

17      I think the lady in back.  Yes, ma'am.

18      JUROR NUMBER 53:  Fifty-three.  Roxanne Lawrence.

19  I'm an L.P.N.

20      THE COURT:  Pardon?

21      JUROR NUMBER 53:  I'm an L.P.N.

22      THE COURT:  You're an L.P.N.  Okay.  As I mentioned

23  to Ms. Adams, there will be some evidence in the case

24  concerning perhaps AIDS and HIV research.  Anything about

25  your training, your education, or your experience that

1  would affect your ability to be fair an impartial in this

2  case?

3        JUROR NUMBER 53:  No, sir.

4        THE COURT:  Thank you very much.

5        All right.  Lady on the second row.  Yes, ma'am.

6        JUROR NUMBER 31:  Martha Pratt.  Juror Number 31.  My

7  sister has been an R.N. for over 30 years.

8        THE COURT:  Have you ever had a chance to discuss

9  with her HIV or AIDS?

10       JUROR NUMBER 31:  Yeah.  We talk about stuff.

11       THE COURT:  Anything about those discussions, or your

12  relationship with her, that would affect your ability to

13  be fair and impartial here today?

14       JUROR NUMBER 31:  No.

15       THE COURT:  Thank you.

16       Yes.  Mr. Folk.

17       JUROR NUMBER 16:  James Folk.  Number 16.  Probably

18  tangential, but I'm a practicing EMT with Spottsylvania

19  County as a volunteer.

20       THE COURT:  Okay.  Anything about your training or

21  your experience that would affect your ability to be fair

22  and impartial here today?

23       JUROR NUMBER 16:  Not at all.

24       THE COURT:  Okay.  Anyone else?

25       Is there any member of the jury panel, or immediate

1 member of their family, that is currently or in the past

2 been involved in any form of HIV or AIDS research

3 professionally or academically?

4     Yes, ma'am.

5     JUROR NUMBER 6:  Yeah.  I guess I should have

6 elaborated.  Rachel Bondurant.  Juror Number 6.  My mom

7 for 15 years worked for an infectious disease doctor who

8 specialized in HIV.

9     THE COURT:  Well, the question again, Ms. Bondurant,

10 would be whether or not it would affect your ability to be

11 fair and impartial?

12     JUROR NUMBER 6:  No.  No.

13     THE COURT:  All right.  And once again I may have

14 asked you this, and if I did I apologize to you, have you

15 discussed HIV and AIDS research with your mother?

16     JUROR NUMBER 6:  No, sir.

17     THE COURT:  Okay.

18     Is there any member of the jury panel who themselves,

19 or an immediate member of their family, is employed by or

20 owns stock in a company or organization that you're aware

21 of that does HIV or AIDS-related research or treatment?

22     Is there any member of the jury panel who themselves,

23 or an immediate member of their family, holds any patents

24 relating to HIV or AIDS research?

25     I probably already covered this, but I want to be

1    careful to make a good record here.  Is there any member

2    of the jury panel who themselves, or an immediate member

3    of their family with the exception of Ms. Bondurant here,

4    who has treated or cared for AIDS patients?

5         Yes, ma'am.

6         JUROR NUMBER 53:  Juror 53.  Roxanne Lawrence.  I

7    cared for a patient that had AIDS.

8         THE COURT:  Would that affect your ability to be fair

9    and impartial in this case today?

10        JUROR NUMBER 53:  No.

11        THE COURT:  Okay.  Thank you.

12        Let me ask a much more general question here.  Is

13   there any member of the jury panel, or member of your

14   family or circle of friends, who have been affected by the

15   HIV or AIDS virus either directly or indirectly that you

16   think may affect your ability to be fair and impartial in

17   this case?

18        Is there any member of the jury panel who has any

19   personal views about AIDS or HIV positive individuals that

20   you think could affect your ability to be fair and

21   impartial in this case?

22        Any member of the jury panel have an advanced degree

23   in the field of biology or related type of field?

24        Any member of the jury panel employed in the

25   securities industry as either a broker, counselor,

1 | investment adviser, corporate stock issuer, or regulator
2 | or investigator?
3 |     Is there any member of the jury panel who conducts
4 | any kind of fraud investigations?
5 |     Yes, ma'am.
6 |     JUROR NUMBER 20:  Tanicka Heiskell-Stokes.  Juror 20.
7 | I am currently a supervisor of fraud investigations with
8 | Capital One.
9 |     THE COURT:  For Capital One?
10 |     JUROR NUMBER 20:  Yes, sir.
11 |     THE COURT:  Are you actively involved in the
12 | investigations?
13 |     JUROR NUMBER 20:  I supervise.
14 |     THE COURT:  You oversee other investigators, is that
15 | right?
16 |     JUROR NUMBER 20:  Yes, sir.  Yes, sir.
17 |     THE COURT:  Okay.  Now, knowing that there are fraud
18 | and fraud-related charges in this case, would that affect
19 | your ability to be fair and impartial in this case in any
20 | way?
21 |     JUROR NUMBER 20:  No, sir, it would not.
22 |     THE COURT:  Thank you very much.
23 |     Anyone else?  Yes, ma'am.
24 |     JUROR NUMBER 9:  Juror Number 9.  Celia Broadus.  I'm
25 | a professional as a Certified Public Accountant.  And

1 during audit and attestation services, I do perform fraud

2 types of internal controls and investigations.

3      THE COURT:  Ms. Broadus, anything about your

4 educational background or your professional experiences

5 that would affect your ability to be fair and impartial in

6 this case?

7      JUROR NUMBER 9:  No, sir.

8      THE COURT:  Thank you, Ms. Broadus.  You may have a

9 seat.

10      Yes, sir.  Gentleman in the back.

11      JUROR NUMBER 39:  Juror 39.  Doug Snell.  I spent a

12 couple years in the military investigating contract

13 quality assurance with product fraud.

14      THE COURT:  Anything about those experiences,

15 Mr. Snell, that would affect your ability to be fair and

16 impartial in this case?

17      JUROR NUMBER 39:  No, sir.

18      THE COURT:  Thank you very much.

19      Anyone else on this side?  Yes, ma'am.  Lady in the

20 back row.

21      JUROR NUMBER 54:  I'm Andrea Rich.  Juror 54.  I

22 previously work at Capital One in the area of

23 transactional fraud and identity fraud.

24      THE COURT:  How long did you do that, if I might ask?

25      JUROR NUMBER 54:  For eight years.

1          THE COURT:  Anything about those experiences that

2    would affect your ability to be fair and impartial here

3    today?

4          JUROR NUMBER 54:  No, sir.

5          THE COURT:  Thank you for your response.

6          Anyone else?

7          Is there any member of the jury panel who themselves,

8    or an immediate member of their family, is employed by the

9    U.S. Securities and Exchange Commission or the Virginia

10   State Corporation Commission?

11         Is there any member of the jury panel who themselves,

12   or an immediate member of their family, is employed by a

13   start-up company?  One that's just getting started.

14         Yes, ma'am.

15         JUROR NUMBER 34:  Number 34.  Logan Sale.  I guess it

16   was last Monday I started working for a start-up company

17   designing a mobile app.

18         THE COURT:  All right.  This case will involve

19   evidence that at one point in time Mr. Harris' company was

20   a start-up company.  Would the fact that you're employed

21   by a start-up company in any way affect your ability to be

22   fair and impartial in this case?

23         JUROR NUMBER 34:  No, sir.

24         THE COURT:  Okay.  Thank you.

25         Anybody else?

1          I think I've asked this question, but I'm going to

2     ask it again at the risk of being repetitious.  Is there

3     anyone here who's ever applied for a patent?  Okay.

4          I don't believe there has been a lot of publicity

5     about this case, but I want to be sure that perhaps you

6     haven't heard anything about it.  Is there anyone here

7     who's heard anything about this case from any source

8     whatsoever, newspaper, beauty salon, barber shop, church,

9     anywhere?  Okay.

10         Yes, ma'am.  I'm sorry.

11         JUROR NUMBER 41:  Temple Stewart.  Juror Number 41.

12    I'm pretty sure I've heard something.

13         THE COURT:  About this case?

14         JUROR NUMBER 41:  Well, something with HIV and, you

15    know, someone trying to use that --

16         MR. WAGNER:  Your Honor, may we approach on this?

17         THE COURT:  Yes.

18         Hold on just one second.

19         MR. WAGNER:  May we approach the Bench?

20         THE COURT:  I'm going to have her come up to the

21    Bench.  Let me have counsel come up to the Bench.

22         And if you would just come up just for a second.

23    Yes, ma'am.

24         Hold on just one moment.

25     (Bench conference held outside the hearing of the voir

1                                    dire panel.)

2         THE COURT:  Mr. Wagner, does your client waive being

3    present at Bench appearances?

4         MR. WAGNER:  He does.

5         THE COURT:  Yes, ma'am.  Tell us about it.

6         JUROR NUMBER 41:  It was just briefly.  I remember

7    hearing something on the news about someone starting a

8    company and using it with HIV, and using that to get

9    people to invest in it.  So I don't -- I don't know if it

10   was a year ago, but I remember hearing about it.  I don't

11   remember the name of the company, or anything like that.

12        THE COURT:  Did you form any impression about the

13   guilt or innocence of the individual?

14        JUROR NUMBER 41:  No.  No.

15        THE COURT:  Okay.

16        JUROR NUMBER 41:  But I do remember hearing

17   something.

18        THE COURT:  Okay.  It was broadcast media, I assume,

19   Ms. Stewart?

20        JUROR NUMBER 41:  Yes, sir.

21        MR. WAGNER:  Do you know if it was TV or the

22   newspaper, radio?

23        JUROR NUMBER 41:  Gosh.  It wasn't the Internet

24   because I don't -- it had to have been either like -- I

25   don't know if it was NPR.  That's the only radio that I

 1   listen to.  And, you know, I have the TV on sometimes, but

 2   I don't know if it was radio or TV.  But I do remember

 3   hearing something briefly about it.

 4        THE COURT:  Okay.  But you have no takeaway

 5   impressions, is that correct?

 6        JUROR NUMBER 41:  No, sir.

 7        THE COURT:  All right.

 8        Mr. Gill, any questions?

 9        MR. GILL:  No, Your Honor.

10        THE COURT:  Ms. Stewart, thank you so much for coming

11   up.

12                (Bench conference concluded.)

13        THE COURT:  Folks, I have a few more questions and

14   that should wrap this up.  Before I do that, I'm going to

15   ask Mr. Gill to read the list of his witnesses to you, and

16   the question I will ask you ultimately is if you know any

17   of these folks.

18        MR. GILL:  Thank you, Your Honor.

19        THE COURT:  Yes, sir.

20        MR. GILL:  Today with us is Special Agent Brad Gregor

21   who's with the Federal Bureau of Investigation.  He'll be

22   a witness in this case.

23        This is Bill Ward.  He's an investigator with the

24   State Corporation Commission, and may potentially be a

25   witness in the case.

1        And these are the other individuals on the United

2   States' witness list:

3        Rosalie Baker.  And she is out of Northern Virginia

4   in the Maryland area.

5        Marcelo Bellato.  He is from San Francisco,

6   California.

7        Erika Carrier from the Castleton, Virginia area and

8   also the Maryland area.

9        Russell Carrier from Castleton, Virginia.

10        Myranda Caudill, C-A-U-D-I-L-L, from Luray, Virginia.

11        Diane Desch, D-E-S-C-H, from the Richmond, Virginia

12   area.

13        David Evans from Portsmouth, Virginia.

14        Nicole Gentry.  She is an officer in Fredericksburg,

15   Virginia.

16        Brian Hanlon, who's out of Washington, D.C.  He works

17   with the U.S. Patent and Trademark Office.

18        Special Agent Tim Huff with the FBI.  He's based out

19   of Fredericksburg.

20        Tim Kanagy who lives in West Virginia.  He spells his

21   last name K-A-N-A-G-Y.

22        Peter McGivney, M-C-G-I-V-N-E-Y.  He is with the

23   National Steeplechase Association out of Elkton, Maryland.

24        Major Joseph Newcomb.  He is presently based out of

25   Hubert, North Carolina.

1        John Pinyerd.  I'll spell his last name.

2   P-I-N-Y-E-R-D.  Marietta, Georgia.

3        Sandra Raynor with RELS Title out of Front Royal,

4   Virginia.

5        Katie Ritter from Monkton, Maryland.

6        Special Agent Julio Tobar who is with the FBI out of

7   Denver, Colorado.

8        John, goes by Ted, Marosi.  He's from Bay Village,

9   Ohio.

10        Steve or Steven Weiner from Marlton, New Jersey.

11        Cindy Williamson who's a financial analyst with the

12   National White Collar Crime Center right here in Richmond,

13   Virginia.

14        David Brandt who is with Brandt and Associates out of

15   Alexandria, Virginia.

16        Julie Hagan out of Poolesville, Maryland.

17        Dr. Colette Moussali, M-O-U-S-S-A-L-I.  She is here

18   in Richmond, Virginia.

19        Patricia Lynn Payne from Fredericksburg, Virginia.

20        Lisa Reichwein, R-E-I-C-H-W-E-I-N, Fredericksburg,

21   Virginia.

22        And that concludes the list.

23        Thank you, Your Honor.

24        THE COURT:  Yes, sir.

25        Any additional witnesses you wish to add to that,

1   Mr. Wagner?

2        MR. WAGNER:  I do.

3        THE COURT:  Go right ahead, sir.

4        MR. WAGNER:  Good morning.

5        Dr. Rodney Sparks from Crozet, Virginia.

6        Bill Alshire from Luray, Virginia.

7        Possibly these names:

8        Janet Delcastillo.

9        John Brewbaker.

10       Anthony Voccia.

11       Lynn Payne.

12       Dr. Anne Prochera.

13       Frank Roth.

14       Jason Jenkins.

15       THE COURT:  Is anyone on the jury panel acquainted

16  with any of the individuals that either Mr. Gill or

17  Mr. Wagner read to you?

18       Is there any member of the jury panel who believes

19  that just because this defendant was indicted by a grand

20  jury he must be guilty of something or he wouldn't be

21  here?  Anyone have that view going into the case?

22       Is there any member of the jury panel who is sensible

23  to any prejudice whatsoever toward either the government

24  in this case or the defendant?

25       Is there any member of the jury panel who could not

1  apply the very fundamental proposition of law that

2  Mr. Harris is presumed to be innocent unless and until the

3  government proves his guilt beyond a reasonable doubt?

4  Anybody have any problem with that fundamental proposition

5  of law?

6       Is there anyone that feels the government's burden of

7  proof, namely beyond a reasonable doubt, is too high a

8  standard to hold the government to?

9       Now, ladies and gentlemen, I have no idea what

10  evidence, if any evidence, Mr. Harris intends to put on in

11  this case.  But assuming for a moment that he decides to

12  put on no evidence, the law is very clear that you cannot

13  hold that against him or even consider it in your

14  deliberations.  In that case, you must base your

15  deliberations strictly on the strength of the government's

16  case.  Is there anyone here who could not apply that

17  principle of law?

18       Ladies and gentlemen, I confess to you I have asked

19  every possible question I can think of, and then a few,

20  but is there any other reason maybe I didn't touch on why

21  you feel you could not sit on this case and be fair and

22  impartial to both the United States and the defendant in

23  this case?  Anything I forgot?

24       All right.  Very good.

25       Let me ask counsel to approach the Bench please.

1          If you all will just sit back and relax for just a

2   second.

3     (Bench conference held outside the hearing of the voir

4                          dire panel.)

5          THE COURT:  Take a look at the following jurors, if

6   you would, and then we'll go through each individual one.

7          Number 2, wife's ill.

8          Number 5 has to go out of town for a meeting.

9          Number 34 has travel plans.

10         Number 37, she's ill today.

11         Forty-two could not be fair and impartial.  Her

12   husband's a State Trooper.

13         Forty-five.  She has to pick up her children at 3:00

14   in the afternoon.

15         I'm inclined to excuse those people for cause unless

16   you have some objection to it.

17         Mike?

18         MR. GILL:  I do not, Your Honor.

19         MR. WAGNER:  No, Your Honor.

20         THE COURT:  All right.  Okay.

21         I forgot Number 51 who said she couldn't be fair and

22   impartial.  Any objection to those?

23         MR. GILL:  No, sir.

24         MR. WAGNER:  No, sir.

25         THE COURT:  Do you have those okay?

1        THE CLERK:  Yes, sir.

2        THE COURT:  Mr. Wagner, any others, sir?

3        MR. WAGNER:  I do want to raise some concerns.  There

4   was one juror, and I believe it was 20, who is a

5   supervisor of fraud investigations for Capital One.  I

6   think that because of that position that she should be

7   struck.

8        THE COURT:  I saw nothing in her responses that would

9   disqualify her as a juror.  She indicated unequivocally

10  she could be fair and impartial.  So that motion is going

11  to have to be denied.

12       Any others?

13       MR. WAGNER:  No, sir.

14       THE COURT:  She indicated she worked for Capital One

15  for a number of years, but she didn't indicate it would

16  affect her ability to be fair and impartial, so I don't

17  think you've made a record on that.  I'll have to deny it.

18       Mike?

19       MR. GILL:  We have no motions for cause, Your Honor.

20       THE COURT:  All right.  Very well.

21       Are there any questions that I forgot to ask?  I took

22  all your stuff and went through them.  Did I miss

23  anything, gentlemen?

24       MR. GILL:  You did not.

25       There's one thing, Your Honor.

```
 1          THE COURT:  Yes, sir.

 2          MR. GILL:  One of the witnesses I told them about,

 3    Lisa Reichwein, the FBI told me she goes by Lisa Parker.

 4    She's a radio personality.  So if somebody can ask them if

 5    they know a Lisa Parker, radio personality in

 6    Fredericksburg, Virginia.

 7          THE COURT:  All right.

 8                    (Bench conference paused.)

 9          THE COURT:  Ladies and gentlemen, let me ask you one

10    additional question.  Is there anyone here who knows a

11    radio personality in Fredericksburg by the name of --

12          Mr. Gill?

13          MR. GILL:  Lisa Parker.

14          THE COURT:  Lisa Parker.  Do you know this

15    broadcaster on one of the local stations?

16          Okay.  Thank you very much.

17    (Resuming Bench conference held outside the hearing of the

18                        voir dire panel.)

19          THE COURT:  Mr. Gill?

20          MR. GILL:  Yes, sir.

21          MR. WAGNER:  Yes, sir.

22          THE CLERK:  Number 20.  She didn't get taken out, did

23    she, Judge?

24          THE COURT:  No, ma'am.

25          THE CLERK:  Okay.
```

```
1              (Bench conference concluded.)

2       THE COURT:  Ladies and gentlemen, we're now going to

3  proceed with jury selection.  It doesn't take long in

4  Federal Court.  What we'll do is this.  We'll select 12

5  jurors, and then we'll select two alternates.  So just

6  bear with us.  We will get started in just a second.

7       THE CLERK:  As I call the names of the following

8  jurors, if they would please come forward and take a seat

9  in the jury box:

10       Juror Number 40, Laverna Noel Stallard.

11       Juror Number 28, Samuel Frank Kothman.

12       Juror Number 18, Kevin Thomas Goldsmith.

13       Juror Number 30, Khawar Mian.

14       Juror Number 27, Robert Anthony Kitusky.

15       Juror Number 50, Deborah Mayo Worten.

16       Juror Number 54, Andrea Crockett Rich.

17       Juror Number 16, James Bradley Folk.

18       Juror Number 20, Tanicka Heiskell-Stokes.

19       Juror Number 1, Marcia Ann Tatum Adams.

20       Juror Number 43, Stuart Philip Webel.

21       Juror Number 46, Richard Paul Williams, Jr.

22       As I call the names of the following jurors, if they

23  would please step down and return to their seats in the

24  courtroom:

25       Juror Number 20, Tanicka Heiskell-Stokes.
```

1      Juror Number 54, Andrea Crockett Rich.

2      Juror Number 46, Richard Paul Williams, Jr.

3      As I call the names of the following jurors, if they

4 would come forward and take a seat in the jury box:

5      Juror Number 6, Rachel Weber Bondurant.

6      Juror Number 39, Douglas Harry Snell.

7      Juror Number 41, Temple Rene Stewart.

8      As I call the names of the following jurors, if they

9 would please step down and return to their seats in the

10 courtroom:

11     Juror Number 6, Rachel Weber Bondurant.

12     Juror Number 39, Douglas Harry Snell.

13     As I call the names of the following jurors, if they

14 would please come forward and take a seat in the jury box:

15     Juror Number 52, Virginia Kent Dunn James.

16     Juror Number 24, Kimberly Lange Jones.

17     As a call the names of the following jurors, if they

18 would please come forward and stand in front of the jury

19 box:

20     Juror Number 4, Angela Sobert Arrington.

21     Juror Number 32, Randolph John Rowekamp.

22     THE COURT:  What was that number again, Ms. Pizzini?

23     THE CLERK:  Number 32, Your Honor.

24     THE COURT:  Thank you.

25     THE CLERK:  Juror Number 48, Shanna Marie Wiseman.

1          Juror Number 44, Brian Scott Wickline.

2          Juror Number 38, Carol Schumacher Smith.

3          Juror Number 17, Todd Everett Foster.

4          As I call the names of the following jurors, you may

5    return to your seats in the courtroom:

6          Juror Number 38, Carol Schumacher Smith.

7          Juror Number 32, Randolph John Rowekamp.

8          Juror Number 4, Angela Sobert Arrington.

9          Juror Number 48, Shanna Marie Wiseman.

10         THE COURT:  Are there any issues concerning jury

11   selection that you want to bring to my attention at this

12   time, Mr. Gill?

13         MR. GILL:  No, Your Honor.

14         THE COURT:  Mr. Wagner?

15         MR. WAGNER:  No, Your Honor.

16         THE COURT:  All right.  Finding the panel free from

17   exception, I'll ask the Clerk of the Court to administer

18   the oath.

19         THE CLERK:  If the jury would please stand, raise

20   your right hand, and answer I shall to the oath about to

21   be given.  If the defendant would also please stand.

22         You shall well and truly try, and a true deliverance

23   make between the United States and Michael F. Harris, the

24   defendant at the bar, whom you shall have in charge and a

25   true verdict give according to the evidence, so help you

1  God?

2       JURORS:  I shall.

3       THE CLERK:  Thank you.

4       THE COURT:  Is there any reason why the balance of

5  the jury panel should not be excused at this time?

6       MR. WAGNER:  No, Your Honor.

7       MR. GILL:  No, Your Honor.

8       THE COURT:  Ms. Pizzini, you may excuse the balance

9  of the jury.

10      THE CLERK:  The remaining jurors may be excused.  If

11  you need further information, or if you have questions,

12  you can go to Room 3000 on the third floor; otherwise, you

13  may leave directly from here.

14      THE COURT:  Ladies and gentlemen, I once again want

15  to express my appreciation for your time and your service.

16  Without your presence here and the time that you take, our

17  system could not operate, and we don't forget that.

18      JURORS:  Thank you.

19      THE COURT:  Ladies and gentlemen, in just a few

20  minutes we're going to take a recess to allow you to get

21  situated back in the jury room and have a coke, glass of

22  water, a cup of coffee, or a cup of tea, but before we do

23  that I want to take a few minutes and kind of outline for

24  you how this case will proceed because you're going to

25  find that the way an actual courtroom works is sometimes

 1  far different than what you see on some of those

 2  television shows.

 3      Now, ladies and gentlemen, when we get back, our

 4  first order of business is what is known as opening

 5  statements.  And it allows counsel for both sides to

 6  address you directly.  And in their open comments, they

 7  will explain to you what they think will and will not be

 8  proven by the evidence in this case.  Keep in mind that

 9  nothing the lawyers tell you during either the opening

10  statement or final arguments is evidence in the case.  The

11  evidence is the testimony and the documents and other

12  items we'll talk about here in just a minute.

13      Now, one of the principal offices of the opening

14  statement is to outline to you what the issues are in this

15  case, and how they will be addressed by both sides.

16  They'll also define for you the issues that you will have

17  to resolve later as a deliberating jury.  It's kind of a

18  roadmap.  It's a preview of coming attractions, but it's a

19  roadmap to help you in your analysis of the evidence and

20  in your deliberations.

21      Now, after the opening statements, the United States,

22  who has the burden of proof, will begin with its evidence.

23  As the United States puts its evidence on, the defense

24  will have the opportunity to cross-examine the

25  government's witnesses.  At the close of the government's

 1  case, if the defendant chooses to do so, remember he has

 2  no obligation to introduce any evidence and if he doesn't

 3  you can't even consider that, but if he does, the United

 4  States will have the opportunity to cross-examine the

 5  defense witnesses.

 6       After the -- if the defendant puts on evidence,

 7  because the government has the burden of proof, they will

 8  have the additional opportunity to put on rebuttal

 9  evidence.  Rebuttal evidence is very narrowly focused

10  evidence.  It's not a chance to kind of go back and reopen

11  your original case and put on a few things you may have

12  forgotten.  It can only address specific issues that are

13  raised by the defense.  And of course during the course of

14  that, the defense will have an opportunity to

15  cross-examine the government's witnesses.

16       At the close of all the evidence, I will excuse you

17  back to the jury room for a few minutes, and the lawyers

18  and I will decide what instructions of law to give you.

19  And the instructions of law are kind of the snippets of

20  legal propositions that will guide you in your

21  deliberation.  They are the legal yardstick that you will

22  use to measure the evidence that you have heard.

23       Now, once we agree upon the instructions, you'll come

24  out and I will read each and every instruction to you.  It

25  will take a little while, but I have to do that.  But you

1  will be able to take a copy of the instructions with you

2  back to the jury room to review them and to refresh your

3  recollection either before and/or during your

4  deliberations.

5      I often advise juries to begin your deliberations by

6  reading the instructions so you will know what must be

7  proven and how it must be proven.

8      After I give you the instructions, you will then hear

9  the final arguments of attorneys.  That is advocacy in

10  action.  They will argue to you what has and has not been

11  proven by the evidence that you've heard.  But once again,

12  nothing the lawyers tell you in their final arguments is

13  evidence.  You can use it in your analysis to kind of link

14  up all the dots.  But if there is an element or an item of

15  evidence that's missing, final argument or opening

16  statement cannot supply it.

17      Now, during the course of the case you must not be

18  influenced in any way by any personal feelings of sympathy

19  for or prejudice toward either side.  It's your sworn duty

20  to give a fair shake to both sides in this.

21      Now, I'm the one that determines the law in the case,

22  and I do that with the instructions which I will give you

23  at the close of the evidence and perhaps during the course

24  of the trial.  Your job is to decide the facts.  You can

25  decide the facts with the evidence that you hear, and you

1  can also draw any reasonable inference from that fact, but

2  keep in mind that you cannot engage in guesswork or

3  speculation.  There has got to be a factual basis, some

4  factual basis, for every decision that you make.

5       Now, the evidence.  It will consist of the testimony

6  of the witnesses and the documents that are admitted into

7  evidence, and other exhibits.  There are times in which

8  lawyers stipulate to things.  That means that both sides

9  have agreed that something is a fact.  And when a

10  stipulation is offered, you're technically not obligated

11  as a jury to accept it, but I strongly advise you to do so

12  because none of the parties in the case are disputing that

13  particular fact.

14       The admission of evidence during the course of the

15  trial is governed by what is known as the rules of

16  evidence which have evolved over centuries of time.  And

17  the rules of evidence are designed to protect the

18  integrity of the fact-finding function that you're engaged

19  in.  Now, during the course of the trial it will

20  undoubtedly be the obligation of the lawyers to object to

21  certain things.  And when they do, do not hold it against

22  them because they're merely trying to preserve the

23  integrity of the proceeding to make sure what you hear is

24  fair and competent evidence.

25       Now, when an objection is made, it is my job as the

1  umpire here to decide what you can and cannot hear.  If I

2  sustain the objection, that means that you should not

3  consider that answer.  If it is overruled, the answer

4  stands.

5        Sometimes during the course of this case there may be

6  evidence where it has a limited evidentiary purpose, and

7  you can only consider it very narrowly.  When that occurs,

8  I will give you a specific instruction as to how you must

9  weigh that evidence.  And I know you will follow it very

10 carefully.

11       You should never consider anything you see outside

12 the courtroom.  During the course of a recess or luncheon

13 recess, if you overhear something or hear something, that

14 cannot be considered by you in your deliberations.  Your

15 deliberations must be confined strictly to what you see

16 and hear in the courtroom.

17       Now, the evidence will have two different types.  It

18 will be direct evidence, which is an eyewitness who

19 recounts directly to you what he or she heard.  And then

20 there is circumstantial evidence, which is proof of fact

21 from which you may infer to conclude that other facts

22 exist.

23       The example that I have given for many many years, if

24 this morning before you came out for jury service you put

25 that big plastic can out at the end of your driveway or

out on the curb with all your recyclables, and when you
get home this evening and you look back in that can and
it's empty, well, you didn't see anybody remove the cans,
but logic and common sense dictated that someone did.  And
that is an example, albeit a bit ridiculous, of
circumstantial evidence.

     It's important for you to keep in mind during the
course of this case that no comment I make, no ruling I
offer, or no admonition that I give, is in any way
intended to telegraph to you my feelings about this
performance of the lawyers, the guilt or innocence of the
accused, or the weight to be given to the evidence.  You
alone are the ones who have the difficult task of
determining the believability of the witnesses, and the
weight and value to be given to the evidence.

     Now, let me give you a couple of thoughts that might
be of value.  In determining the believability of
witnesses and the weight and the value of evidence, you
should first look to the appearance, attitude, and
behavior of the witness on the witness stand.  And this
exercise, folks, is really no different than what you do
everyday in your life, personally and professionally, in
sizing an individual up in determining how believable they
are.

     Then look to the interest that witness may have in

1   the outcome of the case.  What do they have to gain.  What

2   do they have to lose.  Look at the relationship the party

3   may and the witness may have to either side in the case.

4       Look next to the inclination of the witness to speak

5   truthfully.  What does that mean?  Well, often in a case

6   either the defense or the prosecution may present a

7   witness with an inconsistent statement of an inconsistent

8   act that may have been performed.  And in determining how

9   much believability to give to the testimony from the

10  witness stand, you can consider prior inconsistent

11  statements and acts in determining the inclination of a

12  witness to speak truthfully.

13      And lastly, the probability or improbability of the

14  witness's statements.  Folks, one of the most important

15  things that you bring to this courtroom is your collective

16  human experience.  And in determining the probability or

17  improbability of testimony, you should square that

18  testimony against your collective human experience and

19  good common sense and logic to determine whether or not it

20  rings true.

21      But in determining the weight and value of the

22  evidence, you can give any one item of testimony and any

23  one exhibit such weight and such value as you think it's

24  entitled to, but that must be done in the context of all

25  the evidence.  In other words, all your decisions on

1  believability, the weight and value of the evidence, have

2  to be considered based upon the totality of all the

3  evidence that you have heard.

4        Now, pay careful attention to the testimony as you

5  hear it because unlike what you see on TV on all those cop

6  shows, we do not allow our court reporter to go back to

7  the jury room and read back testimony to you.

8        And to allow you to refresh your recollection, the

9  Marshal will give you a pad and pen and you can take notes

10 during the course of the trial, but I will give you an

11 instruction before you hear the opening statements on how

12 to use those notes.

13       Now, keep in mind that the defendant is presumed to

14 be innocent unless and until the government proves his

15 guilt beyond a reasonable doubt.  During the course of

16 this case, you must not discuss it among yourselves or

17 with anyone else.  Avoid contact with anyone else involved

18 in the case until it's closed.  If you have questions or

19 concerns, you can talk to Marshal Wray or members of my

20 staff, but none of the parties or litigants during the

21 course of the case.

22       And also, when you go back to the jury room, as you

23 will in about two or three minutes, you cannot begin

24 chatting about the evidence that you've heard or your

25 impressions about the case.  You cannot discuss the case

1  until you've heard all the evidence and the instructions

2  and you are deliberating under the charge of the presiding

3  juror, and only when all 12 of the jurors are present.  If

4  you're discussing a point during your deliberations and

5  one of the jurors has to excuse themself for a minute, all

6  deliberations must come to a hault until all 12 people are

7  present.

8      Now, for your planning purposes -- also, I want to

9  tell you something obvious.  Don't make up your mind on

10  anything until you've heard all the evidence because,

11  folks, there's always two sides to every story.

12      Now, for your planning purposes, we will recess every

13  day about 1:00, give or take five minutes, for lunch for

14  one hour.  I'll give you a recess in the afternoon about

15  3:00 or 3:30 for about 10 or 15 minutes.  We'll take a

16  recess in the morning about 10:30 or 11:00.  Today we

17  started at 9:30.  Tomorrow we're going to start promptly

18  at 9:00.  I want to get you out of here as quick as we

19  can.  And I will try to close no later than 6:00 because I

20  know each of you have your own personal and family

21  obligations, so I'm going to make sure we close up no

22  later than 6:00.

23      If you have any needs or any concerns during the

24  course of your jury service, let Marshal Wray know and we

25  will address those.  We appreciate your time.  We know

1  it's a sacrifice for you to be here, and I'm going to use

2  your time very, very carefully.

3       Ladies and gentlemen, at this point you can retire to

4  the jury room.  Relax for a few minutes.  We'll come right

5  back out and we're going to hear the opening statements.

6       You may now retire to the jury room.

7       (The jury is no longer present in the courtroom.)

8       MR. WAGNER:  Your Honor, if I may?  I would just

9  offer g114 suggestion for instructions to the jury before

10  they start to hear the case.

11      THE COURT:  Yes, sir.

12      MR. WAGNER:  Judge, I know there's a lot that they've

13  said about jurors going out and looking at social media

14  and looking at the Internet --

15      THE COURT:  And you know something, I should have

16  mentioned that, and I do in almost every case.  I'm going

17  to do that at the close of business today when I give them

18  that instruction.

19      MR. WAGNER:  Thank you, Judge.

20      THE COURT:  I ordinarily do that, but I guess I

21  missed it.  Thank you for reminding me, Mr. Wagner.

22      Is there a request for rule on witnesses, gentlemen?

23      MR. GILL:  Yes, Your Honor.  We request the rule be

24  invoked.

25      THE COURT:  Anyone here who has been subpoenaed as a

1 witness, or you have been advised by an attorney that you

2 will be called as a witness in this case, I would ask you

3 to step out to the witness room.  Do not discuss this case

4 among yourselves, or with anyone else except the attorneys

5 in this case until you're excused as a witness.

6      At this time, the Court will take a 10 minute recess.

7 I'll come back and we'll start right in to the opening

8 statements.

9                     (Recess taken.)

10     THE COURT:  Ready for the jury?

11     MR. GILL:  We are, Your Honor.

12     MR. WAGNER:  Yes, sir.

13     THE COURT:  All right, Marshal, bring the jury in.

14       (The jury is present in the courtroom.)

15     THE COURT:  Ladies and gentlemen, before you hear the

16 opening statements, as promised I want to give you some

17 instructions as to how you should take notes during the

18 course of the case.  The notes that you take are for your

19 own personal edification.  When you get back to the jury

20 room during the course of the deliberations and there's

21 some question about how a witness testified or how a piece

22 of evidence was presented, you can open your pad and

23 refresh your recollection and then present your

24 recollection to the other members of the jury panel.

25      What you may not do is read your notes to other

1   members of the jury.  That's because invariably they're

2   impressionistic and have your own impressions written in

3   there, and rarely do they constitute an exact rendition of

4   what occurred in court.  So, therefore, use them to

5   refresh your recollection, put your pad away, tell your

6   fellow jurors what you saw or heard, but do not read your

7   notes to the jury.

8        Ladies and gentlemen, I'd ask you now to attend to

9   the opening statements of counsel; Mr. Gill, on behalf of

10  the United States.

11       MR. GILL:  Thank you, Your Honor.

12       Good morning again, ladies and gentlemen.  As you

13  heard earlier, my name is Mike Gill.  And today with

14  Gauhar Naseem, we represent the United States of America

15  in this case.  As you also heard, that's FBI Special Agent

16  Brad Gregor.  He is the lead FBI agent on this case.

17  He'll be with us throughout this trial, as well as

18  Paralegal Laura Taylor, who's with the U.S. Attorney's

19  Office.

20       Ladies and gentlemen, as you heard a little bit from

21  Judge Hudson earlier, this case is focused on an

22  investment fraud scheme that was orchestrated by the

23  defendant, Michael Harris.  Now, the indictment focuses on

24  2005 through 2011.  And you're going to find out that the

25  defendant, Michael Harris – when you see a triangle like

1  that throughout my notes, that's me referring to the

2  defendant – had a company named after himself, Michael F.

3  Harris Research, Incorporated.  When you see an MFHR,

4  that's me referring to the company.

5      Now, the defendant, you will find out, solicited

6  investors over the course of this period.  And he told the

7  investors very specific things about what was going to be

8  done with their money.  He told them that if they invested

9  in this company, their money would be used for patents,

10 their money would be used for research, their money would

11 be used for testing.

12     Ladies and gentlemen, in this case we're going to

13 pull back the curtain on what was really happening with

14 the defendant's company and with the defendant.  And we're

15 going to show you through a trail of money that the

16 defendant had lied to the investors, that he concealed

17 from the investors what he was doing with the money, and

18 that he spent an overwhelming majority of that money on

19 his own personal expenses unrelated to the areas that he

20 had promised those investors.  In fact, in this case

21 you're going to find out that through his lies and

22 concealment, that over the course of time from roughly

23 2005 up through July 2011, the time period charged in the

24 indictment, the defendant brought in over $850,000 in

25 investment monies from investors who invested in what he

1   was telling them that their money would get used for at

2   Michael F. Harris Research, Incorporated.

3       We're also going to present detailed financial

4   analysis that will show you that over $700,000 was used

5   for the defendant's own personal expenses during that

6   time, but we'll get even more specific focusing in on the

7   accounts that are charged in the indictment, and show you

8   what happened with investors' monies after they'd been

9   told specific things by the defendant.  You're going to

10  notice a pattern throughout the evidence.  In this case,

11  you'll notice that the defendant will run low on money,

12  will go to a particular investor, will tell them their

13  money is going to be used for a patent, for research, for

14  testing, and then he'll take their money and then he uses

15  it for overwhelmingly his own personal expenses.

16      Now, at Michael F. Harris, M.F. Harris Research,

17  Incorporated, you'll find out that the business has been

18  operating since 2003, but you'll find that the defendant

19  has been involved in this area we'll be talking about for

20  many years before that back in the 1990s.  The evidence

21  will show you that the defendant was in charge of the

22  company.  He was the only person who had control of the

23  accounts, and he guarded the financials closely, not

24  willing to share the information with the shareholders.

25      Now, as I mentioned, the defendant told the investors

1  every step of the way that their money would be used for

2  patents, research or testing, with little variance just

3  depending upon who he was presenting it to.  You're going

4  to hear testimony about that.  You're going to find out

5  what they were investing in was a hyperbaric chamber

6  treatment, potential treatment, for HIV/AIDS.  A

7  hyperbaric chamber is what they use to treat divers that

8  get decompression sickness from diving.

9       Now, ladies and gentlemen, you'll find out the

10  defendant, through this potential treatment, would tell

11  investors that this presented a great investment

12  opportunity for them to potentially help to pitch in on

13  something that would allow people to treat AIDS.  It also

14  presented a lucrative financial investment allowing them

15  to potentially make big returns down the road when this

16  hit the market with the share prices going substantially

17  up from what they paid.

18       To make it really clear, ladies and gentlemen, the

19  United States' case is not about the validity of this

20  treatment.  Whether it works or whether it doesn't work is

21  not an issue in this case; rather, this case is focused on

22  what the defendant told his investors, what the defendant

23  concealed from his investors, and what the defendant did

24  with investor money at each step of the way.

25       The evidence in this case is going to focus on 2005

1    through 2011, and the presentations that the defendant
2    made to the investors.  And you're going to notice, ladies
3    and gentlemen, that it stayed basically the same
4    throughout that entire time what the defendant was telling
5    his investors.  He told them money was going for patents,
6    research, and/or testing.  And in connection with those
7    presentations, you will find out from the witnesses there
8    was never a mention, or even a hint, that the defendant
9    would use their money for his own personal expenses.  That
10   he would use their money to buy his personal residence,
11   that he would use their money to pay his own utility
12   bills, restaurant expenses, purchases at gun stores, and
13   other items.  There was no mention during those
14   presentations, we expect the evidence will show you, that
15   the investor money many times was used to cover already
16   negative balances in the defendant's business and personal
17   accounts.  And not a mention to these investors that the
18   money would somehow be used for a salary he paid himself
19   instead of going to those areas that he had promised.
20       We're also going to focus on acts of concealment in
21   this case.  You will find out that the defendant engaged
22   in concealment at shareholder meetings, one-on-one
23   conversations with different shareholders as well, and
24   other acts that you're going to find out as the case
25   unfolds.  We're going to pull back the curtain in this

1   case, and we're going to follow the money.

2       And the last witness you're going to hear from the

3   United States in this case is going to be financial

4   analyst, Cindy Williamson.  And you see her right here.

5   She's CW.  Cindy Williamson has years of experience in

6   looking at financial records and following the trail of

7   money.  And you're going to find, ladies and gentlemen, as

8   we fully expect, that her analysis in this case is very

9   conservative and very, very thorough.

10      Now, to start out we're going to walk through the

11  time periods, the general time periods you're going to see

12  in this case.  Now, the witnesses won't quite be in this

13  order, but this will give you a framework.  The 2005

14  through 2006 time period, you're going to find out from

15  one of the first key witnesses in this case, a police

16  officer named Nicole Gentry.  She is with the

17  Fredericksburg Police Department, and she's going to tell

18  you that in the fall of 2005, the defendant did a

19  presentation for numerous individuals in Fredericksburg,

20  Virginia about this investment opportunity she attended in

21  her personal capacity with friends and associates of hers.

22  And she'll tell you that during that presentation, the

23  defendant told them that any investment money, and told

24  Nicki Gentry personally as well, was going to be used for

25  research and for patent expenses.

1    Nicki Gentry will tell you that she was very

2  impressed with the presentation, and that she was

3  impressed with the investment opportunity.  In fact, she

4  invested $5,000, along with a partner of hers, into M.F.

5  Harris Research, Incorporated.  Cindy Williamson, through

6  her financial analysis, is going to pull back the curtain

7  on what the financial records show was actually going on

8  with the defendant's business and personal accounts that

9  he, and he alone, controlled.  From October 2005 up

10  through the August 2006 time period, you'll find out that

11  the defendant brought in approximately $140,000 from

12  investors.  Of that included Nicki Gentry's $5,000.  In

13  looking at how that money was spent, about $8,300 went to

14  patents.  Aside from that, about $17,500 went to auto

15  expenses, including the defendant's purchase of a Jeep;

16  $14,000 to various store expenditures; $14,000 in cash

17  withdrawals; $7,500 in gun store expenditures.  You'll

18  find out that the defendant is a gun collector.  $7,000 to

19  PayPal which is associated with Ebay, things bought

20  on-line; $6,000 to an account that the defendant

21  maintained with his girlfriend at the time named Myranda

22  Caudill; $5,000 to restaurants.  And no identified

23  research.  And only the patents that we talked about,

24  those expenses.

25    Now, we'll move up into 2006.  Now, the snapshot that

1   you're going to get about 2006, ladies and gentlemen, from
2   Cindy Williamson' analysis is that the defendant brought
3   in for that year about $256,000 in investor monies.  It
4   accounted for 99% of the net income coming into the
5   defendant's business accounts, as well as his own personal
6   accounts, which you'll find out was just intermingled.
7        Of that total amount brought in, you'll find out
8   approximately $14,500 went to patent expenses; over
9   $110,000 went to housing and utility expenses for the
10  defendant; $40,000 went to stores and restaurants; $22,000
11  to farm expenses.  You're going to find out that the
12  defendant in this case is a steeplechase rider, and he had
13  four to five horses of his own at any given time during
14  this investment fraud scheme.  In addition, there was
15  $17,000 in auto expenses, and other personal expenses that
16  you'll learn about.
17       During the 2006 time period is when investor,
18  Dr. Tom Marosi, seen as TM in here, came on the scene.
19  Now, Dr. Marosi was an anesthesiologist from San Diego,
20  California.  And you'll find out that in August of 2006 he
21  got some tragic news.  He found out that he had been
22  infected with the AIDS virus.  Now, he also talked to his
23  good friends, and former romantic partners, Marcelo
24  Bellato, MB, and Steven Baughman, SB, and found out that
25  they had been infected as well.  It was a tragic time.

1  But Marcelo Bellato will tell you, and he will testify in

2  this case, that they had hope.  And particularly

3  Dr. Marosi had hope because he had done research just on

4  finding out what's out there for potential treatments, and

5  found out about the defendant at M.F. Harris Research,

6  Incorporated.

7       So after finding the defendant, you will find out

8  that Marcelo Bellato, Steven Baughman, and Dr. Tom Marosi

9  took a trip.  They came to Virginia to meet the defendant.

10 They met with the defendant on August 30, 2006.  They

11 stayed a day or two, and they got to sit down and see the

12 defendant's presentation.

13      Marcelo Bellato will tell you that he sat through the

14 presentation.  It was extensive.  It was impressive.  And

15 he understood that if his friend Dr. Tom Marosi invested,

16 that money was going to the company, the company that was

17 working for AIDS research.  Furthermore, with Dr. Marosi's

18 investment, there was an agreement that Dr. Marosi,

19 Marcelo Bellato, and Steven Baughman would get to go to

20 Europe with the defendant.  You'll find out he has ties to

21 Europe.  They would get to go with him to Europe to get

22 treatment through the hyperbaric chambers since the

23 treatment had not been approved in the United States.  And

24 they were all very excited about this.

25      You'll find on September 1, 2006, that Dr. Marosi

1   signed a stock subscription agreement for an investment in

2   MFHR, the defendant's company.  He's going to invest

3   $200,000.  And according to that agreement, he was to

4   receive 200,000 shares in MFHR.

5       On October 3, 2006, and we'll show you the trail of

6   money, Dr. Marosi wire transferred his investment to the

7   defendant's business account and it was received.  We're

8   going to pull back the curtain, ladies and gentlemen, and

9   tell you what was going on that Dr. Marosi did not know at

10  the time.  At the time Dr. Marosi's investment hit the

11  business account, MFHR had only $812.07 in its account.

12  The defendant, $313.57 in his personal account.

13      You're also going to find out, and Myranda Caudill

14  will testify before you, that at that time she was the

15  defendant's girlfriend.  She is the mother of his son.

16  She'll tell you that in 2006, leading up to August of

17  2006, the defendant was living with her and her parents

18  there in Luray, Virginia.  He had been living with them,

19  but the defendant was kicked out of the house and no

20  return.  August 31, 2006.  Right around there.

21      Then you'll find out through the evidence that the

22  defendant's focus shifted to finding a personal place to

23  live.  So he found 1291 Stonyman Road, Luray, Virginia.

24  The same house he lives in today.  It's over 2.6 acres.

25  It's a farm and a house.  And just within days of reaching

1  an agreement with Dr. Marosi, you'll find that on

2  September 11, 2006, the defendant signed a contract to

3  purchase that house.  And that contract, the purchase

4  price, was $190,000.  That same contract, the down payment

5  per the contract, was going to be $115,000 for that

6  property.  At the time, financial analysis will show you,

7  the defendant had $862.31 in his personal accounts at the

8  time he signed that agreement.

9       Dr. Marosi's $200,000 investment hit the business

10  account on October 3, 2006.  The defendant signed the loan

11  documents to purchase this Stonyman house to get a loan on

12  October 24, 2006.  And in those documents that you'll see,

13  he represented that the down payment was coming from his

14  sale of stock.

15       You'll find out that on October 31, 2006, ladies and

16  gentlemen, that Dr. Tom Marosi died.  And you'll find that

17  Dr. Marosi did not die of AIDS, and he did not die of any

18  reason associated with this case.

19       But things continue on from there with respect to the

20  defendant.  On November 22, 2006, the defendant signed the

21  closing papers to purchase that house at 1291 Stonyman

22  Road.  And following the trail of money, $85,000 of Tom

23  Marosi's investment was used for the down payment on this

24  house for the defendant's purchase.  We'll follow the

25  trail and show you where the rest of Tom Marosi's money

1  went.  All the money was spent by February 7, 2007.  It

2  was gone.

3      Six thousand dollars of Tom Marosi's money was spent

4  on patents; $107,900 on a house, for the purchase of the

5  house, for some improvements, and other things you'll

6  learn about; $17,000 was spent at stores; $15,000 was

7  spent on farm and horse expenses; $5,000 for auto; $5,000

8  for another transfer to the joint account maintained in

9  Myranda Caudill and the defendant's personal names; and,

10 $2,400 for purchases at gun stores.

11     And despite the agreement, you'll find out from

12 Marcelo Bellato the agreement was that he, Steven

13 Baughman, and Tom Marosi would get to go to Europe to get

14 the treatment.  Marcelo Bellato will tell you that after

15 Dr. Marosi's death he kept track and was in contact with

16 the defendant as much as possible, and that months drew on

17 with occasional contact and occasional hope that he would

18 get to go, but he never got to go to Europe, nor did

19 Steven Baughman, to even try this treatment.

20     Now aside from this, ladies and gentlemen, you're

21 going to hear testimony from a CPA named Steven Weiner.

22 Steven Weiner will tell you that he was contacted by the

23 defendant by phone in 2007.  The defendant asked him to

24 prepare the tax returns for Michael F. Harris Research,

25 Incorporated for 2003 working up through 2006.  The

1  defendant provided him with financial information, bank

2  information, to use in preparing those returns, which he

3  did.  As a CPA, he went through them and he will tell you

4  he put the information on the returns.

5      With respect to the 2006 U.S. Corporate Tax Return

6  for Michael F. Harris Research, you're going to see checks

7  in this case and investor monies that were not reported on

8  the tax return for that company.  In fact, according to

9  the tax return as prepared by Steven Weiner, the company

10  brought in a little over $10,000 in investments for that

11  year.  The return does not include Tom Marosi's $200,000

12  wire transfer, and it doesn't include other checks that

13  you will see in this case entered into evidence with

14  respect to investments.  And you'll find that the

15  defendant signed that tax return on December 7, 2007, and

16  it was filed with the Internal Revenue Service as

17  accurate.

18      After Tom Marosi's death, his brother, John Marosi,

19  who will testify before you, will tell you about how he

20  was his brother's executor for his brother's will.  And

21  that he, as part of that process, was in charge of

22  gathering up his brother's assets to put into a trust for

23  distribution to different individuals named in

24  Dr. Marosi's will.

25      John Marosi was aware that his brother had invested

1  $200,000 in the defendant's company.  He knew that his

2  brother had hope when he got that bad news that he had

3  AIDS.  When John Marosi went through his brother's

4  belongings, and other family members gathered things

5  together, he found the stock subscription agreement, the

6  agreement to buy the stock, had been signed by his

7  brother.  He also found a wire transfer authorization his

8  brother had signed to transfer $200,000 to the defendant,

9  but did not find the stock certificate from that company.

10 So the evidence will tell you about John Marosi's efforts

11 that go for the next two and half years to obtain the

12 stock certificate from his brother's investment in the

13 defendant's company.  He'll tell you, and you'll see them

14 entered into evidence, that he wrote two certified letters

15 to the defendant at his post office box in Luray,

16 Virginia.  In those letters he represented that he was Tom

17 Marosi's brother.  That he's the executor of his brother's

18 estate.  He tells him that he is not able to locate the

19 stock certificate, and he is requesting financial

20 information about the company as well.

21     As a final point in each of these letters, you'll see

22 that John Marosi tells him that he, John Marosi, and his

23 sister, Susie, would like to take the brother's place when

24 the defendant takes Marcelo Bellato overseas to get him

25 treatment because they'd like to see that go through with

1    respect to the investment.

2        No response from the defendant to either of those

3    letters, so John Marosi starts poking around.  He'll tell

4    you that he starts trying to locate shareholders in this

5    company.  And he went to state regulatory and federal

6    regulatory authorities, and he filed a complaint with the

7    SCC.  He went to the North Carolina State Corporation

8    Commission where the defendant's company was incorporated,

9    and started digging around.

10       March 12, 2008, he gets an e-mail from the defendant,

11   and in that e-mail the defendant tells him that he

12   understands that John Marosi is falsely impersonating a

13   shareholder in the company.  Tells him to

14   cease-and-desist.  He will get a restraining order against

15   him if he continues down that path.  And he says that he

16   had tried -- the defendant claims that he had tried to

17   contact John Marosi's sister on two occasions and she had

18   not responded.

19       We find out shortly after that e-mail John Marosi

20   fires back a response.  Tells the defendant that he had

21   sent him letters advising him of his connection to his

22   brother's estate with letters testamentary confirming his

23   legal authority to gather assets for his brother's estate.

24   He had further requests for financial information about

25   the company, including, he tells him, he wants to know how

1  my brother's $200,000 investment monies were spent.  He

2  tells him he wants the stock certificate issued for his

3  brother's investment.

4      The defendant responds within 28 minutes to that

5  e-mail, doesn't provide any of the financial information,

6  and tells Mr. Marosi that the shares are nontransferable.

7      Now, after that, you'll find out that John Marosi

8  sent another certified letter to the defendant on

9  April 24, 2008.  The letter was received.  He signed the

10 certificate.  He asked for the same information, the

11 financial information, the stock certificate, information

12 about the company, shareholders, and he got no response.

13     So in the fall of 2008, John Marosi files a lawsuit

14 in North Carolina to get those shares back from the

15 defendant, to get them issued.  That lasts up until

16 February of 2010.  You'll find out that finally through

17 negotiations, and everything else, that a court order is

18 entered.  That order says the shares are to be issued to

19 the estate of Dr. Tom Marosi.  And finally, John Marosi

20 will tell you, he got those shares, but since that time he

21 has received no other financial information about this

22 company or how his brother's money was spent.

23     Moving forward to 2007, ladies and gentlemen, through

24 the financial analysis you'll find out the defendant

25 brought in over $300,000 in 2007 from investors.  That

1  accounted for about 97% of the net income that was going

2  into all of the defendant's business and his personal

3  accounts.   Out of that amount, $5,090, give or take, went

4  to patents; $80,000 went to stores, restaurants,

5  entertainment, and credit cards; $50,000 to housing,

6  utilities; $28,000 to farm and horse expenses; $18,000 to

7  auto expenses; $5,000 to child support payments.

8       And you're going to find out about the defendant's

9  concealment of his personal expenses from 2007 -- or

10 concealment of his business expenses from 2007.   Now see,

11 2009, just fast-forward just a moment, in 2009,

12 shareholders are getting very upset with the defendant

13 because he's not giving them financial information about

14 the company and what's being done.   Rosalie Baker, who was

15 an investor who invested in 2009, offered to give the

16 defendant -- RB offered to give him help to put together

17 some of these financials, so the defendant takes her up

18 partially on her offer.   He gives her bank statements to

19 help her prepare the financial statements.   He represents

20 these are the business expenses.   She goes through them.

21 She finds he does not give her any checks underlying those

22 bank statements.   She only has the bank statements.

23      Ms. Baker will tell you that when she went through

24 that stuff and prepared drafts, she was never able to

25 complete this process.   The draft financials will give you

1  a behind-the-scenes look of what was going on in those
2  financials that the defendant had helped her and guided
3  her to prepare.  Number one, you'll find out that the 2007
4  draft financials don't include, because the defendant did
5  not provide Ms. Baker with information about the
6  January 2007 business accounts for M.F. Harris Research,
7  Inc., the same statements that would have shown the
8  spending of the final $30,000 of Tom Marosi's money in
9  that month.  It was gone by the end of that month, but it
10 does not show up on the financials.
11     When Rosalie Baker asked the defendant -- because
12 what it caused is the numbers got out of whack.  It wasn't
13 balancing.  He told her that there had been a bank card
14 theft or something on the account, and she just wrote it
15 off as that on the financials.
16     Now, because she didn't have the checks she could not
17 tell what expenses should go where.  She sat down with the
18 defendant on two occasions for about an hour and a half
19 each time where he went through it and he would tell her,
20 okay, this expense goes here, this expense goes there.
21 She'll tell you she sat down with the defendant to go
22 through patent expenses.  She couldn't tell what was for
23 patents.  So the defendant identified for her, and she put
24 them on the draft financials, these transactions.
25     In total, it identified $46,339.07 had been spent on

1  patents that year.  Among the transactions that you're

2  going to see here, and in Cindy Williamson's testimony,

3  are these that were listed in there.  Check Number 1002

4  that Rosalie Baker didn't have in her possession, $950 for

5  patents.  And it goes down the list.  But when you look at

6  the actual checks from Cindy Williamson's analysis, it

7  will show you -- it shows that that $950 check that the

8  defendant told Rosalie Baker to put down for legal patent

9  expenses was actually made to Larry Parcel for Jeep

10  damage.

11      Check Number 1005, $10,000.  The defendant identified

12  that as legal patent expenses.  The actual check was to MF

13  Harris for payroll.

14      Check Number 1015.  Legal patent expenses, $1,100.

15  That check was to Doug Taylor, with the notation in the

16  memo, *"plumbing bathroom."*

17      Check Number 1017.  Legal patent expenses.  $2,300.

18  The actual check notes *"roofing expenses."*

19      Check 1018.  $10,000 made out directly to the

20  defendant, Michael Harris, for payroll.

21      Check 1019.  $950 identifies patent expenses.  Made

22  out to Ronny's Electric for *"house bath/bar"* listed in the

23  memo.

24      Moving up to 2008 we're going to present to you

25  different investors, and they're going to tell you about

1   their interactions with the defendant, how they met, the

2   representations that he made to them, including David

3   Evans who lives in Portsmouth, Virginia.  He'll tell you

4   that he met the defendant a few years prior and had gone

5   on diving trips with him and stuff.  And that in 2008,

6   David Evans came back from Guantanamo Bay where he'd been

7   working with his wife on a contract job, and decided he

8   wanted to invest, so he contacted the defendant.  The

9   defendant came to David Evans' house, sat down in the

10  living room with David Evans and his wife, Joyce, and did

11  a presentation for them.  A PowerPoint.  Very detailed,

12  and all about what Michael F. Harris Research does with

13  this potential treatment, and what's on the horizon.  And

14  he tells him that the money -- he mentions patents in the

15  presentation, but principally the money will be used to

16  finish the clinical trials.  Finish the testing.  And

17  that's what David Evans believed that if he and his wife

18  invested that's where their money would go.

19       On August 4, 2008, the defendant sends an e-mail that

20  David Evans receives in Portsmouth, Virginia with wire

21  transfer information for his investment.  And he tells

22  him, you know, where to send the money.  And that forms

23  the basis for the wire fraud charge in Count 6.  We're not

24  going to worry about the law right now.

25       What we're going to do, ladies and gentlemen, and

1   you're going to find out, that he invested his money and

2   David Evans fully expected it was going towards finishing

3   those clinical trials.  We'll pull back the curtain and

4   show you the reality of what was going on with that

5   transaction.  Michael F. Harris Research, the account

6   where the money went before David Evans' wire transfer

7   hits, had $40.87 in it.  David Evans' money, he and his

8   wife Joyce's money, hits August 15, 2008.  By August 21,

9   2008, that money is gone.

10       You'll find that the money went $3,560 to farm and

11   horse expenses; $1,067.20 went to housing for the

12   defendant's mortgage; $724.14 to auto expenses; and,

13   $73.95 in bank fees.

14       Another investor you're going to hear from is Katie

15   Ritter.  Katie Ritter will tell you that she and her

16   husband met the defendant at his house in October of 2008.

17   And he told them about what he did and his background.

18   And Katie Ritter will tell you that she was extremely

19   interested in this possibility for investing in this

20   company, and extremely interested to help out.  She made

21   arrangements with the defendant to see the presentation.

22   You will find out that the defendant on December 24, 2008,

23   Christmas Eve, he drove up to Maryland to meet Katie

24   Ritter out of town.  There'd been an ice storm the day

25   before, but he drove up there and met with her.  Did the

1    presentation for her.

2         And Katie Ritter will tell you in no uncertain terms

3    she was told that her money, she and her husband's money

4    they put into this, was going to patent and Phase II

5    testing.   The human trials to get this going.   And the

6    defendant told her that time is of the essence.   She had

7    to get in before the end of the year because there was a

8    big opportunity coming for the company and he probably

9    wasn't going to be taking anymore investments from private

10   investors.   So they felt like they had to get their money

11   in, and they invested $5,000.   They overnighted that money

12   to the defendant.

13        And we'll pull back the curtain on what happened with

14   the money.   The reality is that the Michael F. Harris

15   Research business account where the money was deposited

16   was negative $406.25 at the time Katie Ritter's money

17   comes in.   The defendant's personal account, negative

18   $256.55.   Her money is deposited December 31, 2008, and

19   it's gone by January 16, 2009.   You will find out that it

20   goes to auto expenses, store expenses, utility bills,

21   restaurants, and entertainment.

22        With respect to 2008 investments, you'll also find

23   Major Joe Newcomb.   He's in the United States Marine

24   Corps.   He'll tell you that he met the defendant in 2008.

25   They developed a good relationship.   He considered the

1  defendant a friend.  And he was told that his money would

2  be used for research and patent.  And Major Newcomb

3  invested $6,500.  And we'll trace that money as well.

4       One of his checks for $1,000, we'll show you directly

5  what happens to that.  The other one went into a pool of

6  money.  We'll show you what happens to that.  Again, same

7  pattern.

8       2009.  Now the investor money is starting to dry up

9  somewhat, but the defendant still gets over $100,000,

10 accounting for 73% of the net income coming into his

11 account -- or all of his accounts.  We'll present

12 testimony from Rusty and Erika Carrier.  RC/EC.  They'll

13 tell you that they met the defendant at some point around

14 late 2008 or early 2009.  And Erika Carrier will tell you

15 about how she saw the presentation about the possible

16 research.  She was very impressed by it.  And she'll also

17 tell you about how she came in contact with the defendant.

18 She is a representative at horse auctions.  She actually

19 met the defendant over the phone who was asking her to bid

20 on a horse for him during that for up to $5,000 or $7,000.

21      After that, she and her husband sat down, they

22 watched the full presentation, and they were told that if

23 they invested, their money would be used for patent and

24 human trial testing.  Rusty Carrier finally agreed to

25 invest $10,000.  He'll tell you, and Erika Carrier will

1  tell you as well, that the defendant tried to get him to

2  invest $100,000.  Rusty Carrier decided on $10,000.

3        The day the investment was going to come through,

4  December 27, 2009, they were going to have the defendant

5  over for dinner, but you're going to find out that Rusty

6  Carrier was very ill that evening leading up in the

7  afternoon, and he did not feel like having dinner.  He

8  will tell you about his condition.  It was serious, and he

9  was in bed.

10        Erika Carrier called the defendant to tell him that

11  they couldn't do it.  They'd have to do it another day.

12  But she'll tell you the defendant pushed back.  And he

13  pushed back and he wanted to come and get that investment

14  money.  Erika Carrier went back and checked with Rusty

15  Carrier, and finally she tells the defendant, okay, if you

16  want to come, come.  So the defendant on his motorcycle

17  drove one hour from Luray, Virginia to get to Rusty

18  Carrier's house.  He got there about 9:00 that night.  He

19  had to wait while Erika Carrier went up and had her

20  husband sign the documents to do the investment, and to

21  give him the check for $10,000 that was supposed to go to

22  research and -- or to the patent and human trial testing.

23        We're going to pull back the curtain, ladies and

24  gentlemen, to the reality of what happened to Rusty

25  Carrier and Erika Carrier's $10,000.  At the time the

1  defendant took their investment money, his personal

2  accounts, one of them was a negative $2,438.19.  His other

3  personal account was negative $299.84.

4       He took that investment check from the Carriers, and

5  he goes into the bank, you will find, and it splits in

6  three different directions.  Part of the money goes into

7  the defendant's personal bank account, part of the money

8  goes into the MFHR new business account that he opened,

9  and then the defendant takes $2,000 in cash out of the

10 bank within that day from the Carrier's investment money.

11 You will find that the money was spent -- it comes in

12 March 2, 2009.  It's gone by April 1, 2009.  It was used

13 to cover negative balances, as well as the cash we talked

14 about, auto, stores, farm and horse, restaurant.  No

15 patent or clinical trial expenses identified on that

16 money.

17      2010.  Investors that year -- again, the investor

18 money is starting to dry up.  $43,000 coming in that year,

19 but you'll find that that still is the largest source area

20 coming into the defendant's business and personal

21 accounts.  And there's a situation brewing with the

22 shareholders.  They're very, very upset that they're not

23 getting financial information about what's going on with

24 this company despite repeated requests at previous

25 shareholder meetings.

1        November 20, 2010, there's a shareholders' meeting

2   held up at the Ritz Carlton up at Tyson's Corner.  You'll

3   find out that several attended this, including Rusty

4   Carrier, Katie Ritter.  The meeting was recorded.  And

5   you'll find, and there will be different clips from that,

6   the defendant continues not to provide financials.

7   Provides excuses to the shareholders.  Tells them that

8   we're working on it.  When it's perfect you're going to

9   get it.  And you'll find that he continues the acts of

10  concealing from investors about where the money is really

11  going.

12       He tells the investors, and you'll hear the clip

13  during that, that patent expenses for that year in 2010

14  have been $39,000 -- or that he had brought in roughly

15  $39,000.  That's about right.  And that that had been

16  absorbed in patent fees.  That it costs a lot.  The

17  shareholders pushed him on that, and he said patent fees

18  were about $9,000 a quarter.

19       Now, Cindy Williamson will tell you based on her

20  extensive financial analysis, she identified for the

21  entire year of 2010 approximately $7,000 in patent

22  expenses.  And for the prior years, you will see the

23  expenses categorized through her analysis on patent

24  expenses.  It does not fit this $9,000 a quarter claim by

25  the defendant during that shareholder meeting.

1    Also during that same shareholder meeting, the

2  defendant talked to the shareholders about steeplechase

3  money.  Now, he's an avid rider.  I told you he has horses

4  that you'll find out about during this case.  And he tells

5  them things about that in the meeting.

6    I'll tell you as a side note that you'll find out

7  from various witnesses in this case that the defendant

8  would tell them that he earned money for winning at these

9  races, these steeplechase races, and he would use that

10  money to pay not only his personal expenses, but he would

11  put it into the company.  Well, at the shareholder

12  meeting, he tells the shareholders he's getting his teeth

13  knocked in on the racecourse.  And he's going to keep on

14  doing it and it's going to bring money in.  He represents

15  to them he's brought in about $24,000 through that.

16    The reality, shown through Cindy Williamson's

17  financial analysis, looking at the whole view over the

18  years was that it was shareholder money that was funding

19  his riding as opposed to his riding funding his personal

20  expenses or anything to do with this company.

21    Also, you'll hear testimony from National

22  Steeplechase Association, General Manager, Peter McGivney.

23  And you'll found out that the NSA, as it's called, they

24  manage big ticket steeplechase races for the entire United

25  States, including Virginia and the surrounding areas.  And

1  he will tell you based on his experience that he knows

2  those races are called *"sanctioned."*  Those are the ones

3  where there are these big prizes.  And they keep very

4  detailed records on these events.  And according to the

5  NSA records, you'll find out from 1998 through 2011 the

6  defendant won twice under NSA sanctioned races.  In 1990,

7  he got $500.  In 2011, he got $450.

8       Now, General Manager McGivney, and other witnesses,

9  will describe for you there are other races in the

10  steeplechase world called Point-to-Point and Hunt Club

11  races.  And those races generally have no money in them.

12  Or if they do, it's a very minimal amount to the top prize

13  winner, and that's it.

14       On September 11, 2011, ladies and gentlemen, you'll

15  find out investor money is indeed drying up with the

16  defendant, but he continues to pursue.  In April of 2011,

17  he goes to a seminar in Denver, Colorado.  He sets up a

18  booth there.  You'll find out that FBI Special Agent Julio

19  Tobar, who is acting undercover, sat down and talked to

20  the defendant.  Recorded it.  You're going to hear clips

21  from that conversation.  During that conversation, the

22  defendant tells Agent Tobar in response to his question

23  about where is the investor money being used, the

24  defendant tells him investor money is being used for

25  trials.

1          Now, after that, Special Agent Tobar also, you'll
2   find, e-mailed with the defendant.  And he represented to
3   him that he represented several investors willing to put
4   in half a million dollars into this company.  He requests
5   very specific financial information.  You'll see the
6   exchange and the questions he's asking.  The defendant on
7   the final exchange after he gets the big questions asks
8   Julio Tobar via e-mail, *Are you a federal agent?*  And he
9   won't provide him with the financial information, but
10  basically tells him we're going to start the testing once
11  we get the money.

12          The final investor is Diane Desch.  She is referenced
13  in Count 6 of the indictment.  She wire transfers money
14  for investment.  She'll tell you that she met the
15  defendant around 2009 at a horse show up in Warrenton,
16  Virginia, and that they kept touch by phone since then.

17          In early 2011, she actually visited the defendant in
18  Luray, Virginia.  And she'll tell you that he did a
19  presentation for her about his business and about the
20  treatment.  And she'll tell you she was very taken with
21  this because she lost her own father to AIDS.  That it
22  struck a cord with her.

23          On June 13, 2011, the defendant calls her and tells
24  her that he frantically needs $2,500 to cover patent
25  expenses.  She goes to the bank.  She has $2,500 that she

 1   puts in the defendant's account.  And you'll find out

 2   through analysis that indeed $2,122 of that money went to

 3   patent.

 4        But June 14, 2011, the defendant sends an e-mail to

 5   Diane Desch giving her more information about his company,

 6   and then following up that led to her next investment of

 7   $7,500, which forms the basis for Count 6 -- or Count 7 in

 8   the indictment.

 9        On June 28, 2011, she wire transfers $7,500.  She

10   understood her money was going into the company to further

11   this research and development for AIDS.  The reality is,

12   as we pull back the curtain, the business account at the

13   time her money hits had negative $157.95 in it.  Her money

14   is spent on housing, store, auto, utilities, restaurant,

15   and also farm expenses.  And also to put it in context,

16   the evidence will show you that at this time the defendant

17   knows he's under investigation by the State Corporation

18   Commission.  He also knows that shareholders are very

19   upset about financials and how money has been handled in

20   this entire thing.

21        Finally, Diane Desch will describe for you that she

22   received another call later that month from the defendant.

23   He needed $3,000 from her to shoe his horses because he

24   needed those horses to enter into a race, that he was

25   going to win money, and with those winnings he could repay

1   her and also he could put money towards the research.  You

2   will find out that Cindy Williamson traced that money, and

3   only a minimal amount arguably went to any type of horse

4   expense.  Most of it was spent the same way as the others'

5   - on personal expenses.

6        Finally, ladies and gentlemen, 2012.  You're going to

7   hear from FBI Special Agent Brad Gregor towards the end of

8   the United States' case.  He will tell you that he

9   interviewed the defendant in October of 2012.  During that

10  interview, the defendant admitted to using investor money.

11  He said that he was just paying himself back for expenses

12  in the past.

13       He also told Agent Gregor when Agent Gregor asked

14  him, is he keeping track of that.  He told Agent Gregor,

15  no, he wasn't keeping track.

16       He was asked whether he told investors about this.

17  And he said, oh, they understood.

18       He was asked about the use of Tom Marosi's money to

19  buy the house, and the defendant told him that, you know,

20  he's made some bad decisions in the past but it's not

21  criminal.  That he felt like that was in a gray area.

22       And he was also asked why didn't he take Marcelo

23  Bellato or Steven Baughman on that treatment trip to

24  Europe.  And the defendant told him that there wasn't

25  enough money to do it, and that it was actually Dr. Tom

1  Marosi's responsibility to pay those travel expenses for

2  them to go to Europe.

3       Now, ladies and gentlemen, that sums up a large part

4  of the evidence that you're going to see in this case.

5  And the United States fully expects when you see it

6  develop, you'll find that it relates, it weaves together,

7  and it points in only one direction.  At the conclusion of

8  this case, we'll ask you to return the verdict of guilty

9  on all counts.

10      Thank you.

11      THE COURT:  Mr. Wagner on behalf of Mr. Harris.

12      MR. WAGNER:  Thank you, Your Honor.  May it please

13  the Court, counsel.

14      Ladies and gentlemen, my name is Robert Wagner.  I'm

15  with the Federal Public Defenders Office.  With me at

16  counsel table is Pam Bishop.  She's also with the Federal

17  Public Defenders Office.  And Nick Klaiber.  He is with

18  the firm of Troutman Sanders.  And he has volunteered his

19  time to Michael Harris' case here.  We represent Michael

20  Harris in this case, and we will show you by the end of

21  this trial that Michael Harris is not guilty of all of the

22  charges that he faces.

23      Michael Harris is a very interesting man.  He has

24  done some extraordinary things in his life.  Most

25  significantly, he has developed the science which forms

1    the basis of his company.  The science that could

2    revolutionize the treatment of AIDS, and could make a

3    difference in the health of people all around the world.

4        The government's allegations of fraud in this case of

5    lying and cheating and of stealing is tainted heavily by

6    the influence of a man that the government didn't even

7    talk about in their opening statement, a man by the name

8    of Matt Johnson, and his company called Deep Blue, which

9    stands to take over Michael Harris' science, his life's

10   work, his passion, if Michael Harris is convicted.  We're

11   going to ask that you not let this happen.

12       Now, you're going to see the full force and effect of

13   the United States government through this prosecution.

14   You're going to see some very detailed financial analysis,

15   and you're going to see some beautiful charts that they're

16   going to show you by the end of this case.  You're going

17   to hear some well-prepared witnesses, and you're going to

18   hear some sharp arguments by their attorneys, but in the

19   end we are confident that you're going to find Michael

20   Harris not guilty of all of the charges that he faces in

21   this case.  Not guilty because he never had the intent to

22   defraud anyone.  He felt that everyone who purchased

23   shares in his company was receiving something of value,

24   something that he put his life's work into.

25       Michael Harris is a United States olympic athlete in

1  canoeing and kayaking.  He's an accomplished steeplechase

2  rider.  He's the CEO and president of this company.  He an

3  inventor.  He's a hunter, a fisherman, a diver.  He's a

4  ski instructor and coach, a gun collector, a bird

5  collector, a lady's man, and a pioneer in the AIDS

6  research and treatments.

7      What he is not is a good businessman.  He is not a

8  good CEO of the company.  He'd be the first one to admit

9  that.  He is not organized.  And he's not detailed about

10 the little things of this company, but he is also not a

11 fraudster and he is not a criminal.  He's the kind of man

12 that doesn't always play by the rules, but sometimes

13 that's what it takes to make breakthrough technology and

14 to provide treatments and cures that no one else can.

15     He was raised in Harrisonburg.  Went to Harrisonburg

16 High School.  He attended Ferrum College.  Never received

17 a degree from college.  He joined the U.S. Canoe and

18 Kayaking Team in 1984.

19     He started working with medical technology at

20 Georgetown in 1996.  That's where he received the

21 background and education for developing the science for

22 this company.  Now, remember, the science for this

23 company, what this company is trying to do, is not an

24 issue in this case.  Not an issue at all.

25     He was at Duke University.  Did some medical studies

1   there.  University of Virginia.  Did medical studies

2   there.  And in both of these places he built and developed

3   this science that he was promoting through his company.

4        In 1994, he went on a diving trip in Puerto Rico, and

5   when he was there he noticed that divers who suffered from

6   AIDS didn't have the same kind of symptoms as other people

7   with AIDS, and he theorized that it was because of the

8   nitrogen that was getting into their cells that helped to

9   keep the T-cell level down and to help keep the AIDS

10  symptoms down for those particular divers.

11       And so he took this idea, he took this hypothesis,

12  and he figured that he could replicate this kind of

13  nitrogen cell saturation in hyperbaric chambers, and so he

14  went to Duke University and started some trials at Duke

15  University involving animals.  And those trials were

16  successful.  Then he took a small human trial to Europe,

17  and that trial was successful.  And ever since then, he

18  has been working to get a larger sample of human trials in

19  order to prove that this science works in order to bring

20  this science to the world.

21       Now, the work on the company began in 1999 based on

22  those experiences that he had in Puerto Rico, but the

23  company was actually formed in 2003 with the defendant as

24  the CEO and president of this company.  And for some time,

25  he worked with this man, Matt Johnson, who later formed

1  Deep Blue.  He worked with Nancy Ferguson.  He worked with
2  a patent attorney named Jeff Seto.  Together they tried to
3  promote and invent, in the interest of the company, the
4  science that Mr. Harris had developed.  The company's
5  objectives had also been to obtain patents, to conduct
6  human trials, to do further research, but it was also to
7  find a funding source to move the company forward.  A
8  large funding source to move the company forward.
9      They sought funds from Pfizer.  They sought funding
10 from -- at least Mr. Harris sought funding from Glock.
11 Actually had a non-disclosure agreement signed by
12 Mr. Glock.  He sought grants from Congress, from the NIH,
13 and the tried to get funding from banks.
14     Then in 2005 when he was still working with Matt
15 Johnson, there was a group called The Hill Group that was
16 a potential investor for the company.  Michael Harris
17 didn't trust those people at The Hill Group, but the other
18 people felt that they should use the money from that
19 company, so there was a split between Matt Johnson, Nancy
20 Ferguson, Jeff Seto, and Michael Harris.  As a result of
21 that split, Matt Johnson stole the science from Michael
22 Harris and set up a competing company, and that company's
23 principal objective was to wipe Michael Harris' company
24 out.
25     So back in 2005 they started investigations.  They

1   went to state investigators, and they went to federal

2   investigators to try to bring Michael Harris' company

3   down.  And those experiences are very important here.  It

4   gives you some perspective, some context, on what Michael

5   Harris did from that point forward.  He was very careful

6   about his company.  He required every single individual

7   who invested in Michael F. Harris Research to sign a

8   non-disclosure agreement, but his objectives were always

9   to move the company forward.

10          Now, in 2006 you will hear that he received a

11  $200,000 investment from Dr. Marosi.  And the government

12  is going to go into great deal about that investment and

13  about what happened with that investment.  But remember,

14  ladies and gentlemen, there is no $200,000 fraud count

15  from 2006 that you will decide in this case.  No fraud

16  count alleging that Michael Harris defrauded Dr. Marosi of

17  $200,000 in 2006.  That's not before you in this case.

18          In 2007 and 2008 he worked very hard to obtain

19  funding to keep things going in the company, to raise

20  money in different communities.  One of those communities

21  you'll hear about is the horse community where he was a

22  steeplechase rider.  There were a group of people from

23  Fredericksburg, and you'll hear from people in

24  Fredericksburg that he went to to try to receive money for

25  his company.

1           Finally in 2009 there was a huge breakthrough for
2  Michael Harris' company through the help of a patent
3  attorney named Dr. Rodney Sparks.  And Dr. Sparks is a
4  patent attorney from the University of Virginia.  He does
5  their patent work.  They obtained an American patent and
6  they obtained an African patent.  And the investors were
7  ecstatic.  They were so excited about this breakthrough
8  for the company, they threw Mr. Harris a patent party.
9  They knew that Michael Harris was working very hard for
10 them, working very hard to promote the interests of that
11 company, but at the same time that the shareholders were
12 celebrating this accomplishment of the company, the people
13 at Deep Blue were working very hard to undermine the
14 company especially when they learned that Michael Harris
15 had obtained a patent.
16          And you heard about the 2010 shareholders' meeting.
17 Right before that shareholders' meeting there was an
18 anonymous letter that was sent out to the shareholders to
19 try to get those shareholders to lose their faith in
20 Michael Harris.  We intend to show you over the course of
21 this case that it was Matt Johnson that sent that letter
22 to those shareholders, and that they in fact started
23 losing faith in Michael Harris at that shareholders'
24 meeting.  You're going to hear the transcript -- you're
25 going to see the transcript of that shareholders' meeting,

1   you're going to hear some of the recordings from that

2   shareholders' meeting, and you're going to see that those

3   shareholders were concerned.  They were worried.  They

4   weren't worried before.  Once they got that letter, they

5   started to get worried.

6        It was also at that point that the investigations

7   against Mr. Harris intensified, and unfortunately from

8   that point forward it was very difficult for the company

9   to make any progress with those investigations going on.

10  Now remember, this is the Michael F. Harris Research

11  Company.  He is the company.  It's a one-man show.  And

12  when people invested in MF Harris Research, they invested

13  in Michael Harris.  The greatest asset of the company is

14  Michael Harris, and it's our position that he was entitled

15  to be paid for his time.  He was entitled to receive a

16  salary, and the investors knew, or at least should have

17  known, this.

18       Now, when you break everything down here, there are

19  six counts in this indictment, and only six counts.  Four

20  of those counts are substantive counts involving the loss

21  of money.  And those four counts when you put all the

22  dollar figures together equal a loss of $27,500.  Now,

23  you've seen the government's charts, and you'll see many,

24  many more charts with losses of $800,000.  Well, the

25  counts that you will decide, the fraud counts that you

1    will decide, amount to $27,500.  One count of $10,000; one

2    count of $7,500; and two counts of $5,000.

3         Counts 3 and 4 of the indictment allege securities

4    fraud.  Fraud and offer in sale of securities of shares of

5    stock.  Now, there are two key ingredients to the fraud

6    cases that you'll hear.  One is that there is a material

7    misrepresentation.  A false statement by Mr. Harris to the

8    investors.  And the second key ingredient is that those

9    false statements were made with the intent to defraud.

10   Without the government proving that, Mr. Harris cannot be

11   found guilty of those fraud charges.

12        Now, Counts 3 and 4 involve the Ritters and the

13   Carriers.  The Ritters invested money in October of 2008,

14   and the Carriers in February of 2009.  What you will see

15   from their testimony is that they cannot be relied upon.

16   Here's the reason why.  After that shareholders' meeting,

17   they became aligned with Matt Johnson and Deep Blue.  In

18   fact, Katie Ritter came up with a saying, a name for the

19   group that they formed.  They called themselves The

20   Magnificent Seven.  And The Magnificent Seven's sole

21   intent was to undermine Michael Harris' company.  So they

22   were working in conjunction with the person that wanted to

23   bring Michael Harris down, a person who had an interest in

24   seeing Michael Harris fail.

25        Katie Ritter in regard to Count 3 wrote some very

1  malicious and hurtful letters to the shareholders.  One

2  that she sent out anonymously, and one to the Securities

3  and Exchange Commission saying malicious and often false

4  things in those letters.  So you can't rely on her because

5  of her bias that you'll see in this case.

6       You'll also hear about the Carriers.  That's the

7  February of 2009 investor.  They were also involved with

8  Matt Johnson.  They were also part of this Magnificent

9  Seven.

10      The Carriers were given an opportunity to sell their

11  shares back to Michael Harris but they refused.  They

12  said, no, we want $1 million dollars for our shares.

13  We're not going to take the $10,000 that we gave you.  And

14  so what that demonstrates is that they had received

15  something of value from Mr. Harris.  And I want you to

16  keep that in mind as you listen to the evidence and

17  consider the testimony.  The investors in this case

18  recognized they had received something of value.

19      Now, Counts 5, 6, and 7 are wire fraud counts.

20  Frauds which involve the use of transfers of money or

21  e-mails.  And the first is the Marosi count involving

22  Mr. Marosi, the brother of Dr. Marosi who had invested in

23  the company.  This is a very different count than the

24  other counts.  It doesn't allege that Michael Harris said

25  something to obtain money based on any misrepresentations

1   or alleged misrepresentations.  This involves an exchange

2   of e-mails.

3        I want you to listen very carefully to the evidence

4   surrounding this particular count.  Remember, it's not the

5   2006 purchase of the shares that's at issue here.  It's

6   involving the conversations over the e-mail that

7   Mr. Harris had with Mr. Marosi.  And it's important to

8   understand when this $200,000 was invested in Mr. Harris'

9   company that it was towards the very beginning of that

10  company.  The very initial stages of that company.  And at

11  that point, Mr. Harris believed that he would be getting

12  more large investments, a lot more money like the money he

13  received from Dr. Marosi, so he needed a base of

14  operations.  He needed a place to run his business from.

15  And you will hear his home is where he ran his business

16  from.  It's where his base of operations was.

17       Now, you'll see and you'll hear that Mr. Marosi was a

18  very litigious man.  That's one reason why you can't rely

19  on him.  He sued just about every person who was involved

20  in the estate of his dead brother.  He had an axe to grind

21  with everyone.

22       Count 6 involves a man named Dave Evans.  The $5,000

23  investment in 2008.  The wire that's involved in this wire

24  fraud charge, the e-mail that's involved in this wire

25  fraud charge, is very important.  Attached to that e-mail

1   were several documents that Mr. Harris provided to

2   Mr. Evans in order to get him to invest in the company.

3   One of those items, or two of them, were newsletters.

4   Newsletters from August and September of 2007.  And they

5   discussed what the company was doing, what Michael Harris

6   was doing to move the company forward, all the different

7   organizations that he was going to to try to obtain

8   funding for the company.  All the problems that he was

9   having with Deep Blue were in those newsletters.

10       He also received what we're going to refer to quite

11   frequently in this trial, the 2006 Congressional Budget

12   Proposal.  Now, in this Congressional Budget Proposal

13   which Mr. Harris sent to Mr. Evans as part of the package

14   for his investment was an attachment in that package.

15   What it included was that the CEO and president of this

16   company receives a salary, office expenses, and travel

17   expenses.  All of that is part of the e-mail that he sent

18   to Mr. Evans to get Mr. Evans to invest in the company.

19       Now, you're also going to see that there is the white

20   notebook that Michael Harris brought to virtually every

21   presentation he made to investors.  And in that white

22   notebook was that same 2006 report, the report which

23   provided information to investors that he was entitled to

24   a salary.  So Mr. Evans certainly knew, or should have

25   known, from the attachment from this e-mail that

1  Mr. Harris was very likely to take a salary.

2       Count 7 involves a woman named Diane Desch.  And

3  that's a very sad situation with Ms. Desch.  She had a

4  personal relationship with Mr. Harris.  She knew

5  Mr. Harris very well.  She knew about his lifestyle, she

6  knew about his financial problems, and she had some

7  serious problems of her own.  At the same time as this

8  investment with Mr. Harris, at the same time she was --

9  and the government has referred to the $3,000 for shoeing

10  the horse as a loan, you will see that that was a gift

11  from Ms. Desch to Mr. Harris.

12       But at the same time that this was going on, her

13  relationship with Mr. Harris was going on, she got

14  involved in a terrible scam where she was scammed out of

15  hundreds of thousands of dollars.  She also had brain

16  surgery about this time.  A brain surgery which affected

17  her memory.  So a very sad, sad situation.  But

18  unfortunately with so much going on in her life, it's

19  going to be difficult to rely on Diane Desch for

20  information that would show that Mr. Harris made any

21  misrepresentations to her.

22       Count 8 is a count involving Nicki Gentry.  And she's

23  a police officer from Fredericksburg.  That's also a very

24  different count from all of the other counts that you'll

25  see in this case.  It involves what's called allegations

1  of lulling.  Now, lulling is when an investor tries to --
2  tries to give his investors -- excuse me.  It's when a
3  person who is accused of fraud is trying to give his
4  investors a false sense of security to avoid criminal
5  detection, or to lull investors to not report fraud to law
6  enforcement.  Now, the odd thing about this charge is that
7  it's a lulling charge involving a police officer.
8  Involving a law enforcement officer who should know fraud
9  when she sees it.  Now, this involves statements that were
10 made at a shareholders' meeting in 2010.  Statements that
11 were made allegedly to lull the investors into a false
12 sense of security.
13     Well, you're going to hear all of the statements that
14 were made.  The government is going to want to cherry pick
15 the statements that they like from the meeting, but what
16 he told the investors at that time was that the company
17 was broke.  What he told the investors at that time was
18 that he was not the right person to run this company.
19 Now, I want you to think for yourselves, is that the kind
20 of statement that someone makes to lull people, to lull
21 investors, into a sense of security?
22     Now, some general things I want you to keep in mind
23 about all of the witnesses that you hear from in this
24 case.  One is the Matt Johnson influence.  Matt Johnson
25 and Deep Blue.  Several of these people that you will hear

1  from, the Ritters, the Carriers, Joe Newcome, they were

2  part of this Magnificent Seven group.  They were meeting

3  with Matt Johnson.  They were conspiring with Matt Johnson

4  to undermine Michael Harris and Michael Harris' company.

5      But there's another influence that I want you to

6  think about, too.  And remember, you have to focus on the

7  statements that Michael Harris made.  You heard a lot in

8  the opening statement from the government about the

9  financials in this case.  Well, this case comes down to

10  statements to alleged misrepresentations and the intent to

11  defraud.  And what you're going to see is lots of these

12  witnesses have what we'll call hindsight bias.  Most of

13  the statements at issue, most of the allegations of

14  misrepresentation that were made by Mr. Harris, were made

15  four and five years ago.  Even eight years ago.

16      The investors are trying to recall these statements

17  from a long time ago.  And remember, no one wrote those

18  things down.  There's not a single shred of evidence that

19  will show that any of the investors at the time they were

20  given this pitch by Mr. Harris wrote anything down.

21  Investors are trying to recall these statements from a

22  long time ago.  And remember that the statements that

23  they're recalling are now being made in light of a

24  criminal prosecution and a criminal investigation in light

25  of the fact that they have not received any returns on

1    their investments.  Please keep this in mind as you listen

2    to the testimony of the witnesses in this case.

3         Now, you're going to hear from Rodney Sparks.  And

4    there's going to be some discussion about the patent in

5    this case and whose name the patent was in.  And Rodney

6    Sparks is going to clear up any questions that you may

7    have about that patent.  He's going to talk about start-up

8    companies and how start-up companies work.  He's a very

9    credible witness.  A very helpful witness.  And this is a

10   man who worked with Michael Harris for several years.

11        But in the end what we will show you is that Michael

12   Harris never had any intent to defraud.  The government

13   talks about pulling back the curtain in this case, well,

14   there's no need to pull back any curtain in this case

15   because what you're going to see is that Michael Harris

16   didn't intend to defraud anyone.

17        You're going to hear about a term called *good

18   faith.*  And good faith is a concept in the law that if an

19   investor or someone accused of fraud told that he was

20   going to do something with the money and had a good faith

21   belief in what he told those investors, then he can't be

22   found guilty of fraud.  He can't have created the intent

23   to defraud or deceive.

24        What Michael Harris told those investors time and

25   time again was that he was going to move the company

1   forward.  Everything he did in his life, everything he did

2   with his company, his passion, was going to move the

3   company forward.

4        You're also going to hear about concepts of burden of

5   proof and reasonable doubt.  It is always the government's

6   burden to prove the defendant guilty, and they must meet

7   that burden to a standard of beyond a reasonable doubt.

8   That is a very high standard, ladies and gentlemen.  And

9   as to each count you consider, as to each element of those

10  counts, the government must prove guilt beyond a

11  reasonable doubt.

12       Remember, this is a federal criminal case.  These are

13  felony charges against Mr. Harris.  It's not just about

14  money that was invested in the company, it's about

15  Mr. Harris' life, his future, and his freedom.  Please pay

16  close attention to the evidence in this case, listen

17  carefully to the witnesses, and we're confident that by

18  the end of this trial you will find Mr. Harris not guilty.

19  Thank you.

20       THE COURT:  Ladies and gentlemen, given the hour,

21  we're not going to begin with the first witness.  We're

22  going to take our luncheon recess for one hour.  A couple

23  of cautionary comments.

24       First of all, I neglected earlier today to advise you

25  on using any kind of Internet or social media during the

1    course of this case.  Probably don't need to, but the law

2    requires me to advise you that you may not discuss this

3    case using any kind of social media with anyone else.

4        You also cannot consult any Internet sources for

5    information about the case, about any of the witnesses,

6    any of the corporations, or any of the events that you

7    hear about during the course of this trial.

8        Now, ladies and gentlemen, at this point we're going

9    to recess for one hour.  Remember, do not discuss the case

10   among yourselves or with anyone else.  Have a pleasant

11   lunch.  We'll see you back here at 2:00.  You're excused

12   until then.

13       Be sure to leave your pads right there on your chair.

14       (The jury is no longer present in the courtroom.)

15       THE COURT:  Mr. Gill, I assume you will be ready to

16   go right at 2:00.

17       MR. GILL:  We are indeed, Your Honor.

18       THE COURT:  All right.  Very well.

19       We'll recess until 2:00.  See you all back here then.

20                      (Recess taken.)

21       THE COURT:  Ready for the jury?

22       MR. GILL:  We are, Your Honor.

23       MR. WAGNER:  Yes, sir.

24       THE COURT:  Bring the jury in, Marshal.

25                 (The jury is present in the courtroom.)

1          THE COURT:  Ladies and gentlemen, next you will hear

2     the government's evidence.

3          Mr. Gill.

4          MR. GILL:  Your Honor, we call David Evans.

5          THE COURT:  David Evans.

6          Mr. Evans, if you would raise your right hand, place

7     your left hand on the Bible, and face the Clerk of the

8     Court.

9          THE CLERK:  You do solemnly swear that the testimony

10    which you are about to give, in this case, before this

11    Court, shall be the truth, the whole truth, and nothing

12    but the truth, so help you God?

13         MR. EVANS:  I do.

14         THE COURT:  Have a seat on the witness stand,

15    Mr. Evans.

16         All right, Mr. Gill, you may inquire.

17         MR. GILL:  Thank you, Your Honor.

18              Whereupon, **David Evans**, having been

19    duly sworn in, testifies as follows:

20                        **DIRECT EXAMINATION**

21    BY MR. GILL:

22    Q    Good afternoon.  Would you please introduce yourself

23    to the jury.

24    A    David Evans.

25    Q    Where do you live, Mr. Evans?

DIRECT EXAMINATION OF DAVID EVANS   123

1  A    Portsmouth, Virginia.

2  Q    Will you tell the jury a little bit about how long

3  you lived in Portsmouth, Virgina and what you do for a

4  living?

5  A    I've lived in Portsmouth since 1975.  I came there

6  originally when I was in the Navy.  Currently I work for

7  the Norfolk Naval Shipyard.  I'm the Dock Master for the

8  shipyard.  I oversee and direct all the docking evolutions

9  that occur within the shipyard, all the movements on the

10 piers and the berths, and also the destructive weather

11 manager for the shipyard.

12 Q    And you mentioned you're with the Navy.  How long

13 were you with the Navy?

14 A    Four years, nine months.

15 Q    And what rank were you when you left the Navy?

16 A    E-5.

17 Q    Now, at some point have you worked also at Gitmo?

18 A    Yes.  While I was at the shipyard, I took a job in

19 Guantanamo Bay from 2005 to 2008.  We transferred down

20 there.  Still worked for the Department of Defense.  Just

21 took a job down there for a few years.

22 Q    Mr. Evans, I want to ask you, do you know Michael

23 Harris?

24 A    I do.

25 Q    Do you see him here today?

1  A     Yes.   Right there.

2       MR. GILL:  And, Your Honor, may the record reflect he

3  identified the defendant?

4       THE COURT:  It will so reflect.

5  Q     How long have you known Michael Harris?

6  A     I guess since like 2002, 2003.  I know it was a few

7  years before we went to Guantanamo.

8  Q     How is it you first met him?

9  A     Through scuba diving.  He met a friend of mine one

10 time at a boat ramp.  I believe he had left a spear gun

11 out on one of the wrecks, so my friend gave him a ride

12 back out there to retrieve it.  And then through my friend

13 I eventually met him because, you know, there was a group

14 of us that go scuba diving together quite a bit.  We have

15 our own boats and stuff so, you know, I met him through

16 scuba.

17 Q     And what was the name of your friend that you met him

18 through?

19 A     Bill LaDow.

20 Q     Now, how did your relationship develop with the

21 defendant after you first met him?

22 A     It was just like I said.  It was just casual.  You

23 know, just strictly occasionally see each other going

24 scuba diving either on the same boat or on a different

25 boat.

DIRECT EXAMINATION OF DAVID EVANS        125

1  Q    Did you consider him a friend?

2  A    Sure.

3  Q    Did you know what he did for a living back when you

4  first started to get to know him?

5  A    No.  When I first met him I didn't really know what

6  he did.

7  Q    At some point later did you learn what he did?

8  A    I never really knew what he did for a living.  I

9  mean, a few years later, again, Mr. LaDow told me about

10 the business venture that he was involved in with the

11 research that he had done at Duke University, you know,

12 coming up with a treatment and a means for putting AIDS

13 into remission.

14 Q    Now, eventually did you actually seek out an

15 investment with the defendant?

16 A    I did.  That was after I came back from Guantanamo.

17 So it was in 2008.  I believe we were at Hatteras, and we

18 were supposed to go scuba diving on my boat and the

19 weather wasn't conducive for going so we ended up

20 canceling the dive.  But while we were down there that

21 weekend, yeah, I asked him if he still had, you know,

22 share options available in the business that he had.

23 Q    About what time?  You said 2008.  When was this

24 about?

25 A    Had to be -- had to be like in July.  You know, I

1  think I actually made the investment in August.  So it had

2  to be in July because we didn't come back until June of

3  '08.

4  Q    What did he tell you when you asked him if he was

5  still selling?

6  A    He said, yeah.  That he had set aside I forget how

7  many millions of shares that were available for friends

8  and family, and that there were still some available.

9  Q    What did you do next to pursue a potential

10 investment?

11 A    Well, we set up an appointment with him.  He came to

12 our house in Portsmouth for, you know, me and my wife.

13 And he gave me -- I believe he had a PowerPoint

14 presentation on his computer.  He had some documents in a

15 binder, you know, that he went through and kind of

16 explained, you know, how he had developed this treatment

17 using a hyperbaric chamber to treat AIDS and put it into

18 remission.  And, you know, I was a scuba diving

19 instructor, so I was a bit familiar with, you know,

20 partial gasses, and that sort of stuff, when you're under

21 pressure from scuba diving.  So, I mean, it sounded like,

22 you know, sort of a viable option.  They've been treating,

23 you know, gangrene and that sort of thing with hyperbaric

24 treatment for years.

25 Q    So tell us about the length of the presentation.  How

1  long was the presentation that he did for you and your

2  wife?

3  A    Well, you know, I'm not sure.  Probably -- I'm sure

4  it was at least an hour, you know.  But, you know, we went

5  through the presentation.  He went over some documents

6  with us and, you know, some different things like that.

7  Q    Now describe for the jury going through the documents

8  and this presentation, you know, what was he talking about

9  as far as the nature of what the company was doing and the

10 potential for investment?

11 A    Well, the first part of it was actually how the

12 treatment, you know, basically how it worked by putting

13 the disease into remission.  And then about, you know,

14 applying for patents, you know, overseas in Europe as well

15 as the United States to get the treatment -- you know, get

16 a patent approved for the treatment before he actually

17 went public and potentially tried to start marketing it.

18 Q    What did he tell you and your wife your money would

19 be used for if you invested?

20 A    Well, we had to complete the patent process.  I

21 believe at that time -- I'm not sure if the European

22 patent had already been approved.  He was applying for one

23 over there.  He also had applied for one in the United

24 States.  As soon as the patents were finished, you know,

25 then the clinical trials had to be done, you know, to

1  prove the treatment worked before you could actually

2  market the product.

3  Q    What was he going to do with your dollars if you put

4  them in, according to what the defendant said?

5  A    Complete that research, finish getting the patents

6  approved, and get the clinical trials done.

7  Q    How clear was he about that?

8  A    To me it was crystal clear.

9  Q    How imminent or close was he to, you know, getting

10 the clinical trials according to what he was saying?

11 A    Well, I mean, at the time it seemed like he was

12 pretty close.  It didn't seem like it was going to be a

13 real lengthy process.  I mean, I know that when you apply

14 for a patent that it can take some time.  But, you know,

15 we felt like between the European patent and the one in

16 the United States that it wouldn't be too long before

17 there would be trials beginning.

18 Q    As he's doing this presentation for you and your

19 wife, at any time did he go through and talk to you about

20 salary or using any part of your investment for salary or

21 personal expenses?

22 A    You know, I don't recall anything about any kind of

23 salary.  You know, I think we had some discussions about

24 expenses because I knew there were fees and stuff

25 associated with doing the patents.  That he was probably

1  going to have to go back overseas again to finish stuff

2  over there.  So certainly fees associated with getting

3  that done.  But nothing other than that.

4  Q    Now, what did you and your wife decide to do after

5  the presentation?

6  A    Well, we decided to go ahead and buy some of the

7  stock.  The minimum you could get was $5,000, so we

8  decided to go ahead and invest that amount.

9  Q    Who did you rely upon in making that decision that

10  you felt comfortable that you would invest your money in

11  this?

12  A    Well, I mean, my wife and I discussed it somewhat,

13  and we relied on the information Mr. Harris gave us.

14  Q    Now after the meeting, did Michael Harris, the

15  defendant, send you information?

16  A    Yeah.  He sent me some stuff on e-mail, you know.  I

17  mean, one of them of course was where to wire transfer the

18  money to, and then there were some other documents that

19  were also e-mailed to us.

20  Q    Take a look at the documents in front of you, sir.

21  And please look at Exhibit 35.  Thumb through it and tell

22  us if you recognize that document?

23       THE COURT:  Did you say 35, Mr. Gill?

24       MR. GILL:  Yes, Your Honor.

25  A    Yes.  I recognize this.

1   Q    What is this, sir?

2   A    It's just kind of an overview of the people involved,

3   the company, you know, a summary of what the company was

4   about, the initial research.  You know, kind of a, you

5   know, a bio type thing on some of the key people that were

6   involved in the research of the company.

7   Q    And did all of this come to you via e-mail?

8   A    Yes.

9        MR. GILL:  Your Honor, we move for --

10       THE COURT:  Any objection to 35?

11       MR. WAGNER:  No.

12       THE COURT:  Be received without objection.

13           (Government's Exhibit 35 is received.)

14   Q    If we could, we're going to take a look at Page 1.

15   And it will be on the screen there in front of you,

16   Mr. Evans.

17       MR. GILL:  If we could, let's focus on the little

18   part there, Ms. Taylor.  I'm sorry.  The e-mail address up

19   top first.  There we go.

20   Q    Now, Mr. Evans, looking at this, tell us do you

21   recognize your e-mail address on that?

22   A    Yes.

23   Q    What is your e-mail address?

24   A    Xxxxxxxxxxxx@gmail.com.

25   Q    Were you in Portsmouth, Virginia when you received

1  this e-mail from the defendant?

2  A     Yes.

3  Q     Do you recognize the defendant's e-mail address?

4  A     I do.

5  Q     Is that xxxxxxxxxxx@MSN.com?

6  A     Yes.

7  Q     The jury can read this e-mail.  Generally tell us

8  what it is that he is conveying to you with this e-mail.

9  A     Well, like I say, there were some documents attached

10  to it and, you know, just basically as you can see there,

11  welcoming us to the project.  Giving us the bank

12  information that we needed to transfer the funds to.  And

13  then of course, you know, you see the last sentence there

14  about possibly doing some more diving together.

15     MR. GILL:  If we could scroll down a little bit.

16  Q     And it's signed Michael F. Harris, CEO?

17  A     That's correct.

18  Q     Now, did you ever visit Mr. Harris in Luray,

19  Virginia?

20  A     I did.  We went up to -- we went with some friends of

21  ours.  As soon as we got back from Gitmo it was over the

22  July 4th weekend of 2008, they had just bought an RV, and

23  we went to, I believe it's called, Endless Caverns.  I

24  knew Mike lived up in that area, or very close to there,

25  so we gave him a call over there and we actually drove

1  over to his house and had a little cookout and had dinner

2  with him one night.

3  Q    Do you remember anything about the house?

4  A    Old farm house up, you know, on a hill.  It was --

5  you know, he was doing quite a bit of renovation to the

6  house.  Nothing -- nothing specific.

7  Q    Do you recall any horses on the property?

8  A    No, not right there on the property.  No.

9       MR. GILL:  If we can go back up just a little bit.

10 Q    And finally with respect to where you were going to

11 send your money.  What account did the defendant instruct

12 you to send it to?

13 A    I mean, it wasn't -- just this one that's listed on

14 the e-mail.  Just gave us a routing number and the

15 account, MF Research.  That was all we were given.

16 Q    Did you understand your money was going into the

17 company?

18 A    Yes.

19 Q    Now, did you review the materials that he had sent to

20 you?

21      MR. GILL:  If we could scroll up now to the top.

22 Q    Were there attachments that he sent with this e-mail?

23 A    Yeah, I'm sure I looked over those.  I sent them to

24 myself there, as you can see at my work e-mail, because

25 again we had just come back from overseas and we didn't

1  even have a printer in our house yet.  We hadn't gotten

2  our household goods yet.  And I believe a couple of these

3  documents we had to sign and either fax back or send back

4  to him, like the non-disclosure agreement.  So that was

5  part of the issue with him e-mailing us the documents.

6  Q    And explain to the jury, and we'll see it in a

7  moment, what did you understand from the defendant to be

8  the importance of the non-disclosure agreement?

9  A    Well, basically it was just so that anyone that was

10  investing in the company wouldn't take any of the

11  information about the treatment and, you know, go to

12  another company or share that -- or share that information

13  with people outside of the company.

14      MR. GILL:  Now if we could look at Page 2 of Exhibit

15  35.

16  Q    And generally what is this, sir?

17  A    Well, I think this was just kind of an overview

18  stating about, you know, the present treatment for AIDS

19  was, you know, was the different types of medication was

20  the only treatment that there was, and that this new form

21  of treatment was not using drugs but using a hyperbaric

22  treatment to put the disease in remission.  And he had

23  kind of discovered this while he was down in the Caribbean

24  doing some diving down there.  And, you know, he found

25  that these people that had the disease that were doing

1   these deep dives on a repetitive basis were putting their

2   disease in remission.  I think that's what started him

3   down the path of doing the research for the treatment.

4        MR. GILL:  And let's look at the last paragraph on

5   Page 2, please.  If we could zoom in a little more on

6   that.

7   Q    Tell us what you recall about this, and whether it

8   fit with what the defendant was telling you during his

9   presentation to you and your wife.

10  A    Yes, it did.  And again, it was, as I stated earlier,

11  being a scuba diving instructor.  And also I was a

12  corpsman in the Navy when I was in the Navy so, I mean, I

13  understood, you know, when you go diving that your blood

14  overloads itself with nitrogen, you know, and this

15  treatment was kind of based around that.  That the

16  increased partial pressures and the nitrogen in your

17  bloodstream was having an effect on the diseased cells and

18  putting them into remission.

19  Q    How about the last part there with respect to where

20  the company was planning to go next?

21  A    Well, yeah, you know, he had done the initial

22  research at Duke University and then, you know, he had

23  left there.  And so he talked about animal trials that had

24  been completed and, you know, he was ready to proceed with

25  going into Phase II which would be the actual clinical

1  trials, but that we needed to get the patents approved and

2  completed first.

3  Q    Were these the areas where your money was going to be

4  spent based on what the defendant told you?

5  A    Yes.

6       MR. GILL:  Let's look at Page 5.  And focus in on the

7  upper portion.

8  Q    This is a summary of the defendant's background.  And

9  tell the jury what you understood from the defendant about

10 his background.

11 A    Well, I knew he'd been involved with the medical

12 fields, you know, again, working at Duke University.  You

13 know, this just lays out some of the previous jobs that he

14 had had, you know.  And, you know, again, that he had done

15 these preliminary studies on the animals using the

16 hyperbaric chamber to treat them.

17 Q    In there it also says in the middle.  It says, *"In

18 1994, he set up his own company, M.F. Harris Research,

19 Inc."* Is that what you understood from the defendant?

20 A    Yes.  Yeah, he has set up a company to complete the

21 research for the ideas and to, you know, be able to apply

22 for patents to get the treatment actually patented so

23 that, you know -- that before he went public with it that

24 nobody else could take the idea.

25      MR. GILL:  If we could just scroll back, please.

1   Q    Is there also information in this packet he sent you

2   about other doctors involved with this, according to the

3   defendant?

4   A    Yeah, I remember him going over some stuff like that.

5   That there were some other doctors that were involved in

6   the research and development of the treatment.

7   Q    Overall, how did his presentation and what he was

8   saying to you, how did it make you feel about your

9   investment?

10  A    We felt like it was a sound investment, you know,

11  especially back then, you know, several years ago.  You

12  know, you don't hear as much about AIDS and stuff right

13  now, but, I mean, back then if this was a treatment that

14  was going to be something besides these drug cocktails

15  that you heard about everybody taking for years and years

16  and never could cure the disease, and if this was going to

17  be able to put it in remission, it sounded to us like it

18  would be something definitely worthwhile to invest in.

19       MR. GILL:  If we could look at Page 8.

20  Q    Now this synopsis, let's focus in on the first

21  paragraph, please.  And tell the jury if that fits with

22  the information that the defendant had told you about this

23  process.

24  A    Yes.  Yeah, like I say, when he was -- he'd been down

25  in the Caribbean and then, you know, just like it states

1  here he had heard about these people that were -- that

2  were HIV positive and that, you know, with their diving

3  that they did down there, you know, that when they would

4  go in and have the treatments if they got bent from doing

5  these repetitive deep dives, that it seemed to be putting

6  the disease in remission.

7      MR. GILL:  If we could please zoom back out and focus

8  in on the third paragraph.

9  Q    And tell the jury whether this fits with anything

10  that he told you about how he initially financed this

11  according to the defendant.

12  A    Yeah.  I remember him talking, you know, about the

13  horses and stuff that he had at that time, but not a lot

14  of specifics about it.

15      MR. GILL:  And then let's look at the last paragraph

16  of the synopsis, and also the signature at the bottom.

17  Q    Signed *"Michael Harris."*  That last paragraph, is

18  that what you understood him to be raising funds for when

19  he was soliciting you and your wife in Portsmouth,

20  Virginia?

21  A    Yes.  Yeah.  Yeah.  Yeah, they had done the safety

22  trials which, of course, you have to have that completed

23  before you can even go to the clinical trials.  And then,

24  yeah, again, going forward with the patents to get the

25  patents approved, you know, and then going to complete

1    clinical trials so that you can actually have a marketable

2    product.

3        MR. GILL:  And if we can look at Page 9.

4    Q    Is this also an item that he sent to you?

5    A    Yes.

6    Q    Now during his presentation, did he go through these

7    documents with you and your wife?

8    A    I believe that he did go through most of them.  I

9    mean, I can't -- I can't say for sure if we looked at

10   every one of these page-for-page.  But, yes, he had a lot

11   of these documents either on his computer or in his binder

12   that he was using for the presentation.

13       MR. GILL:  Let's look at Page 11, which is in this

14   packet.  If we could please focus on *"Funding Details."*

15   Q    And tell the jury whether the *"Funding Details"*

16   description there fits with what the defendant told you is

17   going to be done with your money.

18   A    Yeah.  I mean, like I said, he spoke about this that,

19   you know, the fees that were there to perform the

20   treatments as well as getting the patents approved and

21   that, you know, that's what the money was going to be used

22   for if people invested in the company.

23   Q    Based on what he was telling you, was it your

24   understanding it was at the second study according to what

25   he was telling you and your wife?

1   A     Yes.

2        MR. GILL:  If we could just scroll down a little bit.

3   Q     So, *"Second Study, (Efficiency) Hyperbaric*

4   *Treatments, Duration,"* did he talk to you about that

5   generally?

6   A     Where are we at?

7   Q     On Page 11.  If you will look on the screen,

8   actually.  I'm sorry.

9   A     Yeah, I believe that's the way it was briefed to us.

10  That the Phase I trials had already been completed, that

11  the patents had already been approved for, and now we were

12  proceeding with the second portion of the study.

13       MR. GILL:  Now, if we can look at Page 12.  The very

14  next page.  And let's focus in right here, please.

15  Q     Now this says, *"Start Up Marketing Costs after Second*

16  *Study Hyperbaric Treatment."*  So *"after"* is what he was

17  talking to you about?

18  A     Uh-huh.  That's correct.

19       MR. WAGNER:  Objection to leading the witness, Your

20  Honor.

21       THE COURT:  I think he's drawing his attention to it,

22  but to the extent that your questions are suggestive of

23  the answer, please do not form them that way.

24       MR. GILL:  Absolutely, Your Honor.

25       THE COURT:  Objection sustained.  Go ahead.

1  Q    Mr. Evans, tell the jury what part of the process you

2  understood this to be in relation to the Phase II trials

3  that the defendant was talking to you about?

4  A    You know, I don't remember specifically going over

5  this part of this document.  But, I mean, again, when I

6  read this over, I thought this was the cost of the -- once

7  the company was up and running and you were actually

8  started into the second phase of the treatment process

9  that this would be the cost that would be incurred.

10 Q    After the testing was done that you and your wife

11 were investing in?

12 A    That's correct.

13      MR. WAGNER:  Objection to leading, Your Honor.

14      THE COURT:  Objection's overruled.  Go right ahead.

15 Q    Your answer to that, sir?

16 A    Yes.  That's correct.

17 Q    Okay.  And just to be clear, tell the jury, at any

18 time during this presentation did Michael Harris say he

19 was going to be taking some kind of salary or this portion

20 of this money for himself?

21 A    No.

22 Q    If he had told you that he was going to take the

23 money for a salary, would that have had an affect on your

24 investment?

25 A    Yes, it would.

DIRECT EXAMINATION OF DAVID EVANS          141

1   Q    Tell the jury what affect, if any, it would have had.

2   A    If I thought he was going to use my money for salary,

3   I wouldn't have given him any of my money.

4        MR. GILL:  Let's look at Page 14 of Exhibit 35.  Now,

5   if we can just focus on the upper portion.

6   Q    This is a newsletter.  Tell the jury what you recall,

7   if anything, about Deep Blue and Jeffrey Seto.

8   A    The only thing I really recall about him speaking

9   about this was that this was why he was trying to get the

10  patents approved as soon as possible because he was afraid

11  these people were going to take his research ideas and try

12  to market it themselves.

13  Q    At any time when he was talking to you and your wife,

14  did he present to you that somehow the company would not

15  move forward because of Deep Blue and Jeff Seto?

16  A    No.

17  Q    Take a look at Page 15, the very next page of this

18  newsletter.  Tell the jury, did it have any information

19  about the company moving forward and what they were going

20  to do about Jeffrey Seto and Deep Blue?

21  A    Again, I don't recall any specifics about that

22  company other than the fact that this was why he was

23  trying to get the patents approved as soon as he could.

24       MR. GILL:  And let's look at Page 17, which is the

25  last page of this newsletter.

1   Q     Does this have various action items?

2         MR. GILL:  I'm sorry.  The last page.  I apologize.

3   Page 16.  I apologize.

4   Q     Looking at Page 16, which would be *"Page 3 of 4,"*

5   were there various future plans included in that

6   newsletter?

7   A     Yes.

8   Q     Including?

9   A     Again, they're listed there.  The patent application

10  approval.  That was the first one.  And then I think he

11  was trying to apply for a grant.

12        MR. GILL:  Go over to the other side.

13  A     Yeah, the clinical trials.  That was the big thing.

14  That he was -- talked to us about the patent approval and

15  then the clinical trials.

16  Q     In fact, here in bold it says, *"Phase II clinical*

17  *trials:  We need to raise $1.5 million to complete the*

18  *trials we have the facilities and the patients and signed*

19  *contractual agreements."*

20  A     Right.

21  Q     Tell the jury how imminent did you think all this

22  was?

23  A     Well, I mean, we thought it was pretty imminent.

24  Like I said, I knew there was a process to go through to

25  get a patent.  Anytime you're, you know, going through the

1  U.S. Patent Office that there's some time delay with that,

2  but we felt like as soon as that was done that the Phase

3  II trials would begin.

4  Q    Now then, if you would take a look at Exhibits 36 and

5  37 there in front of you, sir.  Tell us what those are.

6  A    Thirty-six is the non-disclosure agreement.  And 37

7  is the subscription agreement.

8  Q    Did you execute those in relation to your investment

9  with M.F. Harris Research, Inc.?

10  A    Yes, I did.

11       MR. GILL:  Your Honor, we move for admission of

12  Exhibits 36 and 37.

13       THE COURT:  Any objection, Mr. Wagner?

14       MR. WAGNER:  No, Your Honor.

15       THE COURT:  Thirty-six and 37 will be received.  You

16  may publish them to the jury if you wish.

17       MR. GILL:  Thank you.

18            (Government's Exhibits 36 & 37 are received.)

19  Q    First off, let's look at the bottom.  Who signed this

20  and when?

21  A    That's my signature and my wife's signature.  August

22  the 6th of 2008.  The other one, 37, is both of our

23  signatures with no date.

24  Q    If we could just back up on Exhibit 36, the

25  non-disclosure agreement.  Just generally tell the jury

1  what you understood to be the effect and necessity of this

2  document.

3  A    It was -- the way it was explained was just that, you

4  know, after seeing the presentation and how the treatment

5  worked and how it was going to be used, that you were not

6  to disclose that to anyone who's outside of the project.

7  Q    Let's zoom in just on the middle.  Is that just

8  basically the circumvention language there in the middle?

9  It says you and your wife are not to talk to anybody about

10  this?

11  A    That's right.  Yes.

12      MR. GILL:  Let's see Exhibit 37, which is the

13  subscription agreement.  Focus in on the upper paragraph,

14  please.

15  Q    Tell us what the date of this agreement was, and who

16  your agreement was between.

17  A    The 6th of August, 2008.  And it was between me and

18  my wife and M.F. Harris Research, Incorporated.

19  Q    Based on what the defendant was telling you, who were

20  you investing in with this agreement?

21  A    M.F. Harris Research, Incorporated.

22  Q    How many shares were you buying, and what was the

23  price of the shares?

24  A    It was 5,000 shares at a dollar a share.

25      MR. GILL:  Scroll down a little bit.

1  Q    Now then, Paragraph 3 (a) talks about that you

2  *"Acknowledges that the undersigned or the undersigned's*

3  *representative has had access to the same kind of*

4  *information concerning the Corporation that is required by*

5  *Schedule A of the Securities Act of 1993, to the extent*

6  *that the Corporation possesses such information."*

7       Tell the jury, were you able to see any financials in

8  relation to your investment?

9  A    No.

10 Q    To this day have you seen any financials for M.F.

11 Harris Research, Inc.?

12 A    No.

13 Q    Now then, Paragraph (b).  Let the jury read that for

14 a moment.  3(b).

15      Sir, does that basically talk about representing if

16 you have the knowledge and experience to evaluate the

17 risks of this investment?

18 A    Yes.  That's correct.

19 Q    Who were you relying upon in making your decision on

20 whether or not you were going to invest, and what your

21 money was going to be used for?

22 A    We were basing it off of Mr. Harris' presentation.

23      MR. GILL:  And then finally 3(d).

24      We'll let the jury read that for a moment.

25 Q    Now with respect to this investment, did you

1  understand that you can go out and just sell these shares

2  if you wanted to?

3  A    You know, I believed that the -- until the patent was

4  received and that the company actually went public, I

5  don't believe you're supposed to be selling your shares.

6  Q    Did you believe based on everything that you've read

7  and what you understood that the stock shares belonged to

8  you and your wife, as well as your estate, if something

9  happens to you?

10  A    Yes.  Yes.

11  Q    Now then, how much money did you and your wife decide

12  to put into this?

13  A    Five thousand dollars.

14  Q    Take a look at Exhibit 38.  And do you recognize the

15  first page referencing the account that you used for your

16  investment?

17  A    Yes.

18  Q    Is that your account at Navy Federal Credit Union?

19  A    Yes, it is.  That's correct.

20      MR. GILL:  Your Honor, we move for admission of 38,

21  which is business and bank records.

22      THE COURT:  Any objection, Mr. Wagner?

23      MR. WAGNER:  No, Your Honor.

24      THE COURT:  Be received without objection.  You may

25  publish it to the jury.

1          (Government's Exhibit 38 is received.)

2      MR. GILL:  See Page 1.  If you can zoom in on the

3  upper portion here, please.

4  Q    And tell us when was it that you actually sent the

5  money to the defendant for this investment?

6  A    August 15, 2008.

7  Q    And does that reference M.F. Harris Research, the

8  company that your money is going to?

9  A    Yes, sir.

10  Q    And Navy Federal Credit Union, Washington, is that

11  your bank account?

12  A    Yes, it is.

13  Q    According to the defendant, what he told you and your

14  wife, what was this money going to be used for?

15  A    To complete the process of –

16      MR. WAGNER:  Ask and answered.

17  A    – securing the patents, and to complete the clinical

18  trials to eventually get to a marketable product.

19      MR. GILL:  I won't ask again.  I apologize, Your

20  Honor.

21  Q    Now, after the investment, how often, tell the jury,

22  would you receive updates on the status of the company or

23  your investment?

24  A    I never really received any kind of updates.

25  Occasionally I would get a call from Mr. Harris.  And I

1  told him on different occasions that I wasn't receiving

2  any kind of e-mails or anything.  He was -- he would call

3  occasionally and ask if we had received anything from this

4  Deep Blue company.  I guess someone had given the e-mail

5  addresses of some of the investors to that company.  But

6  again, I never got anything from him or them.

7  Q    If you will take a look at Exhibit 39.  Do you

8  recognize that?

9  A    Yes, I do.

10 Q    What is that?

11 A    That's the certificate that we received after

12 transferring the money.

13       THE COURT:  Any objection to 39, Mr. Wagner?

14       MR. WAGNER:  No.

15       THE COURT:  Be received.  You may publish it if you

16 wish.

17            (Government's Exhibit 39 is received.)

18 Q    Is this the stock certificate you received in M.F.

19 Harris Research, Inc. following your investment?

20 A    Yes.  That's correct.

21 Q    How quickly after your investment did you receive

22 this, if you recall?

23 A    I mean, I think it was fairly quickly.  I don't

24 remember a real time frame.  But, you know, once we

25 transferred the money up to the account and got

1  confirmation that that was done, he mailed us the

2  certificate.

3      MR. GILL:  Turning away from that.  Thank you.

4  Q   You mentioned that you got an inquiry from the

5  defendant about whether you had been contacted by Deep

6  Blue or any e-mails, and you had not been contacted by

7  them?

8  A   That's correct.  I had not.

9  Q   At anytime have you been in contact with them?

10 A   No.

11 Q   Did you attend any shareholder meetings?

12 A   I did.  I attended one in 2010.

13 Q   Take a look at Exhibit 40.  Tell us what that is.

14 A   This was, I believe, the notice to the shareholders

15 about the meeting.

16 Q   Do you recall how you received that?

17 A   You know, I believe I got this from Mr. LaDow

18 because, again, I was somehow not on the distribution of

19 e-mails for the company.

20     MR. GILL:  Your Honor, we move for admission of 40.

21     THE COURT:  Any objection, Mr. Wagner?

22     MR. WAGNER:  No, Your Honor.

23     THE COURT:  Received.

24         (Government's Exhibit 40 is received.)

25 Q   And tell us what the date of the shareholder meeting

1  was and where it was held.

2  A    It was November 1, 2010 at the Ritz Carlton in

3  McLean, Virginia.

4  Q    Actually, I'll refer you to the middle of that.  Was

5  it on November 1st, or is there a different date as far as

6  when it's going to be held?

7  A    Oh, I see the notice was the 1st.  Yes, it was

8  Saturday, November 20th, at the Ritz Carlton.

9  Q    Who did you go up there with?

10  A    I went up there with Mr. LaDow.

11  Q    Tell us, how many people were there at the meeting,

12  as you recall?

13  A    I guess 15 to 20.  Maybe 25 at the very most.

14  Q    Tell the jury what you recall with respect to that

15  meeting.

16  A    Well it was just, you know, kind of an update of

17  where the company was supposed to be at, so we wanted to

18  go up there and see what was going on.  You know, I hadn't

19  really heard anything about how the company was

20  proceeding.

21      As the meeting proceeded, there were a lot of people

22  I think that were kind of under the same impression that

23  we were.  It seemed like the company was kind of

24  stagnated.  It wasn't really moving forward.  Anytime

25  Mr. Harris would talk to you even during the meeting, he

1   seemed to be much more concerned about Deep Blue trying to

2   steal the idea than moving the company forward.

3       He was asked during that meeting, and I believe I'm

4   the one that asked, you know, is there a financial

5   statement for the company because, again, you know, nobody

6   seemed to have ever seen anything about where the money

7   was being spent.

8   Q   How did the defendant respond to that, if you recall?

9   A   I believe he said that he was going to put something

10  together.  There was a lawyer there that --

11      MR. WAGNER:  Objection to what he believes he said,

12  Judge.

13      THE COURT:  Objection sustained as to any

14  speculation.

15      You can't speculate if you don't have firsthand

16  knowledge.  Just answer you don't, all right?

17      MR. EVANS:  Okay.

18      THE COURT:  Go right ahead.  Next question.

19  Q   Tell the jury what you recall the defendant saying,

20  if anything, about whether financials would be prepared.

21  A   Yes.  He said that they would be prepared and he

22  would send them out.

23  Q   Has that ever happened, to your knowledge?

24  A   No.

25  Q   What do you recall, if anything, about the discussion

1  about patent expenses?

2  A    There was a discussion about patent expenses, about

3  the fees that had to be paid.  Specifically, I think it

4  was the ones over in Europe that there was a continuous

5  amount of money they had to pay for those just to keep

6  that going.  That it had not been approved yet.  And then

7  that the United States one had been submitted, and we

8  still had not gotten approval for that yet either.

9       MR. GILL:  May I have one moment, Your Honor?

10      THE COURT:  Yes, sir.

11      MR. GILL:  We pass the witness, Your Honor.

12      THE COURT:  All right.

13      Mr. Wagner, cross-examination of Mr. Evans.

14      MR. WAGNER:  Let me get some papers together here,

15  Judge.  If I could have just a moment, please.

16      THE COURT:  Yes, sir.

17                    **CROSS-EXAMINATION**

18  BY MR. WAGNER:

19  Q    Good afternoon, Mr. Evans.

20  A    Hi.

21  Q    How are you today?

22  A    I'm all right.

23  Q    I just want to be clear on this.  You attended the

24  2010 shareholders' meeting, correct?

25  A    That's right.

1  Q      And your recollection is from that meeting you heard

2  Mr. Harris say that the U.S. patent had not been approved?

3  A      You know, I might have been mistaken about that.

4  There was a lady there from Canada.  I believe he was

5  pursing something to start clinical trials in Canada.  I

6  can't say for sure, you know, but I believe at that point

7  that the patent in the United States may have been

8  approved.

9  Q      And that was in 2010 that you're not recalling this

10 correctly?

11 A      That's correct.

12 Q      And the interview that you had with Mr. Harris was in

13 2008, right?

14 A      The interview?

15 Q      Well, the presentation.

16 A      Yes, that's correct.

17 Q      That he gave you was in 2008?

18 A      Correct.

19 Q      Is there anything that you testified about from that

20 2008 presentation that you had that you didn't remember

21 correctly either?

22 A      No.

23 Q      Are you sure about that?

24 A      I'm positive.

25 Q      Okay.  Let's go over some of those things that were

1   said.  And let's be clear.  You invested $5,000 of your

2   money with Mr. Harris, isn't that right?

3   A    That's correct.

4   Q    And Mr. Harris was the company, right?

5   A    That's correct.

6   Q    He didn't have anybody else who was on the payroll

7   for him or who he was employing, correct?

8   A    Well, there was a lawyer, and I thought there was a

9   secretary or someone that was helping him file some of the

10  paperwork.

11  Q    But you didn't see any records of anybody on his

12  payroll?

13  A    No.

14  Q    And you did not get any return on your investment,

15  isn't that right?

16  A    That's correct.

17  Q    So you're not happy with Mr. Harris, would that be

18  accurate?

19  A    Yeah.

20  Q    Now, it's fair to say that when Mr. Harris first

21  talked to you about this company that he was very

22  passionate about this science that he was promoting, is

23  that correct?

24  A    That's correct.

25  Q    He really believed in it, didn't he?

1   A     He did.

2   Q     And he caused you to believe in it, didn't he?

3   A     Yes.

4   Q     And is there anything about the science that you

5   don't believe, or you don't believe that Mr. Harris

6   presented to you that was accurate?

7   A     No.

8   Q     Thank you.  Now, Bill LaDow is a good friend of

9   yours, right?

10  A     That's correct.

11  Q     And you and he and Mr. Harris would go diving, is

12  that correct?

13  A     That's correct.

14  Q     And did Bill LaDow tell you anything about Michael

15  Harris' company?

16  A     Yeah, he's the one that first told me that the

17  company was in existence and it was a treatment for AIDS.

18  Q     And did he tell you that he had invested in it?

19  A     Yes.

20  Q     All right.  So some of the information that you

21  received from Mr. LaDow about the company, is it possible

22  you could have confused that with what Mr. Harris told

23  you?

24  A     No, I don't believe so.

25  Q     But that was back before 2008 when you made this

1  investment, correct?

2  A    I'm not sure if that was before I went to Guantanamo

3  Bay or right after I got back.

4  Q    Okay.  Well, let me ask you this.  What exactly did

5  Mr. Harris say to you at the presentation as to what he

6  would do with the money?  Exactly.  If you don't remember

7  exactly, please say so.

8  A    What he did not say exactly, I can tell that you.   He

9  did not say I'm going to use $50 for this or $100 for

10 that.

11 Q    Now, you have testified that he said -- the first

12 time Mr. Gill asked you, you said that he was using the

13 money to apply for patents, is that correct?

14 A    Yes.

15 Q    And using the money for clinical trials, correct?

16 A    Yes.

17 Q    And he was using the money to complete the research,

18 correct?

19 A    Yes.

20 Q    Now, you were asked a second time, and then is it

21 true that you added this, you said, *Eventually get to a*

22 *marketable product,*" is that correct?

23 A    I don't know that he said those specific words.

24 Q    All right.  But that was your testimony in response

25 to Mr. Gill's question?

1  A    Right.

2  Q    And so it was your understanding that part of what

3  your money was going to was to eventually get a marketable

4  product, is that fair to say?

5  A    That's correct.  Yes.

6  Q    Now, you were interviewed by a Bill Ward back in July

7  of 2012, is that right?

8  A    I don't recall the date but, yeah, I spoke to Bill

9  Ward several times.

10  Q    How many times have you talked to Bill Ward?

11  A    Probably three.

12  Q    And the first time you talked to him though was July

13  of 2012, correct?

14  A    What is it you're showing me there?

15  Q    I'm not showing you anything yet.  This is just a

16  report of your conversation.

17  A    I don't know that it was July the 12th.  I know I

18  spoke to Mr. Ward.  I can't remember the exact date.

19  Q    Let me show you a copy of this memorandum and see if

20  this refreshes your recollection of when you spoke to

21  Mr. Ward.

22  A    Okay.

23  Q    And in the middle of that page it's in bold.  Is it

24  true that Mr. Ward asked you the question, *"What did*

25  *Mr. Harris say your money would go to?*

CROSS-EXAMINATION OF DAVID EVANS        158

1   A    Well, I mean it says here *"clinical trials*." Just

2   like I said earlier.

3   Q    Well, that's the only thing you told Mr. Ward that he

4   said to you back then, isn't that correct?

5   A    I guess if this is a word for word verbatim

6   conversation, yes.

7        MR. GILL:  Your Honor, with that I am going to

8   object.  It is not proper impeachment.  And this is not

9   this witness's statement.

10       THE COURT:  As you well know, I believe you can show

11  it to him, refresh his recollection, and ask him what --

12       MR. WAGNER:  I have no problem with that, Judge.

13       THE COURT:  All right.  Please do.

14  Q    So are you saying then to the ladies and gentlemen of

15  this jury that you said anything additional to *"clinical*

16  *trials"* in response to Mr. Ward's question?

17  A    You know, I can't recall the word for word

18  conversation that I had with him.  But again, it was my

19  understanding right from the get-go that the items left to

20  do to complete the company's quest for having a product

21  that could be marketed was to finish getting the patents

22  approved and get the clinical trials done.

23       MR. WAGNER:  I'll take that document back, please.

24  Q    So is it fair to say that when you had this

25  conversation with Mr. Harris about your investment, you

1  didn't write anything down?

2  A    No, I didn't write anything down.

3  Q    Didn't write down what he told you he would do with

4  the money, is that correct?

5  A    No.

6  Q    And is it fair to say you didn't ask him any

7  follow-up questions as to what he would do with the money?

8  A    No, I did not.

9  Q    All right.  Didn't follow-up with any e-mails to him

10  after the presentation to ask him what he's doing with the

11  money, is that fair to say?

12  A    No, I didn't.

13  Q    Isn't it true that Mr. Harris also talked at great

14  length about pursuing funding for the research and funding

15  for the company?

16  A    Yes.  I knew that there was still funding that had to

17  be acquired to complete the research for the clinical

18  trials.

19  Q    And didn't you understand then that some of the money

20  that came into the company was going to be used to pursue

21  the big investor for the company?

22  A    Yeah, I don't know that I understood that completely,

23  but it makes sense that he would have to do some of that.

24  Q    And isn't it fair then that the CEO or president of

25  the company who does that would get paid for that?

1  A    Well, that wasn't really made clear, I mean, that he

2  was drawing a salary off the company.  We never had that

3  conversation.

4  Q    Is it fair to say that the thrust of Mr. Harris'

5  presentation to you, that he intended to move the company

6  forward?

7  A    Absolutely.  Yes.

8  Q    Okay.  And following that conversation, when was the

9  next time that you tried to recall what Michael Harris

10 said during that conversation?

11 A    I mean, as far as specifics go, the next time I

12 probably tried to recall all that was said was when I

13 spoke with Mr. Ward.

14 Q    So that would have been four years after the fact?

15 A    That's correct.

16 Q    Are you an experienced investor?

17 A    No, I am not.

18 Q    Now, you knew that this was essentially sort of a

19 start-up company that you were investing in, correct?

20 A    I did.

21 Q    You knew it was sort of a one-man show, right?

22 A    Yes.

23 Q    Let me back up a second.  Let's talk about the e-mail

24 that you received from Mr. Harris on, I believe it was,

25 August the 4th of 2008.  That was two days before he came

1   to your house to talk about the investment, is that

2   correct?

3   A    I thought it was after.  I don't really recall.

4   Q    So you thought you received the e-mail after you

5   spoke to him at your house?

6   A    Yes.

7   Q    Okay.  Then in response to Mr. Gill's questions, you

8   said that you discussed the things that accompanied the

9   e-mail when you met with Mr. Harris?

10  A    He had some of those documents in his presentation.

11  But the way I recall it, he did not have copies of all

12  those to give to us so he e-mailed them to us.

13  Q    Does this look familiar to you?

14  A    It does.

15       MR. WAGNER:  I'm holding up a white folder.

16  Q    And does this look like the white folder he brought

17  with him?

18  A    It's a white binder.  I don't know.

19  Q    Let me hand it to you and see if you can identify

20  this as the folder that he brought with him and made his

21  presentation to you.

22       THE COURT:  Do you want that marked as an exhibit?

23       MR. WAGNER:  Sure.  Sure.

24       THE COURT:  Going to have to, otherwise we won't know

25  what you're referring to.

1       MR. WAGNER:  It's 53, Judge.  I'm sorry.

2       THE COURT:  All right.

3       I'm sure you've seen this, have you not, Mr. Gill?

4       MR. GILL:  I'm sorry?

5       THE COURT:  You've seen this white binder?

6       MR. GILL:  I have.

7  A    Yeah, I would have to say that some of this looks

8  familiar to me.  I certainly don't recall page-for-page

9  this entire binder.

10 Q    And just to be clear, do you recall saying to

11 Investigator Ward that he came to your house on August the

12 6th of 2008, Mr. Harris?

13 A    I don't recall giving him a date.  No.  I think

14 August the 6th was the date that we signed some of the

15 papers.  So obviously that was the date he was there.

16 Q    So that kind of refreshes your recollection?

17 A    Yes.

18 Q    So that date would have come after when you received

19 the e-mail, correct?

20 A    What was the e-mail date?

21 Q    August 4th.

22 A    Yeah, you're right.  August the 4th is when we got

23 the e-mail.  August the 6th is when he came to the house.

24 Q    Very good.  And do you recall seeing the newsletters

25 that were referred to, the newsletters from August of 2007

1  and September of 2007?

2  A    Yeah.  Yes, I do.

3  Q    And these newsletters needed to be prepared by

4  someone, correct?

5  A    Sure.

6  Q    Isn't it fair to say that whoever prepared these

7  should be paid for their time?

8  A    I suppose.

9  Q    And the 2006 documents that you referred to -- and I

10  think I have it tabbed in that folder there.  There's a

11  yellow marker.  Now, that's a proposal for congressional

12  funding for Michael Harris' research, is that right?

13  A    It's some kind of proposal.  I don't see where it

14  says it's for Michael Harris.

15  Q    So you don't know that that's from Michael Harris'

16  company?

17  A    You know, I recall seeing the document.  I don't know

18  that we discussed where it came from.

19  Q    Well, didn't he tell you that he prepared that for

20  funding for his company?

21  A    You know, I don't recall him specifically stating

22  that.  But looking at the document, I would say that I

23  would assume that, yes, he had done it.

24  Q    Okay.  And in that document, it clearly refers to a

25  salary for the CEO and president of that company, isn't

1   that right?

2   A      It does.  Yes.

3   Q      And it refers to a salary of $100,000 a year, right?

4          THE COURT:  What document are you referring to,

5   Mr. Wagner?

6          MR. WAGNER:  It's the document that the government

7   referred to in asking Mr. Evans about funding for the

8   company for the Phase II trials.

9          THE COURT:  Does it contain a number?

10         MR. GILL:  For the record, it's contained in

11  Government's Exhibit 35 beginning at Page 9 through, I

12  believe, 13.

13         THE COURT:  Okay.  Very good.  I want to establish

14  what exhibit he's reading from.

15         MR. WAGNER:  I'm sorry.

16         THE COURT:  All right.  Go ahead.  Next question.

17  Q      So is it fair to say that you were presented with a

18  document that reflected that Mr. Harris would receive a

19  salary?

20  A      Yes.  I have seen this document.

21  Q      All right.  And did you ask Mr. Harris any questions

22  when you saw that document about him receiving a salary?

23  A      I did not.

24  Q      And that has in it references to office expenses, is

25  that right?  We're talking about Exhibit 39, and I think

1  Page 11 is the correct page.

2  A    Yes.

3  Q    Did you ask him any questions about office expenses?

4  A    I did not.

5  Q    Now, you went to his house, didn't you?

6  A    Yes.

7  Q    And his house was in Luray, Virginia, right?

8  A    That's correct.

9  Q    And the house was in pretty poor shape, at least at

10 that time in 2008 when you went, is that right?

11 A    It was having some renovations done.

12 Q    Kind of falling apart, right?

13 A    It was an older home.  Yes.

14 Q    And this was his base of operations, that home in

15 Luray, Virginia, right?

16 A    At that point I wasn't really involved in the company

17 so, I mean, I don't know if it was or not.

18 Q    Did he tell you whether or not the home was his

19 office?

20 A    No, because at that point I had not had a discussion

21 with him even about investing in the company.

22 Q    Did you go into the house?

23 A    I did.

24 Q    Do you remember going through the kitchen?

25 A    I don't recall going through the kitchen.  I mean, I

1   went into the house.  Had cooked some meat or something

2   out on the grill, and we sat down at a large table in the

3   dining room and had dinner.

4   Q    Okay.  And do you remember a living room adjoining

5   the kitchen?

6   A    I don't remember the specific layout of the house.

7   Q    So you didn't remember an office being in the house?

8   A    No.

9   Q    And in that document, that Exhibit 39 on Page 11 that

10  you're looking at, that 2006 congressional budget

11  proposal, it also references travel expenses, correct?

12  A    I don't see a specific line item for travel.

13  Q    Now, you said in response to Mr. Gill's question that

14  you wouldn't have given him money if you knew it had gone

15  to salary, is that correct?

16  A    That's correct.

17  Q    Yet you didn't ask him any questions about salary?

18  A    That's correct.

19  Q    Now, would you consider Bill LaDow to be a close

20  friend of yours?

21  A    Yes, I would.

22  Q    And isn't it true that Mr. Harris was involved in a

23  personal relationship with Mr. LaDow's daughter?

24  A    Yes.

25  Q    And that relationship did not end well, is that fair

1  to say?

2  A     That's correct.

3  Q     All right.  And are you close to Bill LaDow's

4  daughter?

5  A     No.  I've know her for a long time, but I'm not close

6  to her.

7  Q     But she was hurt by that relationship, right?

8  A     I'm assuming that she was.  Yes.

9  Q     And his father was a little upset about that as well?

10 A     Yes.

11 Q     Now, did you ever ask for any financial statements or

12 documents from Mr. Harris before you invested?

13 A     No, I did not.

14 Q     Didn't ask for any balance sheets from the company?

15 A     No, I did not.

16 Q     But you felt it was a sound investment, right?

17 A     Yes.  If I didn't, I wouldn't have done it.

18 Q     Now, you've indicated that at the 2010 shareholders'

19 meeting that the patent had not yet been approved, is that

20 correct?

21 A     You know, I stated that but honestly I do not recall

22 every word that was spoken in that meeting.  Sometime in

23 that -- sometime in that time frame, the U.S. patent did

24 get approved.  I don't recall if it was prior to the

25 meeting or not.

1   Q    And you were never shown a transcript of that

2   meeting?

3   A    No.

4   Q    Never shown any kind of recording from that meeting?

5   A    I was -- I listened to some pieces of the recording

6   from Mr. Gill.

7   Q    And when was that?

8   A    A week or two ago.

9   Q    How many times have you met with Mr. Gill prior to

10  your testimony?

11  A    I've never met with him.  Just spoke on the phone.

12  Q    How many times did you speak on the phone?

13  A    I think twice.

14  Q    Is it fair to say that at that shareholders' meeting

15  that Mr. Harris was being attacked by the shareholders?

16  A    I don't know that I'd use the word *"attacked."*  He

17  was certainly being questioned because I think other

18  people felt the same way that I did.  No financial

19  documents had been produced or provided to anyone, so

20  nobody knew what was being done with their investment --

21  with their invested money.

22  Q    Now, did you receive an anonymous letter before

23  attending that shareholders' meeting?

24  A    An anonymous letter?

25  Q    Near that time relating to Mr. Harris' company, did

1   you receive an anonymous letter before attending that

2   meeting?

3   A     I did not.

4   Q     Did Mr. LaDow talk to you about a letter that he

5   received prior to that meeting?

6   A     I don't remember if there was any letter.  I know

7   that he had been contacted a couple of times I think by

8   this Deep Blue company.

9   Q     But I'm asking about this letter specifically.

10  A     I don't recall anything about a letter.  No.

11  Q     And do you recall that there were shareholders at the

12  meeting that were questioning Mr. Harris about this

13  letter?

14  A     Again, I don't --

15  Q     And I --

16        THE COURT:  One person speaking at a time.  You may

17  complete your answer.

18        MR. WAGNER:  I'm sorry.

19  A     I don't recall anything specific about a letter.

20        THE COURT:  Next question.

21        MR. WAGNER:  Yes, sir.

22  Q     Is it true that Mr. Harris said at the meeting that

23  the company's money was gone because it was spent on the

24  acquisition of patents?

25  A     I do recall him saying that the money was gone.  I

1   don't remember it specifically being for acquisition of

2   patents alone.

3   Q     And when he said the money was gone, did that in any

4   way lull you into a sense of security?

5   A     Absolutely not.

6   Q     Did that in any way cause you, if you had concerns

7   about fraud of Mr. Harris, to not go to the authorities

8   about that fraud?

9   A     No.

10  Q     Now, Mr. Harris said he owns -- is it true that

11  Mr. Harris said at that meeting that he owns over 50% of

12  the stock, so there is little that anyone can do to force

13  him to comply with their requests?

14  A     I don't -- I know it was made clear that he owned 51%

15  of the stock.  So I don't know that he stated that, you

16  know, there was nothing anybody could do to make him do

17  anything.

18  Q     Do you recall the interview that you had with

19  Mr. Ward in July?

20  A     I do.

21  Q     And do you remember saying exactly that to Mr. Ward

22  during that interview?

23  A     I do not.

24  Q     Do you want to look at this to refresh your

25  recollection?

1   A     Sure.

2   Q     And I'll refer you to the second page of this, and

3   it's the sixth paragraph from the bottom.

4   A     Yeah, I still don't recall saying that.

5   Q     But you told that to Mr. Ward, to Investigator Ward,

6   in July?

7   A     I just said I don't recall saying that.

8   Q     Okay.  Very well.  And based on that statement, if

9   you had heard that statement, would that have caused you

10  to be lulled into a feeling of security about your

11  investment?

12  A     No.

13  Q     And did Mr. Harris express that he was unwilling to

14  take steps to move the company forward?

15  A     He did not.

16  Q     Do you remember Mr. Harris saying that the company

17  was broke at the shareholders' meeting?

18  A     I don't think he used the word *"broke."*  But when we

19  questioned him about the money, I do remember him saying

20  that the money was gone.

21  Q     Do you remember him saying that he is not the right

22  person to run the company?

23  A     I do recall him saying that.  Yes.

24        MR. WAGNER:  One moment, Your Honor.  That's all I

25  have, Judge.

1      THE COURT:  Any redirect, Mr. Gill?

2      MR. GILL:  Very briefly.

3      THE COURT:  All right, sir.

4                  **REDIRECT EXAMINATION**

5  BY MR. GILL:

6  Q    Now, Mr. Evans, I believe I asked you about Deep Blue

7  and Jeff Seto.  You have never been contacted by them or

8  been in contact with them?

9  A    No.  That's correct.

10 Q    Same deal for an individual named Matt Johnson?

11 A    Never been contacted by him either.

12 Q    Now, Mr. Wagner was asking you if you wrote anything

13 down in connection with this investment when the defendant

14 was doing his presentation.  Do you remember that?

15 A    Yes, I do.

16 Q    Even though you didn't write anything down, how

17 certain are you about what you testified to before the

18 jury?

19     MR. WAGNER:  Objection to leading the witness, Your

20 Honor.

21     THE COURT:  No, it doesn't suggest the answer.  *"How

22 certain"* doesn't suggest the answer.  Objection overruled.

23     You may respond.

24 Q    Tell the jury how certain you are about your

25 testimony about what was going to be done with your

1   investment dollars.

2   A    I'm completely certain that it was going to be used

3   to complete the research and to move forward with the

4   company.

5   Q    Now, with respect to the shareholders' meeting, how

6   hot of an issue were the past financial records that the

7   shareholders wanted?

8   A    It was a very hot topic.  Yes.  I mean, several of

9   the people there -- I'm assuming he had had previous --

10       MR. WAGNER:  Objection to him assuming, Your Honor.

11  A    Based on the conversations --

12       MR. WAGNER:  Objection.

13       THE COURT:  Hold on.

14       Why don't you rephrase your question to clarify it.

15       MR. GILL:  I apologize, Your Honor.

16       THE COURT:  Okay.

17  Q    Mr. Evans, with respect to the financials, tell the

18  jury based on what you heard at that shareholder meeting

19  if that was a big issue.

20  A    It was a big issue.

21  Q    What was it you --

22  A    These documents had been asked for previously, and

23  they still had not been received by anyone.  This was the

24  first shareholders' meeting that I had been at, and again

25  it was asked at that meeting is there any financial

1  records for the company.  There was a lawyer there.  We

2  even asked the lawyer is that not required that he has --

3  that you have to provide this at least annually to the

4  shareholders of the company, and nothing had been received

5  by anyone.

6       THE COURT:  Next question.

7  Q   Sir, if financials had been provided to show that

8  your investment had been used on farm expenses, auto

9  expenses, and house expenses for the defendant's personal

10 residence, would you have taken action on that

11 information?

12 A   I certainly would have had a conversation with

13 Mr. Harris about it.  I don't know that I would have gone

14 to do anything legally about it.

15 Q   If you had seen that information, would that have

16 been in line with what you had been led to believe by the

17 defendant when he first took your money?

18 A   Absolutely not.

19      MR. GILL:  No further questions, Your Honor.

20      THE COURT:  May Mr. Evans be excused at this point,

21 Mr. Gill?

22      MR. GILL:  Yes, Your Honor.

23      THE COURT:  Mr. Wagner, may Mr. Evans be excused?

24      MR. WAGNER:  Yes, Your Honor.

25      THE COURT:  Mr. Evans, you're excused and free to go.

1  Thank you for coming in.  We appreciate your testimony.

2      MR. EVANS:  Yes, sir.

3                     **WITNESS STOOD ASIDE**

4      THE COURT:  Who'll be the government's next witness?

5      MR. GILL:  Diane Desch, Your Honor.

6      THE COURT:  Diane Desch.

7      MR. GILL:  Yes, Your Honor.

8      THE COURT:  Ms. Desch, if you would raise your right

9  hand, place your left hand on the Bible, and face the

10 Clerk of the Court.

11     THE CLERK:  You do solemnly swear that the testimony

12 which you are about to give, in this case, before this

13 Court, shall be the truth, the whole truth, and nothing

14 but the truth, so help you God?

15     MS. DESCH:  I do.

16     THE COURT:  Ms. Desch, have a seat on the witness

17 stand, please.

18     Mr. Gill, go right ahead.

19     MR. GILL:  Thank you, Your Honor.

20         Whereupon, **Diane Desch**, having been

21 duly sworn in, testifies as follows:

22                     **DIRECT EXAMINATION**

23 BY MR. GILL:

24 Q   Good afternoon.  Would you please introduce yourself

25 to the jury.

1  A     My name is Diane Desch.  I'm from the west end of

2  Richmond, Virginia in Henrico County.

3  Q     And how long have you lived in the Richmond, Virginia

4  area?

5  A     Since '86.  My family moved away in 1990, and we

6  moved back in 1991.

7  Q     Tell us what you do for a living, ma'am.

8  A     I work part-time with Door To Door Solutions helping

9  people downsize or move into assisted living or

10 independent living depending on their needs.

11 Q     How long have you been doing that?

12 A     Six or seven months now.

13 Q     Earlier did you work in the home raising children?

14 A     Yes, I did.

15 Q     How many children do you have?

16 A     I have two boys.  One is 25 and one is 21, going to

17 be 22.

18 Q     Ma'am, are you currently married?

19 A     No, I'm not.

20 Q     And how long have you been divorced?

21 A     Six years.

22 Q     Who do you currently live with?

23 A     Right now I live with my ex-husband in the west end.

24 Q     Now, ma'am, we'll be talking today about events that

25 occurred in 2010 through 2011.  And starting off, would

1  you tell the jury whether you had a medical issue that

2  occurred during that time?

3  A    I did.  I had terrible headaches, and so I went to

4  several doctors here.  I ended up at John Hopkins.  And

5  the top neurovascular surgeon at John Hopkins diagnosed me

6  with an aneurysm inside a blood clot that had trickled

7  behind my right eye, and so they did a procedure called

8  the pipeline embolization.  I had two stints put in my

9  brain behind my right eye.

10  Q    When was the surgery for that?

11  A    That was November 8, 2011.

12  Q    And leading up to that time you said you were having

13  headaches?

14  A    I was.

15  Q    Tell the jury with what was occurring with you then

16  have any effect on your ability to recall what happened

17  back in 2010 to 2011?

18  A    No, it does not.

19  Q    Now one other thing, Ms. Desch, before we talk about

20  the defendant in this case.  Tell the jury around the same

21  time that the events occurred in relation to this, were

22  you also the victim of what is known as a Nigerian fraud

23  scam?

24  A    I was.

25  Q    Just briefly tell the jury what happened in that.

1  A    I received a phone call or two, and they said that I

2  had won some money.  I followed up.  I got mailings

3  through the mail, and I responded to those mailings and I

4  thought I had won some money.

5  Q    Did you have to provide your own money to get the

6  money?

7  A    I did.

8  Q    Tell the jury how much money you lost.

9  A    I lost a little over $600,000.

10  Q    And is the FBI investigating that?

11  A    They are.

12  Q    And before we leave it, ma'am, tell the jury if you

13  actually got that money, what, in part, were you planning

14  on doing with that money if you had received it?

15  A    I was going to help -- that was going to help with

16  Michael Harris' research.

17  Q    You mention Michael Harris.  Do you see him here

18  today?

19  A    Yes, I do.

20       MR. GILL:  Your Honor, may the record reflect the

21  witness identified the defendant?

22       THE COURT:  It will so reflect.

23  Q    Tell the jury when it is that you first met Michael

24  Harris.

25  A    2009 at the horse show.  The Warrenton horse show.

1  Q    What part of 2009 is the Warrenton horse show?

2  A    It's over the Labor Day weekend.  It starts on a

3  Wednesday before Labor Day, and goes through Labor Day or

4  usually Monday.

5  Q    Does your family have a special connection to that

6  particular show?

7  A    Yes, we do.  My great grandfather owned most of the

8  land in Warrenton that they built the horse show around,

9  and my grandmother and my aunt both rode in that horse

10 show.  That's why I would always go during Labor Day

11 weekend to see them, and to honor them by giving the

12 trophies to the riders.

13 Q    Now in 2009, did your family have a -- set up a

14 tailgate?

15 A    We did.  We always set up a tailgate, as a lot of

16 families do.  You give money to the -- to help with the

17 funds around the horse show and keeping the grounds safe,

18 as well as the shows themselves.  It helps provide for the

19 trophies and to pay for the horse show itself.

20 Q    And describe for the jury where it was at that event

21 in 2009 that you actually met the defendant.

22 A    It was 2009 at the horse show in the evening.  And he

23 arrived on the Saturday evening for the horse show.  He

24 walked up with several people and sat down next to me.

25 Q    Describe for us who do you recall being with the

1   defendant.

2   A    He had several men -- a couple men and several women

3   that were with him.  Some sat behind him and others were

4   standing.

5   Q    Did you -- could you tell what was going on, what you

6   observed, who was kind of the leader of the pack, if

7   anyone?

8   A    Michael Harris was the leader of the pack.  And he

9   was very outgoing, and he introduced himself to me as he

10  sat down.  And he sat and talked to me for two hours.  We

11  talked about the riders in the ring, we talked about what

12  they were wearing, and what I liked.  And he also told me

13  that he didn't ride for the workhorse show.  That he was a

14  steeplechase rider.

15  Q    Describe for the jury how he was dressed.

16  A    Very impeccably.  He knows how to dress.  He had a

17  nice blazer that had a leather collar.  A dark blazer.  He

18  had corduroy pinstripe pants, and nice leather shoes.

19  Q    Now, aside from him discussing the steeplechase, do

20  you remember anything else he talked to you about at that

21  time?

22  A    He handed me his card, and he said he was a

23  scientist.

24  Q    What kind of scientist?

25  A    He didn't really tell me what type of scientist he

1  was at that time.  I didn't really know.  Mostly we talked

2  about the horse show.

3  Q    Now after that evening when you met the defendant,

4  did you get in contact with him after?

5  A    Not that day.  Not during that -- right after the

6  horse show, but I would go up and visit my mom and one day

7  I found the card in the car and then I called him.

8  Q    Do you recall generally, you know, what you talked

9  about with the defendant when you called him?

10  A    When I called I said, *"I notice that you have*

11  *European phone numbers on your card."*

12      And he said, *"Well, I'm really a scientist.  I'm in*

13  *the process of inventing the cure for AIDS."*  And I

14  noticed that it was -- he had M.F. Harris Research, Inc.,

15  and so, you know, that looked very authentic.

16  Q    When he mentioned AIDS, describe for us, did that

17  have a special impact on you or affect?

18  A    Yes, it did.

19  Q    Why?

20  A    I lost my real father to AIDS in New York.  I didn't

21  know him.  I found him when I went up to New York when I

22  was 23, and he died two weeks later.  So I had no idea who

23  he was, but it does have an impact on my life.  I didn't

24  grow up with him.

25  Q    Did you discuss your prior experience with the

1  defendant?

2  A    Yes, I did.

3  Q    Now, when he talked about that he was a scientist and

4  he traveled, did he give you any other details about where

5  he would travel to?

6  A    He said he went to Europe.  I thought he said

7  Romania.  He said he had a daughter there, and he has a

8  son that's here.

9  Q    How did your relationship develop from there with

10  Michael Harris?  How would you keep in contact?

11  A    I called.  It wasn't until, you know, in 2011, it was

12  in the spring of 2011 that he called me.

13  Q    Okay.  And around that time, ma'am, did you ever get

14  a chance to go to Luray, Virginia?

15  A    Yes, I did.  He invited me to come.  The first time

16  he invited me he said it was a party.  It was in the

17  evening.  And I -- you know, he called me in the

18  afternoon, but it was getting dark and I didn't know --

19  I've never driven up in the mountains at night and I'm not

20  very good with directions, so I went up to the -- I was

21  going to go up to his home.  I left Richmond, and I turned

22  around.  I don't know what possessed me, but I turned

23  around and came home and thought, you know, I can't drive

24  at night.  So I called and said, *"I'm sorry.  I was going*

25  *to come, but I'm not going to.  Maybe some other time."*

1  Q     Eventually did you go out to Luray, Virginia?

2  A     Yes.

3  Q     Tell us roughly when that was.

4  A     Not long after.  It was in the daytime.  It was on a

5  weekend.  And I went up during the day, and I actually

6  spent the night but I wasn't planning to.  Well, I guess I

7  was planning to spend the night.  So I went up to his

8  place.  Yeah.

9  Q     Now, tell us about your impression of the defendant's

10 house when you were driving to Luray to find it.

11 A     He said look for a colonial style home with five

12 pillars.  And as you're driving up to the home, there's a

13 big, you know, trailer to hold four horses, a white

14 trailer.  You will see that before you get to the house.

15 I didn't see it.  I was on a country road when I got up to

16 his house.  You wind around.  And I almost passed the

17 house.  And I looked up and I found the flags and I had to

18 double back, and I eventually found his house but it was

19 not what I thought it was.

20 Q     How did it compare to what you thought it was?

21 A     What I thought was it was an old colonial home, you

22 know.  That you had several horses and so you have money

23 and so therefore the, you know, the trailer was -- I was

24 looking for the trailer and I couldn't find the trailer.

25 And the trailer ended up being on the property, but it was

1   hidden.  No, it wasn't anything like I thought it would

2   be.

3   Q      What about the inside of the house?

4   A      That was different.

5   Q      Okay.  Describe to the jury how the inside of the

6   house is different.

7   A      When I walked inside the home, it was displayed with

8   -- there's a wardrobe that's displayed with the habits

9   that riders wear with the boots all in a row and then the

10  wardrobe is open.  And he had a closet to the left.  It

11  was like a room and it has a desk, and then to the left it

12  had a closet that was open and had all these guns from the

13  top all the way down and on the door.  That surprised me.

14  And it looked more like a hunter because he had, you know,

15  he had deer and elk all around it that were stuffed and

16  mounted on the walls.

17  Q      Do you remember if he was working on any of the rooms

18  in the house at the time?

19  A      He was working on the whole house.  But he -- he

20  moved in, and he was living toward the back of the room.

21  It just -- it looked really nice.  In the back of the room

22  was a little office.  As you go up the stairs -- I mean,

23  the house is bigger than it really looked on the outside.

24  And when you went up the stairs, he had a boar's hide over

25  the mantle.  Outside the house he had -- he had an

1  American flag and then he had the Olympic flag with the

2  rings on the outside which was -- I didn't know.  I mean,

3  I inquired eventually about the Olympic flag.

4  Q    Now, eventually did he do a presentation for you?

5  A    Right away.

6  Q    Tell us about that and what you recall.

7  A    He took me back to his office and opened up his

8  laptop and he started right away about Michael F. Harris

9  Research.  And it was all about the AIDS research.  I was

10 -- I was impressed.  It took two and a half hours, and he

11 wouldn't let me ask a question.  That was the only thing

12 that bothered me because I wanted to ask questions.

13     And I said, *"When you're explaining it to me and I*

14 *don't know everything, please let me talk."*

15     And he said, *"I'm talking."*  And then so I just got

16 very quiet, and he ended up talking about his research.

17 Q    What did you understand the company was working on

18 based on that?

19 A    On the cure for AIDS.

20 Q    Did he give you any idea during that presentation or

21 after how close he was to making progress with his

22 company?

23 A    He said he was very close.  He finished Stage I.  He

24 was in Stage II, and all he had to do was go to Stage III.

25     What I saw on his computer made me -- I was excited

1   because, you know, I lost a father to AIDS.  I had -- I

2   lost a large part of my life because of that.

3   Q    Ma'am, if you could, take a look at Exhibit 161.

4   It's at the bottom of that stack you have there.

5        THE COURT:  One hundred sixty-one?

6        MR. GILL:  Yes, Your Honor.

7   Q    If you would, just thumb through the pages.

8   A    Do you mind if I get my glasses?

9   Q    Absolutely.  Go ahead.

10  A    Okay.

11  Q    And thumbing through the pages with the pictures,

12  does this at all look familiar with what he presented?

13  A    This is what he had on his computer.  Yeah.  These

14  are all the -- he wanted to show me the pictures first,

15  and that's what he was showing me was how a virus would

16  look and then what it would look like after.

17       THE COURT:  Mr. Wagner, any objection to 161, sir?

18       MR. WAGNER:  There is not, Judge.

19       THE COURT:  It will be received.  You may publish it

20  if you wish.

21       MR. GILL:  Thank you, Your Honor.

22           (Government's Exhibit 161 is received.)

23       MR. GILL:  And if we could see Page 4 of Exhibit 161.

24  Q    We don't need to get technical, but does this -- in

25  fact, it's on the screen in front of you.

1   A     Okay.

2   Q     Does that appear to be a page that he showed you in

3   doing his presentation?

4   A     Yes, he did.

5   Q     And the next page, Page 5?

6   A     Absolutely.

7   Q     Page 6?

8   A     He said that on the left was what happens with AIDS,

9   on and the right is after his research.

10  Q     Page 7?  So it's fair to say, I mean, he got very

11  technical during his presentation?

12  A     Yes, he did.  And he had a picture of a little boy

13  that he kept referring to.  And he said, *"That's the*

14  *reason that this is so dear to my heart."*

15  Q     Tell the jury about what you recall about the little

16  boy.

17  A     It was a picture of a little boy, and he said that

18  the boy had died of AIDS.

19  Q     And let's look at Page 18.

20  A     These are the containers he said that are his.  He

21  has stored all of his research in these containers.

22  Q     Did he mention anything to you during that

23  presentation that he had told shareholders several months

24  earlier that the company was bankrupt?

25  A     No.

1  Q    According to, you know, this presentation that he's

2  showing you these pictures, what was he taking investment

3  money for?  What was he pushing for?

4  A    Well, the first time I gave him money was to -- for

5  his patent.  His European patent.  He said, *"If I don't*

6  *get the money for the European patent, then it's dead in*

7  *the water.  I can't do anything more here in the United*

8  *States."*

9       And he gave me a phone call in the afternoon and I

10 said, *"Well, when do you need this money?"*

11      And he said, *"Well, it's 10:30 in the morning."*  He

12 said, *"I need it by noon."*

13      And I said, *"That's not giving me much time."*

14      And he said, *"Just trust me.  If you do this, you*

15 *will be the reason I can continue my research."*

16 Q    And we'll get to that in just a moment.  But

17 generally what did you understand he was using investment

18 money for based on his presentation and what he's telling

19 you?

20 A    For the research for the cure of AIDS.  That he was

21 so close to it.

22 Q    At any time during this PowerPoint, or any time he's

23 talked to you about the company, did he talk to you about

24 using your money or other investor's money just for his

25 personal expenses?

1  A    No.  Never.  I would never have done it.  You know,

2  the AIDS was my reason for it.  I hope one day we do find

3  a cure for AIDS.

4  Q    Now, ma'am, I believe you mentioned earlier, did you

5  stay at the defendant's home that night?

6  A    I did.

7  Q    Now tell the jury, were you romantically involved

8  with the defendant at that time?

9  A    No, I was not.

10  Q    Later on was there a time down the road?

11  A    One time when he came to the house to give me a

12  certificate.

13  Q    But here we are back in early 2011 when you first

14  went to Luray, Virginia.

15  A    Yes.

16  Q    You saw his presentation and you stayed the night,

17  correct?

18  A    I did.

19  Q    All right.  Tell the jury what happened the next

20  morning.  Did you go home?

21  A    I thought I was going home.  We went to the country

22  club there and had breakfast.  And when we got there, you

23  know, he didn't have the money.  The card didn't work.

24  His credit card didn't work and so I ended up paying for

25  breakfast.

1    And while we were there, he saw a table next to ours

2    and there was a group of people there and he -- he didn't

3    say anything to me.  He just walked over there and was

4    standing there for the longest time and he was talking to

5    them, and evidently knew them.  So I got up and walked

6    over there to, you know, stand by them.  And they had

7    brought our food.  And we were there for about a half an

8    hour standing, and he was talking about his research for

9    the cure of AIDS.  He invited them to come back to the

10   house.  It turned out that they were his teachers from

11   school growing up, and he was surprised they were all

12   together.  And so they agreed to come back to the house.

13   Q    All right.  And tell us -- take a look at Exhibit 88.

14   And it will be in that stack if you want to put that away.

15   It should be the top folder of that group.  Do you

16   recognize that?

17   A    I do.  I took the picture.  It was in his house that

18   day that they came over that he invited them.

19        MR. GILL:  Your Honor, we move for admission of

20   Exhibit 88.

21        THE COURT:  Any objection, Mr. Wagner?

22        MR. WAGNER:  No, Your Honor.

23        THE COURT:  Eighty-eight will be received.  You may

24   publish it if you wish.

25             (Government's Exhibit 88 is received.)

1  Q     Tell us what we're looking at and where this is.

2  A     This is inside his home.  And the lady on the far

3  right he wanted to impress the most.  I'm not sure if she

4  said she was his English teacher -- I mean on his left.

5  And the lady in the jacket with the color, she was another

6  teacher of his.  They're all teachers from his school

7  growing up.

8  Q     Was there another presentation that day?

9  A     There was.  It went about three hours.  We were back

10 in his office.  He showed his steeplechase racing.  He was

11 very proud of riding, and so he said he had won some of

12 those races that he was showing.  And then after he showed

13 those, he opened up his laptop and he started talking

14 about the AIDS research.

15 Q     Now let's unpack that a little bit.  You mentioned

16 steeplechase.

17 A     Yes.

18 Q     Tell the jury what you recall, if anything, him

19 saying about steeplechase winnings.

20 A     He said that he was one of the top riders for

21 steeplechase.  That nobody could beat him.  And he won a

22 lot of money in steeplechase riding.  He had four horses.

23 I met the horses.  They're beautiful.

24 Q     Okay.  Now then, let's put that aside and let's go

25 back to these individuals there in the house.  You

1  mentioned that he did the same presentation that he did

2  for you.

3  A    Same presentation.  Exactly the same.  And it went

4  two to three hours, and that's because talking about the

5  steeplechase, and then two hours for the AIDS thing.  And

6  during that time, the lady on his left said, *Really?*

7  *Michael, you have really done a good job."*  She said, *"You*

8  *could never sit still in the classroom at all."*  And she

9  looked at me and she said, *"He was so dis --*

10       MR. WAGNER:  Objection.  Hearsay.

11       THE COURT:  Objection sustained.

12  Q    Ma'am, at the conclusion of that investment

13  presentation to these individuals in the photo, did you

14  observe him ask them if they wanted to put money in M.F.

15  Harris Research?

16  A    He did at the end.  He said, *"You know, I can always*

17  *use someone to invest, and you're more than welcome to*

18  *help me.  I'm still working on getting enough money for*

19  *the research."*

20  Q    Now, how soon after that presentation did you stay or

21  did you leave?

22  A    I was there all afternoon, and then I left.  I wanted

23  to leave before dark because I really don't know how to

24  drive in the mountains.

25  Q    Now, you mentioned earlier, eventually did the

1  defendant contact you about giving him money?

2  A    Yes.

3  Q    Take a look at Exhibit 89, which will be the next

4  one.  Tell us if you recognize that.

5  A    This is from June 13th.  I gave him $2,500.  That was

6  the amount of money he said he needed to secure his

7  European patent.

8       MR. GILL:  Your Honor, we move for admission of

9  Exhibit 89.

10      THE COURT:  Any objection, Mr. Wagner?

11      MR. WAGNER:  No.

12      THE COURT:  Exhibit 89 is received.

13      That was June the 13th?  Is that the date?

14      MR. GILL:  Yes, Your Honor.  And if we could publish

15  this?

16      THE COURT:  Yes.  Go right ahead.

17          (Government's Exhibit 89 is received.)

18      MR. GILL:  And if we could zoom in.

19      THE COURT:  Yes.  Go right ahead.

20  Q    And we have zoomed in there on the screen in front of

21  you.  In fact, do you see the withdrawal that you made?

22  It says the date it was written was June 13.  Was that to

23  give the defendant the money?

24  A    Yes.

25  Q    Now, according to what he told you, what was the

1  timeliness of this and what was the money going to be used

2  for?

3  A    It was around 10:30 when he called.  He said, *"I have*

4  *to have the money by noon."*  It had to be in by noon.  And

5  so I went to the bank and I called him after and told him

6  that the money is in the bank.

7      He said, *"Thank you so much."*  He said, *"This has*

8  *secured my European patent for the research and*

9  *development for the AIDS virus."*

10 Q    Now, eventually did you invest more?

11 A    I did.

12 Q    Take a look at Exhibit 90, and tell us what that is.

13 A    That is his explanation of M.F. Harris Research on

14 the virus and what he was -- because, I said, *"I don't*

15 *have any paperwork on this, and I need something."*  And so

16 he sent this to me.

17     THE COURT:  Any objection to 90, Mr. Wagner?

18     MR. WAGNER:  No, Your Honor.

19     THE COURT:  Pardon me?

20     MR. WAGNER:  No, Your Honor.

21     THE COURT:  Okay.  It will be received without

22 objection.

23          (Government's Exhibit 90 is received.)

24     MR. GILL:  Let's zoom in first on the upper portion,

25 please.  There we go.  Up at the top.

1  Q     Tell us who this e-mail is from and who it was to, as

2  well as the date.

3  A     It's from Michael Harris, MF Harris, to

4  xxxxxxxxxx@yahoo.com.

5  Q     That's your e-mail address?

6  A     At the time, yes, that was my e-mail address.

7  Q     Now in connection with your investment, did the

8  defendant talk about the value of the shares you were

9  buying versus what he anticipated the value to be?

10 A     He said that if I invest in shares in the company, it

11 would help toward securing the patent here in the United

12 States and finishing his research.  So he said, *The*

13 *shares per block is $5,000."*  He said, *"You've given half*

14 *of a block of shares, $2,500, but if you give another*

15 *$2,500 you secure a full block."*

16        And so I actually gave him more money to secure two

17 full blocks of shares.  And he said at the time they were

18 a dollar a share, but he said they would be about $22 or

19 $23 a share.  That's what they currently were worth.  And

20 then when it goes public, it could go up.

21        And the only reason I said, *"You know, this is a lot*

22 *of money for me.  I want to buy my home."*

23        He said, *"You'll more than be able to buy your home."*

24        MR. GILL:  Now then, if we could scroll down to the

25 bottom of this, please.  And at the bottom it says,

1   *"Funding details."*  Please zoom in on that.

2   Q    And tell us, ma'am, if that is generally what you

3   understand based on what the defendant told you and what

4   he e-mailed you was going on at that time.

5   A    Yes.

6   Q    What was the money being used for?

7   A    For the finalization for Phase III for the cure of

8   AIDS.

9        MR. GILL:  And if we look at Page 2 of this e-mail.

10  Q    And it's signed at the bottom, *"Michael F. Harris,*

11  *CEO"*?

12  A    Yes.

13  Q    When you invested your money, where did you

14  understand your money was going, to Michael Harris or to

15  Michael Harris' company?

16  A    For his company.

17  Q    Did he also send you a subscription agreement and a

18  non-disclosure agreement with this e-mail?

19  A    Yes, he did.

20  Q    And are those attached?

21  A    Yes, they are.

22  Q    Aside from that, was anything else sent with this

23  e-mail?

24  A    Well, the non-disclosure.  But, no.  No.  I signed

25  these.  All of them.

DIRECT EXAMINATION OF DIANE DESCH          197

1  Q     Let's take a look at Exhibit 91.  And it's there in

2  the folders there in front of you, ma'am.  Tell the jury

3  if that is indeed the subscription agreement and the

4  non-disclosure agreement that you signed?

5  A     Yes, it is.

6        MR. GILL:  Your Honor, we'd move for admission of

7  Exhibit 91.

8        THE COURT:  Any objection to 91, Mr. Wagner?

9        MR. WAGNER:  No, Your Honor.

10       THE COURT:  Be received.

11          (Government's Exhibit 91 is received.)

12       MR. GILL:  See Page 1.  And just zoom in on the upper

13 portion.

14 Q     The jury's seen this before.  Is it fair to say that

15 you signed this, and Michael Harris' signature is on there

16 as well?

17 A     Yes.

18 Q     The 17th of June, 2011.  Now, did you sign this in

19 person or by mail, if you recall?

20 A     We signed it in person.

21       THE COURT:  You said you signed it in person?

22       MS. DESCH:  Yes.

23 Q     Now, it references 5,000 shares.  Did you up your

24 investment?

25 A     I did.

1  Q     Now then, let's look at Page 2.  Is that the

2  non-disclosure agreement that you signed?

3  A     Yes, it is.

4  Q     Look at Exhibit 92.

5       THE COURT:  Before you move on to 92, I think I'm

6  going to give the jury a 10 minute break at this point.

7  Are we nearing the closure of your direct examination?

8       MR. GILL:  Probably about five or -- well, probably

9  five or 10 minutes.

10      THE COURT:  I'm going to give the jury a 10 minute

11  break.

12      Ladies and gentlemen, let's take a 10 minute

13  afternoon recess.  We'll resume about 10 minutes till

14  4:00.

15      (The jury is no longer present in the courtroom.)

16      THE COURT:  Ms. Desch, you may step down for a few

17  moments.

18      We'll be in recess for approximately 10 minutes.

19                  (Recess taken.)

20      THE COURT:  Ready for the jury?

21      MR. GILL:  We are, Your Honor.

22      THE COURT:  All right.

23      Marshal, bring the jury in.

24          (The jury is present in the courtroom.)

25      THE COURT:  Ladies and gentlemen, I'm sorry for the

1   delay in getting started, but I had a conference call in

2   another case that I had to take care of before I could

3   come back.  So thank you for being patient with me.

4        All right.  Next question.

5   Q   Ms. Desch, when we left off we were talking about

6   your $7,500 investment.  Take a look at Exhibits 92 and 94

7   in front of you.

8        THE COURT:  Exhibits 92 and 94?

9        MR. GILL:  Yes, Your Honor.  And for the record, I

10  would move for the admission of Exhibits 92 through 94.

11       THE COURT:  Any objection, Mr. Wagner?

12       MR. WAGNER:  One moment, Judge.  No objection.

13       THE COURT:  They will be received.  And you may

14  publish them if you wish, Mr. Gill.

15          (Government's Exhibits 92 – 94 are received.)

16  Q   We'll look at Exhibit 92, Page 1.  It's going to

17  flash on the screen, Ms. Desch.  And if you would tell

18  them what it is that we're looking at.

19  A   This is my wire transfer of $7,500 to Michael F.

20  Harris Research, Incorporated.

21  Q   Ma'am, this is at the heart of one of the counts of

22  the indictment, so I want to talk to you about some of the

23  information on this.  What is the date you sent the

24  transfer?

25  A   June 28, 2011.

DIRECT EXAMINATION OF DIANE DESCH          200

1    Q     What account did it come from?

2    A     It came from my Wachovia, which is now Wells Fargo.

3    Q     Ma'am, actually, at the top. *"Source Information"* up

4    at the top.

5    A     Oh, I'm sorry.  Union First Market Bank.  I

6    apologize.

7    Q     You also have a Wachovia account?

8    A     I do.

9    Q     But this money came from your Union First Market

10   Account?

11   A     Yes.

12   Q     Tell the jury where you were when you gave the order

13   to send this wire transfer.

14   A     I was home.

15   Q     Did you go to the bank to do this?

16   A     I did.

17   Q     What bank did you go to?

18   A     Wachovia.

19   Q     And, ma'am, did you go to your bank to do the wire

20   transfer for this $7,500?

21   A     I did.

22   Q     Is that a bank that's located near your home in the

23   west end?

24   A     Yes, it is.

25   Q     And is that bank located in Henrico County?

1  A    Absolutely.

2  Q    Okay.  Now if we scroll down.  So it's coming from

3  Union First Market Bank, Diane Desch.  What account is it

4  going to?

5  A    M.F. Harris Research, Incorporated.

6  Q    At what bank?

7  A    Wachovia.

8  Q    And was that your money going to the business?

9  A    Yes, it was.

10 Q    Did you sign this?

11 A    I did.

12 Q    Now let's look at Exhibit 94.  And tell us what it is

13 we're looking at here, ma'am.

14 A    You're looking at the deposit wire to Michael F.

15 Harris, Incorporated for $7,500.

16 Q    And, ma'am, I'm looking at Exhibit 94.

17 A    I'm looking at 94.

18 Q    Okay.  You're on Page 2?

19 A    Yeah, I'm on Page 2.

20 Q    So Exhibit 94 is your Union First Market?

21 A    Yes.

22 Q    Okay.  And then we look at Page 2.  And there at the

23 bottom it's on the screen.  What are we looking at?

24 A    Wire out to M.F. Harris Research, Inc.

25 Q    Is that the money going out of your account to M.F.

1  Harris Research?

2  A    Correct.

3  Q    Okay.  Now, soon after this did you get your stock

4  certificate for your investment?

5  A    I did.  He came to my house to deliver it.

6  Q    Take a look at Exhibit 95.

7  A    Okay.

8  Q    Do you recognize that?

9  A    Yes.  It was an e-mail that I sent to Michael Harris.

10      MR. GILL:  Your Honor, we'd move for admission of

11  Exhibit 95.

12      THE COURT:  Any objection, Mr. Wagner?

13      MR. WAGNER:  No, Your Honor.

14      THE COURT:  Be received.

15          (Government's Exhibit 95 is received.)

16  Q    Let's take a look.  And let's zoom in on the bottom,

17  please.  And that is from you to Michael Harris.  What are

18  you telling him here?

19  A    *"do you have a ball park/ time frame on when you will*

20  *be arriving?  See you then.  Diane."*

21  Q    Did you provide him with any of your address

22  information?

23  A    Yes, I did.  I game him my address so that he could

24  come to my home.

25  Q    Now, prior to this had he ever been to your house?

1   A     No.

2   Q     Now, let's look at Exhibit 96.  Tell us what that is.

3   A     This is a certificate of 10,000 shares in Michael F.

4   Harris Research, Incorporated.

5         MR. GILL:  Your Honor, we move for admission of

6   Exhibit 96.

7         THE COURT:  Any objection to 96?

8         MR. WAGNER:  No, Your Honor.

9         THE COURT:  Be received.

10              (Government's Exhibit 96 is received.)

11  Q     Now we see it on the screen.  Is that for the full

12  10,000 shares, including the 2,500 plus the 7,500?

13  A     Yes, it is.

14  Q     Tell the jury, that $7,500 that you wire transferred

15  to Michael Harris, what did you understand that money was

16  going towards?

17  A     The research and finalization of -- the research for

18  AIDS.

19  Q     At any time in connection with that did the defendant

20  talk to you about using that money for his own personal

21  expenses?

22  A     No.

23  Q     Would you have given that money if he told you he was

24  going to use that for himself?

25  A     No.

1   Q     Now, when he came to your house to deliver those

2   shares around July 7, 2011, was there anyone there at your

3   house to see him?

4   A     My son and his girlfriend.

5   Q     Describe for the jury, did the defendant do a

6   presentation there?

7   A     He did.  He did a presentation for my son and Sarah.

8   And I was surprised that he was going to do that for a

9   teenager.

10  Q     And did he ask them to invest or anything that you

11  witnessed?

12  A     Yes, he did.  Jokingly he did.

13  Q     Okay.  Now, did he stay the night at your house that

14  night?

15  A     Not that night.  No.

16  Q     Was there another visit to Richmond?

17  A     There was.  He said he had to have shoulder surgery

18  -- not shoulder surgery, but having a problem with his

19  shoulder because he had an accident, a riding accident,

20  and he hurt his shoulder and he needed to go to MCV

21  Hospital.

22  Q     In connection with that visit did he see any of your

23  friends?

24  A     Yes.  He saw a friend named Colette Moussali.

25  Dr. Colette Moussali.  I invited her over to meet him.

DIRECT EXAMINATION OF DIANE DESCH          205

1  Q    Why did you invite Dr. Colette Moussali to come over?

2  A    Because he said he was looking for patients that have

3  AIDS, and he was getting ready to go into the next phase

4  where he needed at least 10 patients to actually put into

5  action his research.

6  Q    So this is pretty imminent?

7  A    It is.

8  Q    Did he do a presentation for Dr. Moussali?

9  A    He did a two to three hour presentation.  The same

10 presentation he did before.

11 Q    At the end of that presentation, did he ask

12 Dr. Moussali to invest?

13 A    Yes, he did.  And she said she didn't have enough

14 money at that time.

15 Q    Did you observe her make any offers to get any

16 patients for the defendant?

17 A    She did.  She offered.  She said, *"If you're really

18 serious about your research, I have at least two patients

19 you can start with."*  And he gave her his number, and she

20 tried calling and he never called back.

21    MR. WAGNER:  Objection to hearsay, Your Honor.

22    THE COURT:  Objection sustained.

23 Q    Ma'am, after that presentation did he stay the night

24 at your house?

25 A    Yes, he did.

1  Q     And tell the jury were you romantically involved with

2  the defendant?

3  A     Yes, I was.

4  Q     Were there any other times after that?

5  A     No.

6  Q     Now, soon after you had invested your $7,500 at the

7  end of June and early July, did you provide the defendant

8  with any other money?

9  A     I did.

10  Q     Take a look at Exhibit 97.

11  A     Three thousand dollars.

12  Q     Tell us how this came to pass that you gave the

13  defendant more money.

14  A     He said he needed $3,000 for shoeing -- for putting

15  new hooves on the horses, four horses, so he could

16  continue his steeplechase races and use the proceeds for

17  -- he needed more money, and so he would -- those winnings

18  would go toward getting those patients in, you know.

19  Q     According to the defendant, the full $3,000, what was

20  it going to be used for?

21  A     It was for the horses.  To shoe the horses so they

22  had hooves on their feet.

23  Q     Was this a gift or was this a loan?

24  A     This was a loan.

25  Q     Did he talk to you about paying you back?

1  A      No.

2  Q      Was there any discussion with him about how imminent

3  it was that the steeplechase race was coming?

4  A      Oh, he said he was getting them ready.  And he even

5  said that he would probably be riding in the Warrenton

6  horse show.

7          MR. GILL:  Your Honor, we move for admission of

8  Exhibit 97.

9          THE COURT:  What is that?  Is that a check, a

10 document, or what?

11         MR. GILL:  It is the transfer record that she

12 maintained of that $3,000 payment.

13         THE COURT:  All right.

14         Any objection, Mr. Wagner?

15         MR. WAGNER:  No, Your Honor.

16         THE COURT:  Be received.

17             (Government's Exhibit 97 is received.)

18         MR. GILL:  Let's zoom in on that.

19 Q      And tell the jury what it is we're looking at.

20 Describe for us what that is, ma'am.

21 A      That's my Wachovia statement of deposit for $3,000.

22 Q      And whose account did that $3,000 go to?

23 A      It went to Michael -- Michael F. Harris Research.

24 Q      Now, aside from that -- and that's the $3,000 that

25 was going to shoe the horses?

1   A      Yes.

2   Q      Now then, aside from that did you provide the

3   defendant with any other money or pay for any other bills

4   for him?

5   A      One other thing.  He had a phone bill that he called

6   me about and said that he really needed some help because

7   he would lose his phone.  It was a -- it was his calls

8   that he was making back and forth to Europe on.

9          THE COURT:  To where?

10         MS. DESCH:  To Europe.

11         THE COURT:  To Europe.  Okay.

12         MS. DESCH:  European calls.

13  Q      In looking at Exhibit 99, these are your handwritten

14  notes, ma'am, but are those notes you took in relation to

15  paying that bill?

16  A      Yes.  Because he wanted my account number and I said,

17  *"No, I will call and do what I can.  But I'll call your*

18  *phone company direct."*

19  Q      Ballpark when was it that you made those payments?

20  A      November.

21  Q      Of what year?

22  A      2011.

23         THE COURT:  Any objection to 99, Mr. Wagner?

24         MR. WAGNER:  No objection.

25         THE COURT:  Be received.

1              (Government's Exhibit 99 is received.)

2    A    I actually paid on September 14th the October --

3         MR. WAGNER:  Objection.  There's no question pending.

4         THE COURT:  Pardon me?

5         MR. WAGNER:  I don't believe there's a question

6    pending.

7         THE COURT:  Wait until the next question is asked.

8         Go right ahead.

9    Q    Describe for us what we're looking at there, ma'am.

10   A    It's my writing when I called the phone company.  And

11   he needed $123 for September, $123 plus -- I mean, for

12   October he needed $177.  And in November he needed $123.

13   So the current charges that he needed were $423.  And

14   that's what I paid on his -- for securing his phone.

15   Q    Did you pay it?  Was that paid directly to the

16   company?

17   A    It was directly to the company.

18   Q    Now, ma'am, since that time had you seen the

19   defendant?

20   A    No.

21   Q    Did you have any other contact with him?

22   A    By phone.  I would call every now and then and ask

23   him how was his research going.  I hadn't heard from him

24   in a while.

25   Q    What would he tell you when he called?

1    A    He said, *"It was taking longer.  I need more money."*

2         And so I said, *"Well, I don't have any more money to*

3    *give you."*

4    Q    And to this day have you received any return on that

5    investment?

6    A    Nothing.

7    Q    Have you received any financial records from the

8    defendant's company showing how your money was spent?

9    A    No.

10        MR. GILL:  Pass the witness, Your Honor.

11        THE COURT:  Cross-examination, Mr. Wagner?

12        MR. WAGNER:  Yes, Your Honor.

13                    **CROSS-EXAMINATION**

14   BY MR. WAGNER:

15   Q    Good afternoon.

16   A    Good afternoon.

17   Q    When you first met Michael, you indicated you met him

18   at a horse race in Warrenton, is that correct?

19   A    Not a horse race.  A horse show.

20   Q    A horse show.  Excuse me.  A horse show.  I'm not

21   familiar with the horse business, so you'll have to excuse

22   me.

23   A    That's okay.

24   Q    And after that, the next contact you had with him you

25   called him, correct?

1   A    I did.  He gave me his card and said, *"Give me a*

2   *call."*

3   Q    And when all was said and done -- well, you had a

4   romantic relationship with him, correct?

5   A    Yes.  One time.

6   Q    And you spent a considerable amount of time with him

7   over those two years?

8   A    Not really.  No.

9   Q    You wouldn't say that?

10  A    No, I'm not.

11  Q    When all was said and done, is it fair to say you

12  were embarrassed by your relationship with him?

13  A    I was not embarrassed.  I didn't know that I should

14  have been.

15  Q    Did you say to the investigator that you were

16  embarrassed talking about your romantic relationship?

17  A    Yes.

18  Q    And during the time that you were spending time with

19  Mr. Harris, was that before or after the surgery?

20  A    Before the surgery.

21  Q    And were you suffering from headaches at that time?

22  A    I was off and on.

23  Q    And were you taking any medication for the headaches?

24  A    I was using Advil.

25  Q    That's all?

1  A    That's it.  I don't like medicine.

2  Q    And around this time you indicated that you suffered

3  some losses from a Nigerian scheme that you were involved

4  with, is that right?

5  A    I did.

6  Q    And that was several hundreds of thousands of

7  dollars, wasn't that right?

8  A    Yes, it was.  At the time I didn't realize how many

9  several thousands of dollars.

10 Q    And you had to declare bankruptcy, is that right?

11 A    I did not declare bankruptcy.

12 Q    I'm sorry.  I apologize.  I thought you did.

13      And the surgery that you had, has that caused you

14 some memory loss?

15 A    No.

16 Q    Did you say to the investigator in this case that it

17 caused you some memory loss?

18 A    No.

19 Q    Did you say to the investigator that it caused you

20 some confusion?

21 A    Sometimes.

22      MR. WAGNER:  Excuse me just a second.

23      THE COURT:  Yes, sir.

24 Q    Now, when you first met Mr. Harris you had some

25 things in common with him, is that correct?  For instance,

1    you had an interest in horses?

2    A    The reason I had an interest in horses was that my

3    grandmother and my aunt rode.  I was interested because it

4    was such a familiar thing, and it was routine to go to the

5    horse show once a year.

6    Q    And he was a steeplechase rider?

7    A    He was.  I didn't know a lot about steeplechase.  I

8    know about show riding, but not about steeplechase riding.

9    Q    Now, you knew he had some involvement as a kayak and

10   canoer, is that correct?

11   A    He gave me a tour of his home and I saw the kayak.

12   And he said he was on the Olympic team.

13   Q    And had you tried out for an Olympic team when you

14   were younger?

15   A    No.  I competed in figure skating at the national

16   level.

17   Q    Were you hoping to maybe get to the Olympics?

18   A    Yes and no.

19   Q    Now, you indicated that you went to his house?

20   A    Yes.

21   Q    And that was on one occasion?

22   A    Yes.

23   Q    And you indicated he had a little office in the

24   house, is that right?

25   A    He did.  He does.

1   Q    Isn't it true that the office really extended the

2   full width of the house?

3   A    No.

4   Q    And isn't it true that it went probably 15, 20 feet

5   in width?

6   A    It wasn't a very big room.  It was just a little wing

7   of the house.

8   Q    And you were aware of the lifestyle that he kept

9   during that time when you visited with him, right?

10  A    I was -- I was aware of what he told me.  And the

11  only thing that I saw was what I saw in his home.  But it

12  didn't add up.

13  Q    He drove an old car, didn't he?

14  A    He had a blue Jeep.  Yes.

15  Q    And it wasn't a late model Jeep, was it?

16  A    No.

17  Q    And his house was kind of falling apart, is that safe

18  to say?

19  A    On the outside.  The inside looked good.  He was

20  working on one room at a time.

21  Q    And in the beginning of the relationship with him,

22  isn't it true that you went to a country club for dinner

23  with him?

24  A    No.  That is incorrect.

25  Q    You didn't tell that --

1   A     I went to the country club for lunch.

2   Q     For lunch.  I apologize.

3         And after you ate he left you with the bill, didn't

4   he?

5   A     He did.

6   Q     And was that before or after you had invested in his

7   company?

8   A     When I went up to -- that was before.

9   Q     Okay.  Now, at some point you loaned him, or you said

10  you loaned him, $3,000 for the shoeing of the horses, is

11  that correct?

12  A     Correct.

13  Q     Do you remember telling the agent in this case, Agent

14  Gregor, in May of 2012 that that was a gift?

15  A     I don't remember saying that it was a gift.  I knew

16  that it was going to come back to me because he said he

17  would use the money for the proceeds of winning the

18  steeplechases.  He needed the shoes in order to -- for the

19  horses to be fit to race and in order to have more money

20  for the next phase in the AIDS -- in the research for

21  AIDS.  That he needed some more money, and he was a

22  shoe-in as far as winning those races.  So I -- I felt it

23  was an investment.  And he indicated that's what he was

24  using the money for.  Not just because they were shoes,

25  but he needed them.

1   Q    I understand.  And would you say your recollection is

2   clearer now than it was in May of 2012?

3   A    Clearer now than it was then?  It's as clear now as

4   it was then.

5   Q    Good.  Let me show you something that may help

6   refresh your recollection.  If you would look, this is a

7   302 from Agent Gregor, a May 1, 2012 interview.  And if

8   you would look at the portion of that interview that is

9   highlighted.  Does that help to reflect your -- to refresh

10  your recollection?

11  A    I could have said it was a gift.  I know that I could

12  have said that.  Absolutely.  But what I did know that was

13  very clear was that he said he was going to shoe the

14  horses so that they would be fit to do steeplechase, and

15  the money that he was going to -- that he won from that

16  would go directly to the research.

17       So I -- I felt it was, you know, if he didn't have

18  his horses -- if he didn't have his cell phone I couldn't

19  get ahold of him and he couldn't continue with what he --

20  he said he had taken all of his money, he had no more

21  money, and put everything, his life, his soul into this

22  research.  So you can play on words, and I may have said

23  that, but the bottom line is he said he was using it for

24  the research for AIDS.

25  Q    Sure.  And that reference that you made to the

1  shoeing of the horses for $3,000, that was said in

2  conjunction with what you said about the telephone bills

3  that you paid, correct?

4  A    Telephone bill, again.  You know, how can I get ahold

5  of him.  And I had money invested.  He said he wouldn't be

6  able to have a phone.  That's not a good sign when you

7  have money invested and you don't -- you want that

8  contact.  I was willing to pay for that in order for

9  him -- to get ahold of him.

10 Q    And is it fair to say that the money for the

11 telephone bill was a gift?

12 A    I don't think I'm ever going to get it back.  So,

13 yes.

14      THE COURT:  Ladies and gentlemen, can you hear the

15 witness okay?

16      MS. DESCH:  I'm sorry.  I keep going away from the

17 microphone.  I apologize.

18      THE COURT:  All right.

19 Q    Now, I want to show you what's been marked as Defense

20 Exhibit 53.

21      THE COURT:  The number again, please.

22      MR. WAGNER:  Number 53, Judge.

23      THE COURT:  Fifty-three.  That's already in evidence,

24 is it not?

25      MR. WAGNER:  I don't think we've introduced it yet,

1    Judge, but it's been referenced.

2         THE COURT:   Okay, sir.

3    A    I recognize this book.   He carried it with him

4    wherever -- in a briefcase though, a leather briefcase.

5    And it has letters validating that he went to Duke

6    University and then went to MCV Hospital.   That he knew --

7    that he knew a lot of the doctors from both, and that they

8    gave him the keys to the labs in order for him to continue

9    the research.

10   Q    That was some years ago when he was at Duke, is that

11   correct?

12   A    I didn't know him then, but that's what he said.

13   Q    And did he show that book to Dr. Mousari?

14   A    Moussali.

15   Q    Excuse me.   Moussali.

16   A    Yes, he did.

17   Q    And did he show it to the group of teachers?

18   A    Yes, he did.

19   Q    Okay.   And were they free to look through the book?

20   A    Absolutely they were.   We were -- you know, when

21   you're in a group full of people and he's explaining

22   himself, at the time you don't think he's going to lie to

23   you, so you listen.   We all looked through the book and

24   read some of them.   Not all of them.   But he prided

25   himself on this.

1       And when he first showed me his lab work, he feels

2  like this is all of, you know, his validations from people

3  that, one, invested; and, two, that validated his

4  research.  You know, when you have something like this,

5  you feel like he is telling you the truth.

6  Q    Sure.  He's very passionate about his cause?

7  A    Yes.  He was very passionate.  He was so passionate

8  he wouldn't let me talk about me.

9  Q    Can you point -- can you turn to where there is a

10 little marker there in the binder.  Do you now see that

11 report there?

12 A    Yes.

13 Q    And do you recognize that?

14 A    You know, honestly I don't.  I really don't.  I don't

15 know that -- remember whether he had shown me this or not.

16      THE COURT:  And so the record is clear, do you want

17 to mark that with a sub-exhibit number so the record will

18 show what page she's looking at?

19      MR. WAGNER:  Perhaps we can mark that with Exhibit

20 53-A, Judge?

21      THE COURT:  All right.  Fine.

22      MS. DESCH:  Did you want me to read it out loud?

23      THE COURT:  No, ma'am.  I do not.

24           (Defendant's Exhibit 53-A is received.)

25 Q    Now, you don't recall whether or not you saw that

CROSS-EXAMINATION OF DIANE DESCH

1  before you made your investment?

2  A     No.

3  Q     Do you remember if you asked for any kind of

4  financial information from Mr. Harris before you made your

5  investment?

6  A     Excuse me?

7  Q     Did you ask for any financial information before you

8  made your investment?

9  A     I asked him for validation of where this was going.

10 I felt that the agreement and subagreements and his -- the

11 information he sent me on his research right after I sent

12 him the money, I said, *I need to have validation on the*

13 *money that I'm giving you.*

14       Did I answer your question?

15 Q     I'm not sure.

16 A     Okay.

17 Q     But I'll move on.

18       Now, when he offered you the -- or when he asked for

19 the $2,500 for the patents --

20 A     It was the European patent.  He was very clear about

21 it.  He said, *"If you don't invest in the European patent,*

22 *then anything I do from here on I have to have that or I*

23 *cannot continue with the American patent because FDA*

24 *approved here in the United States takes so much longer*

25 *than it does in Europe."*

1  Q     And is it your understanding that that money, or at

2  least $2,100 of that money, went to the European patent?

3  A     The $2,500, absolutely, to finalize his patent

4  payment.  And it had to be in by noon.  And I absolutely

5  did.  And then he told me about the shares right after and

6  that -- and how much the shares would cost.

7  Q     Now, that additional investment that you made was for

8  $7,500, correct?

9  A     Yes.  To finalize two squares.  You know, one square

10 of shares was $5,000.  I gave $2,500, and that's why I

11 gave $7,500 to complete two squares.  And he said -- and

12 that was right before he came to my home to tell me -- to

13 deliver the certificate.

14 Q     And do you remember exactly what he said when you

15 gave him the $7,500?

16 A     Absolutely I do.

17 Q     Okay.

18 A     This was to finalize two blocks of shares or $10,000.

19 Two blocks of shares, a dollar a share, and that --

20 because I was investing for the shares to help pay for the

21 research for the cure of AIDS.  And I would not have done

22 it if it wasn't for that.

23       I would not have given any money if I didn't --

24       THE COURT:  Hold on.  Wait a second.  Wait for the

25 next question.

1        MS. DESCH:  Okay.

2   Q    Did you write down what he told you about what was

3   going to happen with your money for the 7,500 shares?

4   A    No, I did not.

5        COURT REPORTER:  Your Honor, they can't hear him.

6        MR. WAGNER:  I'm sorry.  Am I not speaking loud

7   enough?

8        JUROR:  We can't hear you.

9        MR. WAGNER:  I'm sorry.  I'm sorry.  I'll try to turn

10  up the volume.

11  A    I did not write it down because he said he was coming

12  to my house and giving me all the information I needed.

13  And when he did come to my home, he gave me the

14  certificate, he gave me the agreement, sub-agreement, the

15  non-disclosure.  And he signed it in front of me at my

16  home.  And that's why I invited -- then I invited Colette

17  Moussali to come as a doctor because I wanted to make sure

18  that what I was doing was valid.

19  Q    And a lot of this was a personal interest because of

20  your father, right?

21  A    Absolutely.

22  Q    And when did you last see your father?

23  A    It's an unusual story.  I was born and my father was

24  in New York.  He casted All My Children before he died.

25  Q    If you could, could you just answer the question,

CROSS-EXAMINATION OF DIANE DESCH          223

1  please.

2  A    Okay.

3       THE COURT:  Why don't you repeat the question one

4  more time.

5  Q    When was the last time you saw him?

6  A    My real father never saw me.  He died of AIDS.  I

7  only had two weeks with him when I was 23 years old when I

8  went up to New York to Sloan Kettering Memorial.  And I

9  was there with him when he died.  That is all I have of my

10 father.  I have a stepfather.

11 Q    Now, the document that you referred to, can you open

12 that up and look at that, please.

13      THE COURT:  This is 53-A?

14      MR. WAGNER:  Yes, sir.  Exhibit 53-A.

15      THE COURT:  All right.

16 A    Open it up?  It's got several pages inside it.

17 Q    If you can just take it out of the plastic folder.

18 Now, do you remember seeing that document?

19 A    You asked me that question before and I said no.

20 Q    Okay.  As you look through it --

21 A    Well, I don't remember this page.  But you had it in

22 a sleeve so that I couldn't see it.

23 Q    I'm sorry.  Please look through it.

24 A    Okay.  This is similar to what he sent to me.  And I

25 don't -- all of this stuff was not in there.  If he did

1  show this to me, I don't remember him looking and showing

2  me this.  This is bits and pieces.  He give me a few

3  pages.  He didn't give me all of this.  I did not see all

4  of that.

5       THE COURT:  Well, I think in order to make the record

6  clear she's going to have to identify what she's seen and

7  what she's not seen, otherwise the record --

8       MS. DESCH:  I have not seen these.

9       THE COURT:  Hold on just one second.  Just one

10 second.  Wait for the next question.

11      I think you need to clarify that for the record,

12 Mr. Wagner.

13      MR. WAGNER:  All right.  Very well.

14 Q   If you will go page by page and let the jury know

15 which pages you've seen and which pages you haven't seen.

16 A   Okay.  Again, part of these are part of the

17 agreement, but some of them are not.  And when he showed

18 me this book, I could have -- there are some things that

19 he flipped through and showed me, so there are things that

20 I don't remember, or I just glanced over.  So I cannot

21 give you an honest answer on these.

22 Q   All right.  Do you see a page there that references a

23 salary for the CEO and president of the company?

24 A   He showed me nothing that had salaries for any of the

25 CEOs.

1   Q     Do you see a page there that references that?  I

2   believe it's the third page from the top.

3   A     Third page from what?

4   Q     From the front of the document.

5   A     I don't recognize these.

6   Q     Very well.

7   A     I never saw them.

8   Q     Thank you.

9   A     Not these.

10  Q     Okay.  You can put them back.

11  A     Yeah.  No.  And if he did show them, again, I don't

12  remember.

13       THE COURT:  Okay.  Why don't you just put them back

14  in the sleeve there and we'll proceed to the next

15  question.

16       MR. WAGNER:  Excuse me.

17       THE COURT:  Yes, sir.

18       MR. WAGNER:  I have no further questions.

19       THE COURT:  Any redirect, Mr. Gill?

20       MR. GILL:  Very, very briefly.

21       THE COURT:  Okay, sir.

22       MR. GILL:  Your Honor, just so the record is clear,

23  we would go ahead and move for admission of 53-A, the

24  defense exhibit.  It's already been admitted by the

25  government, but just so the jury is clear on what she

1  looked at, we'd move for admission of that.

2       THE COURT:  All right.  It will be 53-A as a package

3  in the sleeve.

4       MR. GILL:  Just that paper.

5       THE COURT:  It will be received as Defendant's 53-A.

6       MR. GILL:  Thank you.

7                   **REDIRECT EXAMINATION**

8  BY MR. GILL:

9  Q    Ms. Desch, just one area.  With respect to Mr. Wagner

10 asked you at the very start about whether you were

11 embarrassed about being in a romantic situation with the

12 defendant.  Tell the jury, put it in context, who was

13 there during that interview, and why were you embarrassed

14 to talk about that?

15 A    My older son was in there.  He said, *"Mom,*

16 *something's wrong.  You need to have someone hear that*

17 *this is illegal."*

18      So when he was sitting in the room while we were

19 going over everything, I had to admit in front of my son

20 that I had slept with him.

21      MR. GILL:  No further questions, Your Honor.

22      THE COURT:  All right.

23      May Ms. Desch be excused at this point, Mr. Wagner?

24      MR. GILL:  Yes, Your Honor.

25      THE COURT:  Mr. Wagner?

1      MR. WAGNER:  Yes, Your Honor.

2      THE COURT:  Ms. Desch, you're excused and free to go.

3  Thank you for coming in.  We appreciate your testimony,

4  ma'am.

5                    **WITNESS STOOD ASIDE**

6      MR. NASEEM:  Your Honor, the United States calls --

7  I'm sorry.  The United States calls Nicki Gentry.

8      THE COURT:  Nicole Gentry.  All right.

9      Ms. Gentry, if you would raise your right hand, place

10  your left hand on the Bible, and face the Clerk of the

11  Court.

12      THE CLERK:  You do solemnly swear that the testimony

13  which you are about to give, in this case, before this

14  Court, shall be the truth, the whole truth, and nothing

15  but the truth, so help you God?

16      MS. GENTRY:  I do.

17      THE COURT:  Have a seat on the witness stand.

18      MS. GENTRY:  Yes, sir.

19      Whereupon, **Nicole Gentry**, having been

20  duly sworn in, testifies as follows:

21                    **DIRECT EXAMINATION**

22  BY MR. NASEEM:

23  Q    Good afternoon, Officer Gentry.

24  A    Good afternoon.

25  Q    Could you state your name for the ladies and

1  gentlemen of the jury, and tell them where you live.

2  A    My name is Nicole Gentry.  I live in Fredericksburg,

3  Virginia in Spottsylvania County.

4  Q    And, Ms. Gentry, can you please explain to the ladies

5  and gentlemen of the jury what it is you do for a living.

6  A    I'm a law enforcement officer for the Fredericksburg

7  Police Department.

8  Q    And, Officer Gentry, how long have you been a police

9  officer with the Fredericksburg Police Department?

10  A    Sixteen years yesterday, sir.

11  Q    Now, Officer Gentry, are you familiar with the

12  defendant, Michael Harris?

13  A    I am.

14  Q    Okay.  Can you identify him to the ladies and

15  gentlemen of the jury, please.

16  A    The gentleman seated to my left.

17     THE COURT:  The record will reflect that Officer

18  Gentry has identified the defendant.

19  Q    Officer Gentry, when and how did you first meet

20  Mr. Harris, and what were the circumstances surrounding

21  that meeting?

22  A    The first time I met Mr. Harris was at a local pub in

23  downtown Fredericksburg.  I was introduced to him by what

24  was a mutual friend at the time.  A trusted friend of mine

25  introduced me to Mr. Harris regarding a business type deal

1  that I was supposed to be very hush, hush about and not

2  share information about, but rather I was invited to look

3  at a presentation that he was presenting on his laptop on

4  the patio area.

5  Q    Now, you use the word *"hush, hush."*  Before you went

6  to the meeting or when -- let ask you this.  Did you go to

7  the meeting?

8  A    I did.

9  Q    When you were at the meeting, or before the meeting,

10  did you have to sign any documents?

11  A    I did have to sign a confidentiality agreement

12  document.

13  Q    Okay.  Excellent.  And what I would like you to do is

14  there is a set of documents there in front of you, and I'd

15  like you to pull out what is marked as Government's

16  Exhibit 26 in that first folder.

17         THE COURT:  What was that number again?

18         MR. NASEEM:  Government's Exhibit 26, Your Honor.

19         THE COURT:  Twenty-six.  All right.

20  A    All right, sir.

21  Q    And if you can take a look at that document.  Take a

22  moment to look at that document, and once you've had a

23  moment to look at it let me know.

24  A    I understand what this document is, sir.

25  Q    Okay.  Can you identify that document for the ladies

1  and gentlemen of the jury?

2  A    It's a non-disclosure agreement that was provided,

3  and you had to sign and date it.

4       THE COURT:  Any objection, Mr. Wagner?

5       MR. WAGNER:  No, Your Honor.

6       THE COURT:  Be received.  You may publish it if you

7  wish.

8       MR. NASEEM:  Can you please publish 26.

9            (Government's Exhibit 26 is received.)

10  Q    Now, focus in on the center part of the document

11  there, Officer Gentry.  Did you read that language there

12  before you signed it?

13  A    I did.

14  Q    And can you give the ladies and gentlemen of the jury

15  a brief explanation of what your understanding was based

16  on what you read.

17  A    My understanding was that once I signed this document

18  and chose to participate in this presentation, was that

19  any knowledge that I gained, anything that was spoken

20  about, that I was not to communicate with anyone else

21  about anything that I had heard or learned through this

22  presentation.  I was to keep my mouth shut about it.

23  Q    Now, scrolling down there to the bottom of that

24  document.  Is that your signature?

25  A    That's not my signature.

1  Q    Who signed that?

2  A    That's my partner, Meredith Gompf.

3  Q    And did she attend that meeting?

4  A    She did.

5  Q    And is this the document that she signed?

6  A    She did.

7  Q    Okay.  And did you sign a document similar to this

8  one?

9  A    I did.

10  Q    Now, looking at the date on the bottom of that

11  document, September 20, 2005.  Was that right around the

12  time frame when this presentation would have occurred?

13  A    As I recall, that's when the presentation and all the

14  disclosure agreements would have come into play.  It was

15  important -- it was important to Mr. Harris that if you

16  were to choose to participate that you signed this

17  document.

18  Q    Okay.  Now, I believe I may have asked you this, but

19  where was that meeting held?

20  A    It's called the Colonial Tavern.  It's a local pub.

21  And I happened to be at that pub at the time I was

22  introduced to Mr. Harris.  And it's at 406 Lafayette

23  Boulevard in downtown Fredericksburg.

24  Q    Now, can you tell us a little bit about the

25  presentation.  And did Mr. Harris speak at that

1  presentation?

2  A    He did.

3  Q    Tell us a little bit about that presentation.

4  A    As I recall, the weather was nice enough where he

5  brought his laptop outside on the patio area and one of

6  the picnic tables that was out there, and we all kind of

7  gathered around the one table.

8         MR. NASEEM:  At this time can we publish Exhibit 161,

9  please.  It's already been admitted into the record, Your

10  Honor.

11  Q    Officer Gentry, there in front of you is Government's

12  Exhibit 161?

13  A    Yes, sir.

14  Q    And if you can just thumb through that for a moment.

15  And if you could, could you identify that set of documents

16  that you're looking at there.

17  A    So far as I flip through, sir, this appears to be

18  very similar to what was on the laptop on the patio area

19  of the tavern that evening.  It was similar to a

20  PowerPoint presentation.  It had graphs, and many

21  photographs and graphs that I had had no clear

22  understanding of.  But it looks very similar to what was

23  on the laptop.

24  Q    Now, could you tell the ladies and gentlemen of the

25  jury a little bit about what specifically it was that

1  Mr. Harris was talking about with respect to the slides?

2  A    Well, as I said, I didn't have a clear understanding

3  of all the information that was included in the slides.

4  What I was clear about when I left that day was that this

5  project was going to be -- to help research a cure for

6  AIDS.  And that my understanding is that his works was

7  working towards the cure for the AIDS disease.

8  Q    Now, were you provided with any documents at that

9  meeting that you recall?

10  A    The kind of a document that kind of summarizes --

11  kind of a summary of what the studies were.  It's kind of

12  like a summary of who was involved, and what they were

13  doing, and there was some biographies.  Small snippets of

14  biographies.

15  Q    Did Mr. Harris say anything about raising money?

16  A    Yes.  The monies needed to be raised for Phase II

17  research trials.  Those words were used.

18  Q    Okay.  And at this time if you could pull out

19  Government's Exhibit 25.  It's been labeled there in front

20  of you, ma'am.

21  A    This is what I was referring to, sir.

22  Q    Okay.  Can you identify that document to the ladies

23  and gentlemen of the jury, please.

24  A    It's a -- it's marked *"CONFIDENTIAL."*  And it's

25  marked, *"EXECUTIVE SUMMARY."*

DIRECT EXAMINATION OF NICOLE GENTRY          234

1  Q    And was this the document that you recall being

2  provided to you at that presentation in Fredericksburg?

3  A    Yes.  And this was supposed to be, again, information

4  that was not to be shared, you know.

5       THE COURT:  Any objection, Mr. Wagner?

6       MR. WAGNER:  No, Your Honor.

7       THE COURT:  The executive summary will be received as

8  your 25.

9            (Government's Exhibit 25 is received.)

10      MR. NASEEM:  Could we publish it.

11  Q    Now, focusing in on the top portion of what's been

12  labeled as *EXECUTIVE SUMMARY,* take a moment and just

13  give an explanation as to whether the information you see

14  there is the information that was imparted to you that day

15  at the Colonial Tavern in Fredericksburg, Virginia.

16  A    Yes.  I mean, there are many words in that paragraph

17  that I don't understand, but my understanding was that it

18  was research regarding a cure or remedy for AIDS.  And

19  that there was some talk about hyperbaric chambers and

20  diving.

21  Q    And when you were -- when you made -- when Mr. Harris

22  made that presentation, what affect did that have on you?

23  A    Well, I wanted to -- certainly did want to help.  I

24  mean, he seemed to be very interested and charismatic

25  about his work.  And again, I was introduced to this

1   gentleman by a trusted friend and, you know, I wanted -- I

2   wanted to help in some way.  He seemed like he wanted to

3   do this work and he seemed very diligent about wanting to

4   do the work and wanting to do this good.  And, you know,

5   at the time, frankly, I thought it was great that somebody

6   was wanting to do that.

7        MR. NASEEM:  If we could scroll down to the fourth

8   paragraph, please.

9   Q    Looking at that fourth paragraph, and I'll read it

10  out to the ladies and gentlemen of the jury, *"The Phase I*

11  *safety trials have been successfully completed, therefore*

12  *additional research funds of $907,670 are being sought to*

13  *initiate Phase II trials."*

14       Did Mr. Harris talk about Phase II trials at this

15  meeting?

16       MR. WAGNER:  Your Honor, I must object to counsel

17  reading from the document unless there's a question.

18       THE COURT:  It's already been read.  You're too late.

19  Objection is overruled.

20       MR. WAGNER:  Just for future reference.

21       THE COURT:  The document speaks for itself.  It's

22  published to the jury.

23       All right.  Let's move on.  Next question.

24  Q    Now, Officer Gentry, again focus on the language of

25  the first sentence there.  Can you explain a little bit

1  about what Mr. Harris talked about with respect to raising

2  funds for Phase II trials?

3  A    Well, the money -- he did speak about that, you know,

4  he needed money to fund those Phase II trials.  There was

5  also talk about trying to get patents, U.S. patents for

6  these works.  But I remember the beginning stages of what

7  was spoken about was very much about, you know, being gung

8  ho about starting these Phase II trials, and it's time to

9  do that.  And, you know, to be able to fund that in order

10 to make it happen.

11 Q    Now, Officer Gentry, I want you to be very clear

12 about this to the jury.  Based on the presentation done by

13 Michael Harris and the documents you reviewed, what was

14 your understanding with respect to what Mr. Harris was

15 going to do with the money if he was provided with it?

16 A    The money that I gave I thought was going to go

17 towards Phase II trials and this work, this good work, of

18 finding a cure for AIDS.

19 Q    Now, what was your -- what was your understanding of

20 when those Phase II trials would begin and when they would

21 start?

22 A    My understanding is as soon as the money was there

23 they could begin.  I invested right away.

24 Q    All right.  So you decided to invest?

25 A    I did.

DIRECT EXAMINATION OF NICOLE GENTRY      237

1  Q     Now, if you can look at what's been marked as

2  Government's Exhibit 27, please.  Now, did you decide to

3  invest on your own?

4  A     I did.

5  Q     And did you have someone -- or did you invest with

6  your -- did your partner invest with you?

7  A     My partner and I invested a total of $5,000

8  collectively together half and half.

9  Q     And what did you receive in exchange for that $5,000

10 investment?

11 A     Immediately I received a subscription agreement.

12 Q     Okay.  So let's take a look at what's been marked as

13 Government's Exhibit 27.  If you can identify that

14 document for the ladies and gentlemen of the jury.

15 A     It's a subscription agreement that has my handwriting

16 at the top where I filled in my name and my address and

17 the date.  And that's my signature in the bottom left as

18 the subscriber.

19     THE COURT:  Any objection to 27, Mr. Wagner?

20     MR. WAGNER:  No, Your Honor.

21     THE COURT:  It will be received.

22     MR. NASEEM:  Can we go ahead and publish that.  Thank

23 you.

24          (Government's Exhibit 27 is received.)

25 Q     Focusing on the top part of that document.  What was

1  the date on which you signed that subscription agreement?

2  A    Third day of October, 2005.

3  Q    Okay.  And is that your name that appears there on

4  the document?

5  A    It is, sir.

6  Q    Now, looking at Paragraph 1.  What was the total

7  amount of shares reflected that were purchased by you

8  individually?

9  A    Two thousand five hundred.

10 Q    And how much shares did you receive in exchange for

11 that $2,500?

12 A    Two thousand five hundred is my understanding.

13 Q    And again, $2,500.  Did you invest a total of $2,500?

14 A    My total investment.  I wrote a check for $5,000.  A

15 personal check for $5,000.

16 Q    And that investment, did that reflect your investment

17 and your partner's?

18      THE COURT:  She already answered that.  Next

19 question.

20 Q    Scrolling down to the bottom there.  That is your

21 signature, correct?

22 A    Yes, sir.

23 Q    And next to that, do you recognize that signature?

24 A    That's Mr. Harris' signature.

25 Q    Okay.  Now, you mentioned you used a check to pay for

1  those shares, correct?

2  A     I did, sir.

3  Q     Okay.  And if you can look at Government's Exhibit

4  Number 28, Sergeant Gentry.

5  A     Okay, sir.

6  Q     And can you identify that document?

7  A     It's my personal check.

8  Q     Is it a copy -- a true and accurate copy of the

9  personal check you used to make this investment?

10  A     Yes, it is.

11       THE COURT:  Any objection, Mr. Wagner?

12       MR. WAGNER:  There's not, Judge.

13       THE COURT:  It will be received.

14           (Government's Exhibit 28 is received.)

15  Q     Now, looking at that check.  Who is that check made

16  out to?

17  A     M.F. Harris Research, Incorporated.

18  Q     And what's the total dollar amount again?

19  A     Five thousand.

20  Q     And the date reflected on that check, October 3,

21  2005, does that accurately reflect the date on which you

22  made your investment?

23  A     Yes, sir.

24  Q     Now, Sergeant Gentry, after you made your investment,

25  did there come a time when you -- what happened after you

1  made your investment?

2  A     After I made my investment, some time had gone by and

3  I was feeling a little uncomfortable about not receiving

4  something tangible saying that I was a shareholder.   And

5  then sometime after that I received a certificate of

6  sorts.   And frankly when I received that, I wasn't super

7  overwhelmed and happy visually about the way that looked

8  either.

9       MR. NASEEM:   Now going back to Government's Exhibit

10  Number 27.   If you can publish that for the ladies and

11  gentlemen of the jury.   And going to the second page of

12  that exhibit.

13  Q     Now, do you recognize that as the certificate that

14  you received in exchange for your investment?

15  A     I do.

16  Q     Now, did there -- did there come a period of time

17  that passed before you made communication with Mr. Harris

18  again?

19  A     There had.   Yes.

20  Q     And how did you make communication with Mr. Harris?

21  A     I didn't make communication with him directly from

22  myself.   I had expressed through this mutual friend that I

23  was not feeling very comfortable about not having received

24  anything tangible regarding this $5,000 check I had

25  written.   Something tangible to say that, you know, I had

1   shares in this company something other than the subscriber

2   agreement.

3        Sometime after that, after I had expressed that I was

4   starting not to feel -- I was starting to feel like I had

5   made a mistake writing this check, I started to feel

6   uncomfortable so I tried to talk to this mutual friend to

7   see if Mr. Harris could give me -- at least give me some

8   piece of mind and give me something tangible so I don't

9   think that I've written this check out into the blue.  And

10  that's what I received.

11  Q    So looking at what's been labeled as Government's

12  Exhibit 29 there before you in the folder.  Now, can you

13  take a moment to look at the 2-page document there before

14  you.

15  A    I understand what it is, sir.

16  Q    Can you identify that document for the ladies and

17  gentlemen of the jury, please.

18  A    It's an e-mail communication between myself and

19  Mr. Harris, and then to other shareholders.

20  Q    And do you recognize them as e-mails that you sent

21  and received to and from your e-mail address?

22  A    Yes.

23  Q    Okay.

24       MR. NASEEM:  Your Honor, at this time we'd like to

25  move in the e-mails.

1      THE COURT:  Any objection, Mr. Wagner?

2      MR. WAGNER:  No objection, Judge.

3      THE COURT:  Be received.

4          (Government's Exhibit 29 is received.)

5      MR. NASEEM:  If we could publish Exhibit 29, please.

6  Q    Going to the -- now, this is a 2-page document.  And

7  going to the second page of the document, if we can focus

8  in on the bottom part.  And, Sergeant Gentry, up at the

9  top, can you explain a little bit about who this e-mail is

10 from and who it's to?

11 A    The e-mail where it begins at the bottom is from

12 myself to Mr. Harris.  And then the top is his reply.

13 Q    Can you generally explain what it is you are

14 communicating to Mr. Harris in that e-mail?

15     THE COURT:  Well, the document speaks for itself.  Do

16 you want her to read it or explain her impression of what

17 she sent?

18     MR. NASEEM:  Why don't I ask her to --

19 Q    Why did you send this e-mail?

20 A    I sent the e-mail because of the shareholders,

21 particularly in the Fredericksburg area.  The ones that

22 I'm very close to and familiar with, we had gotten

23 together and expressed how uncomfortable we were --

24     MR. WAGNER:  Objection as to what other people

25 expressed, Your Honor.

1          THE COURT:  Objection sustained.

2          I think, officer, you just need to talk about your

3    personal impressions, all right?

4          MS. GENTRY:  Yes, sir.

5          THE COURT:  All right.  Go ahead.

6    A    I was not feeling comfortable about not having any

7    contact with Mr. Harris, you know, no updates, what's

8    going on with trials, you know, what's happening.  So I

9    elected to send an e-mail to him and he replied, so I

10   forwarded it on.

11   Q    And the date of this e-mail is May 5, 2009, correct?

12   A    Yes.

13         MR. NASEEM:  If you would scroll up.

14   Q    Did you recognize that as the response provided to

15   you by Mr. Harris?

16   A    Yes, sir.  At the top.  Yes, sir.

17         MR. NASEEM:  Let's scroll up to the top there.  Is

18   that all the way to the top?

19   Q    Now, in the e-mail it mentions, *"we got awarded our

20   US patent and this past Monday our African patent no one

21   threw a party either and it's sad???"*

22         What was your understanding with respect to what that

23   meant?

24   A    That we had gotten our U.S. and African patents.

25   Q    Okay.  Continuing on it says, *"We have a web site*

1   *mfharrisresearch*" --

2        MR. WAGNER:  Objection.  The document speaks for

3   itself, Judge.  She can give her response.

4        THE COURT:  Well, unless he's drawing her attention

5   to that portion for some specific purpose, I'm going to

6   sustain the objection.

7        Are you going to direct her attention to a specific

8   portion of the e-mail?

9        MR. NASEEM:  Yes, Your Honor.

10       THE COURT:  All right.  Do it as succinctly as you

11  can, please.

12  Q    Directing your attention to the following sentence,

13  Sergeant Gentry, what was your impression with respect to

14  what is displayed there and what affect it had on you when

15  you read it?

16  A    I mean, the following couple of sentences, my

17  understanding is that we have a website now and somebody

18  is working on gathering our taxes and financials together.

19  Q    And when you received this information in this

20  e-mail, what affect did that have on you?

21  A    I thought that was great news.  It sounded like some

22  information was on the horizon.  Maybe I would hear more

23  soon.

24  Q    Turning to the first page of that exhibit.  Now, can

25  you explain to the ladies and gentlemen of the jury, is

1   this an e-mail that you sent?

2   A    Yes.

3   Q    And to whom did you send this e-mail?

4   A    Any shareholders that I knew of that I had their

5   e-mail addresses.

6   Q    And what was the purpose of you sending this e-mail

7   to all the other shareholders?

8   A    The other shareholders wanted the information as

9   well, expressed that to me, and I said I would pass on

10  anything that I was able to find out.

11  Q    Now, did there come a time later on when you received

12  a communication to attend a shareholders' meeting?

13  A    Yes.

14  Q    And if you would look to what's been marked as

15  Government's Exhibit 30.

16  A    All right, sir.

17  Q    And can you identify that document, please.

18  A    It's a notification.  An invitation for a meeting

19  from Mr. Harris that I got in the mail.

20  Q    Okay.

21       MR. NASEEM:  And do you have any objection, counsel?

22       Your Honor, at this time I would move to have the

23  letter admitted into evidence.

24       THE COURT:  It will be admitted without objection.

25       MR. WAGNER:  It's already admitted, Judge.

1          THE COURT:  I thought that it was.

2          MR. NASEEM:  Well, this is Government's Exhibit 30,

3     Your Honor.

4          THE COURT:  Well, I think that the same item under a

5     different number with a different witness has been

6     admitted.  I'll let this one come in at this time, but I

7     think there's two.  That's going to be sufficient.

8          MR. NASEEM:  Your Honor, this was the specific

9     invitation that Sergeant Gentry received in --

10         THE COURT:  Is it addressed to her?

11         MR. NASEEM:  Yes, sir.  Well, this --

12         THE COURT:  I apologize to you.  It will come in.

13    All right.  I thought you were putting in the same thing

14    that you put in through another witness.  It will be

15    received.

16         Next question.  Let's go.

17              (Government's Exhibit 30 is received.)

18    Q    Officer Gentry, the letter there before you, how did

19    you receive that letter?

20    A    Through the mail.

21    Q    Okay.  Now, can you briefly explain to the ladies and

22    gentlemen of the jury what is -- what you were invited to

23    and whether you attended that meeting.

24    A    It's an invitation or notification for an annual

25    shareholders' meeting.  It provided the date and the time

DIRECT EXAMINATION OF NICOLE GENTRY

1  and location.  And I did attend that one.

2  Q    And why did you attend that meeting, Sergeant Gentry?

3  A    I was hoping to get some more information to find out

4  what was going on with the investment.

5  Q    And why was that?  At that point in time, why was

6  that?

7  A    There was not a lot of communication.  Not a lot of

8  information was being offered up.

9  Q    Okay.  Now, tell us a little bit about the meeting

10  itself that you attended.  Tell us a little bit about what

11  was discussed.  Who was there and who spoke?

12  A    Mr. Harris was there.  There were several people

13  there.  I was only familiar with the shareholders that

14  were from Fredericksburg that were at this meeting.

15       I will tell you this, I left the meeting --

16       MR. WAGNER:  Objection.  Nonresponsive, Judge.

17       THE COURT:  Wait for the next question, officer.

18       MS. GENTRY:  Yes, sir.

19       THE COURT:  Go ahead with your follow-up question.

20       MR. NASEEM:  Okay.  I apologize.

21  Q    Can you explain to the ladies and gentlemen of the

22  jury what it was -- who was at the meeting?

23  A    Mr. Harris was at the meeting.  There was an

24  attorney.  I don't remember the name of that person.

25  There were -- like I said, I was familiar with the

1   Fredericksburg shareholder people there.

2   Q     Did Mr. Harris speak at that meeting?

3   A     He did.

4   Q     Did he talk about the financial condition of the

5   company at that meeting?

6   A     I don't recall if he did that or not.  I didn't leave

7   with a better understanding of anything when I left that

8   meeting.

9   Q     What was your impression of what was discussed at

10  that meeting?

11  A     I thought it was all really confusing and not clear.

12  And, again, I left that meeting not feeling anymore

13  worldly about my investment than when I arrived.

14  Q     Now, were you provided with any financial information

15  regarding the company and how investor money had been

16  spent?

17  A     I don't recall receiving anything regarding that.

18  Q     Okay.  Now, Officer Gentry, after you left the

19  meeting, can you give the ladies and gentlemen of the jury

20  an explanation of what impression you left with and how

21  you felt about your investment at that point?

22        THE COURT:  I think she just described that.

23        But if there's anything you haven't described, you

24  may.

25        MS. GENTRY:  Well, Your Honor, if I can just add, I

1  felt like I had made a mistake.

2       THE COURT:  Okay.

3  Q    And why is that, Sergeant Gentry?

4  A    I felt as though I had written a check and thought I

5  was doing the right thing and thought we were all doing

6  good things, or headed in that direction of doing good

7  things.  And I feel like I wrote a check and I made a very

8  big mistake.

9       MR. NASEEM:  Now, referring back to Government's

10 Exhibit 30, Your Honor, I'm going to ask this question

11 again because this is related to our count.

12 Q    Are you certain that you received this document via

13 U.S. Mail?

14      MR. WAGNER:  Judge, this has been asked and answered.

15      THE COURT:  No.  Not that specific question.  The

16 objection is overruled.  Not that she received it by U.S.

17 Mail.

18      You may respond, officer.

19 A    I received it in my mailbox at my home address.  Yes.

20 Q    Sergeant Gentry, I have one question.  At the

21 shareholders' meeting in 2010, what was your impression of

22 what Mr. Harris was trying to do and communicate to the

23 investors at the meeting?

24      MR. WAGNER:  Objection to the form of the question.

25      THE COURT:  Yes.  That calls for speculation on her

1   part.  Why don't you rephrase your -- think about it, and

2   rephrase your question.

3   Q    What impression did you have with respect to what

4   Mr. Harris was communicating at the meeting?

5        MR. WAGNER:  It's been asked and answered, Judge,

6   several times.

7        THE COURT:  That's my impression, but is there

8   anything that was responsive to that question that you

9   have not answered already?

10       MS. GENTRY:  May I hear the question again, please.

11  Q    What impression did you have with respect to what

12  Mr. Harris was communicating, or attempting to

13  communicate, at that meeting regarding the company and

14  its --

15       MR. WAGNER:  I have to say asked and answered, Judge,

16  several times.

17       THE COURT:  I think she has.

18       MR. NASEEM:  We'll withdraw the question.

19       THE COURT:  I think she's answered the question.

20       MR. NASEEM:  Thank you, Your Honor.

21       THE COURT:  All right.  Very good.

22       MR. NASEEM:  I pass the witness, Your Honor.

23       THE COURT:  Yes, sir.

24       Mr. Wagner, questions of Officer Gentry?

25       MR. WAGNER:  I do, Judge.

**CROSS-EXAMINATION**

BY MR. WAGNER:

Q    Good afternoon, Sergeant Gentry.

A    Good afternoon.

Q    How are you?

A    I'm well.  Thank you.

Q    First time you met Mr. Harris was back in 2005, is that safe to say?

A    It's been some time ago.  Yes.

Q    And was the first time you met him at that meeting with other people from Fredericksburg at a tavern?

A    It was.

Q    And are you sure this was at the Colonial Tavern?

A    The full name is Home of the Irish -- the Colonial Tavern, Home to the Irish Brigade.

Q    It's also referred to as the Irish Brigade Tavern, is that true?

A    Yes.

Q    Okay.  Thank you.  And do you remember whether Helen Cantrell was there?

A    On that particular visit, I don't know if she was there particularly on that occasion, but I know that she is a shareholder.

Q    Have you spoken to her about her investment?

A    Helen and I really don't -- I mean, we were very,

1   very dear friends about 20 years ago.  Unfortunately, I've

2   not spoken to her -- the last time I spoke to Helen was

3   before she got sick with cancer, and that's been a while.

4   Q    So you didn't speak with her about what happened at

5   that meeting?

6   A    I may have spoken to her.  Several people were fired

7   up, including myself.  I may have spoken to her.  She may

8   have been in the same room.  I can't say whether I did or

9   didn't.  It wouldn't have been uncommon for me to speak

10  with her.

11  Q    Okay.  And do you recall her saying at that meeting

12  that Mr. Harris indicated that he would take a salary from

13  the money that was received?

14  A    That's not familiar to me.

15  Q    Okay.  Was your mother there?

16  A    My mom?  Yes, my mom drove.  I rode with her.

17  Q    And was Michelle Clark there?

18  A    I believe Michelle was there.  Yes.

19  Q    And Terri Hubbell?  Am I saying that name right?

20  A    Terri Gamlin.

21  Q    Terri Gamlin.  There's another Terri perhaps?  Terri

22  Hubbell as well?

23  A    I did not understand her to be a shareholder, but she

24  could have been there perhaps.  I don't think she was,

25  frankly.

1  Q     And Terri Gamlin?

2  A     I believe Terri Gamlin was there.  She is a

3  shareholder.

4  Q     All right.  And do you remember exactly what

5  Mr. Harris said about what he was going to do with the

6  money that you invested into his company?

7  A     It was all going to be for research for a cure for

8  AIDS.

9  Q     And did you testify on direct examination that it was

10  for Phase II trials?

11  A     Yes.  All part of the research.  I mean, I understood

12  Phase II trials would be all part of the research.

13  Q     Okay.  That wasn't part of the human trials which may

14  be a little different than the research?

15  A     I understood it all to be all for the common, like,

16  good for finding a cure for AIDS.  Phase II trials,

17  research, there were a lot of words that were used.  To me

18  it all pointed in the direction of research, sir.

19  Q     Okay.  When you talked about the Phase II trials and

20  when you talked about the research, did you write anything

21  down from that meeting?

22  A     No.  I don't recall that I did.

23  Q     I'm sorry?

24  A     I don't believe I wrote anything down.  I would have

25  kept it, and I don't have anything.

CROSS-EXAMINATION OF NICOLE GENTRY       254

1  Q    Do you know if your mother wrote anything down?

2  A    I don't.

3  Q    Have you spoken to your mother about her investment?

4  A    Yes.

5  Q    And did there come a time when your mother was asked

6  to fill out a questionnaire sent to her by state

7  investigators?

8  A    Yes.  She did speak about that.

9  Q    All right.  And did you see the questionnaire?

10  A    I did.  I got one in the mail.

11  Q    Okay.  And you filled out a questionnaire as well?

12  A    I looked at the questionnaire.  I have a blank one at

13  home, but I believe it belongs to Meredith.  I can't

14  remember if I filled it out or not, to tell you the truth.

15  Q    Did you help your mother fill hers out?

16  A    No.  I don't think I had to help her.

17  Q    Okay.

18  A    She did express to me that she had received this.

19  She asked me if I had received one in the mail, and I said

20  I had.

21  Q    Did she talk to you about who she relied upon in

22  order to make this investment in Michael Harris' company?

23  A    That would have been me.

24  Q    Is it possible that in response to the questionnaire

25  it would have been Michelle Clark?

1   A      As my mother would have filled it out?

2   Q      Yes, ma'am.

3   A      Well, I can see where potentially she would have

4   filled that name in.  Yes.

5   Q      Thank you.

6   A      But I'm the one that notified her --

7   Q      There's no question now.

8   A      I'm sorry.

9   Q      After the presentation, when was the next time that

10  you actually thought about what was said at that meeting

11  in 2005?

12  A      The question is when was the next time after the

13  meeting that I thought about?

14  Q      What was said by Michael Harris about what was to be

15  done with your money, when was the next time you thought

16  about that?

17  A      Quite frankly, I thought about it for probably about

18  another month after the meeting, and I was angry,

19  disappointed, embarrassed, and pretty much decided that I

20  would call that whole adventure a part of my past.

21  Q      So is it safe to say that you didn't think about it

22  for six, seven years?

23  A      It had been some time.  I had made it a part of my

24  past.  Yes.

25  Q      And the next time you thought about it was in

1   response to a request from a law enforcement officer?

2   A    Yes.

3   Q    And you're a law enforcement officer, correct?

4   A    I am, sir.

5   Q    And in that conversation with the law enforcement

6   officer, did you say anything to the officer about Michael

7   Harris referencing Phase II trials?

8   A    I imagine it came up during the interview.  That was

9   part of my understanding is what the money was going

10  toward is research, which included Phase II trials.

11  Q    You say you imagined it did.  You're not sure,

12  though?

13  A    I can't recall every word that I told the

14  investigators, if that's what you're asking me.

15      MR. WAGNER:  If I could have just one moment, Judge.

16      THE COURT:  Okay.

17  Q    Maybe this will refresh your recollection.  Let me

18  show you what is a summary of an interview that you had

19  with Agent Gregor in October of 2012.  If you will look at

20  the second page of the highlighted portion in there.

21  A    All right.

22  Q    Did Agent Gregor write anything down about your

23  saying to him that Michael Harris referenced Phase II

24  trials?

25      THE COURT:  I think you should ask whether that

1   refreshes her recollection.

2        MR. WAGNER:  That's probably true.

3   Q    Did this help to refresh your recollection?

4   A    I want to answer your question.  There's no --

5   Q    I don't think the Judge allowed my question.  If you

6   could, does this help to refresh your recollection?

7   A    Yes.

8        THE COURT:  All right.  Proceed.

9   Q    And isn't it true that you said to Agent Gregor

10  nothing about Phase II trials?

11  A    As it's transcribed on this document, I don't see

12  anywhere on here where it references Phase II trials.

13  Q    Thank you.  And it also says there -- well, let me

14  ask you this.  Did you tell Agent Gregor that you believed

15  that the investment was to be used to further conduct

16  research for the company?

17  A    Yes.

18  Q    Okay.  So it would appear that you weren't sure about

19  what Mr. Harris said, is that fair to say?

20       MR. GILL:  Your Honor, I object to that

21  characterization.  He's using a document provided by

22  another person that's used to refresh her memory, and now

23  he's trying to impeach her with a report written by

24  somebody else.

25       THE COURT:  I think the objection is sustained.  You

1   may approach it differently, but not the way you presented

2   it to her.

3         MR. WAGNER:  Thank you.

4   Q    Were you certain about what you said to Agent Gregor

5   about the statements that Mr. Harris made back in 2005 to

6   get you to invest in the company?

7   A    I'm certain that what I -- the way I was interviewed

8   and answered the questions for Agent Gregor was true and

9   correct as I can recall from 2005.

10  Q    That's fair enough.  Thank you.

11        Now, as a police officer -- you're a sergeant, is

12  that correct?

13  A    Yes, sir.

14  Q    How long on the force?

15  A    Sixteen years yesterday.

16  Q    And do you investigate fraud cases?

17  A    I have taken preliminary police reports on fraud

18  cases.  It's been some time, but I've done it.

19  Q    And through the course of this experience, this

20  situation you had with Mr. Harris in 2005, that never

21  prompted you to seek any investigation of him for fraud,

22  is that correct?

23  A    Several times.

24  Q    In 2005?

25  A    Maybe not by the end of that first year, but there

1   were several times that I thought that I should report

2   something, but out of embarrassment I did not.

3   Q    Okay.  In 2009 you learned that the company received

4   a United States patent, is that right?

5   A    Yes.

6   Q    And an African patent, correct?

7   A    As indicated in the e-mail.

8   Q    And would it be fair to say that you were pretty

9   excited about the company then?

10  A    I don't think at any time did I feel excited.  I

11  mean, I never really felt like I had a clear understanding

12  as to what was going on.  I mean, I was glad that, you

13  know, face value on the e-mail it appeared that he seemed

14  to be very excited.  And I was a shareholder and I wanted

15  to be part of this wonderful thing we were doing, but it

16  was never really clear to me if anything was getting done.

17  Q    Now, is it true that Mr. Harris in his presentation

18  in Fredericksburg back in 2005 that he was trying to tell

19  the people there that he was moving the company forward,

20  is that safe to say?

21  A    It sounded -- yeah, it sounded like he was ready to

22  go forward with the Phase II trials.

23  Q    And you indicated that there was an attorney present

24  at that meeting, correct?

25  A    As I -- the one in Tyson's, sir?

1  Q    I'm sorry.  At the 2005 meeting that you had with

2  Mr. Harris.

3  A    No, sir.  I was -- the attorney I referenced what I

4  meant was at Tyson's Corner.

5  Q    I'm sorry.  Was there an attorney present --

6       THE COURT:  Now, you're talking about 2005?  You're

7  talking about at the pub in Fredericksburg, right?

8       MS. GENTRY:  Yes, sir.  That's my understanding.

9       THE COURT:  Go ahead.

10 Q    Do you recall whether there was an attorney present

11 in 2005 at that meeting in Fredericksburg?

12 A    I don't recall an attorney being present.  No.

13 Q    Do you recall someone named Jeff Seto that was

14 involved with Mr. Harris at that time?

15 A    No, sir.  I don't recall.

16 Q    Did you speak with your mother about -- did your

17 mother attend any meetings with Mr. Harris that you did

18 not attend, to the best of your knowledge?

19 A    I don't know, sir, if she did or not.  It wouldn't

20 seem reasonable to me that she would, but I don't know

21 that she didn't.

22 Q    And did you discuss with her at any time whether Jeff

23 Seto was a speaker at that meeting?

24      THE COURT:  What meeting?

25

1          MR. WAGNER:  The 2005 meeting at the tavern.

2  A    I don't recall a Jeff Seto, sir.

3  Q    Okay.

4          MR. WAGNER:  Let me see Exhibit 53, if I could.

5  Q    Do you recall if Mr. Harris had this folder with him

6  at that meeting in 2005?

7          THE COURT:  You're referring to your Exhibit 53?

8          MR. WAGNER:  Exhibit 53.  Yes, sir.

9  A    I don't have any idea.  It's been several years ago.

10          MR. WAGNER:  I'll move on.

11  Q    Now, do you remember over the course of your meetings

12  and your discussions with Mr. Harris whether he talked

13  about the Deep Blue group?

14  A    He did.

15  Q    And did he indicate that the folks in Deep Blue were

16  trying to steal his science?  Do you remember that?

17  A    Yes.

18  Q    And that they had split off from him at a time in the

19  past and were in competition with his company, is that

20  right?

21  A    Yes.  I mean, that was my understanding.  When he

22  spoke about that, it was usually very quick snippets and

23  he was typically angry when he was speaking about it.  I

24  could tell that these were folks that he used to worked

25  for or worked with, and that he was not happy with them.

1   And then he would reiterate how important it was to keep

2   the information that we knew to ourselves and not talk

3   about it.

4   Q     And did you ever remember the name Jeff Seto being

5   associated with the people from Deep Blue?

6   A     Again, sir, I don't know that name.  I really can't

7   associate any name with Deep Blue.  I don't really recall.

8   Q     Matt Johnson doesn't ring a bell?

9   A     No, sir.

10        MR. NASEEM:  Your Honor, objection.  Asked and

11   answered.

12        MR. WAGNER:  Okay.

13   Q     Do you recall that Mr. Harris -- one of the things he

14   talked about when he tried to -- when he showed his

15   PowerPoint presentation and when he talked about his

16   company, do you recall that he talked about the need to

17   get big sources of income coming into the company?

18   A     Sir, if you're asking me if I recall that verbiage

19   from 2005, I don't necessarily recall it.  My

20   understanding during that meeting is that money was

21   needed.  As far as large investments, I don't remember

22   that verbiage.

23   Q     And in order to conduct the Phase II trials, a large

24   amount of capital would have been required for the company

25   to conduct those trials, is that fair to say?

1   A    I left knowing that money was needed to go further,

2   sir.

3   Q    And do you remember from the 2010 shareholders'

4   meeting that there was a lot of talk about raising capital

5   in order to move on to the Phase II trials to the human

6   trials?

7   A    Money was always needed.  It was always a topic.

8   Q    All right.  And isn't it true that Michael Harris was

9   the CEO and president of this company?

10  A    It's my understanding.

11  Q    And it was a one-man show?  It was just him really?

12  A    As far as I understood except for who this secretary

13  was.  That was my understanding, yes.

14  Q    And you felt that Mr. Harris was very passionate

15  about the work he was doing, isn't that right?

16  A    That was the very first impression he gave me when I

17  met him.  Yes.

18  Q    And there were things that he was doing to move the

19  company forward, is that fair to say?

20  A    It sounded to me during the first meeting I had with

21  him that he had a plan.  Like there were things that he

22  wanted to do for the future.  In fairness, I had just met

23  the gentleman so I didn't know a lot about his past, but

24  he seemed to have kind a mapped out a future with the

25  Phase II trials and going forward, and he seemed to be

1   very excited about this research regarding the cure for

2   AIDS.

3   Q     All right.  And is it fair to say that as a president

4   and CEO of this company that he's entitled to a salary?

5   A     I don't see why not.

6   Q     And is it fair to say that as president and CEO of

7   this company that there are office expenses that he

8   incurs?

9   A     I would imagine you need certain supplies to do this

10  work.  Yes.

11  Q     And travel expenses that he had in promoting the

12  company?

13  A     As it relates to research for the cure of AIDS, I

14  would have been all right with that.

15        MR. WAGNER:  One moment, please.

16        Nothing further, Judge.

17        THE COURT:  Mr. Naseem, any redirect?

18                    **REDIRECT EXAMINATION**

19  BY MR. NASEEM:

20  Q     Sergeant Gentry, at that meeting in 2005 when

21  Mr. Harris made the presentation at the Colonial Tavern,

22  what did he say about applying investor funds to personal

23  expenses?

24  A     We didn't talk about personal expenses.

25  Q     Did he mention anything about using the investor

1   money that he had took from the people at that meeting to

2   apply toward things such as his mortgage?

3   A      No.

4   Q      Such as his farm?

5   A      No.

6   Q      Such as utilities on his house?

7   A      No.  That was not my understanding, sir.

8   Q      Now, you were provided with a document.  A 302 is

9   what it was.  Is that 302, the document that counsel

10  provided to you, is that a transcription of the statements

11  that you made word-for-word to Agent Gregor?

12  A      It appears to be, sir.

13  Q      So what distinction did you make based on the

14  representations of Mr. Harris between Phase II trials and

15  research?

16         THE COURT:  What distinction did she make to the

17  agent or to herself?  Put it in context, Mr. Naseem.

18  Q      What distinction did you make between the term Phase

19  II trial and the research in the context of how Michael

20  Harris explained them to you?

21  A      Sir, my understanding is that the research --

22         MR. WAGNER:  Objection to her understanding.  That's

23  not relevant.  What's relevant is what Michael Harris told

24  her.

25         THE COURT:  I think the question is what is her

1 understanding.  The question calls for in her mind is

2 there a distinction between research and Phase II trials,

3 is that correct?

4     MR. NASEEM:  That's correct, Your Honor.

5     THE COURT:  You may answer, sergeant.

6 A   My understanding is research, Phase II trials,

7 everything was the same thing.  It's all research all

8 going towards the cure for AIDS.

9     THE COURT:  Next question.

10 A   So, I made no distinction, frankly.

11 Q   Thank you.

12     MR. NASEEM:  Those are all the questions I have, Your

13 Honor.

14     THE COURT:  May the sergeant be excused?

15     MR. NASEEM:  Yes, Your Honor.

16     THE COURT:  Mr. Wagner, may the sergeant be excused?

17     MR. WAGNER:  She may.

18     THE COURT:  Sergeant, thank you for your testimony.

19 We appreciate you coming in today.

20     MS. GENTRY:  Yes, sir.

21                    **WITNESS STOOD ASIDE**

22     THE COURT:  Do you have a relatively short witness,

23 Mr. Gill?

24     MR. GILL:  No, Your Honor.  This will be a few

25 minutes.

1        THE COURT:  What do you mean by that?

2        MR. GILL:  Probably 40 minutes on direct.

3        THE COURT:  All right.  Then we're going to take it

4   first thing tomorrow morning.

5        Ladies and gentlemen, we're going to recess now until

6   9:00 tomorrow morning.  Until then, I want to remind you

7   how important it is not to discuss the case among

8   yourselves, or with anyone else.  I know how tempting it

9   is tonight when you get home to talk to your children,

10  your spouse, your friends about the exciting case you're

11  hearing down here at the courthouse, but you just simply

12  cannot do that.  Keep your own counsel.  Avoid any news

13  contact about this case.  Get a good night's sleep.  We'll

14  see you back here tomorrow morning at 9:00.

15       JUROR:  Do we leave these here?

16       THE COURT:  Yes, ma'am.  Just leave them right there.

17  The Marshal will take care of them for you.

18     (The jury is no longer present in the courtroom.)

19       THE COURT:  Anything further before we recess?

20       MR. GILL:  No, Your Honor.

21       THE COURT:  Mr. Wagner?

22       MR. WAGNER:  No, Your Honor.

23       THE COURT:  All right.  Then we'll stand in recess

24  until tomorrow morning at 9:00.  I've got a matter at

25  8:30.  I'm planning on having that completed by 9:00, but

1    if not it may be a minute or two late.  I'm going to

2    strive to be finished by 9:00.

3         MR. WAGNER:  Sounds good, Your Honor.

4         THE COURT:  All right.  I'll see everyone then.

5    Thank you.

6         We'll stand in recess.

7              (The proceeding concluded at 5:27 p.m.)

8                   REPORTER'S CERTIFICATE

9              I, Krista M. Liscio, OCR, RMR, Notary
     Public in and for the Commonwealth of Virginia at
10   large, and whose commission expires March 31, 2016,
     Notary Registration Number 149462, do hereby certify
11   that the pages contained herein accurately reflect
     the notes taken by me, to the best of my ability, in
12   the above-styled action.
              Given under my hand this 10th day of July, 2013.

13

14              _____
                Krista M. Liscio, RMR
15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25