UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA        }
                                }
v.                              }        Criminal Case No.:
                                }        3:12 CR 170
MICHAEL F. HARRIS               }

                                        February 26, 2013

**COMPLETE TRANSCRIPT OF JURY TRIAL**
**BEFORE THE HONORABLE HENRY E. HUDSON**
**UNITED STATES DISTRICT COURT JUDGE**

APPEARANCES:

Michael R. Gill, Esquire
Gauhar Naseem, Esquire
OFFICE OF THE UNITED STATES ATTORNEY
600 East Main Street
Suite 1800
Richmond, Virginia  23219
     Counsel on behalf of the United States


Robert J. Wagner, Esquire
OFFICE OF THE FEDERAL PUBLIC DEFENDER
701 East Broad Street
Suite 3600
Richmond, Virginia  23219

Nicholas R. Klaiber, Esquire
TROUTMAN SANDERS LLP
1001 Haxall Point
P.O. Box 1122
Richmond, Virginia  23219
     Counsel on behalf of the Defendant


                    KRISTA M. LISCIO, RMR
                   OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT

# E X A M I N A T I O N S

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Erika Carrier | 273 | 307 | 322 | --- |
| Rusty Carrier | 329 | 345 | 356 | --- |
| Agent Tobar | 359 | 389 | 395 | --- |
| Marcelo Bellato | 397 | 427 | --- | --- |
| Peter McGivney | 436 | 443 | --- | --- |
| John Marosi | 446 | 477 | 499 | --- |
| Steven Weiner | 503 | 531 | 536 | --- |
| Wendy Thrane | 538 | --- | --- | --- |
| Sandra Raynor | 549 | --- | --- | --- |

1          (The proceeding commenced at 9:08 a.m.)

2     THE COURT:  Are we ready for the jury?

3     MR. GILL:  We are.  One quick issue, Your Honor.

4     THE COURT:  Yes, sir.

5     MR. GILL:  With respect to yesterday, I just wanted

6 to bring this up out of the jury's presence.  Mr. Wagner

7 is cross-examining government witnesses with FBI 302,

8 investigative reports.

9     THE COURT:  Yes, sir.

10     MR. GILL:  They were not crafted or adopted by those

11 witnesses.  I fully understand you can refresh the

12 witness's recollection, but I think it's improper to sit

13 there and then say isn't it true that it says, and then

14 kind of cross them with that when it's not in context and

15 they didn't draft it.

16     THE COURT:  Well, I thought we had corrected that and

17 Mr. Wagner backed off on that.  I think he understands

18 that.  But as you well know because you're as schooled in

19 evidence as anybody here, you can refresh a witness's

20 recollection with a document that you didn't draft.

21     MR. GILL:  Absolutely.

22     THE COURT:  As long as after you review it it does in

23 fact refresh your recollection.  And as long as he asked

24 them whether or not it does, then I think that he can go

25 ahead and question them about the substantive matter of

1  the 302.

2       MR. GILL:  Yes, sir.

3       THE COURT:  But he knows that.

4       MR. GILL:  That's clear, Your Honor.  Thank you.

5       THE COURT:  Gentlemen, are we ready for the jury?

6       MR. GILL:  We are.

7       THE COURT:  Marshal, bring the jury in.

8            (The jury is present in the courtroom.)

9       THE COURT:  Good morning, ladies and gentlemen.

10      JURORS:  Good morning.

11      THE COURT:  We continue with the government's

12  evidence.

13      Mr. Gill, who will be your next witness, sir?

14      MR. GILL:  Erika Carrier, Your Honor.

15      THE COURT:  Okay.

16      Ms. Carrier, if you would come forward, please.

17      Ms. Carrier, if you would raise your right hand, left

18  hand on the Bible, and face the Clerk of the Court.

19      THE CLERK:  You do solemnly swear that the testimony

20  which you are about to give, in this case, before this

21  Court, shall be the truth, the whole truth, and nothing

22  but the truth, so help you God?

23      MS. CARRIER:  I do.

24      THE COURT:  Have a seat on the witness stand,

25  Ms. Carrier.

1          Whereupon, **Erika Carrier,** having been

2  duly sworn in, testifies as follows:

3                      **DIRECT EXAMINATION**

4  BY MR. GILL:

5  Q    Good morning.  Please introduce yourself to the jury.

6  A    Good morning.  I'm Erika Carrier.  I live on a farm

7  near Culpeper, Virginia.  And I work in the horse

8  industry.

9  Q    How long have you lived in the Virginia area?

10 A    Since 1994.

11 Q    Tell us -- you mentioned that you work in the horse

12 industry?

13 A    Uh-huh.

14 Q    Tell us what you do in the horse industry.

15 A    I have a variety of positions.  I worked both in

16 Virginia and in Lexington, Kentucky in the thoroughbred

17 racing industry.  I work for a consignor in Kentucky at

18 the thoroughbred sales, and I also look for horses for

19 private clients and evaluate them if they're not able to

20 be in Kentucky at the time.

21      THE COURT:  Ms. Carrier, would you kind of relax a

22 little bit and slow down just a little bit because this

23 young lady has got to take your testimony down, okay?

24      MS. CARRIER:  Sorry.  Thanks.

25      THE COURT:  All right.

1   Q    Now, how long have you been in the horse industry?

2   A    For 25 years.

3   Q    Tell us a little bit about your educational

4   background.

5   A    I went to the University of Maryland, and graduated

6   with a teaching degree in '93.  And I used to teach school

7   and now I do the horses full-time.

8   Q    Later on today the jury is going to meet Russell or

9   Rusty Carrier.  How do you know him?

10  A    We were dating and then married for about nine years.

11  Q    Now, are you currently married to Mr. Carrier?

12  A    No.  We're currently separated.

13  Q    You're currently separated?

14  A    Yes.

15  Q    Now then, ma'am, I want to talk to you about Michael

16  Harris.  Do you see him here in the courtroom today?

17  A    Indeed.

18       MR. GILL:  Your Honor, may the record reflect the

19  witness identified the defendant?

20       THE COURT:  It will so reflect.

21  Q    When did you first hear of the defendant?

22  A    I was working at a horse sale in Lexington, Kentucky

23  in the beginning of 2009.  Frequently when I'm out there I

24  keep an eye out for horses that might go from a career in

25  flat racing, which is sort of the basic, you know, the

1  horses run around the circular track like at Colonial

2  Downs.   Some of those horses can transition into a career

3  in steeplechasing, which is when they race over fences.   I

4  frequently keep an eye out for that kind of a horse for

5  some clients in Virginia and Pennsylvania.

6       There was a particular horse that I thought looked

7  like an interesting prospect, and I found a friend of mine

8  and just pointed out that, you know, this horse might be

9  interesting.   Do you have a client that's looking, or do

10 you know anybody.   And he said he didn't personally, but

11 he knew a guy that he'd met at the races and he felt that

12 he might be looking.   And it was Michael.   And so he had

13 -- you know, he phoned Michael who phoned me, and we went

14 back and forth about the horse a little bit and discussed

15 it as a possible prospect.

16 Q    So that day did you actually talk to the defendant,

17 Michael Harris, on the phone?

18 A    Yes.

19 Q    Did he identify himself as Michael Harris?

20 A    Yes.

21 Q    Tell us what he told you about what he was looking

22 for and what he was willing to pay in early 2009 for a

23 horse.

24 A    He was looking for a horse to ride himself over

25 fences.   There are a lot of like amateur races.

1        MR. WAGNER:  Objection.  Not responsive to the

2   question, Your Honor.

3        THE COURT:  The objection's overruled.  I think it's

4   foundational.

5        Go ahead.

6   A    He explained that he was looking for a horse to ride

7   in some of the amateur races.  And I said I wasn't quite

8   sure what price range it would go to.  It could be, you

9   know, very expensive or be very inexpensive.  It all

10  depends on who's there looking.  And we talked about the

11  horse being in the $5,000 to $10,000 range.  And I just

12  said I would be on the phone with him when the horse went

13  to the ring.

14  Q    Based on that conversation, what did you understand

15  he authorized you to spend, if possible, to get that

16  horse?

17  A    At least $5,000.  And he may be willing to go higher.

18  It didn't really come to a specific once the horse went

19  over $10,000.  It ended up being a reasonably expensive

20  horse, so we dropped out of the bidding.

21  Q    So after he said he was willing to go to $5,000, or a

22  little bit higher, were you able to close the deal at all

23  on this horse?

24  A    We were not.  The horse ended up going for about

25  $20,000.

1  Q    Now, did you keep in contact with the defendant after

2  that day?

3  A    I did.  In our phone conversations, and in my

4  conversations with my friend who had introduced us, you

5  know, Michael spoke of a really neat start-up company that

6  he had and he wanted to tell me more about it.  So when I

7  got back to Virginia, he invited me over to see the horses

8  that he had and to hear more about his company.

9  Q    Did he tell you about his background or his training?

10 A    Yes.

11 Q    What do you recall about that?

12 A    He spoke quite at length about, you know, sort of the

13 scientific background he had.  That he'd been in medical

14 school but that he hadn't graduated.  And the other -- he

15 talked a bit about how he'd worked in a research capacity

16 and then in various labs.  And also went into some detail

17 about being in the Caribbean working with one of the SEAL

18 Teams when they were diving, and that was where he told me

19 that he learned about these divers that have been cured of

20 HIV through the high pressure and hyperbaric.

21 Q    And now you mentioned that you went to his house?

22 A    I did.

23 Q    How soon?  You said in early 200 --

24 A    In the week after I returned from the sale.  In

25 Virginia at that time I was also representing a horse feed

1  company, and he was interested in finding out more about

2  that so I took some samples and brochures over for that as

3  well.

4  Q    Eventually did he become a customer of yours for

5  horse feed?

6  A    Yes.

7  Q    How long did that relationship last?

8  A    A couple of months.

9  Q    Now then tell us about the house.  When you arrived

10 at the defendant's, what do you recall about it?

11 A    It was kind of a cute little farm house in the

12 country.  It had a little barn next to it that he was

13 still working on.  Sort of a typical horse person's house.

14 You know, there was lot of photographs of horses and a lot

15 of other photographs of, you know, canoeing.  And he

16 explained about the competitive whitewater canoeing that

17 he'd done, and had some photographs of that.

18 Q    Do you remember the number of horses that he had at

19 that time in early 2009?

20 A    I think he had two or three on the property.  He had

21 one that he was getting ready to race, and it was the one

22 that we focused on.

23 Q    Now, did he do the presentation for you at his house?

24 A    Yes.

25 Q    Just generally describe for the jury what you recall

1  about the presentation itself.

2  A    He discussed the -- being in the Caribbean and these

3  lobster divers that he said had been HIV positive and that

4  were diving, you know, to get the lobsters to support

5  themselves.  But these -- and he was explaining how

6  because of the deep depths to which they were diving

7  something was happening with the HIV virus and they were

8  turning up HIV negative after this exposure to I guess

9  like the deep pressure.  And he talked about how he had

10 replicated this with some of the people with whom he was

11 doing research using a hyperbaric chamber.  And he talked

12 about how in Europe and in the Caribbean there are people

13 who had actually become HIV negative after treatment in

14 the hyperbaric chamber.  And he had a lot of, you know,

15 scientific briefing or slides and photographs.

16 Q    Take a look at the stack in front of you at the very,

17 very bottom.  Exhibit 161, which has been admitted into

18 evidence.  Thumb through that real quick.  And does that

19 appear to be similar to the presentation that he did for

20 you?

21 A    Yes, it does.

22       MR. GILL:  If we could see Exhibit 161, Page 5.

23 Q    During that presentation, did he get pretty technical

24 about the science and what the company was doing?

25 A    Yes.

1  Q     Did he also talk to you about, you know, that the

2  company had hyperbaric chambers?

3  A     Yes.

4  Q     Take a look at 161, Page 18.  Take a look at that

5  slide.  Does that look in any way familiar to what the

6  defendant showed you?

7  A     Yes.  Uh-huh.

8  Q     What do you recall about that?

9  A     He explained that the hyperbaric chamber was in

10 existence.  It was sort of sitting there ready to go.  And

11 it showed the diagram, you know, of the number of people

12 that could fit inside it.  And the wonderful part of it

13 being portable in this container was that it could be

14 transported.  He said he could go to Africa with it and

15 treat all these people and, you know, just the sheer

16 numbers of people that could be helped very quickly was a

17 really, you know, appealing part of the presentation.

18 Q     And also we see Exhibit 161, Page 19.  Tell us if

19 that at all looks familiar to you.

20 A     It does.

21 Q     What is that?

22 A     That was the diagram of the inside of the chamber.

23 The way -- the number of people that could fit in there.

24 Q     Now, did he solicit investment money from you?

25 A     At that point he told me that he was looking for

1  investors.  I do sort of sales and marketing in my jobs in

2  the horse industry, and he brought up that I could be

3  really helpful doing some marketing and bringing people in

4  to invest in the company.  He pointed out that many of the

5  initial trials were already completed, and that he needed

6  money to finish securing the patent because the patent was

7  supposedly coming through very soon.  And then all that

8  was needed was some more money to fund the last trials,

9  human trials, and get it approved by the F.D.A. and begin

10 helping people both in the States and abroad.

11 Q    And according to what the defendant told you in early

12 2009, how imminent was all this?  How close?

13 A    Very imminent.  He said that the patent was already

14 in the works, and it should be coming through really

15 anytime.

16 Q    Now, you mentioned he talked to you about marketing

17 possibilities.  I mean, did he encourage you to find other

18 investors?

19 A    He did.  He asked me to bring Rusty over to meet him

20 and hear the presentation, and then he encouraged me to,

21 you know, think about who else in the horse industry I

22 might know or, you know, just in my circle of friends that

23 I might be able to introduce him to and let him make his

24 presentation so that they could also invest.  Because not

25 only was it this a wonderful opportunity to help people,

1  but he said as soon as the patent came through and they

2  could sell the shares publically, he projected that the

3  investment would, you know, multiply exponentially.

4  Q     He mentioned that he wanted to meet your husband.

5  Did that actually happen?

6  A     It did.

7  Q     And when did that happen and where?

8  A     Probably in that next week we went over to Luray and

9  had dinner and, you know, saw the horses, discussed

10 horses, and things like that, but also saw this

11 presentation.  And, you know, he went into some detail

12 about, you know, the diving and the whole synopsis of the

13 entire project.

14 Q     Did he do basically the same presentation again for

15 your husband that he had done for you?

16 A     Yes.

17 Q     Same representations about what was going to be done

18 with the money and the status of the company?

19 A     Yes.

20 Q     Did he talk to you about Deep Blue, or anything like

21 that?

22 A     He briefly mentioned that he'd had some partners in

23 this project initially who I think while he was in Europe

24 or while he was out of town had tried to take over the

25 project and sort of take it out from under him, but he

1  indicated that that had been settled or taken care of and

2  it wasn't an issue or a threat in terms of people

3  investing in it.  He used that as sort of a springboard to

4  explain why the non-disclosure agreements, and all these

5  things, were so crucial.

6  Q    You mentioned non-disclosure agreements.  Did you and

7  your husband sign non-disclosures?

8  A    Yes.

9  Q    Now, have you been in contact that you know of with

10  Deep Blue or Matt Johnson or --

11  A    Well, once late in the spring or early summer once it

12  became a little clearer of what was really going on, I

13  tried to phone a couple of them and I couldn't really come

14  up with phone numbers, or I couldn't really connect with

15  any of them.  I tried to do a little bit of research and

16  figure out where they might be and if they could give me

17  any information, but I wasn't really able to get ahold of

18  anyone.

19  Q    Now then, let's talk about some of the documents that

20  you and your husband received.  Take a look at Exhibits

21  75, 76, and 77 in the folders there in front of you.  And

22  tell us generally, are those documents that you received

23  from the defendant in connection with this opportunity?

24  A    That is.  Yes.

25       THE COURT:  Any objection to these documents,

1  Mr. Wagner?

2         MR. WAGNER:  No, Your Honor.

3         THE COURT:  Exhibits 75, 76, and 77 will be received

4  without objection.

5         MR. GILL:  Thank you, Your Honor.

6         THE COURT:  You may publish them as well.

7             (Government's Exhibits 75, 76 & 77 are

8              received.)

9         MR. GILL:  Thank you, Your Honor.

10  Q    Let's take a look at Exhibit 75.  The jury has seen

11  this before.  Just generally tell us what we're looking at

12  here.

13  A    It's the basic synopsis, which is what he started

14  with me with the diving and, you know, the HIV-positive

15  people, how they had been cured.  This was sort of the

16  intro to why this project worked, as well as his medical

17  and scientific background.

18  Q    If we could go all the way to the bottom to the very

19  last paragraph.  First sentence.  Is that generally what

20  he represented to you that he was at in this process when

21  he was asking you and Rusty Carrier for money?

22  A    Yes.

23  Q    Exhibit 76.  And generally what was this?

24  A    Basically, it's the same thing expanded.  Again,

25  reviewing the reasons that it would work, you know, the

1  science behind it and, you know, in the synopsis of the

2  consultants and the medical and business experts that he

3  said were on the board that were supporting the project.

4       MR. GILL:  If we could zoom out and focus in on the

5  last paragraph of the executive summary, Page 1, Exhibit

6  76.  The jury has it in front of them.  They're reading

7  it.

8  Q    And does that also represent or fit with what he told

9  you that he was doing and where he was in this process?

10 A    Yes, it does.

11 Q    Now, there's other information attached to the

12 executive summary such as the background of Michael

13 Harris.  It also references another doctor.  All in all,

14 did this information give you confidence or did not give

15 you confidence in the investment plan you were doing?

16 A    It did give me confidence.  You know, I felt that

17 people from Duke and, you know, some of these very well

18 regarded institutions were on board with this, that it was

19 legitimate, and a really positive thing.

20 Q    Finally, Exhibit 77.  If we can just focus on the

21 upper portion.  This is a newsletter talking about Deep

22 Blue, Incorporated and Jeff Seto.  You mentioned this a

23 while ago.  According to the defendant, was this

24 presenting a problem for your investment in the company,

25 the company moving forward, or was it not a problem?

1   A     My understanding was that it wasn't a problem.    It

2   was simply a reason to be cautious in terms of the people

3   with whom he was going to share the information, that the

4   non-disclosures were very important and that, you know, he

5   wanted me to go find people to invest but to be careful

6   that they would be sort of on our side.

7   Q     Now, through your interactions with the defendant,

8   what he told you, what did you understand about who was in

9   charge of this company, that being M.F. Harris Research,

10  Incorporated, and also if it had a board of directors?

11  A     I was led to understand that he was in charge.    The

12  board, you know, the scientific review type people were

13  there more in an advisory capacity, but that he was

14  running the day-to-day operations and doing, you know, the

15  research and presentations to the F.D.A. and to various

16  entities overseas.

17  Q     Now, at some point around this same time period did a

18  patent party come up?

19  A     It did.   Sort of in the spring when the patent was

20  theoretically imminent, he did bring up the concept that

21  some of the investors should perhaps get a room downtown

22  or at the Ritz or some place to have a big party to

23  celebrate the patents having come through, and sort of to

24  use that as a springboard to get more investing --

25  investments from people.

1  Q    Now, before we get to Rusty Carrier's investment,

2  around this same time did he also help Michael Harris with

3  his horses?

4  A    He did.  Rusty had been a very, very good

5  steeplechase trainer for quite a long time, and Michael

6  had a horse that he was trying to get ready to run in one

7  of the Point-to-Point competitions in the Foxhunter's

8  Race.  The horse had some issues, and Rusty offered him

9  some coaching, and I helped out a bit.  I had my horse

10  dentist fix the horse's teeth which can make a big

11  difference to their comfort and to their ride-ability, and

12  then Rusty helped him a couple of times schooling and then

13  at the races.

14  Q    And while we're on that, I mean, tell us what did you

15  understand the defendant's riding involvement to be in

16  steeplechase based on yours and your husband's interaction

17  with him at that time?

18  A    He was an amateur who did it for entertainment.  You

19  don't ride in Point-to-Points really to make any money

20  because you get a little silver cup and the fun of having

21  done it.  But the Point-to-Points are sporting

22  competitions.

23  Q    Go ahead and explain to the jury.  You say

24  Point-to-Point.  Is that different from what are referred

25  to as sanctioned races?

1  A    In Virginia, for example, you have most of the fox

2  hunting clubs will have a Point-to-Point meet, which is,

3  you know, all you get for a prize is, you know, a little

4  trophy or sometimes somebody will put up a gift

5  certificate or maybe $1,000 at some of them. But it's

6  really just a sporting competition. Some of the

7  professional trainers will send a young or an

8  inexeperienced horse to a Point-to-Point to, you know,

9  school it up to possibly run in the sanctioned races

10 later.

11     The sanctioned races are governed by the National

12 Steeplechase Association. They're frequently run at some

13 of the bigger racetracks. Up in Sarasota up in New York,

14 they'll have racing for real money under pari-mutuel

15 rules. But it's sort of two different echelons. They're

16 sort of the bush-league, so to speak, and then the

17 professionals. And they're a different caliber of horses

18 and a different caliber of rider/trainer.

19 Q    Based on your experience in Point-to-Point races in

20 Virginia, is there significant money involved in those

21 races for the top winners?

22 A    No. You can spend a significant amount of money on

23 it, but the likelihood of making it back with a

24 Point-to-Point horse is fairly unlikely.

25 Q    Are you aware of the defendant winning any of these

1  Point-to-Point races in February of 2009?

2  A    He did.  He won the Foxhunter's Race at Casanova.

3  Q    Were you there that day?

4  A    We were.

5  Q    Describe for the jury what happened.

6  A    You know, we showed up to help him.  Help him sort of

7  get his equipment and things a little bit more organized.

8  And then there were three entries.  I think somebody fell

9  off at the first fence, and the other rider, you know, it

10  was the horse's first time out so they were schooling

11  around and, you know, Michael's horse ended up in front at

12  the end.

13  Q    So he won that race?

14  A    He did.

15  Q    Was there any money on that race that you know of?

16  A    No.  Not that I know of.

17  Q    Now then, around that same time period that this is

18  happening, was the defendant talking to your husband about

19  making a particular investment?

20  A    Yes.

21  Q    Tell the jury about what you recall about the amounts

22  that were being discussed between the defendant and your

23  husband.

24  A    Michael was interested in -- and he pointed out that

25  $100,000 would go a long way towards really finalizing --

1   at that point he said the patent was pretty much ready,

2   you know, to get in hand, and that he really needed the

3   $100,000 to do the next phase of like human trials and to

4   actually begin recruiting people into the human trials and

5   to be able to start helping people and to get the F.D.A.

6   approval of the process.

7   Q    So $100,000 is thrown out there by the defendant.

8   What did Rusty Carrier settle on as far as an investment?

9   A    $10,000.

10  Q    Now, around that same time did Rusty Carrier also

11  execute a non-disclosure agreement?

12  A    Yes.  I think there may have been more than one that

13  was signed.

14  Q    Let's take a look at Exhibit 78 that's in the stack

15  there in front of you.  And while you're doing it, if you

16  will look at 79, 80, and 81.

17       THE COURT:  Any objection to these documents,

18  Mr. Wagner?

19       MR. WAGNER:  Just one second.  No, Your Honor.

20       THE COURT:  They'll be received without objection.

21            (Government's Exhibits 78 - 81 are received.)

22       MR. GILL:  If we can briefly show the jury Exhibit

23  78.

24  Q    Is this the non-disclosure agreement?

25  A    Yes.

1  Q    And you recall executing multiples?

2  A    I think that this was the one that was signed close

3  to the time of the investment.  I'm reasonably sure that

4  he also signed another one when I signed it -- or close to

5  early in the month of February when we first met him.

6  Q    Now then, the amount that Rusty Carrier settled on

7  was $10,000?

8  A    Yes.

9  Q    So tell the jury about the circumstances that led to

10 him actually providing that money to the defendant.

11 A    The time frame -- Michael indicated to us that the

12 patent was so imminent, and that after the patent was

13 received he wouldn't be able to sell the shares at that

14 same price point.  And he said it was really crucial to

15 get the money and to get it recorded, you know, very, very

16 quickly.

17       He had -- or we discussed him coming to our house for

18 dinner and, you know, getting the check at that point in

19 time and chatting about the horse.  But Rusty occasionally

20 suffers from a seizure disorder and wasn't well that day

21 that Michael was supposed to come.  He had to go to bed,

22 and he had a very bad headache and wasn't feeling well.

23 So I phoned Michael and said, *"Hey, we're just going to*

24 *have to postpone.  Rusty is not feeling well."*

25       And he was very insistent that he had to come and get

1  the check, you know, right then.  It was very, very

2  important.  My understanding was that, you know, he was

3  worried that the patent was going to be issued and we'd be

4  shut out of the investment.  So we went back and forth on

5  the phone a couple of times.  I said, *"Let me call you*

6  *back."*

7       I went and checked with Rusty who wasn't going to be

8  up to entertaining, so Michael finally ended up driving

9  over on his motorcycle.  You know, it was dark.  It was

10 well past dark.  He came just to get the check.  You know,

11 he indicated it had to be that night.

12 Q    Now, you said there was back and forth.  Were there

13 different phone calls between you and the defendant about

14 this?

15 A    Yes.

16 Q    And eventually what was settled?

17 A    That he would come and just pick the check up and

18 leave.

19 Q    Now, explain to the jury at the time where you and

20 Rusty carrier were living, and where that is in relation

21 to Luray, Virginia.

22 A    It's about an hour -- give or take an hour and change

23 over the mountains.

24 Q    About what time did he arrive as you recall?

25 A    I'd say it was probably easily 9:00, if not a little

1  bit later.

2  Q    And what was he driving when he arrived?

3  A    A motorcycle.

4  Q    Now, what happened when he came into the house?

5  A    He clearly just came to the porch.  And I had the

6  lights out and was trying to not get the dogs to bark and

7  to keep things peaceful and quiet because Rusty wasn't

8  well.  And he asked did I want him to have a look at Rusty

9  from a medical standpoint.  And I said, *"No.  No.  Let's*

10 *just get this done."*  And, you know, I wanted to go back

11 in and make sure the dogs weren't barking.

12 Q    Did your husband actually execute documents that

13 night?

14 A    I think they were done earlier and Michael was just

15 coming to pick them up.  They'd been filled out and the

16 check had been written earlier in the day or the day

17 before.  It was before he had not been feeling well.

18       MR. GILL:  Let's take a look at Exhibit 79.

19 Q    Let's look at the upper portion of this.  And just

20 tell us generally what this is and what it's in relation

21 to.

22 A    That's the agreement to purchase the 10,000 shares of

23 stock.

24 Q    Is this around the date of the agreement as you

25 recall?

1  A    Yes.

2  Q    It was on February 27th, or the day after?

3  A    It was right in there.

4  Q    Okay.  And we'll briefly scroll down.  Is that your

5  husband's signature and Michael Harris?

6  A    Yes.

7  Q    And also on Page 2 of 79, is this the stock

8  certificate?

9  A    Yes.

10  Q    Let's take a look at Exhibit 80.  What are we looking

11  at here?

12  A    That's the check that he came to pick up that

13  evening.

14  Q    And it says there *"investment."*  Was this the

15  investment for the reasons you already testified to?

16  A    Yes, it was.

17  Q    At anytime in relation to that investment did Michael

18  Harris talk about it being used to pay his personal

19  expenses or salary?

20  A    No.

21  Q    Had that come up in your mind when you were involved

22  in these negotiations, would that have had an affect on

23  your willingness to part with this money?

24  A    Yes.

25  Q    Why?

1  A    Insofar as we were informed, and that it ever came up

2  during our conversations, the money was strictly going,

3  you know, once the patent was secured to initiating this

4  next phase of trials and getting the F.D.A. approval so

5  that it could be marketed.  That was exactly what we were

6  told the money was for.

7  Q    All right.  Now, let's look at Exhibit 81.

8  Generally, what is this document?

9  A    It's another summary of what we're investing in.

10 Q    And Page 2.  More information at the top consistent

11 with what you understood.  I want to focus in on this note

12 here at the bottom.  And what do you recall about this

13 note?

14 A    I think this was in something that Michael had mailed

15 or given to Rusty.  Basically welcome aboard into the

16 company.  And, you know, Rusty had saddled the horse at

17 the Point-to-Point, and it was just thanking him for

18 saddling the horse.  Typically the trainer or someone

19 who's not riding, you know, saddles the horse and has it

20 in the puddock and the rider comes in and gets on him and

21 goes.

22 Q    So when he's referring to *my first win of the*

23 *season,"* is that the race you were describing for the jury

24 a few moments ago?

25 A    Yes.

1  Q    Now after the investment, did the defendant keep you

2  and Mr. Carrier apprised of the status of the investment

3  and what was going on?

4  A    For a while.  We got some updates that -- you know,

5  and it was usually the patent was imminent and that really

6  nothing could go forward until the patent was released and

7  in hand.  So it was basically a waiting game to see, you

8  know, how quickly the patent would be issued.

9  Q    Did things begin to sour in your relationship with

10 the defendant?

11 A    They did once the -- sorry.  Once the patent had

12 apparently been received, you know, we had inquired, well,

13 when is the next step going to take place?  When are the

14 human trials going to start?  What's happening?  Because

15 it all seemed so urgent.  We were anxious to see when the

16 next steps were going to take place, and they didn't seem

17 to be happening.

18      And the more -- the more we inquired, the more

19 antagonistic Michael seemed to feel about the questions.

20 You know, by late in the spring, Rusty had stopped helping

21 him with the horses, I had stopped bringing horse feed

22 over there, and we were not as cordial because we just

23 didn't feel that we were getting answers.

24 Q    Now, eventually was there any type of offer to buy

25 the stock back that you're aware of?

1  A    Quite a bit later once Michael had decided that we

2  were no longer on his side or on the team.  I don't

3  remember exactly how he put it.  He told Rusty that he was

4  going to buy the stock back.  And Rusty said, *"Fine.  You*

5  *can buy it back for the amount of money that you told me*

6  *it would be worth once the patent was issued,"* which was

7  like $1 million.

8       And Michael said, *"That's ridiculous.  I'll give you*

9  *exactly what you paid for it."*  And he was very insistent

10 that it was his stock and he could buy it back when he

11 wanted to and he could inform us that we were no longer

12 welcome in the company.  But I thought it was a lot of

13 bluster.  And never did he show up with an actual check

14 and say I'm buying it back.  It was more --

15      MR. WAGNER:  Objection to what she thought.

16      THE COURT:  Objection sustained.

17 Q    Ma'am, at this time, or around that same time period

18 where there were problems with the defendant, were you

19 also contacted by the State Corporation Commission in the

20 investigation?

21 A    Eventually, yes, we are.

22 Q    And did you cooperate in that investigation?

23 A    We did.

24 Q    Did they conduct themselves professionally?

25 A    Absolutely.

1   Q    Now then, let's talk about shareholder meetings.  Did

2   you and Rusty Carrier receive invitations?

3   A    Yes.

4   Q    Take a look at Exhibits 82 and 83 there in front of

5   you.  And are those shareholder invitations you received

6   for 2009 and 2010?

7   A    Yes.

8        MR. GILL:  Your Honor, we would move for admission of

9   Exhibits 82 and 83.

10       THE COURT:  Any objection, Mr. Wagner?

11       MR. WAGNER:  No, Your Honor.

12       THE COURT:  Exhibits 82 and 83 will be received.

13           (Government's Exhibits 82 & 83 are received.)

14       MR. GILL:  If we could see Exhibit 82 on the screen.

15   Q    And if you would, just hold that up for the jury.

16   The original that you've got in your hands.  Tell the jury

17   how it is that you received these items.

18   A    In the mail.

19   Q    Would you hold that up.  Is the envelope attached to

20   that one?

21   A    Yes.

22   Q    And this was an invitation for what year shareholder

23   meeting?

24   A    That was 2009.

25   Q    Where was that one to be held?

1   A     In Fredericksburg, Virginia.

2   Q     Did you or your husband attend that meeting?

3   A     I was out of town.  My husband was going to attend

4   it, but I think the weather was inclement and he decided

5   not to go.

6   Q     Now then, let's look at Exhibit 83.  And if you pull

7   that original out and hold it up for the jury.

8   A     (Witness complies.)

9   Q     Do you have the envelope for that one?

10  A     I don't have the envelope for that one, but it also

11  came in the mail.

12  Q     You're absolutely certain it came to you in the U.S.

13  Mail?

14  A     Positive.

15  Q     Now then, for this shareholder meeting where was it

16  going to be held and what day?

17  A     It just said at the Ritz Carlton in Tyson's Corner on

18  the 20th of November, but it didn't specify where in the

19  Ritz Carlton.

20  Q     Did you and your husband go up to Tysons Corner in

21  McLean, Virginia for that meeting?

22  A     We did.  The day before I had texted Michael to try

23  to find, you know, some more specifics.  A, to confirm

24  that it was happening.  And, B, to see specifically where

25  because it's a large complex.  But, yes, we made plans to

1  go up, and we did indeed go up to Tysons's.

2  Q    Now if you would, take a look at Exhibits 85 and 86.

3  Identify those for us.  What is 85?  Where did that come

4  from?

5  A    When Mr. Ward had come to interview us initially at

6  the house in Castleton, he had asked if I had anymore, you

7  know, correspondence or anymore records.  And I had an

8  exchange of text messages on my phone back and forth

9  between Michael and I trying to confirm, you know, where

10 the meeting was and if it was actually taking place.  And

11 I didn't know how to print them out, so I just highlighted

12 the whole text message sequence and e-mailed it to him.

13 He was at the house, and I e-mailed it to him while he was

14 there.

15 Q    Is Exhibit 85 a completely accurate representation of

16 the conversation?

17 A    Yes.  It's the whole conversation.  It just mushed it

18 all together.

19 Q    And then is 86 broken down by that conversation and

20 you've looked at it and it's accurate?

21 A    Yes.

22      THE COURT:  Any objection, Mr. Wagner?

23      MR. WAGNER:  Yes, Your Honor.  The *mushed it all

24 together*" part is what I have a problem with, Judge.  He

25 asked if it was reliable, and she said it *mushed it all*

1  *together."* I don't know what *"mushed it all together"*

2  means, Judge.

3       THE COURT:  All right.  I'll have him explore that.

4       But there's no objection to 86, I assume, Mr. Wagner?

5  That's an accurate representation?

6       MR. WAGNER:  I don't know if that's been offered yet.

7       MR. GILL:  That's what we're offering.

8       MR. WAGNER:  Well, 85 is what we're having a problem

9  with.

10      THE COURT:  All right.  How about 86, Mr. Wagner?

11  We'll take up 85 here in just a moment.

12      MR. WAGNER:  That's fine, Your Honor.

13      THE COURT:  All right.  Eighty-six is received.

14      Mr. Gill, if you would clarify the accuracy of 85.

15      MR. GILL:  Absolutely.

16  Q    Ma'am, would you explain to us if you're confident

17  that is an accurate combination of the conversation and

18  why it is, to use a technical term, *"mushed"* together?

19  A    I will look for a better technical term.  When the

20  exchange of texts was viewed on my phone, as most phones

21  do, it had my words and then Michael's words.  When I

22  e-mailed it, it didn't preface each sentence with my name

23  or his name.  It simply put each sentence one after the

24  other.

25      And in 86, all we've done is go through and I

1  indicated which were my words and which were Michael's

2  words so it's more readable.  The words and the content

3  are exactly the same.  It's just --

4      THE COURT:  For clarification, the content is

5  accurate, Ms. Carrier?

6      MS. CARRIER:  Yes.  The content is completely

7  accurate.

8      THE COURT:  Objection is overruled.  It will be

9  received over the defense's objection.

10          (Government's Exhibits 85 & 86 are received.)

11      MR. GILL:  Let's take a look Exhibit 86.  And I

12  believe this is the conversation after you broke it out as

13  to who is talking where.  So if you would, just take us

14  generally from the top.  The jury can read this, but

15  explain to us the interchange between you, EC, and the

16  defendant represented by MH.

17  A    I had just gotten back in town.  I'd been in Kentucky

18  for a sale, and wanted to confirm where the meeting was,

19  time, place, et cetera.  And I started, you know, being

20  very cordial.  And I obviously had to drive Rusty because

21  of his seizure disorder.  He wasn't driving at the time.

22  So I needed to drive him up there and, you know, Michael

23  was antagonistic and saying that I wasn't permitted to

24  come.

25  Q    So we'll work down the conversation.  First one, your

1  introduction to him.  You're referring to the Ritz Carlton

2  and where it is going to occur.

3  A    Uh-huh.

4  Q    And Michael Harris' response?

5  A    We needed to consult with an attorney before we came.

6      And I said, you know, there was no indication on the

7  invitation of any attorney that we needed to consult, you

8  know.  I said Rusty has the invitation.  Please advise.

9      MR. GILL:  And if we could move it up.  All the way

10 up to where this is at the top.  Okay.  Thank you.

11 Q    It indicates, *"you will not be permitted."*  What was

12 your reaction to that?

13 A    Well, I pointed out that I would obviously be driving

14 him there because that was the way he was going to get

15 there, and I probably shouldn't need permission since, you

16 know, it's a large public space.

17 Q    And he asked next, *"What is the number there that he*

18 *may contact Rusty."*  And you provided that?

19 A    Yes.  All the numbers were the same.  My phone number

20 hadn't changed, Rusty's phone numbers hadn't changed.

21 And, you know, I was basically inquiring why we were being

22 banned or not permitted after having received the

23 shareholders' meeting invitation.

24 Q    So you're still asking about shareholder meeting

25 information.  And his response?

1  A    His was that someone was going to call Rusty, and

2  that I could plan on going shopping in the mall.

3       MR. GILL:  Let's go on down.

4  Q    Now, right there you see your request.  *That is very*

5  *nice.  Back to planning my day tomorrow."*  His response

6  was?

7  A    Was that I could plan on going shopping.  He said I

8  knew the mall well.

9       And I just asked -- you know, all I wanted was

10 confirmation of whether the meeting was taking place.

11      THE COURT:  Well, Ms. Carrier, why don't you hold off

12 and wait for Mr. Gill to ask you another question, okay?

13      MS. CARRIER:  Sorry.

14      THE COURT:  Go right ahead, Mr. Gill.

15      MR. GILL:  The jury can read the rest of that page.

16 We've done that, so let's go on to the next page.

17 Q    And you asked some additional information.  What firm

18 are you talking about, the lawyer?

19 A    Yes.

20 Q    His response?

21 A    Was not to contact him.

22 Q    And then you asked that next interchange right there

23 still seeking information?

24 A    Correct.

25 Q    His response?

1  A    Was that I wasn't a shareholder.

2  Q    And eventually did Rusty end up representing that he

3  was texting all this?

4  A    He -- I typed it, but he said, you know, point out

5  that we haven't heard from the lawyer, and we need to know

6  if the meeting is happening.  Mr. Stumpt, the lawyer,

7  hadn't contacted us, and we still needed confirmation of,

8  you know, where this meeting was supposed to be.

9  Q    Eventually did you and your husband receive

10 confirmation?

11 A    This Mr. Stumpt person phoned Rusty at I believe

12 10:00 that night.  It was late.  Well after business

13 hours.  And he told him where the meeting was going to be

14 taking place, and reiterated that I wouldn't be allowed

15 in.

16 Q    Did you attend the meeting?

17 A    I drove Rusty there and he attended the meeting.

18 Q    Are you aware of whether that meeting was recorded?

19 A    He did.  We'd gone out and he'd bought a little

20 recording device which he kept in his pocket to be able to

21 refresh his memory as to what had happened in the meeting

22 afterwards.

23 Q    All right.  Since that time, did you have any other

24 significant contact with the defendant, Michael Harris?

25 A    No.  At one point we did send an inquiry as to

1  whether or not, you know -- via e-mail as to whether

2  Michael was willing to, you know, purchase back these

3  stock shares.  And he sent a very strange response saying

4  that he didn't know who we were, and that we would need to

5  clearly identify ourselves and identify that we were

6  shareholders.  And it was very vague.

7  Q    So is that how he left it with you and your husband?

8  A    Yes.

9  Q    So to this day have you ever -- are you aware of you

10 or your husband receiving any financial information about

11 the company or where your money was spent?

12 A    No.

13      MR. GILL:  May I have one moment, Your Honor?

14      THE COURT:  Yes, sir.

15      MR. GILL:  We pass the witness.

16      THE COURT:  Cross-examination, Mr. Wagner?

17      MR. WAGNER:  Thank you, Judge.

18      MR. GILL:  Thank you, ma'am.

19                        **CROSS-EXAMINATION**

20 BY MR. WAGNER:

21 Q    Good morning.

22 A    Good morning.

23 Q    I'm Rob Wagner, and I represent Mr. Harris.  You

24 talked about selling feed to Mr. Harris for a period of

25 time for his horses, is that right?

1  A    Yes.  I delivered feed –

2  Q    Oh, I'm sorry.

3  A    – to the horses.

4  Q    So, you didn't actually sell the feed to Mr. Harris?

5  A    Well, I took him a few sample bags and he bought the

6  first couple bags, and by the end of our relationship I

7  had an unpaid bill.

8  Q    So you did sell them?

9  A    Well, I sold it to him.  I didn't always get paid for

10 it.

11 Q    Okay.  And the company that you sold the seed from,

12 that's your company?

13 A    It was at the time, yes.

14 Q    And were you the only person who ran the company?

15 A    No.  I had a partner at the time.  We parted ways

16 several years back.  I had a shoulder injury and wasn't

17 able to continue in the business.

18 Q    But this was your company and your partner's company?

19 A    Correct.  It was a small distributorship for a larger

20 company.

21 Q    And you took a salary for your work from this

22 company, right?

23 A    Not initially.  It was a start-up, and we were really

24 trying to get it off the ground.  So at this point I did

25 not.

1  Q    You didn't pay yourself at all?

2  A    Not trying to get it off the ground.  We were putting

3  profits back into marketing.

4  Q    Paid for expenses?

5  A    We paid for the feed.  Yes.

6  Q    Okay.  And eventually did you pay yourself?

7  A    Not very much.  No.  I think -- eventually, I took

8  some feed out of the company as a salary, but I never --

9  we neither one issued ourselves a cash salary because it

10 was a start-up.

11 Q    All right.  When you first met Mr. Harris, how long

12 was it until he started talking about his company?

13 A    He mentioned it very briefly in our phone

14 conversation when we very initially met, and frequently

15 thereafter.

16 Q    Is it fair to say that Mr. Harris is passionate about

17 his company?

18 A    He was very enthusiastic.

19 Q    And that he was committed to his company?

20 A    He was very enthusiastic about --

21 Q    And that he had a science that he believed was going

22 to change the world, is that fair to say?

23 A    That's what he said.

24 Q    And you believed him, didn't you?

25 A    At the time, yes.

1  Q    And that's why you invested in his company, isn't

2  that right?

3  A    That's true.

4  Q    And you got something of value for your money because

5  you believed that you were involved in something that

6  could help people, correct?

7  A    Actually helping people would have made me feel much

8  better than the concept that it might happen some day.

9  Q    But this was a start-up company, right?

10 A    Theoretically it was established and ready to go

11 public.

12 Q    Are you an experienced investor?

13 A    I'm not.

14 Q    Is your husband an experienced investor?

15 A    Yes.

16 Q    Did you discuss this investment with your husband?

17 A    Yes.

18 Q    And did you discuss whether or not to get any

19 financials from Mr. Harris before you invested?

20 A    He and Michael discussed, you know, the financials in

21 a bit more detail.  But, you now, Michael indicated during

22 most of our conversations that, you know, he was looking

23 for money for this particular --

24 Q    My question was did you discuss getting financials

25 from Mr. Harris before you invested money?

1    A     I didn't see specific financials.

2    Q     How long did you spend with Mr. Harris, actual time,

3    with him before you actually invested in his company?

4    A     Three weeks seeing him on a fairly regular basis

5    several times at least.

6    Q     Every other day perhaps?

7    A     Maybe three times a week.

8    Q     All right.  And did you text him on a fairly regular

9    basis?

10   A     I did.

11   Q     How often would you say you texted him?

12   A     I would say it really sort of depended on what was

13   happening.  You know, it was --

14   Q     Every day?

15   A     Probably not every day.  Probably a couple times a

16   week either to check on the horse or just to chat.

17   Q     Okay.  Did you speak on the phone with him during

18   that three week period?

19   A     Sometimes.

20   Q     And how many texts would you say that you exchanged

21   with him over that three week period?

22   A     I haven't the faintest idea.

23   Q     Now, you've said your husband has some health

24   problems, is that right?

25   A     Correct.

1   Q      And as a result of those health problems, he has some

2   memory problems?

3   A      Occasionally.

4   Q      How many times did you go to Mr. Harris' house before

5   you invested in his company?

6   A      Probably at least half a dozen.

7   Q      Okay.  So in that three week period, maybe six times

8   over at his house?

9   A      Probably.

10  Q      And did you go there with your husband or by

11  yourself?

12  A      Primarily with my husband.  The first time I went

13  over and saw the presentation we went out for a ride and

14  discussed the company.

15  Q      And would you call his house a fixer-upper?

16  A      It was fine.  It was a cute little farm house.  The

17  barn was a fixer-upper.

18  Q      And isn't it true that he added that barn after he

19  purchased the house, or did you know that?

20  A      I'm not sure.

21  Q      Are you familiar with Connie Dulaney?

22  A      I'm sorry.  Who?

23  Q      Are you familiar with a woman named Connie Dulaney?

24  A      No.

25  Q      You're not familiar with her in the horse industry,

1   the horse business?

2   A     Not to my knowledge.

3   Q     Okay.  Going to Mr. Harris' house six times before

4   you made the investment, you were able to see what

5   Mr. Harris did on a day-to-day basis, isn't that right?

6   A     Well, while we were there he was primarily working

7   with the horses or discussing the company.

8   Q     All right.  And you knew that he made a lot of

9   e-mails to people about his company, isn't that right?

10  A     I suppose.  Most people do.

11  Q     Spoke on the phone with people about his business?

12  A     I would assume so, but I wasn't there watching him.

13  Q     Texted a lot of people about company matters?

14  A     He texted me frequently.  I don't know what he was

15  doing with other people.

16  Q     There were meetings that he went to regarding the

17  business, correct?

18  A     He said so.

19  Q     All right.  And you had meetings with him, didn't

20  you?

21  A     I did.

22  Q     All right.  And at those meetings he talked about

23  getting capital for his business, is that fair to say?

24  A     Uh-huh.  Yes.

25  Q     And one of the things that he was pursuing was

1    capital for -- was a very large investor for his company,

2    isn't that true?

3    A    That's true.

4    Q    And that was one of the principal goals that he was

5    focused on was getting the big investor, isn't that right?

6    A    Yes.

7    Q    And he spent a lot of time doing that, didn't he?

8    A    He spoke about it frequently.  I can't address what

9    he was doing when I wasn't there.

10   Q    And he sent out newsletters, isn't that right?

11   A    We got one.

12   Q    You didn't get the one from September of 2007?

13   A    I don't recall that.

14   Q    He put together proposals for bids for money, isn't

15   that right?

16   A    That's very possible.

17   Q    Did you not see the --

18   A    I mean, I have all the things that I got.  I can't

19   address what he was doing when I wasn't there.

20   Q    Did you see this folder?

21        THE COURT:  Let the record show that he's displaying

22   Exhibit 53.

23        MR. WAGNER:  I'm sorry.  Exhibit 53.

24   A    What's in it?

25   Q    Excuse me?  You don't recognize it from just seeing

1  it?

2  A    No.  Most of the things that he showed me were either

3  pieces of paper or on the computer.

4  Q    Let me hand this to you, if I could.  This is Exhibit

5  53.  See if by looking at it more closely you maybe

6  recognize it.

7  A    I don't recognize this specifically.  Some of the

8  pieces of paper look familiar in terms of the things that

9  he gave to me or to Rusty.

10  Q    There's something tabbed there.  A little yellow

11  sticky there.  If you will look to that particular

12  document.  Does that look familiar?

13  A    No.

14  Q    Now, do you remember when it was he told you what he

15  was going to do with the money that you and your husband

16  invested?

17  A    Do I remember?  Yes.

18  Q    When was it?

19  A    I'm sorry.  Could you clarify?  Do you want to know

20  when he was going to use some of this money or what he was

21  going to do with it?

22  Q    I'm concerned about the statements that Mr. Harris

23  made to you in order for you and your husband to invest,

24  and I want to know when it was he told you what he was

25  going to do with the money that you invested in.

1    A    During most conversations, from our initial

2    conversation onward, he indicated that he was looking for

3    investment money to finalize the patent and to begin the

4    next stage of trials.

5    Q    All right.  Did he say anything about continued

6    research?

7    A    He primarily focused on the trials.  Getting people

8    into the hyperbaric chamber, getting F.D.A. approval, and

9    showing that it worked.

10   Q    And he talked about, as you've indicated, getting

11   other investors to invest capital into the company?

12   A    Yes.  He strongly encouraged me to go and find people

13   for him to be able to make a presentation to, and to

14   encourage my friends and family to invest.

15   Q    Now, he was the CEO and president of the company,

16   correct?

17   A    Yes.

18   Q    And it was a one-man show, isn't that right?

19   A    He discussed the advisory board, but he indicated

20   that he was making the decisions.

21   Q    He was doing all the work, right?

22   A    He indicated to me that most of the work was really

23   done.  The research was complete.  It worked, and we just

24   needed to get people into this hyperbaric chamber to get

25   F.D.A. approval and get it out there.  Get it sold

1  publicly and make millions of dollars doing it, and get

2  cracking helping people.

3  Q     There were patents that needed to be obtained?

4  A     Correct.  He said the patent was imminent.

5  Q     But he was obtaining patents all over the world,

6  wasn't he?

7  A     He discussed things that he was doing in Switzerland,

8  and other countries abroad.  That he was getting patents

9  in those countries so as to be able to market the product

10  there as well.

11  Q     He was seeking patents in Africa, correct?

12  A     He said he was going to use the hyperbaric chamber in

13  Africa because of the high level of --

14  Q     If you could please answer my question.  Very simple

15  question.  He was seeking patents in Africa?

16  A     I can't speak to that whether he was in Africa

17  seeking patents or not.  He only told me that he wanted to

18  use it to help people in Africa.

19  Q     But in 2009, weren't you celebrating the award of an

20  African patent?

21  A     I thought the patent was in the United States because

22  he spoke about being downtown in Washington talking to

23  people at Health and Human Services about getting a patent

24  in this country.

25  Q     There was an American patent in 2009, but there was

1  also an African patent in 2009.  Were you aware of that?

2  A    I was not.

3  Q    And is it fair to say that all he was telling you

4  over this three week period before you invested was that

5  he intended to move the company forward?

6  A    That was one of the things he said.  Yes.

7  Q    And isn't it fair and reasonable that the CEO and

8  president of the company should receive a salary?

9  A    In many cases, yes.

10 Q    And isn't it fair that someone who is vested

11 personally in their company should be paid for their time?

12 A    Michael indicated to me that --

13 Q    Please answer the question.

14 A    It is.

15 Q    Thank you.  Now, are you familiar with a group called

16 The Magnificent Seven?

17 A    Is that a comic book?

18 Q    No.  No.  No.  It's, as I understood it, it's a group

19 of people who had gotten together to a certain extent to

20 undermine Michael's company.

21 A    I'm not familiar with that.

22 Q    Do you know who Matt Johnson is?

23 A    No.

24 Q    Do you know who Nancy Ferguson is?

25 A    No.

1   Q     Do you know who Katie Ritter is?

2   A     The last name sounds vaguely familiar, but I'm not

3   placing a name.

4   Q     Do you remember exchanging any e-mails with Katie

5   Ritter?

6   A     I don't.

7         MR. WAGNER:  Now, I'd like to bring up on our system,

8   if we can, something that has not been admitted into

9   evidence, and I'd like to have this witness take a look at

10  it.  It's Exhibit Number 6.  I'm sorry.  Exhibit 4.

11        THE COURT:  Defense Exhibit 4, correct?

12        MR. WAGNER:  Defense Exhibit 4.

13        If I could have a moment?

14        THE COURT:  Mr. Gill, is there an objection to Number

15  4?

16        MR. WAGNER:  I don't have the right exhibit.  I'm

17  sorry.

18        THE COURT:  All right.

19        MR. WAGNER:  We need to use the ELMO.

20        THE COURT:  Before it's displayed to the jury I want

21  to make sure it's in evidence.

22        MR. WAGNER:  Oh, no, no.  We're not offering it at

23  this time.

24        THE COURT:  Okay.  What number is this item?

25        MR. WAGNER:  This will be 18.

1    THE COURT:  Eighteen?

2    MR. WAGNER:  No.  Fifty-five.

3    THE COURT:  Pardon?

4    MR. WAGNER:  Fifty-five.  I need to be better with

5  the exhibits.

6    THE COURT:  All right.  Okay.

7  Q    Can you see that?

8  A    Yes.

9  Q    And it's addressed to the shareholders of Michael F.

10  Harris' company, is that correct?

11  A    Yes.

12  Q    All right.  And it is an anonymous letter, is that

13  right?

14  A    Yes.

15  Q    It says there, *"anonymous."*  Do you recognize this

16  letter?

17  A    Yes.

18  Q    And do you remember when you received this -- or did

19  you receive this letter?

20  A    It was mailed to the house.  And I remember we looked

21  at it, and there was not really much to do with it.  It

22  was anonymous.  It confirmed things that we were already

23  thinking ourselves, but we didn't know from whom it had

24  come.

25  Q    All right.  Do you remember when you received it?

1    A    Not specifically.  No.

2    Q    Do you know if it was before the 2010 shareholders'

3    meeting when you went up to Tyson's Corner?

4    A    Honestly, I don't remember specifically.  It wouldn't

5    surprise me if it was, but I can't state when it showed

6    up.

7    Q    Do you know if it was after you received the notice

8    for the 2010 shareholders' meeting?

9    A    Again, I really don't remember.

10   Q    And this was very critical of Michael Harris,

11   correct, this letter?

12   A    It was -- people had concerns.  The people who had

13   written it clearly had concerns.

14   Q    And to this day you don't know who wrote that letter?

15   A    I don't.

16   Q    Did you ever ask anyone if they had written the

17   letter?

18   A    I didn't really have anyone to ask.

19   Q    Now, you've indicated that --

20        MR. WAGNER:  We can take that down.  Thank you.

21   Q    You've indicated that Michael Harris offered you and

22   your husband your money back, is that right?

23   A    He made demands that we sell the stock back.  He

24   didn't ever actually come with a check and say I'm going

25   to buy it back.  He fussed and fumed and said in an

1  antagonistic manner that he was throwing us out of the

2  company and that he was going to invalidate the shares,

3  that he might buy them back.  It was a different story

4  every time we heard from him.

5  Q    Is it fair to say at this time that you and Michael

6  Harris were having some disagreements about the direction

7  of the company?

8  A    It didn't appear to us that anything was happening

9  with the company.  So, yes, we were unhappy.

10 Q    But you did not agree to sell those shares back to

11 Mr. Harris, isn't that correct?

12 A    There was never really a concrete offer.  I think

13 Rusty did offer to sell them at a profit at the price that

14 Michael had indicated they were worth and --

15 Q    You felt those shares had value at that time?

16 A    Frankly, we wanted to get our money out of what we

17 felt was a bad investment.

18 Q    But when he offered to sell you the shares for what

19 you put into it, you refused, correct?

20 A    I can't -- I wasn't conducting the conversation.

21 Rusty was.

22 Q    You indicated that your husband recorded the

23 shareholders' meeting when you went, is that right?

24 A    Yes.

25 Q    He didn't attend the entire meeting, did he?

1   A     Yes.

2   Q     And did he let anybody at the meeting know that he

3   was recording that meeting?

4   A     I wasn't there.

5   Q     Did he tell you whether he let anyone know that he

6   was recording that meeting?

7   A     I'm not sure if he conversed with anyone there or

8   not.  I think he primarily went there to listen.

9   Q     Okay.  Now, in 2009, you recall that the company

10  received an American patent, correct?

11  A     That's what Michael said.  I never viewed the patents

12  in person, but he said that it had been --

13  Q     But he said a patent was obtained?

14  A     Yes.

15  Q     And is it fair to say that the investors were very

16  excited about this?

17  A     I can't speak to how excited the investors were

18  because I don't really know any of them except for us.

19        MR. WAGNER:  Thank you.  No further questions.

20        THE COURT:  All right.

21        Mr. Gill, redirect?

22        MR. GILL:  Yes, Your Honor.

23                    **REDIRECT EXAMINATION**

24  BY MR. GILL:

25  Q     Ma'am, I want to show you an exhibit that has been

1   marked as Government's Exhibit 84.

2        THE COURT:  Government's Exhibit 84?

3        MR. GILL:  Yes, Your Honor.

4        THE COURT:  I believe that is in evidence, is it not?

5        MR. GILL:  I have not moved it into evidence.

6   Q    Take a moment and look at that and identify it for

7   us.

8   A    Yes.  This is -- this is familiar.

9        THE COURT:  This is what?

10       MS. CARRIER:  This is familiar.

11       MR. WAGNER:  It's the same as the defense exhibit

12  that we showed her.

13       THE COURT:  Okay.  Same as Defense Exhibit 55?

14       MR. WAGNER:  Fifty-four.

15       MR. GILL:  And, Your Honor, we move for admission of

16  Exhibit 84.

17       MR. WAGNER:  Your Honor, we would ask that portions

18  of this be redacted.  I spoke with Mr. Gill about this if

19  it were to be introduced.

20       THE COURT:  All right.  I tell you what I'm going to

21  do.  Right after this witness, I'm going to take a recess

22  to give the jury an opportunity to step out for a few

23  minutes.  We'll discuss it at that time.

24       MR. WAGNER:  Thank you, Judge.

25       THE COURT:  All right.  So I'm going to conditionally

1  admit it.

2        MR. GILL:  Thank you, Your Honor.

3        THE COURT:  Conditioned upon that.

4        Mr. Wagner, we've gone from Exhibit 6, Exhibit 18,

5  Exhibit 22.  I have 55, and now you're telling me it's 54.

6        Ms. Bishop, I'm counting on you, okay?

7        All right.  Fifty-four.

8        Go ahead, Mr. Gill.

9        MR. GILL:  And, Your Honor, if we can display Page 1

10 of this exhibit.  We're in agreement that that will be

11 good.

12       THE COURT:  That's fine.  Go ahead.

13       MR. GILL:  Just so the jury will get an idea.  And

14 it's going to flash it up on the screen, Ms. Carrier.

15              (Defense Exhibit 54 is received.)

16 Q    And generally describe what this is, and if this is

17 the letter you were referring to a moment ago with the

18 defense.

19 A    Yes, it is.  It's a letter from someone – I'm not

20 sure who wrote it – indicating that other people were also

21 uncomfortable with the direction of what was happening and

22 what was being done with their money.  And it had a list

23 of people that were ostensibly conducting an

24 investigation.

25 Q    If we could scroll down to the bottom of Page 1.  It

1  talks about an investigation of various entities.  It

2  specifically references William Ward.  And I believe you

3  mentioned his name earlier.  But have you been in contact

4  with him?

5  A    We phoned Mr. Ward to see if an investigation was

6  actually going on, and he got back to us and came out to

7  the house and we spoke with him.  It's to Mr. Ward to whom

8  I forwarded the text messages on to.

9  Q    Now, without going into the other pages at this time,

10 is it fair to say that this letter talks about problems

11 with whether the patent is actually in the company's name,

12 financial problems, commingling funds, using it for

13 personal expenses, those types of allegations?

14 A    Yes.

15 Q    Do you recall, and I believe -- just to make it

16 clear, do you recall if you received this before or after

17 the shareholders' meeting?

18 A    I don't specifically remember.  You know, in reading

19 it it sounds like it probably came after the shareholders'

20 meeting.  But I can't pinpoint the date that it showed up

21 at the house.  The tone of it --

22 Q    Go ahead.

23 A    In reading it again, you know, the tone of it sounds

24 like it probably came after the shareholders' meeting.

25 Q    And, ma'am, the type of allegations in this letter,

1  were those concerns that you and your husband had before

2  you even received this letter?

3  A     Absolutely.

4  Q     Now, Mr. Wagner showed you the big binder marked as

5  Exhibit 53.  And he pointed out what's been admitted into

6  evidence in this binder is 53-A.  I believe you said that

7  you had not -- that you don't recall seeing this.  Take a

8  look at it and make sure.

9  A     I don't recall seeing this.

10 Q     And, ma'am, at the time that the defendant was

11 presenting to you and your husband to invest in this

12 company, did he talk to you about taking portions of that

13 money for his salary in some form of your investment?

14 A     No.

15 Q     Mr. Wagner was asking you about moving the company

16 forward.  That Michael Harris was enthusiastic and that he

17 wanted to move that company forward.

18 A     Yes.

19 Q     Wanted to get investor dollars?

20 A     Yes.

21 Q     When he was discussing with you and your husband

22 about using your investor dollars, did he mention to you

23 about the status of his personal accounts being in

24 negative balances when he took that money?

25 A     No.  He indicated to me really on our first meeting

1  because we'd gone out for a little ride on the horses, and

2  he showed me, you know, large tracks of land that he said

3  had been in his family for some time and indicated that he

4  was, you know, fairly well-heeled in terms of owning land

5  and personal contacts with him doing business.  He

6  mentioned a member of European royalty with whom he had a

7  child.

8       MR. WAGNER:  Objection, Your Honor.  Move to strike.

9       THE COURT:  Objection sustained.  It's irrelevant,

10  nonresponsive.

11      Go ahead.

12  A    He indicated to me that he was fairly comfortable.

13  Q    So were you concerned at all about his personal

14  finances based on his representations to you in connection

15  with this investment?

16  A    Not at all.

17      MR. GILL:  No further questions.  Thank you, ma'am.

18      THE COURT:  All right.

19      May Ms. Carrier be excused, Mr. Gill?

20      MR. GILL:  Yes, Your Honor.

21      THE COURT:  Mr. Wagner?

22      MR. WAGNER:  Yes, Your Honor.

23      THE COURT:  Ms. Carrier, you're excused and free to

24  go.  Thank you very much for coming in.  We appreciate

25  your testimony.

1      MS. CARRIER:  Thank you.

2                **WITNESS STOOD ASIDE**

3      THE COURT:  Ladies and gentlemen, at this point we'll

4  take about a 15 minute recess to give you a chance to

5  relax for a few minutes.  We'll come back out and move

6  right on to the next witness.

7      (The jury is no longer present in the courtroom.)

8      THE COURT:  Now, Mr. Wagner and Mr. Gill, you're

9  going to take care of redacting Defense Exhibit

10 54/Government's 84?

11     MR. GILL:  We will, Your Honor.

12     MR. WAGNER:  Yes, sir.

13     THE COURT:  All right.  You-all agreed on what's

14 going to be redacted?

15     MR. GILL:  We have.

16     THE COURT:  All right.  We'll take a 15 minute

17 recess.

18     Who will be your next witness, Mr. Gill?

19     MR. GILL:  Rusty Carrier, Your Honor.  And it will be

20 quicker and it's going to start rolling.

21     THE COURT:  Great.

22                         (Recess taken.)

23     THE COURT:  Are we ready for the jury, gentlemen?

24     MR. GILL:  Yes, Your Honor.

25     MR. WAGNER:  Yes, Your Honor.

1      THE COURT:  Bring the jury in, Marshal.

2          (The jury is present in the courtroom.)

3      THE COURT:  Mr. Naseem, who will be your next

4  witness, sir?

5      MR. NASEEM:  The United States calls Rusty Carrier.

6      THE COURT:  All right.

7      Mr. Carrier, if you would come forward.  Raise your

8  right hand, place your left hand on the Bible, and face

9  the Clerk of the Court.

10      THE CLERK:  You do solemnly swear that the testimony

11  which you are about to give, in this case, before this

12  Court, shall be the truth, the whole truth, and nothing

13  but the truth, so help you God?

14      MR. CARRIER:  I do.

15      THE COURT:  Have a seat on the witness stand, sir.

16      Whereupon, **Russell Carrier, Jr.**, having been

17  duly sworn in, testifies as follows:

18                    **DIRECT EXAMINATION**

19  BY MR. NASEEM:

20  Q    Good morning, Mr. Carrier.

21  A    Good morning.

22  Q    How are you?

23  A    Fine.  Thank you.

24  Q    Could you please state your name for the ladies and

25  gentlemen of the jury, please.

1   A     Russell N. Carrier, Jr.

2   Q     And, Mr. Carrier, where do you presently reside?

3   A     I reside in Castleton, Virginia.

4   Q     How long have you lived in Castleton, sir?

5   A     For 12 years.

6   Q     What is your background?  What did you do for a

7   living, sir?

8   A     I'm retired now.  But I was for many years a

9   steeplechase trainer.  I served my apprenticeship in

10  Ireland and England, and served under the leading

11  steeplechase trainer, Jonathan Sheppard, who is now in the

12  Hall of Fame.

13  Q     Overall, how long have you been involved in training

14  horses?

15  A     Thirty-five years.

16  Q     Now, Mr. Carrier, are you familiar with the

17  defendant, Michael Harris?

18  A     Yes, I am.

19  Q     Can you identify Mr. Harris?

20  A     Michael Harris is sitting on the end of the bench

21  right there.

22        MR. WAGNER:  We'll stipulate.

23        THE COURT:  The record will reflect that Mr. Carrier

24  identified the defendant.

25  Q     Now, before we begin to talk about your relationship

1  with Mr. Harris, it's my understanding that you had an

2  injury related to riding horses.  Could you give the jury

3  a little bit of a background regarding your injury.

4  A    I got a severe blow to the left side of my head which

5  caused scar tissue, and a condition called CTE which a lot

6  of boxers and football players get which causes me to have

7  what's called petit mal seizures where I will slightly

8  blackout.  And I now have a device that every now and

9  again you'll hear my voice go funny.  It's like a

10 pacemaker.  It sends an electric jolt to my vagal nerve

11 which is in the process of breaking up the scar issue.

12 And it really is a miracle because I am getting better.

13 Q    Very good to hear, sir.

14 A    Thank you.

15 Q    Will that implant affect your ability to testify

16 truthfully and accurately today here in court?

17 A    No, sir, it won't.

18 Q    Will it affect your ability to recall the events as

19 they occurred with respect to the defendant, Michael

20 Harris?

21 A    No.  It shouldn't.

22 Q    Can you give the jury a brief explanation of how it

23 is you met Michael Harris.

24 A    Just give me a second for the electric jolt to stop.

25 Q    Sure.  And we'll take as many pauses as you need,

1  sir.

2  A     Thank you.  All right.  I met Mr. Harris through a

3  friend, Paul Rolland, (phonetic) who had been one of my

4  assistants in Pennsylvania.  We were talking, and he'd

5  asked me to help him at the Casanova Point-to-Point.  He

6  said that he'd met him in Florida.  An affable nice guy,

7  but the horse came to the races unclipped.  You don't take

8  a horse to Florida with 2-inch long hair and looking a bit

9  rough.  And Paul is a really good guy, so he helped him

10 out, clipped his horse for him, and got him ready for the

11 races because Paul is a true professional and a really

12 nice guy.  Asked me to help --

13        THE COURT:  Hold on one second, Mr. Carrier.

14        Next question, please.

15 Q     When did it -- when did you meet Mr. Harris?

16 A     I'm sorry.  At the Casanova Point-to-Point in

17 February of 2009.

18 Q     And when you met Mr. Harris, did he discuss with you

19 what he did for a living?

20 A     Yes.

21 Q     Can you tell the jury what it was that you discussed

22 with him.

23 A     He said that he was working on a cure for AIDS

24 through something that he discovered for nitrous exchange

25 from a hyperbaric chamber.

1  Q     Did there come a time later on when you were provided

2  an opportunity to invest in that company?

3  A     Yes.  Very shortly after.

4  Q     Can you explain the circumstances around when that

5  was, if you recall, and how that occurred?

6  A     He said he was looking for investors, and there was

7  an opportunity for me to invest in his company.

8  Q     Do you want to take a moment?

9  A     It's 30 seconds.

10 Q     Sure.

11 A     All right.  I have my voice back.

12 Q     Great.  Did there come a time when you visited

13 Mr. Harris' home?

14 A     Yes, there was.

15 Q     Can you tell me a little bit about what the

16 circumstances were regarding the visit to Mr. Harris'

17 home?

18 A     My wife, Erika, and I went down for dinner.

19 Q     Okay.  And at the dinner, can you explain a little

20 bit about what it was that you discussed with Mr. Harris?

21 A     What he was offering, and what a great thing it was

22 going to be for people who had AIDS, and I had a chance to

23 invest in it and I could make a lot of money.

24 Q     Now, did he give you a presentation at that meeting?

25 A     Yes.

1  Q    And I'm going to ask you to look at what's been

2  marked as Government's Exhibit 161.  It's there in the set

3  of folders right there in front of you, sir.  It should be

4  the first folder.

5  A    Yes, sir.

6  Q    If you can just thumb through that set of documents

7  there.

8  A    Do you want me to read the whole thing?

9  Q    No.  No.  Not at all.  Do you recognize that set of

10 documents there?  Have you seen that before?

11 A    Yes.

12 Q    And can you identify to the jury what it is you're

13 looking at?

14 A    It was a presentation made to Erika and myself on how

15 he had the ability to cure AIDS, and also possibly cancer

16 and many other things, and very inexpensive to the public.

17 Q    Now, at that meeting when he made that presentation,

18 what did you think about the possibility of investing in

19 this company?

20 A    It was presented very well, and I thought it was a

21 great opportunity.

22 Q    Now, before the presentation was given to you, were

23 there any -- did Mr. Harris mention anything about the

24 privacy or the secrecy of the information that was being

25 imparted to you?

1    A    Yes.

2    Q    What did he say?

3    A    That this was all highly confidential because he did

4    not want anybody else to get this information because they

5    would steal it and somebody else would bring it to the

6    public and we'd lose our opportunity to make a lot of

7    money.

8    Q    Did he make you sign any documents before he made the

9    presentation?

10   A    Yes.

11   Q    And if you would look at what's been marked as

12   Government's Exhibit 79.

13        MR. NASEEM:  And that is in the record, Your Honor.

14   A    Yes, sir.

15   Q    And do you recognize that document?

16   A    I do indeed.

17   Q    I'm sorry.  Can you identify that document for the

18   ladies and gentlemen of the jury?

19   A    Yes, sir.  This is the agreement that I signed with

20   Michael Harris to invest in his company.

21   Q    And what was the amount of money that you decided to

22   invest, sir?

23   A    Ten thousand dollars.

24   Q    And in exchange for that $10,000 investment, sir, how

25   many shares did you receive?

1   A    I received -- here's the stock certificate.  I

2   received 10,000 shares.

3   Q    Okay.  Now, looking at what's been marked as

4   Government's Exhibit 81.  I'm sorry.  It's 80.

5   A    Yes, sir.

6   Q    Can you identify that document, sir?

7   A    This is the check that I gave to Michael Harris for

8   the investment in the company.

9   Q    And the check is for what amount?

10  A    Ten thousand dollars.

11  Q    Thank you, sir.  Now, when you were made -- when you

12  were given that presentation by Mr. Harris -- now, at the

13  time of the presentation, what was specifically discussed

14  by Mr. Harris with respect to what your investment money

15  would be used for?

16  A    It would be used for research, and also to get the

17  patent fully approved by the F.D.A.

18  Q    Was there any discussion at that meeting regarding

19  the use of investor money to pay Mr. Harris' salary?

20  A    No, there was not.

21  Q    How about with respect to paying for Mr. Harris'

22  personal expenses?

23  A    No.  Not at all.  I thought my money was going to be

24  used for the company.

25  Q    Now, can you tell us a little bit about the

 1  circumstances around how the check was provided to

 2  Mr. Harris for your investment?

 3  A     Well, he came to my house and got it.

 4  Q     Did you personally give the check to Mr. Harris?

 5  A     No, I don't think -- no, I didn't.  My wife did.

 6  Q     Now, was your wife involved with you at every step of

 7  the way?

 8  A     Every step of the way.  And with the seizures that

 9  I've had, she did an awful lot and I relied on her heavily

10  for everything.  It was a tough time for me in a lot of

11  ways with the seizures, and I really depended on her.

12  Q     Now, after you made your investment, Mr. Carrier, did

13  there come a time when things started to go south in terms

14  of your relationship with Mr. Harris?

15  A     Reasonably quickly.

16  Q     And could you explain to the ladies and gentlemen of

17  the jury what it is that happened.

18  A     We would ask questions on how things were going and

19  how the money was being spent, and he became more and more

20  standoffish.  Going from a very affable nice fellow to a

21  fellow that didn't want to give anybody any information,

22  and I wanted to know.

23  Q     What kind of information were you requesting from

24  Mr. Harris?

25  A     Basically how things were going with the approval for

1  the patent, the human testing that we were told was pretty

2  much done, and when we were going to start to see --

3  Q     Do you want to take a moment?

4  A     Yes.

5  Q     Sure.

6  A     When we were going to see some return for our

7  investment, or at least start seeing it being used like we

8  were told it was going to be used.

9  Q     What representations did Mr. Harris say regarding the

10  type of return that you would be receiving?

11  A     For my $10,000, I could make anywhere between

12  $100,000 and $1 million.

13  Q     Now, how imminent did Mr. Harris represent to you

14  that those returns would be coming?

15  A     Not instantly, but I would start to see a good return

16  in a couple years.

17  Q     Now, did there come a time when Mr. Harris attempted

18  to purchase the shares back from you?

19  A     Yes, he did try.  He called me up and said he wanted

20  to purchase the shares back.  And I said, *"Sure.  You can*

21  *purchase them back for the money you told me I'd be*

22  *making,"* at which point he got very belligerent with me

23  and said they were his shares and he could do whatever he

24  wanted to with them.  And I said, *"Yes, you can if you pay*

25  *me what you said I'd make."*

1          Looking back on it, if he had the money at all, I

2  probably should have sold them back.

3          MR. WAGNER:  Objection.

4          THE COURT:  Objection sustained.

5          Mr. Carrier, wait for the next question, sir.

6          MR. CARRIER:  Yes, sir.

7  Q    Mr. Carrier, did there come a time when you attended

8  a shareholders' meeting?

9  A    Yes, I did.

10 Q    Do you recall when it was?

11 A    November 20th of '09.

12 Q    Okay.  Now, when you attended -- I'm going to hand

13 you a -- I'd like for you to look at a document there in

14 front of you marked as Government's Exhibit 83.  And do

15 you recognize that document, sir?

16 A    I do indeed, sir.

17 Q    And I would like to focus in on the top there, sir.

18 And did that document help you refresh your recollection

19 as to what date the meeting was?

20 A    Yes.

21 Q    When was that, sir?

22 A    November 1, 2010.

23 Q    When you attended the meeting, tell us a little bit

24 about what it was that occurred during that meeting.

25 A    My wife took me to the meeting and she was not

1   allowed to attend.  And at the Ritz Carlton we found where

2   the room was, and then he made -- or started to make his

3   presentation, but it quickly broke down because a lot of

4   people there wanted to know how their investment was being

5   used.

6   Q     And what did Mr. Harris say with respect to those

7   particular questions?

8   A     That the money was being used for the research.  And

9   I didn't know anybody in the room, but one gentleman in

10  the room asked him, *"Well, have you been putting any of*

11  *your money into this?"*

12        And at this point he said, *"Yes.  I've put $24,000"*

13  --

14        MR. WAGNER:  Objection, Your Honor, as to what

15  someone else said.

16        THE COURT:  No, this is what your client said.

17        MR. WAGNER:  I'm sorry.

18        THE COURT:  Objection is overruled.

19  Q     You can continue.

20  A     And Mr. Harris said that he put $24,000 of his own

21  money that he'd made as a steeplechase trainer into the

22  company, which I knew wasn't true.

23        MR. WAGNER:  Objection as to that, Your Honor.

24        THE COURT:  Objection sustained unless you lay some

25  foundation for his knowledge.

1          MR. CARRIER:  All right.  I will.

2          THE COURT:  Wait for the next question.

3          Go right ahead, Mr. Naseem.

4   Q    Mr. Carrier, let's just stick with what Mr. Harris

5   represented to you at the meeting.  Now, did Mr. Harris

6   talk about the financial condition of the company?

7   A    Yes.

8   Q    What did he say?

9   A    He said that things were going well, but more money

10  was needed.

11  Q    Did he present any financials or financial statements

12  to you at that meeting?

13  A    None, sir.

14  Q    Now, what did he say about the patents?

15  A    That the patent was a part of the company.

16  Q    Okay.  Did he mention spending investment money on

17  the patents?

18  A    He did.

19  Q    Now, Mr. Carrier, would you -- did you record that

20  meeting?

21  A    Yes, I did.

22  Q    Can you tell the ladies and gentlemen of the jury a

23  little bit behind the circumstances of your recording of

24  that meeting?

25  A    Give me a second.

1  Q      Sure.

2  A      Okay.  Mr. Ward from the State Securities Commission

3  met with me and said that they were investigating

4  Mr. Harris, and asked if I could keep him abreast of what

5  was going on.  And at that point, I believed that things

6  weren't going as they were presented, so I took a tape

7  recorder and recorded the meeting.

8  Q      Now, to be very clear, did Mr. Ward ask you to record

9  that meeting?

10  A      No.

11  Q      Now, what happened during the meeting?  Or did there

12  come a time when a representation was made by Mr. Harris

13  that caused you to leave the meeting?

14  A      Yes.  He had said that he had put $24,000 of his own

15  money into the company that he'd made as a steeplechase

16  trainer.  And it was my belief that this wasn't true, so I

17  called up the National Steeplechase Association.

18  Q      Let's stop there for just a second.  Mr. Carrier, can

19  you tell us a little bit about your background with

20  respect to steeplechase riding and your involvement with

21  the steeplechase racing?

22        THE COURT:  I think he's been through an awful lot of

23  that, so let's do it in an abbreviated fashion.

24        MR. CARRIER:  Okay.  I can go into great lengths

25  about it.

1        THE COURT:  No, sir.  Just abbreviate it,

2   Mr. Carrier.

3        MR. CARRIER:  Okay.  Yes, sir.

4   A    I won every steeplechase race as a trainer in this

5   country, and I've also done quite well in Ireland.  I won

6   the Irish Grand National.  And it's been my whole life.

7   Q    Now, did Mr. Harris represent that he was making

8   winnings as a result of steeplechase riding?

9   A    Yes.

10  Q    And why was that representation incredible to you?

11  A    To put it politely, he doesn't know one end of a

12  horse from another.

13  Q    And with respect to making money in the steeplechase

14  industry and steeplechase racing industry, what is your

15  understanding of how it is one makes money racing horses?

16  A    You make money from the purses.  If it were a $10,000

17  purse and you won, you would get 60% of that, but you have

18  huge expenses for horses.  For example, to take a horse to

19  the races might cost $500.  At today's race, it would cost

20  probably $85 a day just to keep a horse as an expense that

21  a trainer would charge.  It's a very difficult industry to

22  make money in.

23  Q    And what kind of racing was your understanding that

24  Mr. Harris was involved in?

25  A    Mostly Point-to-Points.

1  Q    And is it your understanding that in Point-to-Point

2  races, racers make money?

3  A    No.  There is no money in Point-to-Pointing.  If I

4  could make a comparison?  It would be --

5       MR. WAGNER:  Objection, Your Honor.

6       THE COURT:  Objection sustained.

7       Mr. Carrier, just hold off and wait for the next

8  question.

9       MR. CARRIER:  Yes, sir.

10      THE COURT:  Go ahead.

11 Q    What source of races or what source of competition

12 steeplechase horse racing competitions would a rider have

13 to ride in in order to make money through winning purses?

14 A    Stakes races.

15 Q    Okay.  And is there a difference between those type

16 of races and the types of races that Mr. Harris competed

17 in?

18 A    One has purses and one doesn't.

19      MR. NASEEM:  If you can just give me a moment, Your

20 Honor, to go through my notes.

21      THE COURT:  Yes, sir.

22 Q    Now, Mr. Carrier, when you left the meeting, was

23 there any indication provided by Mr. Harris that he would

24 not be moving forward with the company?

25 A    No.

1  Q      What was your understanding based on the

2  representations of Mr. Harris?

3  A      That the company would be moving forward.

4  Q      And what did he say was keeping the company from

5  moving forward at that meeting?

6  A      The patents.

7  Q      What specifically about the patents?

8  A      Getting them approved.  But they were just about

9  there.

10      MR. NASEEM:  Your Honor, I pass the witness.

11      Please answer defense counsel's questions.

12      THE COURT:  All right.

13      Mr. Wagner, cross-examination.

14      MR. WAGNER:  Thank you, Judge.

15                    **CROSS-EXAMINATION**

16  BY MR. WAGNER:

17  Q      Good morning, Mr. Carrier.

18  A      Good morning.

19  Q      How are you?

20  A      In good form.  Yourself?

21  Q      All right.

22  A      Good.

23  Q      You've indicated that at the shareholders' meeting

24  Mr. Harris said that this money that he puts into the

25  company was from prize money, is that correct?

1   A     That's correct.

2   Q     Did you go back to your recording and see exactly

3   what was said at the shareholders' meeting about that?

4   A     I wouldn't remember that right now.

5   Q     All right.  Well, is it possible that what was said

6   was that Mr. Harris said that riding brings in money to

7   this business?

8   A     No.

9   Q     That's not possible?

10  A     Nope.

11  Q     And that someone else asked how much has come in.  Is

12  it possible that someone said that?

13  A     No.

14  Q     And he said I guess close to $25,000?

15  A     No.  That's incorrect.

16  Q     Are you aware of a woman named Connie Dulaney in the

17  horse business?

18  A     No.

19  Q     And were you aware of the horse that Mr. Harris rode,

20  Mariah's Promise?

21  A     No.

22  Q     Or the horse he rode, Pan Adam?

23  A     Yes.  That was a very poor Point-to-Pointer.

24  Q     But do you know who owned Pan Adam?

25  A     No.

1  Q    And is it customary for riders to get paid by the

2  owner for training a horse?

3  A    Not necessarily.  There are trainers, and then there

4  are riders.

5  Q    Okay.

6  A    One can do both.

7  Q    One can do both.  And if one does do both, does it

8  sometimes happen that the owner pays that person for the

9  training and the riding?

10 A    Absolutely.

11 Q    Now, is it fair to say that you are an experienced

12 investor?

13 A    Yes.

14 Q    And do you have trusts?

15 A    Yes.

16 Q    I know that the check you wrote in this case was from

17 a trust through your horses, is that right?

18 A    No.

19 Q    The Kinross Farm Partnership?

20 A    It is a company which is owned by a trust.  It is an

21 L.L.C. which is owned by a trust.

22 Q    And how many other trusts do you have?

23 A    None.

24 Q    And your name, Carrier, is that part of the Carrier

25 family from up in New York?

1  A    I wish.

2  Q    Now, you invested in February of 2009, is that right?

3  A    That is correct.

4  Q    When did you meet Michael Harris?

5  A    Excuse me?

6  Q    When did you meet Michael Harris first?

7  A    I first met him at the Point-to-Point in Casanova.

8  Q    But do you remember when that was?

9  A    It was, I believe, the 21st.

10  Q    The 21st of?

11  A    February.

12      MR. WAGNER:  Can we bring up the non-disclosure

13  agreement for Mr. Carrier.

14      MR. GILL:  That's 78.

15      MR. WAGNER:  Thank you.

16  Q    Did you sign this non-disclosure agreement on the

17  19th of February?

18  A    No, I didn't.

19      THE COURT:  Let the record reflect that he's showing

20  the witness Government's Exhibit 78, am I correct?

21      MR. GILL:  That's correct.

22      MR. WAGNER:  That's correct.

23      THE COURT:  Okay.  Go ahead.

24      MR. WAGNER:  I'm sorry.

25  Q    And so this is incorrect here, the date of the 19th

1  of February?

2  A    Yes, it is.

3       MR. WAGNER:  And if we could show, I guess, 79,

4  please.

5  Q    And that's the subscription agreement.  And was that

6  signed on the -- do you see Exhibit 79?

7  A    Yes.

8  Q    That was signed on the 27th?

9  A    Yes.  I believe so.

10 Q    Now, so you didn't meet Mr. Harris three weeks before

11 the investment was made?

12 A    I don't remember.

13 Q    And how many times did you go to Mr. Harris' house

14 before you made the investment?

15 A    I don't remember.

16 Q    Did you ever go to his house, do you recall?

17 A    Yes.

18 Q    But you don't remember how many times?

19 A    No.

20 Q    And before you made the investment, did you request

21 any financials from Mr. Harris?

22 A    No.

23 Q    Any balance sheets?

24 A    No.

25 Q    Any kind of business records at all?

1  A     No.

2  Q     Now, how many discussions did you have with

3  Mr. Harris about what he would do with the money that you

4  invested?

5  A     How many discussions?  I don't remember how many

6  discussions.

7  Q     You testified that he told you what he was going to

8  do with the money, correct?

9  A     Yes.  That's correct.

10  Q     But you don't know how many times you discussed that

11  with him?

12  A     No, I don't.

13  Q     And do you remember exactly what he told you about

14  what he would do with your money?

15  A     Yes.

16  Q     And is it true he told you that he would continue

17  with the research?

18  A     Yes.

19  Q     And that he would pursue patents?

20  A     Yes.

21  Q     And that he would implement human trials?

22  A     Yes.  And that they'd already been done.

23  Q     And did he also talk to you about how he was pursuing

24  other sources of funds to -- for the company?

25  A     No.

1  Q      So, it was never your understanding that one of

2  Mr. Harris' principal objectives was to get a large

3  investor for his company?

4  A      No.

5  Q      Do you recall seeing a newsletter that Michael Harris

6  had prepared for his company?

7  A      Yes.

8  Q      And do you remember in that newsletter there being

9  anything about pursuing any kind of funding, any capital?

10 A      The newsletter that I got was mostly about a company

11 called Deep Blue that was supposedly trying to steal what

12 he had.  And that's what I mostly remember about that.

13 Q      And you don't remember anything about pursuing large

14 contributors?

15 A      What I mostly remember about it is that I had a very

16 small opportunity to get in because there was so much

17 interest in it.

18 Q      And is it fair to say that when he talked about his

19 company and talked about your investment, his intent was

20 to move the company forward?

21 A      Yes.

22 Q      Let me show you what's been marked as Defense Exhibit

23 53.  Do you recognize that?

24 A      No.

25 Q      So you've never seen that?

1    A    No.

2    Q    Thank you.  You can put that down.  Or actually

3    there's a tab spotted, that folder with a yellow tab.  Do

4    you see the document there?

5    A    Yes.

6    Q    Had you ever seen that before?

7    A    No.  I've heard it mentioned.

8    Q    I'm sorry?

9    A    But I've never seen the document.

10   Q    Who mentioned it?

11   A    It was in one of the sheets of paper that I got from

12   it.

13   Q    There was reference to --

14   A    Eric Cantor.

15   Q    Right.  Right.  A congressional request for funds?

16   A    It said that he was looking for it.

17   Q    Looking for funds?

18   A    Yes.

19   Q    So you were aware that Mr. Harris was pursuing funds

20   for his company?

21   A    I would suppose so.

22   Q    And that was one of the objectives of the company was

23   to pursue funds?

24   A    It would be for any company.

25   Q    Now, in 2010, isn't it true that Mr. Harris offered

1  your money back?

2  A    Yes.

3  Q    And you declined, correct?

4  A    I said he could buy it back for the investment for

5  the money he said I'd make for my investment.

6  Q    And did you ask him for $1 million?

7  A    I asked him for $1 million.

8  Q    But you didn't take the offer that he extended to

9  you, right?

10 A    That's correct.

11 Q    You felt that your shares had value, didn't you?

12 A    No, I didn't.  I was just being belligerent because I

13 knew I had made a huge mistake, and I was just being dumb.

14 I should have taken my money because I never thought I'd

15 get what I was told I would.

16 Q    Do you recall receiving an anonymous letter in 2010?

17 A    Yes.

18      MR. WAGNER:  And if we could bring up Government's

19 Exhibit 84, please.  Just the first page.

20 Q    Did you recognize that letter?

21 A    It's hard to see.

22 Q    Is that better?

23 A    Much better.  Thank you.  Yes, I do recognize it.

24 Q    And do you remember when you received that letter?

25 A    After the shareholders' meeting.  But at that point,

1    I'd already been working with Mr. Ward.

2    Q    Do you remember this letter being discussed at the

3    shareholders' meeting?

4    A    No.

5    Q    Did you ever listen to the recording that you made of

6    the shareholders' meeting?

7    A    Yes.

8    Q    And this letter didn't come up?

9    A    No.

10    Q    Have you seen a transcript of the shareholders'

11    meeting?

12    A    No.

13    Q    When did you speak with Investigator Ward prior to

14    going to the shareholders' meeting?

15    A    A bit before.  Exactly when, I don't remember.

16    Q    And did he ask you to record the meeting?

17    A    No.  That was my idea.

18    Q    Did you tell anyone at the meeting that you were

19    recording the meeting?

20    A    No.

21    Q    But you didn't record the entire meeting, correct?

22    A    No, I did not.

23    Q    Is it fair to say at the meeting that Michael Harris

24    told the assembled group that the company was broke?

25    A    No.

1   Q    If you had heard that, would that have lulled you

2   into a sense of security about the company?

3   A    I don't understand.

4   Q    Well, would that have given you confidence?  If you

5   heard him say the company is broke, would that have given

6   you confidence for the company moving forward?

7   A    No.

8   Q    And if you had heard -- or did you hear Michael

9   Harris say that he's not the right person to be running

10  this company?

11  A    I don't remember that.

12  Q    If you had heard that, would that have given you

13  confidence in the company moving forward?

14  A    No.  At that point I'd lost all confidence anyway.

15  Q    Now, do you recall that in 2009 that Mr. Harris

16  obtained a patent from -- an American patent?

17  A    That's what he told us.

18  Q    Did you ever see the patent?

19  A    No.

20  Q    Did you ever ask to see the patent?

21  A    I just assumed that he was telling the truth.

22  Q    Were you aware of an attorney that he was working

23  with by the name of Rodney Sparks?

24  A    No.

25  Q    Were you aware that an African patent was obtained

1  right around that same time?

2  A    No.

3  Q    Did the fact that you heard about the American

4  patent, did that give you some confidence that the company

5  would move forward?

6  A    Yes.  But again, I never saw the patent.  Not that

7  I'd know what I was looking at anyway.

8  Q    Do you own any companies?

9  A    Do I personally?  No.

10  Q    Have you owned any companies?

11  A    No.

12  Q    Have you been the head of any companies?

13  A    I've been a trustee.

14  Q    And is it fair to say that the CEO and president of a

15  company should receive a salary?

16  A    I don't.

17  Q    But generally speaking?

18  A    I can't say.

19       MR. WAGNER:  Just one moment, Your Honor.

20       THE COURT:  Yes, sir.

21       MR. WAGNER:  No further questions.

22       THE COURT:  Mr. Naseem, redirect?

23       MR. NASEEM:  Briefly, Your Honor.

24                    **REDIRECT EXAMINATION**

25  BY MR. NASEEM:

1   Q     Now, Mr. Carrier, you stated earlier that your wife

2   was involved with you as part of this investment?

3   A     Yes.  She did an awful lot for me.

4   Q     Was she with you every step of the way?

5   A     Yes, she was.

6   Q     Now, prior to your investment at the meeting in

7   Mr. Harris' home in Luray, Virginia, what did he state

8   about looking for funds from other sources, if anything?

9   A     Not a whole heck of a lot.  He was mostly telling me

10  that this was a great opportunity to get in because so

11  many people were interested in it.

12  Q     What indication did Mr. Harris give you that he would

13  be using investor funds, or your investor funds

14  specifically, to try to get other money?

15  A     I was basically told that my funds would be going for

16  getting the patent done and research.

17  Q     Now, at the 2010 shareholders' meeting –

18  A     Yes, sir.

19  Q     – again, did Mr. Harris provide you, or any of the

20  investors at that meeting, with any financials?

21  A     No.  None.

22  Q     Did he give any indication whatsoever that the

23  company would not be moving forward?

24  A     None.

25        MR. NASEEM:  Those are all the questions I have.

1      THE COURT:  All right.

2      May Mr. Carrier be excused, gentlemen?

3      MR. NASEEM:  Yes, Your Honor.

4      MR. WAGNER:  Yes, sir.

5      THE COURT:  Mr. Carrier, you're excused and free to

6   go.  Thank you very much for coming in today.  We

7   appreciate your testimony.

8      MR. CARRIER:  Yes, sir.

9                    **WITNESS STOOD ASIDE**

10      MR. GILL:  We call Julio Tobar.

11      THE COURT:  Julio Tobar?

12      MR. GILL:  Yes, Your Honor.

13      THE COURT:  All right.  Thank you.

14      Agent Tobar, if you would raise your right hand, sir,

15   left hand on the Bible, and face the Clerk of the Court.

16      THE CLERK:  You do solemnly swear that the testimony

17   which you are about to give, in this case, before this

18   Court, shall be the truth, the whole truth, and nothing

19   but the truth, so help you God?

20      AGENT TOBAR:  I do.

21      THE COURT:  Have a seat on the witness stand, sir.

22      Whereupon, **Agent Julio Tobar**, having been

23   duly sworn in, testifies as follows:

24                    **DIRECT EXAMINATION**

25   BY MR. GILL:

1  Q     Good morning.  Would you please introduce yourself to

2  the jury.

3  A     Julio Tobar.  Good morning, sir.

4  Q     Tell us what you do for a living.

5  A     I'm an FBI agent.

6  Q     How long have you been an FBI agent?

7  A     It's going to be 10 years in August of this year.

8  Q     Where are you currently assigned, and what are your

9  responsibilities?

10 A     I am currently assigned to the Denver Division.  I'm

11 assigned to a squad that investigates violent gangs and

12 drug investigations.

13 Q     Do you also serve the FBI on undercover operations?

14 A     I do.

15 Q     Tell us a little bit about that.

16 A     I have been assigned to the program for the last five

17 years.  I'm a certified undercover agent, and that gives

18 me an opportunity to work throughout the Bureau in all

19 sorts of investigations.

20 Q     Now, aside from 10 years with the FBI, how many other

21 years have you had in law enforcement?

22 A     I was a police officer in south Florida, and a deputy

23 sheriff for a period of 12 years.

24 Q     Now, would you tell the jury how it is that you first

25 got involved in the investigation part of this case?

1    A    I was at my home division in Denver, and I was

2    contacted by the case agent.

3    Q    I'm going to ask you to slow down a little bit.  The

4    court reporter's hands are smoking.

5    A    I'm sorry.  I was contacted by the case agent here in

6    Richmond in regards to a conference, a medical conference,

7    that was going to take place in Denver, Colorado at the

8    Sheraton Hotel.  I was asked by the case agent if I could

9    attend and try to find Mr. Harris and engage him in

10   conversation.

11   Q    Back on that day when you did the undercover

12   operation, did you meet Michael Harris?

13   A    I did.

14   Q    Do you see him here in the courtroom today?

15   A    Yes, sir.  I do.

16   Q    Describe where he's seated and an article of clothing

17   he's wearing.

18   A    He's in the corner seat, and he has a suit, gray in

19   color, and --

20        THE COURT:  The record will reflect the

21   identification of the defendant by Agent Tobar.

22   Q    Describe for the jury what you did as far as

23   preparation for this undercover operation and gathering

24   information so you would know what you're going to do.

25   A    During my discussions with the case agent, he

1  basically told me that Mr. Harris was going to be having a

2  presentation at this convention, medical convention.  He

3  briefly gave me information about him being involved in

4  the research regarding the cure of AIDS.  And also there

5  was concerns about Mr. Harris had been involved in some

6  sort of a fraud scheme.

7  Q    What was going to be your cover?

8  A    After a discussion with the investigators, we thought

9  that the best way to approach him would be if I portrayed

10 myself to be an investor.

11 Q    Were you going to present yourself in a technical,

12 scientific way at all?

13 A    No.  In fact, we tried to stay away from that, and

14 just go in as an investor and not anything related to the

15 science part of the research that he was conducting.

16 Q    Now, I want to turn your attention to April 8, 2011.

17 Was that the date of the conference?

18 A    Yes, sir.

19 Q    Describe for us where it was located and the type of

20 conference this was based on your personal observations.

21      THE COURT:  What was the year of that again,

22 Mr. Gill?

23      MR. GILL:  It was 2011, Your Honor.

24      THE COURT:  Go right ahead, agent.

25 A    Yes, sir.  On that date when I arrived to the hotel,

1  I noticed that there were two convention centers -- or two

2  rooms separated, but in the same general area.  One of the

3  rooms they were using as a guest speaker room, there was a

4  large audience, and they had different speakers throughout

5  the day.  And adjacent to that there was a second room,

6  and in that room I found quite a few exhibits related to

7  the cure of AIDS.

8  Q    Now, what was the defendant's position in this

9  conference?  Was he a presenter to the audience at large,

10 or a booth?

11 A    No, he was not.  He was in the portion of the

12 convention that was an exhibit.

13 Q    Tell us about how it is that you located Michael

14 Harris and where you first located him.

15 A    I identified him based by his name and his research.

16 Like I said, he had an exhibit so that was how I was able

17 to locate him.

18 Q    Describe for us generally what his exhibit looked

19 like, and if he was with someone or alone when you first

20 arrived.

21 A    When I first arrived there were several other guests

22 that were looking at the exhibit, but I was able to

23 identify him.  And he had what I would say is a table with

24 some documents, and behind him he had several diagrams or

25 pictures similar to that behind like three or four of them

1  that had information regarding the research.

2  Q    What did -- did you sit down and talk to the

3  defendant?

4  A    I spoke with him for a while, but I don't remember

5  sitting down talking to him.

6  Q    Generally tell us, at the time were you wearing a

7  recording device?

8  A    Yes, sir, I was.

9  Q    Did that record the conversation?

10  A    That's correct.

11  Q    Now, we're going to talk about a few of the specifics

12  on that, but give the jury just an overall picture of what

13  he told you about what he does and his background.

14  A    I engaged Mr. Harris in a conversation.  He told me

15  that he had attended medical school or he was going to

16  college for medical school.  We -- he then began to in

17  great detail give me a description of his research, his

18  goals, what was the purpose of it.  And as that

19  conversation was taking place, what I did was I tried to

20  gear it away from the science part and then that's when I

21  portrayed myself to be an investor.

22  Q    During the conversation did you meet anyone else?

23  A    I did.

24  Q    Who did you meet?

25  A    I met this gentleman by the name of Joe Newcomb.

1  Q    And Joe Newcomb, who did he represent himself to be,

2  and what was his connection to the defendant?

3  A    He identified himself as a pilot for the Marine Corp.

4  And he was -- Mr. Harris told me that he was one of his

5  investors.

6  Q    Take a look at Exhibit 167.  It will be the first

7  folder under that transcript.  Take a look.  Do you

8  recognize that?

9  A    I do.

10 Q    What is that?

11 A    This is the business card that was given to me by

12 Mr. Harris, and the business card that was given to me by

13 Joe Newcomb.

14     MR. GILL:  Your Honor, we move for admission of

15 Exhibit 167.

16     THE COURT:  Any objection?

17     MR. WAGNER:  No, Your Honor.

18     THE COURT:  Exhibit 167 will be admitted without

19 objection.

20          (Government's Exhibit 167 is received.)

21     MR. GILL:  If we can go ahead and show it.

22 Q    First let's focus on the top card.  Whose card is

23 this?

24 A    Mr. Harris'.

25 Q    Multiple addresses, international and United States?

1  A    That is correct, sir.

2  Q    During this did he talk about his work

3  internationally?

4  A    Briefly, yes.  He did mention that he had a patent in

5  Europe for his research.

6  Q    Let's scroll down to the other business card.  And

7  what is this?

8  A    This is the business card that was given to me by

9  Mr. Newcomb.

10  Q    Now, during this conversation did the defendant --

11  well, number one, tell the jury about his demeanor.

12  A    I found him to be very outgoing, outspoken,

13  determined.  He seemed very knowledgeable for what he was

14  talking about.

15  Q    And did he talk to you about soliciting money for

16  investing?

17  A    Yes.

18  Q    Generally what was the overall nature of that entire

19  conversation you had with him?

20  A    Basically, he indicated that he was heading towards a

21  new phase in his research, which he referred to as Phase

22  II or the next step.  And that was going to be the human

23  trials.  And he wanted people to invest.  He needed the

24  money from investors in order to proceed with that

25  research.

1  Q     Based on your interactions with the defendant both

2  that day and afterwards on e-mails, if you had invested

3  where did you understand in your undercover capacity the

4  funds were going to go?

5  A     My understanding was that it was going to go into his

6  corporation for the purpose of the second trial.

7  Q     Now then, if you'll take a look first at the CD in

8  front of you, Exhibit 165.  And, sir, did you actually

9  listen to that and does that contain clips of the

10 conversation that you had with the defendant that day?

11 A     Yes, sir.

12       MR. GILL:  Your Honor, we move --

13       THE COURT:  What is that exhibit number, Mr. Gill?

14       MR. GILL:  One hundred sixty-five, Your Honor.

15       THE COURT:  Exhibit 165.  Is there an objection,

16 Mr. Wagner?

17       MR. WAGNER:  Sorry.  I don't think I have it here.

18       MR. GILL:  It's a CD.  Exhibit 166 is the transcript.

19       THE COURT:  All right.  Exhibit 165 will be admitted

20 without objection.  That is the CD disk itself, is that

21 correct?

22       MR. GILL:  That is correct, Your Honor.

23           (Government's Exhibit 165 is received.)

24       MR. GILL:  And also, Your Honor, we'd move for

25 admission of 166, which is a transcript.

1  Q     And have you received that transcript as a fair and

2  accurate representation of the conversation?

3  A     Yes, sir, it is.

4        THE COURT:  Any objection to 166, Mr. Wagner?

5        MR. WAGNER:  This is just clips from it.  It's not

6  the entire CD.  Does that have the entire conversation?

7        MR. GILL:  It has the clips.

8        MR. WAGNER:  We would ask under the Rule of

9  Completeness that the full transcript of that conversation

10 with the defendant be introduced.

11       THE COURT:  Under the Rule of Completeness, that

12 merely gives you the opportunity to publish the balance of

13 the conversation, and you may do so.

14       MR. WAGNER:  Very well.

15       THE COURT:  All right.  Exhibit 166 will be admitted,

16 but with that objection.

17            (Government's Exhibit 166 is received.)

18       MR. GILL:  All right.  Let's begin with Clip Number

19 1.

20       THE COURT:  Before you do that, are you going to

21 publish the transcript to the jury?

22       MR. GILL:  We are, Your Honor, in that it will be on

23 the screen and it tracks on the screen for the jury.

24       THE COURT:  All right.  Very well.

25            Ladies and gentlemen, one cautionary instruction.

1  These transcripts are provided to you for the purpose of

2  assisting you in following the conversation while the tape

3  is being playing.  If there's any question in your mind as

4  to whether or not the information on the transcript is

5  correct, you must rely upon what you hear on the tape.

6  What you hear on the tape is the actual evidence.  The

7  transcript is merely given to you to assist you in

8  following that tape.  Anybody have any questions about

9  that?

10       All right.  Go right ahead.

11 Q    And, sir, before we play Clip #1, if you would give

12 the jury a little context.  While he is talking to you

13 giving his presentation or this discussion, did he use

14 anything or refer you to anything while he talked?

15 A    I remember that he had a notebook or a binder.  I

16 vaguely remember.  I think it has some endorsements, and

17 also some information similar to the information that he

18 had on the diagrams behind him.

19 Q    Now, with respect to Clip #1, does this clip relate

20 to just general information about the company and what

21 he's selling?

22 A    Yes, sir.

23       MR. GILL:  All right.  If we could play that for the

24 jury.

25            (Clip #1 is being played at this time.)

1  Q    When you are referring to $250 a patient, what did

2  you understand that to be?

3  A    That would be the cost for the new trial that he was

4  proposing to do in the future.

5  Q    Based on his representations to you during that

6  meeting, what did you understand the next level to be as

7  far as your undercover investor dollars were concerned?

8  A    The next level would have been receiving money from

9  investors so that he could continue with the research.  In

10 this case, an investment from me.

11      MR. GILL:  If we could look at Clip #2.

12 Q    And during this clip, is there a discussion about

13 patents?

14 A    Yes, sir.

15      (Clip #2 is being played at this time.)

16 Q    And you're there at that conversation, and based on

17 what he was saying to you and representing to you, what

18 did you understand he was referring to when he says *"we"*?

19 A    His company.

20      (Clip #2 is being played at this time.)

21 Q    All right.  And he just said, *"He's one of them."*

22 And he's starting to talk about *"Joe."*  Who is he about to

23 talk about?

24 A    Mr. Harris is referring to Mr. Newcomb.

25 Q    Okay.

1          (Clip #2 is being played at this time.)

2  Q    Now, at that time he's also referring to others.

3  What is he referring to based on your recollection when

4  he's discussing that?

5  A    In this case, he's referring to a person that he had

6  in that binder that he was using of people that were

7  endorsing his work.

8  Q    Now then, we're going to go to Clip #3.  I believe

9  there is discussion about Puerto Rico in there.  And tell

10  the jury before we get into that, do you have a connection

11  to Puerto Rico?

12  A    I do.  I was born and raised in Puerto Rico.

13  Q    So you have some familiarity with it and things down

14  in Puerto Rico?

15  A    Yes, sir.

16      MR. GILL:  Can we play Clip #3?  Thank you.

17          (Clip #3 is being played at this time.)

18  Q    When he talks about *"el comandante,"* tell the jury

19  what that is in Puerto Rico.

20  A    El Comandante, it's a very popular horse racetrack

21  from the metropolitan area.

22  Q    Tell us about the level of El Comandante based on

23  your knowledge of Puerto Rico.  Is this just a standard

24  racetrack or is it upper crust?

25  A    No.  Based on my knowledge, it's pretty high-end

1  class.   The most prominent people in Puerto Rico that have

2  horses, that's where they take their horses to race.

3                (Clip #3 is being played at this time.)

4  Q    And I don't know if I asked you earlier, but a lot of

5  the conversation before and after this time, does it get

6  very technical?

7  A    Yes, sir, it was.

8  Q    And did you want to stay and talk in technical

9  science stuff, or were you steering away to topics such as

10 these we're showing the jury?

11 A    My goal was to steer away from this type of

12 conversation to an investment type of conversation.

13 Q    Fair to say, a lot of the time that you spent with

14 the defendant that day was a lot of the technical science

15 of this?

16 A    Yes.

17 Q    It was very impressive when he presented it?

18 A    It sounded good.

19               (Clip #3 is being played at this time.)

20 Q    And when he's referring to *"Chip Locker,"* what are

21 you looking at?

22 A    He's referring back to the binder that I spoke about

23 earlier.

24               (Clip #3 is being played at this time.)

25 Q    Now, in that exchange when you're talking to him

1  about the money, the original money from investors, what

2  was your interest in asking that question?

3  A    I wanted to see exactly where the money was going.

4  And I also wanted to determine if I invested, or the

5  people that I was portraying to be like the middleman for

6  other investors, where was that money going to go at that

7  point.

8  Q    And what did he represent to you?

9  A    My understanding, based on the conversation, was that

10 the money I was going to give from my investors was going

11 to go to the human trials, which was supposed to be the

12 next stage of his research.

13 Q    And when you're talking to him about original money

14 from investors, did he represent to you during that

15 conversation that it had gone to the trials?

16 A    He did.  Yes, sir.

17 Q    And what did you take the trials to refer to based on

18 your interactions and conversations with him?

19 A    From the conversation, and from some of the stuff

20 that he was telling me, it appeared to me when he said

21 initial trials he was referring to animal trials, which

22 was the first stage of his research.

23 Q    What stage was he at now?

24 A    He was proposing the second.

25 Q    Which would involve what type of subjects?

1  A      Human trials.

2          (Clip #3 is being played at this time.)

3  Q     What was he representing there about the value of the

4  company?

5  A     I'm sorry, sir?

6  Q     What did he represent to you about the value of the

7  company?

8  A     That he has sold -- we were talking about the fact

9  that he split the shares and has sold 1% of the company.

10 Q     About his representation about the value of the

11 company as attributed by him, in here it says *Williams

12 and Mullingstead."*

13 A     Oh, I see.  *"three hundred billion"* dollars as far as

14 the value of the company in reference to this report from

15 *"Williams and Mullingstead."*

16 Q     Do you know what that is?

17 A     I've seen it.  Oh, do I know what it is?

18 Q     Yes.

19 A     No.  I don't know what it is.

20 Q     Okay.

21         (Clip #3 is being played at this time.)

22 Q     And when he's talking about getting money to pay for

23 it, what dollars is he talking about?

24 A     I'm sorry.  Say that again.

25 Q     When he's talking about getting money to pay for it,

 1  for the second trial, what is he referring to?

 2  A    Investments from potential investors like myself for

 3  the second trial, for the human trial.

 4       MR. GILL:  Let's go to the next clip, Clip #4.

 5           (Clip #4 is being played at this time.)

 6  Q    Now, as far as if you had invested in an undercover

 7  capacity, what did you understand the price to be that he

 8  was offering you?

 9  A    Minimum of a $5,000 investment.

10  Q    What about the price per share?

11  A    It was $17.50 per share.

12       MR. GILL:  And let's look at the final clip.

13           (Clip #5 is being played at this time.)

14  Q    And do you recall what he was referring to when he

15  talked about *"a picture of that kid"*?

16  A    No, I don't, sir.

17  Q    Based on his representations to you, where was the

18  money going to go if you had invested?

19  A    To his corporation.

20  Q    Now, sir, I'm going to show you Defense Exhibit 53.

21  Take a moment to look through that.  Is that looking

22  familiar to you?

23  A    It does, sir.

24  Q    What does it look like to you?

25  A    It reminds me of the binder that he had on the day

1  that he was showing me as he was talking about his

2  research.

3  Q      And tell the jury, as he went through it and he was

4  talking to you in the fashion that we were just talking

5  about, and the entire time you're sitting there with him,

6  did he pull things out and discuss in depth with you

7  particular things about this plan or was it just more of a

8  global view?

9  A      Just global view.

10 Q      Take a look, and if you would thumb through the

11 portion there that's flagged.  It's got a little flag on

12 the side.

13 A      Okay.

14 Q      And if you would please pull that out.  It's been

15 admitted as Defense Exhibit 53-A.

16 A      Okay.

17 Q      Now, is this a document that you actually received --

18 I'm sorry.  Does it appear to be a document that you

19 actually received via e-mail from the defendant later?

20 A      Yes, sir.  That's correct.

21 Q      Now, as you're sitting there with him and talking

22 about investments, did Michael Harris take time to explain

23 to you or mention anything about salary, or anything like

24 that –

25 A      No, sir.

1  Q      - as part of the investment?

2  A      No, sir.

3  Q      Now, after the recording that you had with him at

4  that time, did you see Michael Harris anymore that day?

5  A      I did.  I returned a few minutes after I stopped

6  talking to him the first time.  We had a brief

7  conversation.  We discussed potentially getting together

8  that day because he had a PowerPoint presentation that he

9  was interested in showing me, but that meeting never took

10 place.

11 Q      After that day, did you actually reach out to Michael

12 Harris?

13 A      I did.

14 Q      Take a look at Exhibits 168 up through 170.  Are

15 those e-mails and a non-disclosure agreement related to

16 your interactions with the defendant after that day?

17 A      Yes, sir.

18        MR. GILL:  Your Honor, we would move for admission of

19 Exhibits 168 through 170.

20        THE COURT:  Any objection, Mr. Wagner?

21        MR. WAGNER:  No, Your Honor.

22        THE COURT:  They'll be received.

23           (Government's Exhibits 168-170 are received.)

24        MR. GILL:  Do you mind touching the lower right-hand

25 side.  I think it will clear.  There's a green dot in the

1  middle.   Thank you, Howard.

2       Now, let's show Exhibit 168 to the jury.  This is

3  Page 1.  And let's focus in on the upper portion up here.

4  Q    Explain to us what it is that we're looking at there.

5  A    Basically, this is an e-mail -- I reached out to

6  Mr. Harris.  The initial portion of the e-mail I wrote

7  basically explaining that I have not been able to get back

8  with him because of some travel.  But then I explained

9  that I had potential investors that were interested in

10 making an investment up to -- well, $500,000 up to a

11 million dollars, with the understanding that there were

12 going to be some big returns for their investment.

13      And the purpose of the e-mail was to request some

14 sort of financial status or information regarding his

15 company.  And then the e-mails followed by several

16 questions that were put together by the case agent and his

17 investigative team.

18      MR. GILL:  And if we could scroll down.

19 Q    It says, *"Other questions e-mailed by potential*

20 *investors."*

21 A    Correct.

22 Q    These are questions that were provided by Agent

23 Gregor?

24 A    That is correct.  Yes, sir.

25 Q    Okay.  Tell us generally, the jury can see the

1  questions, but what was the purpose of what you were

2  doing?

3  A    The main purpose, like I said, was to get the

4  financial information regarding the corporation.  And then

5  any other information, documents, brochures in regards to

6  his corporation as well.

7  Q    It mentions there at the last, *"Also, I signed the*

8  *non-disclosure agreement."*  Did you actually do that?

9  A    I did.

10  Q    Okay.  And that's Government's Exhibit 169.  The jury

11  has seen it plenty of times so we're just going to leave

12  it for them later.

13      Now, this was sent on April 25, 2011.  If we scroll

14  down just a little bit.  That name there, *"Julio Tobias."*

15  Whose name is that?

16  A    That was my covert name.  My undercover name.

17  Q    Okay.  Did you receive a response?

18  A    I did.

19  Q    When was the response received, and was it from the

20  defendant's e-mail address as you understood it?

21  A    Yes, sir.  It was the following day on April 26th,

22  and it was from Mr. Harris at his e-mail address.

23  Q    Now, *"To answer your questions,"* so he goes through

24  and answers your questions.  He's talking there about

25  *"investigators"*?

1   A     Yes.

2   Q     What were those *"investigators"* related to?

3   A     I've sorry.  Can you say that again.

4   Q     What was that related to?

5   A     His response was in regards to the -- basically, he

6   said for the first question about his financial status, he

7   said he only has bills and expenses for the company.

8         MR. GILL:  Let's look at Page 2.  Let's focus on the

9   upper portion.

10  Q     Now first off, he provided information he said, *"All

11  investigators have been MD's."*  Were these people you

12  understood to be associated with this treatment?

13  A     I'm sorry.  I apologize.  I understand now.

14  Q     That's okay.

15  A     Physicians that were involved in the research that he

16  was conducting.

17  Q     Okay.  And Number 1 you had asked him in the previous

18  e-mail, *"Any financial available to look at, profit/loss,*

19  *balance sheets for the last couple of years."*  Is that

20  Number 1 his response?

21  A     Yes, sir.  And basically said that he only has bills

22  and expenses.

23  Q     Number 3.  You had asked him for *"Brochure,*

24  *prospectus, disclosure documents available to look at"* for

25  the company.  And is Number 3 right there the response

1  that he provided?

2  A    He basically said, *"We have a Business plan, the*

3  *prospectus was done by Williams/Mullens and gives the*

4  *company 300 billion for the AIDS Treatment."*

5  Q    Number 5.  You asked, *"What is Harris' business*

6  *background?"*  And is that Number 5 there his response?

7  A    Yes.  I asked him for his background.  He basically

8  answered, *"I want to be able to hire the right people."*

9  And every time he referred to *"right people,"* he led me to

10  believe that he was talking about investors.

11  Q    Also he represented, *"I have kept this company alive*

12  *and obtained"* --

13  A    The patents and the research.  Correct.

14       MR. GILL:  If we can scroll down.

15  Q    That information there, the paragraph begins, *"I hope*

16  *this is helpful."*

17  A    Right.  So, in that paragraph basically he said that

18  his resume was up-to-date to 2004, and it was the same one

19  that he had presented during the medical convention,

20  including his medical background.  And then also he

21  restated that the *"200,000 shares authorized by the State*

22  *of North Carolina,"* and that that was 1% -- with 1% that

23  had already been sold to previous investors.

24  Q    Now, he tells you as well he attached a subscription

25  agreement.  Was there other information attached to this?

1  A     Yeah, there was a -- there was an attachment with the

2  House Appropriations document, his resume, and then a

3  subscription.  Let's see if I can find it here.

4  Q    I believe it's attached to the end of that e-mail.

5  A    And a subscription agreement.

6  Q    Okay.  Let's take these documents one at a time that

7  he sent to you beginning on Page 3.

8       MR. GILL:  I'm sorry.  It's Exhibit 168, Page 3.

9  Q    So this was attached, and this is the response to

10 your request for information?

11 A    Yes, sir.

12      MR. GILL:  All right.  Let's look at Page 5, please.

13 I want to focus in on the upper portion.  *"Funding*

14 *Details."*

15 Q    It talks about Phase I, seeking funds to initiate

16 Phase II.  Did that fit -- how did that fit with the

17 presentation you'd received and your understanding?

18 A    To me it was consistent with what he was saying that

19 he had finished Phase I testing and that he was moving on

20 to Phase II.

21      MR. GILL:  Now if we can go down.

22 Q    This is *"Funding Details"* for this.  Now then, right

23 here, *"Second Study Hyperbaric Treatments."*  What did that

24 refer to in relation to what the defendant represented to

25 you?

 1  A    It led me to believe that this is the part of the --

 2  part of the program of the research that I was going to be

 3  investing in, or my investors.

 4  Q    Now let's look at the very next page, Page 6.  Is

 5  that more information for that part that you believed you

 6  were investing in?

 7  A    Yes, sir.

 8       MR. GILL:  Let's scroll down.

 9  Q    What about this next part?

10  A    Based on my interpretation of this document --

11       MR. WAGNER:  Objection to his interpretation.

12       THE COURT:  Objection sustained as to his

13  interpretation.  It speaks for itself.

14  Q    Sir, based on the presentation made to you by the

15  defendant, did you believe you were investing, if you had,

16  in this aspect --

17       MR. WAGNER:  Objection to what he believed, Your

18  Honor.

19       THE COURT:  No.  Objection is overruled on that one.

20  A    No.

21  Q    All right.  And at any time in your meeting with the

22  defendant there in Denver, did he ever talk about salary

23  or anything being taking out of potential investments?

24  A    No, sir.

25  Q    Now then, let's look at Page 8.

1            MR. GILL:  Let's focus in on the upper portion of

2   this.

3   Q     What is this?

4   A     This is his resume or his curriculum.

5   Q     And with respect to his CEO, founder, M.F. Harris, he

6   says, *"Phase I trials completed."*  Did that fit generally

7   with what he'd told you?

8   A     Yes, sir.  It was consistent with what he'd told me.

9            MR. GILL:  Now let's go down -- stop right there,

10  please.

11  Q     He's talking about *"President set up corporation."*

12  That paragraph.  Does it say anything in there about his

13  responsibilities to file annual reports and tax returns?

14  A     Yes, sir.

15           MR. WAGNER:  Objection, Your Honor.

16           THE COURT:  It does speak for itself.  It's

17  innocuous.  Overruled.  Let's move on.

18  Q     Let's just run through the rest real quickly.  Page

19  9.  Does that have more information about his background?

20  A     That's correct, sir.

21  Q     All right.  In going through this, were you able to

22  find that the defendant had obtained any degrees?

23  A     I did not.

24           MR. GILL:  Next page.

25  Q     Same information from the resume?

1  A     Yes, sir.

2        MR. GILL:  And then the next page.

3  A     Same information.

4  Q     And organizational activities.  Now, I know that he

5  told you this resume had been updated to 2004?

6  A     Yes, sir.

7        MR. GILL:  Let's look at the last page.

8  Q     And what was -- the last year entry there is 2001?

9  A     It says, "*Successful Completion of Phase I of Human*

10 *Trials.*"

11 Q     And the final page of this.  The next page.  This is

12 the "*Subscription Agreement.*"  And what was the price per

13 share he was selling to you?

14 A     Seventeen dollars and 50 cents.

15 Q     Now then, did you e-mail with him again?

16 A     I did.

17       MR. GILL:  Let's take a look at Exhibit 170.  And if

18 we could turn to Page 2 of that.  And we'll focus on the

19 very, very bottom of that, which is the start of the

20 e-mail.  A little further down.  Right down there.

21 Q     Do you see your e-mail back to him?

22 A     Yes, sir, I do.

23 Q     And above this, is that the exchange that we just

24 showed the jury, the e-mail where he had forwarded

25 information to you?

1  A      That is correct.

2  Q      Okay.  So we're on to May 13th.

3       MR. GILL:  Let's look at the next page.  Let's focus

4  on the top.

5  Q      And generally tell the jury what your goal was with

6  this e-mail.

7  A      The case agent felt that we were not able to get the

8  information regarding the financial status of his

9  corporation, so the goal of this e-mail was to get more

10  specific answers -- questions and answers as to what was

11  the standing or the extent of his corporation.  And it's

12  portrayed to be as a potential investor who has these

13  questions, which I forwarded.  But in fact, the section

14  where it says *"Client email below,"* those were the

15  questions put together by the case agent and investigative

16  team.

17       MR. GILL:  And let's scroll down just a little bit.

18  Q      And in the first part you're talking about your

19  initial -- I'm sorry.  Does this show a *capital*

20  *contribution of $500K"*?

21  A      Correct.

22  Q      And this is supposedly from you or from the

23  undercover?

24  A      An investor.

25  Q      Okay.  What was the timeliness of the information?

1  How fast of a turnaround were you requesting?

2  A    The investor in this case requested that his e-mail

3  would by answered within -- by the end of the following

4  week.

5  Q    Number 1 there refers to patent and ownership of

6  patent.  What did you understand to be the reasoning

7  behind that question?

8  A    We were trying to determine -- originally he said it

9  was a corporation, but it was later determined that the

10 patent was actually owned under Mr. Harris' --

11     MR. WAGNER:  Objection as to what they determined

12 without a foundation, Judge.

13     THE COURT:  It's being offered to show exactly what

14 here?

15     MR. GILL:  This is being offered to show the

16 questions he asked to the defendant regarding specific

17 issues, and then his response to these issues.

18     THE COURT:  Well, he can go over his question and the

19 response, but as far as any external information from a

20 secondary source I'm going to sustain the objection.  So,

21 just kind of restructure your question, Mr. Gill.

22     MR. GILL:  Absolutely, Your Honor.

23 Q    Basically, was this question designed to get to the

24 heart of who owned the patent?

25 A    Yes.

1  Q    All right.  Let's look at Number 2.  What was this

2  directed at?

3  A    The question was to find out how many people were

4  under the company's payroll.

5  Q    Number 3?

6  A    Once again we were trying to get assets, and

7  everything that was related to the corporation.  Financial

8  information.

9  Q    And you got subparts there.

10  A    *"A list of all assets, tangible and intangible owned*

11  *by the company and their value."*

12  Q    Okay.  And b., which the jury can see.

13  A    It also asks for *"all debts and liabilities with*

14  *amounts owed."*

15  Q    And then at the top, c.  Is that a part of that same

16  question?

17  A    Yes, sir, it is.

18  Q    And finally question Number 5.

19  A    I asked him once we make the investment how long it

20  was going to take for him to start the human trials.

21  Q    And did you get a response?

22  A    I did.

23  Q    Let's look below.  Is this the response you received?

24  A    Yes, sir, it is.

25  Q    How did the defendant begin?

1  A    The first part of the e-mail he asked me if I was a

2  federal investigator.  And then he went on to say that he

3  did not share this information with just anyone.  He

4  claimed that the company was vulnerable, as he had

5  mentioned previously during the initial meeting.  And then

6  he wanted to emphasize that he *"has sold less than 1% of*

7  *shares to get to a pilot phase trial which started 6*

8  *years"* prior to that.

9         And then, *"The company owns all the patents."*  And

10 also they were waiting for investments so that they could

11 do the human trials which he described as, *"A 24 patient*

12 *trial can be started immediately with the proper funding."*

13 Q    So, we just need your investment dollars and we can

14 get started?

15 A    Basically.

16 Q    That final paragraph there, is he talking about

17 future potential opportunities to merge with other

18 companies?

19 A    Yes, sir.

20 Q    All right.  And how did you respond to this e-mail?

21 A    Under the instruction of the case agent, my final

22 e-mail basically says, *"My investors have never invested*

23 *in a corporation without seeing the financial statements,"*

24 and they would not invest with him.

25 Q    Did you get a response from the defendant to that

1  e-mail?

2  A     No, I did not.

3        MR. GILL:  No further questions.

4        THE COURT:  All right.

5        Cross-examination of the agent.

6        MR. WAGNER:  Thank you.

7                    **CROSS-EXAMINATION**

8  BY MR. WAGNER:

9  Q     Good afternoon, agent.

10 A     Good afternoon.

11 Q     I'm Rob Wagner.  I represent Mr. Harris in this case.

12       When did Agent Gregor contact you about going to this

13 conference in Denver to work undercover and ask Mr. Harris

14 questions?

15 A     About three or four days before the actual

16 conference.

17 Q     And do you know how Agent Gregor knew that Mr. Harris

18 was going to be in Denver?

19 A     No, sir.  I don't remember.

20 Q     Do you know whether Agent Gregor was in contact with

21 Joe Newcomb?

22 A     No, sir.

23 Q     So you never discussed how it was that the government

24 knew that he was going to Denver?

25 A     I don't remember.  No.

1  Q     Now, do you know now that Joe Newcomb provided some

2  information to the government about Mr. Harris?

3  A     I did.  Yes.

4  Q     Okay.  And were you given any indication at the time

5  that you conducted this undercover operation that Joe

6  Newcomb was working with the government?

7  A     No, sir.

8  Q     Now, let's go back through some of your testimony and

9  some of the recordings here.  Let's be clear.  Mr. Harris

10 told you during this undercover investigation that there

11 had been no returns on investments, is that right?

12 A     Yes, sir.

13 Q     And you asked him about going to Puerto Rico, and he

14 said he goes to the El Comandante while he is there,

15 right?

16 A     That's correct.

17 Q     He didn't say he rode in the El Comandante, did he?

18 A     No, sir.

19 Q     Okay.  Just to be clear.

20        Now, throughout your investigation and your

21 experience with Mr. Harris, the science of what he was

22 doing was never questioned, is that correct?

23 A     Not on my part.  I wasn't knowledgeable enough to

24 question him on that.

25 Q     And you weren't even asked to inquire about it, is

1  that right?

2  A    No.   We intentionally tried to gear him to, like I

3  said, the conversation from the science part to the

4  investment part.

5  Q    Now, at one point you indicated some kind of a

6  valuation of the company by *"Williams and Mullingstead"*?

7  A    Yes, sir.

8  Q    Let me try to clarify that here.

9      MR. WAGNER:  If we can go to Exhibit 166, Page 5,

10 please.

11     THE COURT:  Go right ahead.  Next question.

12     MR. WAGNER:  I'm sorry.  I'm waiting for it to appear

13 on the screen -- on the ELMO.

14     THE CLERK:  It's on.

15     MR. WAGNER:  Maybe if we can show it the same way the

16 government showed it?

17     THE COURT:  Sure.  Whatever mechanism you wish to use

18 is fine.

19     MR. WAGNER:  Sorry?

20     THE COURT:  Whatever mechanism you wish to use is

21 fine with me, Mr. Wagner.

22     MR. WAGNER:  Is the ELMO not working?

23     THE COURT:  You're asking me?

24     MR. WAGNER:  I'm asking whoever is controlling the

25 computer here, the technology here.

1          THE COURT:  Ask Ms. Bishop.

2          We'll have to have -- Marshal Wray will take a look

3    at it.

4          MR. WAGNER:  Thank you.  I'm sorry.  I'd like to move

5    along, Judge, but I want to show this to the jury.

6          THE COURT:  All right.  Understood.

7          Ladies and gentlemen, if you would like to stand up

8    in place just for a moment, go right ahead.  I apologize

9    for the delay.

10         MR. WAGNER:  If we can go back to the government's.

11   I think they've got it on the screen there.

12   Q    If I can direct the jury to where it says, *"Harris:*

13   *We have not made is split since."*  And let me try to

14   clarify.  Here you said, your testimony in this

15   transcript, *"and Williams and Mullingstead (phonetic) with*

16   *respect has three hundred billion just on the AIDS*

17   *treatment,"* correct?

18   A    I'm sorry.  Say that again.

19   Q    I'm reading it.  Can you see Page 5 of Exhibit 166?

20   It's up on the screen and maybe you have it in front of

21   you.  But there's a point there where it says, *"Williams*

22   *and Mullingstead."*

23   A    Yes.

24   Q    Now, is it possible that Mr. Harris said and Williams

25   and Mullen said *"with respect has three hundred billion"*?

1   A       Sure.

2   Q       Are you aware that there is a law firm in Richmond

3   called Williams and Mullen?

4   A       I did not.

5   Q       Okay, sir.  And did you transcribe this yourself?

6   A       No, I did not.

7   Q       And it also speaks about a prospectus on this

8   company, correct?

9   A       Yes.

10  Q       Okay.  And he didn't say when this prospectus was

11  made, did he?

12  A       Not in this conversation.

13  Q       He didn't say this was the value of the company, did

14  he?

15  A       No.

16  Q       But that's what you testified to, wasn't it?

17  A       Well, yeah -- no, I did not testify to that.  There

18  was a misunderstanding because he made a reference to what

19  the value was, and then there was this document from this

20  attorney law firm.  But that's not -- no, I didn't -- if I

21  said it, then it was a misunderstanding.  I did not try

22  and say the company was worth $300 billion.

23  Q       And he didn't represent that to you as the value of

24  the company, right?

25  A       No.

1    Q     Okay.  Just to be clear.

2          Now, he told you --

3          MR. WAGNER:  And we can take that down.  Thank you.

4    Q     He told you that his company needed money for second

5    trials, right?

6    A     Correct.

7    Q     And he never told you that he had the money for the

8    second trials, right?

9    A     Correct.

10   Q     And he was trying to raise that money for the second

11   trials, correct?

12   A     Yes, sir.

13   Q     And when it comes to the patent here, you're not

14   aware -- you're not a patent attorney, are you?

15   A     No, sir.

16   Q     You're not aware of the effect of the patent being

17   either in the company's name or his name, correct?

18   A     No, sir.

19   Q     And he represented himself as the company, didn't he?

20   A     Yes.

21   Q     And then he never made any reference to you about

22   salary information, did he?

23   A     No, he did not.

24   Q     He didn't specifically say anything.  And you didn't

25   ask him anything about a salary, did you?

1   A      No, sir.

2   Q      But when he responded to your e-mail, he sent you a

3   document that had salary information in it, isn't that

4   right?

5   A      Yes.

6   Q      Thank you.

7          THE COURT:  Are you finished with your cross?

8          MR. WAGNER:  No further questions.

9          THE COURT:  All right.

10         Redirect?

11         MR. GILL:  Yes, Your Honor.

12         Just to clarify, if we could look at Exhibit 168,

13  Page 2.  Can we focus in on Number 3.

14                    **REDIRECT EXAMINATION**

15  BY MR. GILL:

16  Q      That Number 3, was that information that he sent to

17  you via e-mail after this?

18  A      Yes, sir.

19  Q      And just to clarify, what did you understand to be

20  his representation about the value?  Was it the value of

21  the treatment or the patent --

22         MR. WAGNER:  Speaks for itself, Your Honor.  What he

23  understood is irrelevant.

24         THE COURT:  You're going to have to repeat the

25  question.  I'm sorry.  I didn't focus on it.

1          MR. GILL:  Tell us what your interpretation was on

2    the defendant's representations about the value.

3          THE COURT:  Objection sustained.

4          MR. GILL:  No further questions.

5          THE COURT:  All right.

6          May Agent Tobar be excused at this point?

7          MR. GILL:  Yes, Your Honor.

8          MR. WAGNER:  I would ask that he remain briefly.

9          THE COURT:  All right.

10          Agent, if you would step out.  Don't discuss your

11    testimony with anyone until the case is concluded or

12    you're excused, sir.

13          AGENT TOBAR:  Yes, Your Honor.

14          THE COURT:  Obviously you can talk to the attorneys,

15    but no one else.

16          AGENT TOBAR:  Of course.

17          THE COURT:  Thank you, Agent Tobar.

18                    **WITNESS STOOD ASIDE**

19          MR. NASEEM:  Your Honor, the United States calls

20    Marcelo Bellato.

21          THE COURT:  Marcelo Bellato?

22          MR. NASEEM:  Yes, sir.

23          THE COURT:  All right, sir.

24          Mr. Bellato, if you would raise your right hand, sir,

25    left hand on the Bible, and face the Clerk of the Court.

1        THE CLERK:  You do solemnly swear that the testimony

2   which you are about to give, in this case, before this

3   Court, shall be the truth, the whole truth, and nothing

4   but the truth, so help you God?

5        MR. BELLATO:  Yes.

6        THE COURT:  Have a seat on the witness stand, sir.

7          Whereupon, **Marcelo Bellato**, having been

8   duly sworn in, testifies as follows:

9                    **DIRECT EXAMINATION**

10  BY MR. NASEEM:

11  Q    Good morning, Mr. Bellato.

12       MR. NASEEM:  Your Honor, are we ready to proceed?

13       THE COURT:  Yes, sir.  Go right ahead.

14  Q    Good morning, Mr. Bellato.  Would you state your full

15  name for the jury, please.

16  A    Marcelo Bellato.

17  Q    And, Mr. Bellato, where do you presently reside?

18  A    San Diego, California.

19  Q    How long have you lived in San Diego, sir?

20  A    About eight years.

21  Q    Can you tell the ladies and gentlemen of the jury a

22  little bit about what it is that you do for a living?

23  A    I work for a marketing and public affairs firm.

24  Q    How long have you worked for this particular firm?

25  A    Two and a half years.

1  Q     Before that what were you doing?

2  A     I worked for a hotel.

3  Q     And how long did you work for a hotel?

4  A     Four years.

5  Q     Now, Mr. Bellato, are you familiar with the

6  defendant, Michael Harris?

7  A     Yes, I am.

8  Q     Can you identify Mr. Harris in the courtroom today?

9  A     (Witness points.)

10       MR. NASEEM:  Can the record reflect that he

11 identified the defendant?

12       THE COURT:  The record will reflect that Mr. Bellato

13 identified the defendant.

14 Q     Now, can you explain to the ladies and gentlemen of

15 the jury how it was that you first came to meet

16 Mr. Harris?

17 A     I met Mr. Harris through Tom Marosi.  We heard about

18 him and his research, and we came down to Virginia to meet

19 with him.

20 Q     So you came to Virginia with Mr. Marosi.  Was it

21 Mr. Marosi -- or what did Tom Marosi do for a living?

22 A     He was a doctor.

23 Q     I'll refer to him as Dr. Marosi.

24 A     Okay.

25 Q     So can you explain to the ladies and gentlemen of the

1   jury what your relationship with Dr. Marosi was at the

2   time that you came to visit Mr. Harris in Virginia.

3   A    I had a romantic relationship with Dr. Marosi.

4   Q    Okay.  Mr. Bellato, I know this is going to be

5   difficult for you to talk about publicly, but was there

6   something that occurred to you sometime in 2006 that

7   happened to you and both Mr. Marosi that led you to

8   ultimately meeting with Mr. Harris?

9   A    Yes.  We both were confirmed HIV positive.

10  Q    Now, we don't need to get into too much detail, but

11  can you tell the ladies and gentlemen of the jury what

12  affect that had on you at the time?

13  A    It was a life change.  Turned my life upside down.

14  Pretty devastating for anyone.

15  Q    And thank you for sharing that with us, sir.  I know

16  that was difficult for you to do.  Now, how did learning

17  about your infection at the time, again, ultimately lead

18  you to Michael Harris?

19  A    Tom, Dr. Marosi, he heard through a friend that Mike

20  Harris was conducting research with -- for HIV treatments,

21  and he got -- and they got in contact.  And Michael shared

22  some of the -- you know, what he was doing with Tom, and

23  we booked a trip to Virginia.

24  Q    Okay.  Now, do you recall when it was that that trip

25  occurred?

1  A    It was in 2004.

2  Q    All right.  I'm going to hand you -- there's a set of

3  exhibits there.

4       MR. NASEEM:  Your Honor, could we take just a moment?

5  I need to get the exhibits for the witness.

6       THE COURT:  Sure.  Go ahead.

7  Q    If you can look at Exhibit Number 5, Mr. Bellato,

8  please.

9  A    Uh-huh.

10 Q    And if you can identify -- can you identify that

11 document, sir?

12 A    Yes, I can.

13 Q    Can you identify the document, please.

14 A    It's an e-mail between Dr. Marosi, myself, and

15 Michael.

16 Q    Okay.  And do you recognize that as an e-mail that

17 you retrieved from the e-mail account?

18 A    Yes.

19 Q    And to the best of your recollection, is the

20 information that's contained on there a true and accurate

21 representation of the e-mail maintained on your account?

22 A    Yes, sir.

23      THE COURT:  Any objection, Mr. Wagner?

24      MR. KLAIBER:  No, Your Honor.

25      THE COURT:  Excuse me.  I'm sorry.  Mr. Klaiber.

1      Be received.

2           (Government's Exhibit 5 is received.)

3      MR. NASEEM:  May we publish it to the jury?

4      THE COURT:  It's in evidence.  You may go ahead and

5 publish the exhibit.  Yes, sir.

6 Q    Turning to Page 2 of that document, sir.

7 A    Okay.

8 Q    Now, focusing on the lower part.  Now, this is -- do

9 you recognize this as an e-mail chain, Mr. Bellato?

10 A    Yes.

11 Q    Okay.  And is this the first part of the chain?

12 A    Yes.

13 Q    Looking at the top of the document there.  And is

14 this -- was this particular part of the chain directed

15 directly to you?

16 A    No.  There was an e-mail from Tom to Michael.

17 Q    And was that forwarded to you?

18 A    Yes.

19 Q    What is the date of that e-mail, sir?

20 A    August 29, 2006.

21 Q    Does that refresh your recollection as to what time

22 period it was that you visited Virginia?

23 A    Yes.

24 Q    Who are *"The Three Laboratory Mousekatteers"*?

25 A    It's Tom Marosi, Steve Baughman, and myself.

1  Q    Who is Steven Baughman?

2  A    He was Tom Marosi's former partner.

3  Q    And was Mr. Baughman -- had Mr. Baughman also

4  contracted the HIV virus?

5  A    Yes.  He was for years.

6  Q    Mr. Bellato, you can set that aside for a moment.

7       Now, tell us a little bit about your travel to

8  Virginia in August of 2009.  Did you meet with Mr. Harris?

9  A    Yes.

10  Q    Where did you fly to?

11  A    We flew to Washington, D.C. airport.  And we drove

12  for a while to, you know, a lodge in the woods where --

13  where we met with Mr. Harris.

14  Q    And where was that lodge, do you recall?  Do you know

15  what state it was in?

16  A    It was in Virginia.  Yes, it was here.

17  Q    So you met with Mr. Harris.  What time of day was it?

18  A    We first met with him that evening.  We arrived that

19  evening.  We had dinner with him that evening.

20  Q    And did you talk with Mr. Harris about the treatment

21  at all that evening, or what he did?

22  A    Yeah, we briefly talked about a little bit.  We

23  didn't get much into it, but we talk about him and his

24  research and about ourselves with dinner.

25  Q    And who was present at that dinner?

1    A    Michael Harris, Tom Marosi, Steven Baughman, and

2    myself.

3    Q    Now, did there come a time then when you got into

4    more detail about the treatment itself?

5    A    Yes.  The next day.  Middle of the day.

6    Q    Tell us a little bit about what happened the next

7    day.

8    A    We went to a room.  It was a type of conference room,

9    ballroom at the lodge.  And Mr. Michael Harris opened his

10   laptop and did a presentation for us.

11   Q    Now, Mr. Bellato, at the presentation can you tell

12   the ladies and gentlemen of the jury what it was that

13   Mr. Harris discussed?

14   A    He discussed research that he was doing with HIV

15   treatment and the hyperbaric chambers with being exposed,

16   you know, in the hyperbaric chambers for a number of times

17   and that would cause and effect to, you know, cure HIV or,

18   you know, at least isolate the virus.

19   Q    What did you think about the presentation?

20   A    I had hopes.  I'm not a doctor, but I had hopes.

21   Q    How did Mr. Harris seem?  How did he seem in terms of

22   -- how knowledgeable did he seem in terms of the science

23   behind the particular treatment?

24   A    He seemed knowledgeable for, you know, my

25   understanding.  I understand he's not a doctor, but Tom

1  was a doctor and, you know, I was there more for hope than

2  anything else.

3  Q    Again, who was present at this meeting?

4  A    Michael, Tom Marosi, Steven Baughman, and myself.

5  Q    And did you stay for the entire duration of that

6  meeting?

7  A    Yes, I did.

8  Q    Okay.  I'm going to hand you a document here, sir, or

9  a set of documents.  If you can briefly thumb through

10  those.

11      THE COURT:  What number exhibit are you giving him?

12      MR. NASEEM:  That's Government's Exhibit 161, Your

13  Honor.

14      THE COURT:  Exhibit 161.  Okay.  Which I believe is

15  in evidence.

16      MR. NASEEM:  Yes, Your Honor, it is.

17      THE COURT:  Okay.

18  Q    Thumb through that and let me know if you recognize

19  that series of documents there.

20  A    I do.

21  Q    Does that adequately -- are those documents -- or is

22  that the slide presentation that was presented to you by

23  Michael Harris at that meeting?

24  A    Yes.  It seems like it.  I remember.

25  Q    All right.  Now, Mr. Harris presented the PowerPoint

1  presentation and he talked about the science.  Did he talk

2  about anything else at that meeting?

3  A    He did.

4  Q    What did he talk about?

5  A    He talked about selling of shares for this company to

6  fund the research.

7  Q    What was your understanding as to what it would cost

8  to purchase shares?

9  A    It was a dollar a share.

10 Q    And did he offer that opportunity to everybody that

11 was at the meeting?

12 A    He did.  Mostly through Tom but, you know, he talked

13 about it openly.

14 Q    And based on what Mr. Harris represented at that

15 meeting, what was your understanding of what your

16 investment money would go towards?

17 A    To research.

18 Q    Was there any other arrangement made that you

19 understood between Mr. Harris, you, and Dr. Marosi, and

20 Mr. Baughman with respect to any investment being provided

21 by you?

22 A    I understood that both -- actually us three, Tom,

23 Stephen, and myself, would go -- we would do the

24 treatment.

25 Q    So you would receive the treatment in exchange for

1  the investment?

2  A    Yeah.  We actually -- we would be the three first

3  persons to go through the treatment in the next year or

4  the end of that year.

5  Q    Now, at any point during that presentation in 2006

6  did Michael Harris make any representations that he was

7  going to use investor money to pay himself a salary?

8  A    Not that I recall.

9  Q    At any point during that presentation did Mr. Harris

10 represent that he would be using funds to pay for his

11 personal expenses?

12 A    I don't recall.

13 Q    Now, Mr. Bellato, how long were you in Virginia?

14 A    Three days.

15 Q    Can you tell us a little bit about what happened

16 after the meeting on the first day.

17 A    We stayed at the hotel for a little bit and we went

18 and visit Mike Harris.  He was with a girlfriend.  She

19 just had a baby.  We went and visit her.  Tom brought some

20 presents for the newborn.  We had some tea and coffee in

21 the afternoon at her house, and then we went to see

22 Michael Harris' horses that he had.  He had a few horses

23 where he kept them, and we went there and looked at the

24 horses and left the horses.

25 Q    What did Mr. Harris tell you about his horse riding?

1  A    That those were like competition horse, and he hope

2  for one of his horses to, I believe, become an Olympic

3  horse, or something like that.  It was amazing horse, or

4  something.

5  Q    Did he represent to you that he actually rode horses

6  and raced horses?

7  A    Yeah.  I knew he raised horses.  I don't know if rode

8  the horses, but he raised the horses.

9  Q    Now, Mr. Bellato, what did Mr. Harris say about his

10 personal financial condition at that time?

11 A    There was a conversation that weekend where he

12 mentioned that he never had money, and which time a

13 confidentiality agreement should be able to see the

14 research.  And he never said he had money and he was very

15 concerned that his research would fall in the wrong hands

16 and that he knew that once his study and his research

17 could be public, that would be a huge thing and he was

18 very protective of that.

19 Q    And what about with respect to how he earned his

20 living, did he talk about that at all?

21 A    No.  I had no idea.

22 Q    Now, after you left Virginia, do you have knowledge

23 of whether Dr. Marosi invested in the company?

24 A    Yes.  Yes.  He invested $200,000.

25 Q    Now, going back to Government's Exhibit Number 5,

1  which is there before you.

2  A    Okay.

3  Q    Let me focus in on the lower part of the e-mail

4  chain.  You previously identified this as an e-mail that

5  was forwarded to you and that you received.  Now, looking

6  at this e-mail, looking at the first sentence there, does

7  that -- does the e-mail represent -- do you recall, does

8  that refresh your recollection as to the time period when

9  Dr. Marosi invested his $200,000?

10 A    Yes.

11 Q    Now, looking at that e-mail, what was your

12 understanding about when the treatment that you were told

13 about by Mr. Harris would begin?

14 A    It was the end of that year between December and

15 early January of the next year.

16 Q    And did the treatment move forward during that time

17 period?

18 A    It did not.

19 Q    So end of December, early January, it didn't move

20 forward.  What were the reasons provided to you by

21 Mr. Harris that the treatment didn't go forward that

22 December?

23 A    It was several reasons it was happening, you know.

24 And first was some documents that we have to sign to give,

25 you know, the liability.  And it was always something.

1          And it got to the point that he said there was a

2    battle between Tom Marosi's brother over the shares.  You

3    know, he wants to know about the company and what the

4    money was --

5    Q    I think we might be getting a little ahead of

6    ourselves.  Let's back up just a second.  I want to talk

7    about just what occurred in the fall of 2006 when you were

8    supposed to receive the treatment.  What did Mr. Harris

9    say with respect to this time period about why the

10   treatment couldn't move forward?

11   A    I believe there -- it was -- the excuse was that we

12   would have to sign documents, you know, for the liability.

13   And I don't recall why.

14   Q    Okay.  Let's turn to the second page there of that

15   e-mail.  Does that refresh your recollection at all as

16   to -- just the top portion there of that e-mail.  Does

17   that refresh your recollection at all as to what it was

18   that caused the treatment to be delayed?

19   A    Because of my visa.

20   Q    Can you explain this a little bit about the visa

21   situation?

22   A    Well, I had a student visa at the time, and if I

23   leave the United States I will have to go back to Brazil

24   and reapply for the same visa to come back to the States.

25   And Mike Harris said he knew somebody at the State

1  Department that will help me with my visa situation, and

2  told me I should contact them.

3  Q    And did you?

4  A    I did.

5  Q    And can you tell us about that?

6  A    It never went anywhere.  He just --

7       MR. KLAIBER:  Objection, Your Honor.

8       THE COURT:  Objection sustained.

9  Q    Mr. Bellato, after this time period, after you

10 received this e-mail, what was your understanding of when

11 the next treatment was supposed to occur since it didn't

12 occur in the November/December time frame?

13 A    It was supposed to happen within the next year.  The

14 next year.  And we were actually looking to dates.  We had

15 -- I had even signed a document saying that I was like --

16 about the liability of, you know, any consequence that the

17 treatment will bring to my health.

18 Q    Now, if you can look at a set of documents there in

19 front of you that's marked as Government's Exhibit 10.

20 It's in the folder.

21 A    Sorry.  I don't have Number 10.

22      MR. NASEEM:  Before we move on to Number 10, could we

23 publish Number 5 again, please.

24 Q    And looking at the screen there in front of you,

25 Mr. Bellato --

1       MR. NASEEM:  Could you zoom in to the top.  The top

2  portion.

3  Q    And can you identify your e-mail address on that

4  e-mail?

5  A    Yes.  From Tom Marosi to myself.

6  Q    And can you identify your e-mail address?  What is

7  your e-mail address?

8  A    It's xxxxxxxx@hotmail.com.

9  Q    All right.  Now, in the fall of 2006, was there

10 something -- it's the jury's understanding and the Court's

11 understanding that Dr. Marosi passed away.  Is that

12 correct?

13 A    Yes.

14 Q    And Dr. Marosi passed away due to causes unrelated to

15 his disease, correct?

16 A    Yes.

17 Q    And nothing related to Mr. Harris?

18 A    No.

19 Q    Okay.  Now after Tom, Dr. Marosi, passed away, what

20 was your understanding with respect to whether the

21 treatment would move forward or not?

22 A    It would move forward with Stephen and myself.

23 Q    And Mr. Harris told you that?

24 A    Yes.

25 Q    Now, when was it that Dr. Marosi died?

1  A     October 31, 2006.

2  Q     So, Mr. Marosi passes away on October 31st of 2006.

3  What was your understanding about when the treatment would

4  occur in the following year?  Was it going to be at the

5  start of the year?

6  A     It was going to be at the start of the year.  At that

7  point the dates would be the same.

8  Q     Now, turning to Exhibit 10 now.  And can you identify

9  that document there?

10 A     Yes.  It's an e-mail from Mike Harris to myself.

11 Q     And do you recognize your e-mail in that e-mail?

12 A     Yes, I do.

13 Q     And did you obtain that e-mail from your account?

14 A     Yes, I did.

15 Q     Is it a true and accurate copy of the e-mail from

16 your e-mail?

17 A     Yes.

18       THE COURT:  Any objection to 10, Mr. Klaiber?

19       MR. KLAIBER:  No objection.

20       THE COURT:  Be received.

21       MR. NASEEM:  I'd like to publish it.

22       THE COURT:  You may publish it.

23          (Government's Exhibit 10 is received.)

24       MR. NASEEM:  And can we focus in on the first part of

25 the e-mail.

1  Q    Now, in January of 2007 when you were contacted by

2  Mr. Harris, you mentioned something about documents.  Did

3  you provide those documents to Mr. Harris?

4  A    Yes, I did.

5  Q    Okay.  Did you hear anything from Mr. Harris after

6  you were provided with those documents?

7  A    I don't recall.  Not by e-mail.  No.  I didn't hear

8  from him for a long while after that.

9  Q    Did the treatment go forward at the start of the new

10 year?

11 A    It did not.

12 Q    And behind that set of documents there, if you can

13 scroll to Page 2.

14 A    Okay.

15 Q    And then 3, 4, and 5.  And can you tell us a little

16 bit about what that sequence of documents is there?

17 A    It was a sequence of documents between Michael and

18 somebody where we were supposed to go and seek the

19 treatment.  The e-mail talk about, you know, he having

20 three or four pilot studies which would probably be myself

21 and Stephen and somebody else.

22 Q    Now, when you obtained that information, what did you

23 -- what did you believe would -- what was your

24 understanding of whether the treatment would go forward or

25 not?

1   A     Well, I had hopes that it would go forward.  It was

2   very clear it was going to happen.

3   Q     And did this e-mail cause you to believe that the

4   treatment would be going forward?

5   A     Absolutely.

6   Q     Okay.  Now, did some months pass after this e-mail

7   was sent and you received no treatment?

8   A     No.

9   Q     When was the next time after January of 2007 that you

10  were contacted by Mr. Harris, do you recall?

11  A     Not on top of my head.

12  Q     Okay.  Why don't we go to Exhibit Number 11.

13  A     Okay.

14  Q     And if you can identify that document there before

15  you, sir.

16  A     It is an e-mail from Mike to myself and Ed.  And he

17  is coming to San Diego.  This is his travel itinerary.

18  And he was going to arrive in San Diego for his friend,

19  Annie's birthday.

20       MR. NASEEM:  Your Honor, at this time I'd like to

21  publish the e-mail.

22       THE COURT:  Any objection?

23       MR. KLAIBER:  No, Your Honor.

24       THE COURT:  Be received.

25            (Government's Exhibit 11 is received.)

1  Q    And focusing in on the top part there.

2  A    Uh-huh.

3  Q    Now, what is the date -- what date was it that

4  Mr. Harris communicated with you?

5  A    April 13, 2007.

6  Q    So from January to April four months had passed, any

7  treatment?

8  A    No.

9  Q    What did Mr. Harris tell you during that time period

10 were the delays with the treatment?

11 A    I -- I don't recall.  It was also something happening

12 in -- that was when the conversation starts about Tom

13 Marosi invested the money on the shares in the company,

14 and his brother was like asking questions and wanted to

15 know what the money was invested in.  And at that point,

16 Michael said that the treatment was on hold because Tom

17 was trying to, you know, stop or was asking questions

18 about the money.  And that was the reason that I

19 understood that why the treatment was not happening at

20 that point.

21 Q    So, the dispute between -- did Mr. Harris tell you

22 the dispute between him and Tom Marosi is what prevented

23 the treatment from moving forward?

24 A    Yeah.  It was a hold on the research.

25 Q    Now, did you -- now, the e-mail here, did Mr. Harris

1    come to San Diego in April of 2007?

2    A    Yes, he did.

3    Q    Did you meet with him during that time?

4    A    Yes, I did.

5    Q    If you can turn to Government's Exhibit Number 12.

6    Can you identify that document?

7    A    Yes.  It was an e-mail from Michael.

8    Q    And is that e-mail sent to you at your e-mail

9    account?

10   A    Yes.

11        MR. NASEEM:  At this time I'd like to move for the

12   e-mail to be published.

13        THE COURT:  Any objection to 12, Mr. Klaiber?

14        MR. KLAIBER:  No objection, Your Honor.

15        THE COURT:  Be received.

16            (Government's Exhibit 12 is received.)

17        MR. NASEEM:  Let's go ahead and publish the e-mail,

18   Exhibit 12, and let's focus in.

19   Q    Now, what was Mr. Harris conveying to you about why

20   he had not been in touch?

21   A    He just had -- he just apologized for not being in

22   touch, and that he was going to be in San Diego that next

23   following week and we could meet and discuss what's the,

24   you know, problem with the project.

25   Q    Do you know why Mr. Harris was in San Diego?

1  A    I believe this was for to visit his friend, Annie.

2  Q    And was there anything going on?  Any particular

3  occasion going on with Annie?

4  A    That was her birthday.  It was a birthday party for

5  her.  And he came to her birthday party.

6  Q    Did you go to that party?

7  A    I did not.

8  Q    Did you meet with Mr. Harris after the party?

9  A    I did.  The day after.

10  Q    Tell us a little bit about the meeting after that

11  party.

12  A    We went to the meeting.  We went to Annie's house and

13  Michael was there.  My friend, Ed, went with me, and there

14  was Annie, and there was two people who came to the

15  meeting where he present the same presentation that he did

16  for Tom, Stephen, and I in Virginia.  He presented to

17  those guys.

18  Q    And did he make -- did he provide the attendants at

19  that meeting an opportunity to invest?

20  A    Yes, sir, he did.  It was the same.

21  Q    At any point during that meeting in April of 2007 did

22  Mr. Harris make any representations regarding whether he

23  would be paying himself a salary with investor's money?

24  A    No.

25  Q    Did he make any representations at that meeting as to

1  whether he would be using investor money to pay his

2  personal expenses?

3  A    Not that I recall.  I guess I imagined he would.

4  Q    Well, let's get into what you know.

5  A    Okay.

6  Q    All right.  Now, April of 2007, at this point after

7  that meeting you met with Mr. Harris.  Did he tell you

8  anything about the treatment during that time period?

9  A    He told me that the treatment was going to happen,

10 you know.  It was just delayed but, yeah.

11 Q    Now, at that point did you believe the treatment

12 would be going forward?

13 A    I have red flags, but I had hope.

14 Q    Now, you said *red flags*.  Why did you have red

15 flags at that point?

16 A    Because there was too much delays and, you know, too

17 much excuses.  And it was just -- I was just anxious to

18 see what was happening.

19 Q    Did there come a time after that meeting with

20 Mr. Harris in April of 2007 when you were contacted by

21 Mr. Harris again?

22 A    Yeah, there was a time that he contact me and said

23 the treatment was going to go forward in the United

24 States, and there was a doctor in California that was

25 going to contact me.

1  Q     Okay.  If you can turn to Government's Exhibit 18.

2  It's there before you.

3  A     Yes.

4  Q     And if you can identify that document.  It's a 3-page

5  document.

6  A     Okay.

7  Q     Can you identify that document for the ladies and

8  gentlemen of the jury?

9  A     It was an e-mail between Michael Harris and myself, a

10  chain of e-mails.

11      MR. NASEEM:  Your Honor, I'd like to move for

12  Government's Exhibit 18 to be admitted.

13      THE COURT:  Any objection?

14      MR. KLAIBER:  No objection, Your Honor.

15      THE COURT:  Be received.

16          (Government's Exhibit 18 is received.)

17      MR. NASEEM:  Can we publish Exhibit 18?

18      THE COURT:  Yes, sir.

19  Q     Going to the second page of that e-mail.  Now, is

20  this a set of two e-mails -- or is this an e-mail chain

21  between you and Mr. Harris?

22  A     It's an e-mail chain between us.

23  Q     And going to the second page.  And let's focus in on

24  the bottom e-mail there.

25  A     Okay.

1  Q     Can you explain what it was that Mr. Harris was

2  contacting you about?

3  A     He wants my information, my phone number, an e-mail

4  address so he could forward to this doctor in California

5  and he could contact me regarding the treatment.

6  Q     Okay.  Now scrolling to the top of this e-mail.  What

7  was the date that Mr. Harris contacted you?

8  A     It was September of that -- of 2008.

9  Q     So more than a year had passed –

10  A     Yes.

11  Q     – since the last time you communicated with

12  Mr. Harris?

13  A     Yes.

14  Q     All right.  Now, going to the first page of that

15  e-mail, Government's Exhibit 18.  Did you provide

16  Mr. Harris with the requested contact -- or did you

17  provide the doctor with the requested contact information?

18  A     I provided my contact information.  He was supposed

19  to forward that contact to the doctor.

20  Q     Okay.  Now, did you follow-up with Mr. Harris after

21  that to determine whether your information had been

22  forwarded on?

23  A     I did.

24  Q     And what was the response?

25  A     Well, I tried to call him a few times and I sent him

1  a follow-up e-mail, and then he sent me the e-mail a few

2  days after that, five or six days after that, saying have

3  they contacted you yet.  And nobody ever contacted me.

4  Q     Okay.  So you -- going to the second page of

5  Government's Exhibit 18.  So you sent this e-mail,

6  focusing on the bottom, on September 16, 2008, and then

7  you followed up --

8         MR. NASEEM:  Let's scroll down to the bottom of that

9  e-mail.

10 Q     Okay.  And looking at that -- looking at the date on

11 that e-mail, does that date accurately represent the time

12 that you were contacted by Mr. Harris?

13 A     Yes.

14 Q     And then that would be September 16th of 2008.

15        MR. NASEEM:  Okay.  Now, going back to the first page

16 of that e-mail.  Let's scroll back down to the bottom.

17 The very bottom.

18 Q     And now the date of that e-mail when you responded

19 back with your information, when was that -- or when

20 Mr. Harris responded back to you?

21 A     It was on September 16th of 2008.

22 Q     And your follow-up e-mail just above it?

23 A     It was October 3rd.

24 Q     So a month afterwards?

25 A     Yes.

1  Q    And after that month, Mr. Harris contacted you at the

2  top.  Let's go to the top there.  What is he asking you?

3  A    Have they contacted you yet.

4  Q    Did they contact you?

5  A    Never contacted me.

6  Q    At that point, Mr. Bellato, what was your -- did you

7  believe the treatment would be moving forward?

8  A    I started not to believe at this point.  I didn't

9  believe anymore.

10 Q    Did you still have hope that the treatment might move

11 forward at that point?

12 A    Absolutely.

13 Q    Did there come -- did there come -- did some time

14 pass during that time period?

15 A    Yes.

16 Q    Were you contacted by Mr. Harris during -- how much

17 time passed before the next time you heard from

18 Mr. Harris?

19 A    I don't recall.  He called me a few times and he left

20 me some voice mails, but I don't recall like when or what

21 time.

22 Q    Did you recall speaking with Mr. Harris over the

23 phone during that time period?

24 A    Yes, I did.

25 Q    Did you have any conversations about anything besides

1    the treatment during that time period?

2    A    It was -- we had a conversation once, probably one of

3    the last times we talked on the phone, where he asked me

4    how I was and we talked about Tom Marosi.  And he said --

5    he mentions again Tom Marosi's family and tried to get,

6    you know, talk about the money that he invested.  And then

7    he asked me if Tom ever lent me any money.  He was under

8    the impression that I was part of Tom's will.

9    Q    And what did you tell him?

10   A    I said, no, that I wasn't.

11   Q    And how did Mr. Harris respond?

12   A    He said, *"I didn't know that."*  And that was the last

13   time I talked to him.

14   Q    Now, did there come a point in time when you received

15   a communication from Mr. Harris which confirmed to you

16   that the treatment would not be going forward?

17   A    It was one last e-mail.

18   Q    And looking at Government's Exhibit 19 there in front

19   of you.

20   A    Yes.

21   Q    And can you identify that document?

22   A    Yes.

23   Q    Please identify that document to the jury.

24   A    It was an e-mail that I received from Mike Harris in

25   February of 2009.  It was a -- he sent an e-mail for

1   like -- it was an e-mail list, and it had two pictures

2   attached of him and his horses at Casanova Cup that he

3   won.

4        THE COURT:  Any objection to 19?

5        MR. KLAIBER:  Your Honor, I object to relevance.  I

6   just don't see anything in this e-mail that has anything

7   to do with what the witness is here for.

8        MR. NASEEM:  Your Honor, the relevance of the e-mail

9   is the question that preceded this was whether Mr. Bellato

10  received an e-mail that confirmed to him that the

11  treatment would not be going forward.  This e-mail, and

12  Mr. Bellato's explanation of this e-mail, will provide a

13  context for why he believed that.

14       MR. KLAIBER:  Your Honor, the e-mail speaks for

15  itself.

16       THE COURT:  Well, whether or not the e-mail speaks

17  for itself is not the question.  The question is, is it

18  coming into evidence.  Objection's overruled.  It will be

19  admitted.

20            (Government's Exhibit 19 is received.)

21  Q    Looking at Government's Exhibit Number 19, the first

22  page of the e-mail, let's focus in on the first part of

23  that e-mail.

24  A    Okay.

25  Q    And do you recognize Mr. Harris' e-mail address?

1  A     Yes, I do.

2  Q     Can you identify it for the ladies and gentlemen of

3  the jury?

4  A     Xxxxxxxx_xx@msn.com.

5  Q     And is your e-mail in that chain?

6  A     Yes, it is.

7  Q     And can you identify it for the ladies and gentlemen

8  of the jury?

9  A     Xxxxxxxx@hotmail.com.

10 Q     So it would be one, two, three, the fourth line down

11 in the *"To:"* column?

12 A     Yes.

13 Q     Now, let's turn to the -- and you said the e-mail

14 came with two attachments?

15 A     Yes.  Two pictures.

16 Q     Let's go to the second page of that e-mail.  Do you

17 recognize that as the attachment photograph?

18 A     Yes.

19 Q     Going to the next picture.  Do you recognize that as

20 well?

21 A     Yes.

22 Q     Mr. Bellato, when you received this e-mail, what

23 caused you to believe that your treatment would not be

24 moving forward?

25        MR. KLAIBER:  Objection, Your Honor.

1  A      It was the --

2        MR. KLAIBER:  The e-mail speaks for itself.

3        THE COURT:  He's not asking about whether it speaks

4  for itself.  His question is what it caused him to

5  believe.  Objection is overruled.

6        You may respond.

7  A      It was the most offensive e-mail I ever received

8  because I haven't heard from Mike Harris in a time and the

9  stories keep going, you know, the treatment is going to

10 happen, and then suddenly I get an e-mail of him winning a

11 cup with his horses.  And I knew that Tom Marosi had given

12 him $200,000, and I was just tired of it.

13       THE COURT:  Wait for the next question.

14       Next question, sir.

15 Q      Now, you said you were deeply offended.

16 A      Yes.

17 Q      Why is it that you were deeply offended?

18       THE COURT:  Objection sustained.

19       MR. NASEEM:  All right.

20       Your Honor, I'm going to pass the witness.

21       THE COURT:  All right.  Very well.

22       Ladies and gentlemen, we're going to recess at this

23 point for lunch until about 2:00.  Same admonition as

24 before.  No discussion among yourselves or with anyone

25 else.  Avoid contact with anyone involved in the case.

1  Have a pleasant lunch.  See you back here at 2:00.  You're

2  excused until then.

3       Leave your pads right there on the chair.

4       (The jury is no longer present in the courtroom.)

5       THE COURT:  Mr. Bellato, you may step down.  Do not

6  discuss your testimony with anyone except the attorneys

7  during the lunch hour, okay, sir?

8       MR. BELLATO:  Okay.

9       THE COURT:  All right.  You're excused until 2:00.

10      We'll stand in recess until 2:00.

11                     (Recess taken.)

12      MR. GILL:  Ready for the jury?

13      MR. KLAIBER:  Yes, sir.

14      MR. GILL:  We are, Your Honor.

15      THE COURT:  All right.  Bring the jury in.

16          (The jury is present in the courtroom.)

17      THE COURT:  Mr. Klaiber, go right ahead.

18      MR. KLAIBER:  Thank you, Your Honor.

19                    **CROSS-EXAMINATION**

20  BY MR. KLAIBER:

21  Q    Mr. Bellato, how are you?

22  A    Good.

23  Q    My name is Nick Klaiber.  And as you might imagine, I

24  represent the defendant, Mr. Harris.

25       Now, as I recall we heard quite a bit on direct about

1  the treatment that was to take place in Europe, correct?

2  Is that a yes?

3  A    Yes.

4  Q    And I believe you testified that Mr. Harris promised

5  this treatment in exchange for Dr. Marosi's investment of

6  $200,000, isn't that right?

7  A    I didn't say it was an exchange.  I said it was part

8  of the deal.  Like he -- Tom bought $200,000 in shares of

9  the company, and we said that we're going to be the first

10  three people to do the trial for those -- for this

11  treatment.

12  Q    And so as a result of Dr. Marosi investing in the

13  company, the three of you were entitled to go to Europe to

14  get treated, is that your understanding?

15  A    Yes.

16  Q    Okay.  Do you recall telling an investigator just

17  about a year ago that in fact Dr. Marosi's investment was

18  not to pay for treatment?

19  A    I don't recall.  No.

20  Q    Okay.  I'd like to pass you a document to refresh

21  your recollection.  Mr. Bellato, this is a Federal Bureau

22  of Investigation Form 302.  If you can turn to the second

23  page of that document.  Do you see the highlighted text?

24  A    Yes.

25  Q    Does that highlighted text refresh your recollection

1  as to what you told the investigator?

2  A    Sure.

3  Q    And so you did in fact tell the investigator that the

4  money that Dr. Marosi invested was not to pay for your

5  treatment?

6  A    Yes.  It was an investment.  That's what I told him.

7  Q    Okay.  So then aside from any efforts that Mr. Harris

8  may have needed to do to get the treatment rolling in

9  Europe, to that point there had been no payments made for

10 the treatment, correct?

11 A    Well, it was part of the -- you know, what Tom got

12 from Michael.  He said that we were going to be the three

13 first persons to go to Europe for the trial.  We were part

14 of the first trial.  And Harris told Tom's brother several

15 times that it was a matter of, you know, he want us to be

16 treated even after Tom's death.  He said it was a matter

17 of time for Steve and I to get treated.

18 Q    But Mr. Harris never explained to you where the

19 funding was going to come from for that treatment,

20 correct?

21 A    He did not.

22 Q    Okay.  Just to be clear, you were not and you are not

23 an investor in M.F. Research, correct?

24 A    I'm not.

25 Q    Okay.  And isn't it fair to say that you were -- when

1   you went to visit Mr. Harris in 2006, you were more

2   concerned with the treatment possibilities than you were

3   with the investment potential for M.F. Harris Research?

4   A    Absolutely.

5   Q    Okay.  And you can't be certain, can you, that you

6   were privy to every communication between Dr. Marosi and

7   Mr. Harris prior to coming to Virginia in 2006, correct?

8   A    Yeah, they talk on the phone.  I don't know about

9   those conversations, yes.

10  Q    Okay.  And isn't it true that you were suspicious of

11  Mr. Harris right from that initial meeting in 2006?

12  A    I had concerns.

13  Q    And you voiced those concerns to Dr. Marosi at that

14  time, didn't you?

15  A    I just told him to be careful.  Yes.

16  Q    Okay.  But ultimately Dr. Marosi was pretty

17  enthusiastic about the treatment, correct?

18  A    Yes.

19  Q    And Dr. Marosi was an anesthesiologist, correct?

20  A    Yes.

21  Q    And he knew a pretty good deal about biology and

22  medicine by virtue of his career, correct?

23  A    I imagine so.  Yes.

24  Q    Now, from what you heard from Mr. Harris, you

25  understood, didn't you, that investor funds were to be

1  used for company expenses?

2  A    The money that Tom invested?

3  Q    Correct.

4  A    I just imagined the money was invested in the

5  company, you know, and if the company has expenses, that's

6  part of the company.

7  Q    Okay.  So the investment would go toward company

8  expenses?

9  A    It will go to company.

10  Q    Okay.  And that would include Mr. Harris' travel

11  expenses, correct?

12  A    I don't know.  If that's how the company runs.

13  Q    Okay.  And you understood that M.F. Harris Research

14  was pretty much a one-man show, isn't that right?

15  A    Yes.

16  Q    In fact, after the presentation you received in 2006,

17  you were left with the impression that Mr. Harris was the

18  entire company, correct?

19  A    Well, yes.

20  Q    Okay.  And often a company's expenses can include

21  payment of salaries to executives, is that fair to say?

22  A    Yes.

23  Q    Now, I think you testified on direct that Mr. Harris

24  told you that he never had any money, isn't that correct?

25  A    He said that he never grew up with a lot of money.

1  Yes.

2  Q    Okay.  And I think you also testified that he never

3  explained to you how he earned a living when you came out

4  to visit?

5  A    No.

6  Q    So aside from Mr. Harris' work on M.F. Harris

7  Research, there was no other indication that he had a

8  full-time job or anything outside of the company?

9  A    No.

10      MR. KLAIBER:  If we can bring up Exhibit 10, please.

11      THE COURT:  Government's Exhibit 10?

12      MR. KLAIBER:  Yes, Your Honor.

13      THE COURT:  Sure.

14      MR. KLAIBER:  It's already been published to the jury

15  on direct.

16  Q    Mr. Bellato, do you see the e-mail on the screen?

17  A    Yes.

18  Q    Okay.  Now, in this e-mail Mr. Harris is writing to

19  you, correct?

20  A    Yes.

21  Q    And he is referencing informed consent, isn't that

22  right?

23  A    Yes.

24  Q    And that's related to efforts to get you over to

25  Europe and get treated, correct?

1  A     That consent was regarding any medical problems that

2  might arise from the treatment.  And, yes, he explained to

3  me that there was chances of having problem with your ears

4  because the hyperbaric chambers would be exposed several

5  times.

6  Q     I understand.

7      MR. KLAIBER:  And if you could go to the next page,

8  please.

9  Q     And now if you will see on the next page this is the

10 body of an e-mail that's part of the same chain.  Do you

11 notice who signed this e-mail?

12 A     This person, Harald.

13 Q     Do you have an understanding of who Harald is?

14 A     I believe he's the contact in Switzerland in Europe

15 where we're going to get the treatment.

16 Q     Is that Professor Harald Andel?

17 A     I don't know if he's a professor.  I don't recall.  I

18 never met him.

19 Q     And this Harald is in Europe, correct?

20 A     Based on the e-mails, yes.

21 Q     Okay.  And in this e-mail, Harald refers to you as

22 *"pilot-patients,"* correct?

23 A     Yes.

24 Q     So from this e-mail, it appears that Mr. Harris is

25 working to make that treatment in Europe happen for you,

1    doesn't it?

2    A    It does look like it.  Yes.

3         MR. KLAIBER:  And if you can go to Page 3, please.

4    Q    Do you see at the top to whom this e-mail is

5    addressed?

6    A    To Harald.

7    Q    It says, *"Univ. Prof. Dr. Harald Andel,"* correct?

8    A    Yes.

9    Q    And it provides the consent form that's discussed in

10   the e-mails?

11   A    Uh-huh.

12   Q    And I understand you testified on direct that

13   Mr. Harris referenced a doctor in California at some point

14   taking over the treatment possibility.  So as far as you

15   were aware at that time, Mr. Harris was continuing to

16   contact doctors even later on in an attempt to get the

17   treatment completed in California, correct?

18   A    Yes.

19   Q    Do you recall at any point seeing a white binder

20   during your -- the presentation of Mr. Harris in October

21   of 2006?

22   A    I don't recall.

23   Q    Okay.  I'm going to show you one document inside that

24   has been marked as Exhibit 53.  Defense Exhibit 53.  Can

25   you please turn to the tabbed document and pull that out

1  of the plastic wrap.

2      MR. KLAIBER:  And for the record, I'm referring to

3  the document previously marked as Defense Exhibit 53-A.

4  Q    Do you recall seeing that document at all during

5  Mr. Harris' presentations when you came to Virginia in

6  2006?

7  A    No, I don't recall.

8  Q    Okay.  You're aware of the company known as Deep

9  Blue, correct?

10 A    Yes.  I heard about that.

11 Q    And you understand that Deep Blue was a rival of M.F.

12 Harris Research?

13 A    Yeah.  I remember Michael talking about that company.

14 Q    And have you heard the names Matt Johnson or Jeff

15 Seto with respect to Deep Blue?

16 A    I don't recall.

17     MR. KLAIBER:  That's all I have, Your Honor.

18     THE COURT:  All right.

19     Any redirect?

20     MR. NASEEM:  No, Your Honor.

21     THE COURT:  May Mr. Bellato be excused?

22     MR. NASEEM:  Yes, Your Honor.

23     MR. KLAIBER:  Yes, Your Honor.

24     THE COURT:  Mr. Bellato, you're excused and free to

25 go.  Thank you, sir.  We appreciate your testimony.

1    **WITNESS STOOD ASIDE**

2    MR. GILL:  Your Honor, we call Peter McGivney.

3    THE COURT:  Peter McGivney?

4    MR. GILL:  Yes, sir.

5    THE COURT:  All right.

6    Mr. McGivney, if you would raise your right hand,

7    sir, left hand on the Bible, and face the Clerk of the

8    Court.

9    THE CLERK:  You do solemnly swear that the testimony

10   which you are about to give, in this case, before this

11   Court, shall be the truth, the whole truth, and nothing

12   but the truth, so help you God?

13   MR. McGIVNEY:  I do.

14   THE COURT:  Have a seat on the witness stand, sir.

15   Go right ahead, Mr. Gill.

16   Whereupon, **Peter D. McGivney**, having been

17   duly sworn in, testifies as follows:

18   **DIRECT EXAMINATION**

19   BY MR. GILL:

20   Q    Good afternoon.  Please introduce yourself to the

21   jury.

22   A    My name is Peter D. McGivney.

23   Q    Tell us what you do for a living, sir.

24   A    I am the general manager of the National Steeplechase

25   Association.

1  Q    How long have you been the general manager of the

2  NSA?

3  A    Since 1990.

4  Q    Can you tell us a little bit about that organization,

5  what it is, and what it does?

6  A    We're located in Fair Hill, Maryland.  We are the

7  sanctioning body, the governing body, of steeplechase

8  racing in the United States.  We approve the racecourses

9  that -- we have about 30 some odd races that we conduct

10 around the country.  We approve the courses, we license

11 the participants, we train the officials.  You know, we

12 are the governing body of the sport.

13 Q    Now, would you explain to us what you mean when you

14 say a sanctioned event versus a non-sanctioned event?

15 A    A sanctioned event is one that's sanctioned by us.

16 We are a recognized turf authority.  So our records are

17 kept by the Jockey Club, which is the official

18 record-keeper of thoroughbred racing in the U.S.

19 Q    How does that translate with respect to sanctioned

20 events versus other events on purses that stand to be won?

21 A    Well, there are other events that take place.

22 They're called Point-to-Points.  And they are more, I call

23 them, like the little league of the sport.  It's more

24 amateur oriented.  There is very little, if any, purse

25 money involved.  Our purse structure for the 30 or so race

1  meets that we have runs about $5,000,000.  In

2  Point-to-Point races, most of the races carry no purse.

3  And maybe there would be one featured event on the card

4  that might have a $2,000 pot.

5  Q    So an entire card -- so for an entire Point-to-Point

6  race involving several races, there may be one that has a

7  top prize at the most $2,000?

8  A    That's correct.  And --

9  Q    Go ahead.

10 A    And there are about a dozen or so of these events.

11 They run primarily in Virginia, Delaware, and

12 Pennsylvania.  And they're run for the benefit -- they're

13 more a fund raiser for the local hunt club.

14 Q    Sir, do you know Michael Harris?

15 A    I do.

16 Q    Would you recognize him if you saw him again?

17 A    I would.

18 Q    All right.  Would you tell us if you see him here

19 today?

20 A    He's right there.

21      THE COURT:  The record will reflect the

22 identification of Mr. Harris.

23 Q    Tell the jury how it is that you know Michael Harris.

24 A    I've known Michael, I guess, since I started with the

25 NSA in 1990.  He has been a participant in the sport as a

1  owner/trainer and rider.  Probably more an owner.  He runs

2  a few times a year with us.

3  Q    Now, to understand NSA's records and how it is that

4  y'all keep track, you mentioned that he is an owner,

5  rider, and a trainer?

6  A    Correct.

7  Q    Do you keep records for all of those individuals if

8  they're involved in NSA events?

9  A    We do.  The participant has to be licensed.  Has to

10 take out a license each year.

11 Q    You indicated he'd been licensed with NSA since 1990?

12 A    Correct.  There was a period where he kind of dropped

13 out I'd say from 1994 or '95 until around 2007 or so.  He

14 kind of came back to the sport.

15 Q    Came back in 2007, and was he around from 2007 up

16 through 2011?

17 A    Through 2011.  Correct.

18 Q    Now, do you have records at the NSA about winnings of

19 a particular licensee whether it be an owner, trainer, or

20 a rider?

21 A    We do.

22 Q    Take a look at Exhibit 244.  It's in that folder

23 there.

24     THE COURT:  Mr. Gill, did you say Government's

25 Exhibit 244?

1        MR. GILL:  Yes, Your Honor.

2   Q    Are these the records maintained by the NSA for

3   Michael Harris dating back from 1988 up through 2011?

4   A    They are.

5        MR. GILL:  Your Honor, we'd move for admission of

6   Exhibit 244.

7        THE COURT:  Any objection?

8        MR. WAGNER:  No, Your Honor.

9        THE COURT:  They'll be received.

10           (Government's Exhibit 244 is received.)

11  Q    Now, we've got Page 1 on the screen there beside you

12  and for the jury.  And zooming it in.  If you would just

13  generally explain to the jury what this reflects with

14  respect to Michael Harris.

15  A    What this reflects here -- I'll look at this copy.

16  It shows his participation in 2011.  It shows the date on

17  which he raced, his abbreviation for the race meet.  It

18  lists the track conditions, the type of race it was, the

19  finish, and the particular horse that he ran.  And this

20  record is for him as an owner.

21  Q    It's for an owner.  And according to the records as

22  we have there, as an owner for this page all the way back

23  to 1988 through 2011, how much money has Michael Harris

24  won according to NSA records?

25  A    According to this particular record, it shows $450.

1  I will add that the stats on this page are only

2  representative of his races over jumps.  I did look back,

3  and he did race -- he did earn another, I believe it was,

4  $500 in a flat race which normally do not have purses.

5  And that was back in 1990.  Those are the only monies that

6  I'm aware that he's ever earned.

7  Q    Okay.  And we'll look at that page in a moment.  On

8  this page it also has the horse.  Would that have been the

9  horse that he was riding on the races indicated at the

10  top?

11  A    Right.

12  Q    Mariah's Promise?

13  A    Mariah's Promise.

14  Q    And with respect to your involvement in the sport, do

15  you know of the arrangements that people make at times

16  with horses, leasing them, training them?

17  A    There is a variety of ways it can be done.  Most

18  horses are probably owned solely by one owner.  There are

19  instances where there are partnerships or syndicates and

20  they share in the cost of the horse as well as the

21  earnings that the horse makes.

22  Q    In your experience of the sport, is it an expensive

23  sport as far as even if a person gets paid some money,

24  taking care of horses -- it takes money to take care of a

25  horse?

1    A     It takes money.  It's a losing venture.

2    Q     All right.  Let's look at Page 2 of Exhibit 244.  If

3    we could zoom in and tell us what we're looking at there.

4    A     Okay.  Similar report.  This is for his record as a

5    trainer in 2011.  And it shows that Mariah's Promise raced

6    with him being listed as the trainer on three occasions.

7    Q     And again for trainer, the steeplechase records go

8    all the way back to 1990.  Any winnings reported?

9    A     No.

10   Q     Let's look at the third page.  If we could zoom in on

11   this.

12   A     And this is his riding record for 2011.  It shows

13   again the horse Mariah's Promise, and that he rode two

14   times in 2011.  The horse finished fourth and tenth, and

15   the horse did not earn any monies.

16   Q     And for the rider records dated back 1988 through

17   2011, zero winnings?

18   A     Correct.

19   Q     Now, let's look at Page 4.  I know this is hard to

20   see.  It's small, but we're going to blow it up.  And just

21   tell the jury what it is we're looking at and the

22   significance of this.

23   A     This is the report that I can produce using access to

24   query the database, or whatever particular records I'm

25   looking for.  So this is Michael Harris strictly as an

1  owner with his record as far as back that we have in the

2  database, and it shows again the year, the date, the race

3  where he participated, the horses, and the finishers, and

4  type of race.

5  Q    And with respect to the dates on the left on that

6  column with what the jury can see, it goes from the top

7  30, April, 2011 down to the bottom of the screen to around

8  5, November, 2005.  Do those reflect dates when Michael

9  Harris, you know, would have had a horse one way or

10 another in one of those races?

11 A    Yes.

12 Q    The only winnings reported there is $450 on the top

13 of that?

14 A    Correct.

15 Q    And then go down to the bottom.

16 A    And in 1990, his horse, Inaugurated, earned $500.

17     MR. GILL:  No further questions, Your Honor.  Thank

18 you.

19     THE COURT:  Cross-examination.

20     MR. WAGNER:  Very briefly.

21                    **CROSS-EXAMINATION**

22 BY MR. WAGNER:

23 Q    Good afternoon.

24 A    Good afternoon.

25 Q    I'm Rob Wagner.  I represent Mr. Harris.  Do the

1  records that you have here include non-sanctioned races?

2  A     They do not.

3  Q     And you talked a little bit -- or you were asked

4  about leasing and training.  Does it sometimes happen a

5  rider will lease the horse from someone else?

6  A     It does.

7  Q     And list it themselves as the owner?

8  A     If you lease a horse, it then runs in the name of the

9  person to whom it's been leased to.  So in a couple of

10  instances -- we don't have too much of it but, yes, an

11  owner could buy a horse and lease it to another owner and

12  it would race in that individual's name.

13  Q     Meaning the rider's name as opposed to the original

14  owner's name, correct?

15  A     It would run in the other owner's name.

16  Q     Okay.  Now, are you familiar with Connie Dulaney?

17  A     No.

18  Q     Never heard of Connie Dulaney involved with politics

19  against NSA or Prejudice Against Time?

20  A     Constance.  Constance Dulaney.  I do not know -- I

21  know a Frances Dulaney.

22  Q     Does she go by Connie?

23  A     No.

24  Q     Oftentimes an owner of a horse will pay someone to

25  ride the horse, is that correct?

1  A      Correct.

2  Q      And will pay someone to train the horse?

3  A      Correct.

4  Q      Are you familiar with a horse, Pan Adam?

5  A      Yes.

6  Q      Do you know who owns that horse?

7  A      Michael Harris, I believe.

8  Q      And do you know if he has a leasing arrangement with

9  that horse with anyone else?

10  A      Not off the top of my head.

11  Q      And Mariah's Promise, do you know if he has a leasing

12  arrangement with anyone for that horse?

13  A      Not to my knowledge.

14         MR. WAGNER:  Thank you.

15         THE COURT:  Any redirect?

16         MR. GILL:  No, Your Honor.

17         THE COURT:  May Mr. McGivney be excused, gentlemen?

18         MR. GILL:  Yes, Your Honor.

19         MR. WAGNER:  Yes, sir.

20         THE COURT:  Mr. McGivney, you're excused and free to

21  go.  Thank you for coming in, sir.  We appreciate your

22  testimony.

23         MR. McGIVNEY:  Thank you, Your Honor.

24                    **WITNESS STOOD ASIDE**

25         MR. GILL:  Your Honor, we call John Marosi.

1     THE COURT:  John Marosi.  All right.

2         Mr. Marosi, if you would raise your right hand, sir,

3   left hand on the Bible, and face the Clerk of the Court.

4     THE CLERK:  You do solemnly swear that the testimony

5   which you are about to give, in this case, before this

6   Court, shall be the truth, the whole truth, and nothing

7   but the truth, so help you God?

8     MR. MAROSI:  I do.

9     THE COURT:  Mr. Marosi, have a seat on the witness

10  stand, sir.

11        Whereupon, **John E. Marosi**, having been

12  duly sworn in, testifies as follows:

13                    **DIRECT EXAMINATION**

14  BY MR. GILL:

15  Q    Good afternoon, sir.

16  A    Good afternoon.

17  Q    Would you please introduce yourself to the ladies and

18  gentlemen of the jury.

19  A    My name is John Edward Marosi.  Also known as Ted

20  Marosi.

21  Q    Tell us, sir, where do you live?

22  A    I live in a suburb of Cleveland, Ohio called Bay

23  Village.

24  Q    How long have you lived in that area?

25  A    Pretty much my whole life outside of a couple years

1  in Pittsburgh.

2  Q    Tell us, what do you do for a living?

3  A    I work for myself.  I own a company I started in 1991

4  called Raider Air Incorporated.  I do international

5  foreign mailings.

6  Q    And describe for us a little bit more about that,

7  what Raider Air does as far as how it is that it makes

8  money.

9  A    Well, you consolidate customer's mail, whether it be

10 an annual report or any type of a report usually.  And I

11 take it overseas.  I consolidate it.  Bypass the U.S.

12 Postal Service.  Take it overseas to say Denmark, and post

13 it from there because they have private postal

14 authorities.  You know, it's private.  Their post office

15 is private.  And I split the difference with the customer.

16 Q    How long have you been doing this?

17 A    Since 1991.

18 Q    Now, I want to talk to you about Dr. Tom Marosi.

19 Tell the jury, is that your brother?

20 A    That is my brother.

21 Q    Would you just tell them just very briefly a little

22 about your brother, where he was living, and what he was

23 doing for a living at the time of his death?

24 A    He was living in San Diego, California.  He moved

25 there in 2000.  He was an anesthesiologist.  And he had

1  been an anesthesiologist in Cleveland, and then he moved

2  to California.

3  Q    Now, are you aware through your brother and the

4  family, of the bad news your brother got around August of

5  2006?

6  A    Yes.

7  Q    Was he in communication about that, his situation?

8  A    Yes.

9  Q    Just tell the jury without getting into the nature of

10  exactly what he said, but did you know whether he had a

11  plan in action?

12  A    My brother did.  He had a plan.  He was a man that

13  took action.  He had -- unfortunately, he found out he had

14  the HIV virus.

15  Q    And what was -- with respect to that, was there a

16  company connected to his plan that your brother had

17  discussed with you?

18  A    Yes.

19  Q    What was that company or individual?

20  A    It was M.F. Harris Research, Incorporated.  Michael

21  Harris.

22  Q    Were there any plans for investment that you became

23  aware of?

24  A    Yes.

25  Q    Now, the jury has heard about the circumstances

1  underlying that, so I want to move forward just a little

2  bit.  Did your brother unfortunately die later that year?

3  A     Yes.

4  Q     What day was that?

5  A     Halloween of 2006.

6  Q     For the purposes of this case that we have talked

7  about, you know, we understand that Dr. Marosi died and it

8  had nothing do with AIDS or Michael Harris or anything in

9  this case?

10  A     That's correct.

11  Q     All right.  Now, tell us, when was he buried and

12  where?  Were you present for that?

13  A     Yes.  Of course.  He was buried in a suburb of

14  Cleveland, Ohio.  And that was on or about November 9,

15  2006.  By the time we got the body back from San Diego and

16  we had the ceremony, I believe it was November 9th.

17  Q     And in connection to that ceremony, did you meet

18  Michael Harris?

19  A     No.

20  Q     Are you aware of him coming to Cleveland, Ohio or

21  anything?

22  A     No.

23  Q     Now, was there another service for your brother held

24  somewhere else?

25  A     There was a celebration of life in San Diego.

1  Q      Were you able to attend that?

2  A      No.

3  Q      Now, tell us, did your brother have a will in place?

4  A      Yes.

5  Q      Tell us just generally what you understood,

6  Mr. Marosi, about just the nature of that will and what

7  your responsibilities were for your brother's will.

8  A      As the executor and trustee, my job was to find all

9  of my brother's assets and what he owned, and kind of do

10 inventory on that and value that for not only the State of

11 California, but for Ohio and the government all for estate

12 tax purposes.  And, you know, general purposes for filing

13 different, you know, death -- I guess it would be death

14 tax.

15 Q      Were there other -- how many beneficiaries were there

16 of this will?

17 A      The will was a horrible will.  So in the trust there

18 were six beneficiaries.

19 Q      And were you included in those beneficiaries?

20 A      Yes.

21 Q      Was Steven Baughman as well?

22 A      Yes.

23 Q      How about Marcelo Bellato?

24 A      No.

25 Q      Now, we're going to talk about the stock certificates

1   that your brother had, but first we want to touch on a

2   couple of other things with respect to your duties as the

3   executor of your brother's will.  Was there litigation

4   that you had to pursue for particular items?

5   A    Yes, there was.

6   Q    Okay.  Briefly, very briefly, just tell the jury

7   about those items and just where you stand.

8   A    Okay.  In the trust there is a trust construction

9   lawsuit.  The beneficiary had received his full amount.

10  Didn't cash the check.  Set up his own special needs trust

11  six weeks later, and wanted us to administer that to him

12  in the name of his new special needs trust.  So it was a

13  trust construction lawsuit.

14  Q    Who is the individual at issue in that suit?

15  A    Steve Baughman.

16  Q    Is that suit -- I mean, was the money basically on

17  its way out of the trust?

18  A    He had the check in his hand.

19  Q    And so it was just at issue where that money was

20  going to go?

21  A    Right.  And he wanted it not in his name.  He wanted

22  it in the trust -- I mean, in his newly-formed trust,

23  special needs trust, so he could escape his creditors.

24  Q    Now then, was there another item also at issue in the

25  estate?

1  A     Yes.  My brother owned the Golden Globe from the 1959

2  movie, *"Some Like It Hot."*  The Golden Globe that Marilyn

3  Monroe was awarded.  This was stolen from the estate, so I

4  had to sue to get this back.

5  Q     And did you successfully bring it back?

6  A     Yes.

7  Q     Now then, tell the jury about the steps you took to

8  gather all of the materials together for your brother's

9  estate, items that were in his possession at the time of

10 his death.

11 A     Well, I really just had to inventory everything, and

12 take a look at every asset he had.

13 Q     How is it that you got possession or inspected

14 anything that was in your brother's possession out in

15 California?

16 A     When my brother died, I sent my sister and

17 brother-in-law out there to prepare the body to bring it

18 back home to Cleveland and to grab all of -- to grab his

19 files, his general files, at his house.

20 Q     Take a look at the items in front of you, and please

21 refer to Exhibits 6, 7, and 8.  And tell us, do those

22 items look familiar?

23 A     Yes.

24 Q     What are those items?

25 A     Number 6 is the subscription agreement that my

1  brother signed with M.F. Harris.

2       Exhibit 7 is some of the background of M.F. Harris

3  Research, Inc. that was in his file.

4       And Exhibit 8 is his wire transfer of $200,000 to

5  M.F. Harris Research, Inc.

6       MR. GILL:  Your Honor, we move for admission of

7  Exhibits 6, 7, and 8.

8       THE COURT:  Any objection, Mr. Klaiber?

9       MR. KLAIBER:  No, Your Honor.

10      THE COURT:  Be received.

11          (Government's Exhibits 6, 7 & 8 are received.)

12  Q    First, let's look at Exhibit 6.  And it's going to

13  flash up on the screen for the jury.  First, let's look at

14  the bottom of this if you don't mind.  There do you see

15  your brother's signature?

16  A    Yes.

17  Q    And let's look at the top of it.  And is this the

18  agreement and the terms that were in your brother's

19  possession at the time of his death?

20  A    Yes.

21  Q    How many shares did he purchase and what was the

22  date?

23  A    He purchased 200,000 shares.  The date is the first

24  day of September '06.

25  Q    Now, after it says, *"aggregate price of $200,000,"* it

1  talks about *"Issuance of an appropriate certificate*

2  *representing such shares to and in the name of the*

3  *undersigned will be provided within sixty (60) days."*

4  Were you able to locate anything, any stock certificates,

5  in your brother's belongings for this investment?

6  A    No.

7       MR. GILL:  Now let's look at Exhibit 7.  If you can

8  zoom in on the upper portion.

9       And the jury has seen this document at various times

10 during this trial.

11 Q    Was this a document that was in your brother's

12 possession?

13 A    Yes.

14 Q    Now, let's look at Exhibit 8.  Generally, what are we

15 looking at anyway with Exhibit 8?

16 A    Oh, this is the wire transfer from my brother's

17 Charles Schwab account to M.F. Harris Research,

18 Incorporated on September 29, 2006.

19 Q    And it's for $200,000.  And it has the company name,

20 *"M.F. Harris Research, Inc."*?

21 A    That's correct.

22 Q    And this document after you scroll drown to the

23 bottom also had your brother's signature on it?

24 A    Yes.  That's correct.

25 Q    What was the date of that signature according to

1  this?

2  A    September 29, 2006.

3  Q    Now then, you weren't able to locate the stock

4  shares, so what was your responsibility as the executor

5  for those shares as you saw it?

6  A    To get the shares in the estate.  To get them valued

7  as well.

8  Q    Now, I want you to put yourself back at the time that

9  you were actually doing this, okay, and you're gathering

10 your brother's items together.  And based on the

11 information provided to you by your brother -- I mean, at

12 that point, what were your intentions and what were your

13 feelings about this investment?

14 A    I was leery.  I was curious.  I was leery, but I was

15 curious, too.  Maybe there was some validity to this

16 treatment.

17 Q    What was your goal for the stock shares themselves?

18 Where did you want them to go?

19 A    Well, it was my job to get them in the estate, in the

20 name of the estate, so we could disburse them once the

21 will rolls over to the trust in Ohio, then that's when the

22 distribution was going to be made to all the

23 beneficiaries.

24 Q    Now also would you please explain to the jury as

25 executor of your brother's will legally what that means.

1  And I guess this was under the laws of California and Ohio

2  as well?

3  A    Yeah, to my knowledge.

4       MR. KLAIBER:  Your Honor, I'm going to object to him

5  explaining the laws of the State of California.

6       THE COURT:  The objection is sustained.  He can

7  explain to the jury what he felt his responsibilities

8  were, but not from a legal perspective.  Only from a lay

9  perspective.

10      MR. GILL:  Absolutely, Your Honor.

11 Q    Let me ask you that question.  What was your

12 understanding as far as your responsibility and how --

13 what representation you had for your brother in this?

14 A    Well, I was the executor and trustee.  My brother is

15 no longer living, so now I was speaking for him as if he

16 was alive.

17 Q    Now, what steps did you take to reach out and

18 actually, you know, try to get these shares and get

19 information about the investment?

20 A    I had written a letter to Mike Harris.

21 Q    Take a look at Exhibits 13 and 14.

22      THE COURT:  Mr. Klaiber, is there any objection to

23 Exhibits 13 and 14, sir?

24      MR. KLAIBER:  No, Your Honor.

25      THE COURT:  They'll be received.

1          (Government's Exhibits 13 & 14 are received.)

2   Q    Let's take a look at Exhibit 13 up on the screen.

3   And before we zoom in on anything, just describe for the

4   jury what this is and what your intentions were.

5   A    This is a letter to Mike Harris requesting

6   information on my brother's investment that was part of my

7   duties as part of the executor and trustee.

8   Q    Okay.  What was the date you sent this letter, and

9   how is it that you came up with the address in which to

10  send it to *"Mr. Michael Harris CEO"* of *"M.F. Harris*

11  *Research*"?

12  A    The address -- there were so many addresses for M.F.

13  Harris Research, I don't know exactly how I chose this one

14  because there were many.  I just figured a P.O. Box would

15  be open so he'd get it.

16  Q    All right.  And the date you sent this letter?

17  A    September 13th of 2007.

18       MR. GILL:  And let's zoom in on the first paragraph

19  of it, please.

20  Q    Sir, are these the representations you made in this

21  letter?

22  A    Yes.  I'm sorry.  What was the question?

23  Q    I'm sorry.  I was just giving the jury a moment to

24  read.

25  A    I'm sorry.

1          MR. GILL:  Let's back up and zoom back out.  And

2     we're going to look at Paragraph 2 now.

3     Q     This one requests financial information.  Tell us

4     what you were interested in getting and why, as well as

5     the stock.

6     A     Well, now my brother's estate are -- we are

7     shareholders, so we wanted to get the quarterly reports.

8     Basic shareholder information, annual reports, any

9     additional brochures about the company, a list of present

10    stockholders, and when and where the next stockholders'

11    annual meeting would be.  And I wanted to know as much as

12    I could about this not only for estate tax purposes, but

13    for the other beneficiaries.  And I needed to get a value

14    on this for the States of California, Ohio, and the U.S.

15    Government.

16    Q     For tax purposes?

17    A     That's correct.

18    Q     And your experience as far as that you wanted

19    shareholder information, did you base that off your prior

20    experience in investments?

21    A     Well, yes.  I mean, I'm not a guru on this stuff, but

22    I know my general rights as a shareholder.  Yes.

23         MR. GILL:  Back up.  And the final paragraph.

24    Q     Explain to us what it is that you and your sister

25    wanted to do.

1  A    Well, we were pretty excited about this.  I mean, if

2  this is true, then it's great.  So we wanted to go over

3  there and replace my brother and go overseas and view this

4  procedure and get this thing to market.

5  Q    Now, I notice in the paragraph it mentions

6  Mr. Bellato.  Who is that?

7  A    Marcelo Bellato is a good friend of my brother.

8  Q    And it does not include Steven Baughman.  Did you

9  understand that Steven Baughman was part of this

10 arrangement?

11 A    I did.

12 Q    Tell the jury, why did you not include Mr. Baughman

13 in this letter?

14 A    I -- I -- I left him off purposely because I didn't

15 trust him.

16 Q    Later on did you change your mind on that decision?

17 A    I did.  I did.

18 Q    Now, let's look at Exhibit -- oh, and with respect to

19 this letter, if we can look at Page 2 just briefly.  Look

20 at the top.  Did you send this letter certified?

21 A    Yes.

22 Q    Any response?

23 A    No response from Harris from this letter at all.

24 Q    Now, let's look at Exhibit 14.  Now, what is it we're

25 looking at and what was the purpose of this?

1   A    This was the second attempt to contact Harris.   And

2   it was basically the same letter.   I didn't send the

3   Letters of Testamentary this time to prove that I was the

4   executor.   I had sent that the first time, so he already

5   had a copy of it.

6   Q    And that's an important point.   I'm sorry I didn't

7   bring that up.   With the first letter you said you sent

8   letters of what?

9   A    Letters of Testamentary from the California -- you

10  know, from my California attorneys and the probate -- the

11  probate court there.

12  Q    What does that represent based on your knowledge of

13  the executor of your brother's estate?

14  A    That just proves that I'm the executor.   The guy to

15  contact.   And I have certain duties to fulfill.

16       MR. GILL:   If we could just scroll down.

17  Q    This letter is the same in general except for that

18  exception that you just pointed out to us?

19  A    I believe it is.   I mean, that's the only thing --

20  yeah, it's basically the same letter.

21  Q    Okay.   Now, did you send this one certified as well?

22  A    I did.

23  Q    Did you get a response from Michael Harris or M.F.

24  Harris Research?

25  A    No.

1  Q    What did you do next?

2  A    Well, now let's see, it was -- oh, that was about

3  2008.  I went and made complaints to various state and

4  government agencies like the SCC, the United States Postal

5  Service, the North Carolina corporate commission type of

6  organization, an organization called the NASAA of

7  California and North Carolina, because I needed some help.

8  I was getting no response from Harris.  I've never talked

9  to the guy.  Never met the guy.  I needed help.

10 Q    And through those organizations, did you get some

11 help along the way?

12 A    Well, I did.  I -- the SCC called.  The fellow's name

13 was Bob Crane.

14 Q    Without getting into the nature of what he told you,

15 did they try to provide assistance in this situation?

16 A    They did.

17 Q    Now, as time went on, and we're talking early 2008,

18 aside from reaching out to those agencies, what attempts,

19 if any, did you make to reach out to shareholders of this

20 company, M.F. Harris Research?

21 A    I made a couple.  The SCC, the fellow I mentioned,

22 Bob Crane, had said, hey, if you can get some more

23 shareholders, I'd like to talk to them if you can find

24 some.

25     MR. KLAIBER:  Objection, Your Honor.  Hearsay.

1     THE COURT:  If you really think it's important I'll

2 grant your objection.  If you really think it's important.

3     Next question.

4 Q    Sir, after you started reaching out to shareholders,

5 eventually did you receive contact from Michael Harris

6 himself?

7 A    Yes.

8 Q    Take a look in front of you at Exhibit 15.  Tell us

9 if you recognize that.

10 A    Yes.

11 Q    And describe for us what that is.  Is that the e-mail

12 exchange you had with Michael Harris?

13 A    Yes.  That's correct.  He had sent me -- he had

14 e-mailed me.

15     MR. GILL:  Your Honor, we move for admission of

16 Exhibit 15.

17     THE COURT:  Any objection to 15, Mr. Klaiber?

18     MR. KLAIBER:  No, Your Honor.

19     THE COURT:  Be received.

20         (Government's Exhibit 15 is received.)

21     MR. GILL:  Now then, let's look at Page 2 of Exhibit

22 15, please.  And if we could, zoom in.  That's just

23 perfect.

24 Q    Is this the e-mail you received from Michael Harris?

25 A    Yes.

1  Q    Now then, Mr. Marosi, with respect to his claim that

2  you were impersonating an investor of the company, did you

3  respond to that claim?

4  A    Yes.  I e-mailed Harris back.

5  Q    Also with respect to the claim about contacting

6  people in the company, did you believe that was related to

7  any actions you had been taking to try to track down what

8  was going on with your brother's money and the stock?

9  A    Yeah.  Well, can you repeat that again?  I'm sorry.

10 Q    I'm sorry.  In receiving this e-mail, what did you

11 think had caused this e-mail to come based on what you

12 read?

13 A    It was me searching for other investors in the

14 company on the advice of the SCC, Mr. Bob Crane.

15 Q    Now then, it also references your sister, Susie.  Do

16 you know who Susie is?

17 A    She's my sister.  Susie Giza.

18 Q    Where does Susie live?

19 A    She lives in a suburb of Cleveland called Avon Lake,

20 Ohio.

21 Q    Now, without getting into the nature of it, but just

22 tell the jury, based on your knowledge very soon after

23 your brother's death did Susie have contact with Michael

24 Harris?

25 A    Did you say *very soon after*?

1  Q    Yes.

2  A    Yes.

3  Q    You don't need to get into the nature of it; however,

4  were you able to verify since that time whether there was

5  any attempted contact from Mr. Harris to Susie or you?

6  A    None whatsoever.

7  Q    Now, in looking at the top of this it says, *"From:*

8  *xxxxxxxx_13."* Whose e-mail address did you understand

9  that to be?

10 A    Michael Harris'.

11 Q    Xxxxxxxx@aol.com.  Whose e-mail address is that?

12 A    That's me.

13 Q    Was that the e-mail address you used at all times

14 with respect to these e-mail communications we're going to

15 be telling the jury about?

16 A    Yes.

17      MR. GILL:  Your Honor, at this time we would move for

18 admission of Exhibit 246, which is a stipulation between

19 the parties with respect to interstate connections with

20 respect to proof in this case.

21      THE COURT:  I assume there's no objection to 246,

22 Mr. Klaiber?

23      MR. KLAIBER:  No objection, Your Honor.

24      THE COURT:  Go right ahead.

25           (Government's Exhibit 246 is received.)

1    THE COURT:  Can he just read it to the jury?  Is that

2    the way you want it published?  Is that okay?

3         MR. KLAIBER:  That's fine, Your Honor.

4         THE COURT:  All right.  Go right ahead.

5         MR. GILL:  And, Your Honor, I'll publish with respect

6    to Number 1, which is Count 5.

7         THE COURT:  All right.

8         MR. GILL:  *"Count 5 involves an email that was sent*

9    *from Michael Harris (using email account*

10   *xxxxxxxx_13@msn.com) to e-mail account J.M. (using email*

11   *account xxxxxxxxx@aol.com).  That email was transmitted*

12   *between different states and was processed through AOL*

13   *servers located in the Eastern District of Virginia.  This*

14   *email qualifies as a wire communication in interstate*

15   *commerce.  The email was also transmitted and processed*

16   *through the Eastern District of Virginia."*

17        THE COURT:  All right.

18        MR. GILL:  Okay.  Now then, if we could look at Page

19   1 of Exhibit 15.  And let's focus in right here on the

20   middle of that, including the header.  Thank you.

21   Q    Now, describe for the jury, this is again that e-mail

22   that came in from Michael Harris at 10:44 a.m. on

23   March 12, 2008.  How soon after that did you respond?

24   A    Well, I responded March 12, 2008 at 2:00 eastern

25   standard time.

1  Q     Who is it that wrote this e-mail?

2  A     I did.

3  Q     Now, what was your purpose and intention in conveying

4  the information in this first paragraph to Michael Harris?

5  A     Basically, I had made several attempts to contact him

6  either via certified mail that he received, and I proved

7  to him that I was my brother's executor and trustee, and

8  that I do in fact represent my brother now as an investor

9  for his estate.  And I needed to get this information for

10 my -- for myself, and people in my brother's trust, the

11 beneficiaries, States of California, Ohio, as well as the

12 U.S. Government.

13      MR. GILL:  Let's scroll down.

14 Q     There in the middle where you have the asterisks and

15 those items, are those items and information you're

16 specifically requesting?

17 A     Yes.

18 Q     Now, with respect to the stock certificate, where did

19 you want the stock certificate to go?

20 A     At this time, it was -- if he was going to send it

21 out, it would have gone to California to my attorney

22 there, or to me.  Any which way we could have got the

23 stock certificate would have been fine, but eventually it

24 had to go to California to go through the probate, go to

25 the trust, go out of the trust, and then to the people in

1  the trust -- the trust beneficiaries.

2  Q    One way or another did you want that into your

3  brother's estate?

4  A    I'm sorry?

5  Q    One way or another did you want just the stock

6  certificate for your brother's estate?

7  A    Yes.  Absolutely.  It was holding up everything.

8  Q    Now, you have that information, and the very next

9  paragraph, that third paragraph below the last star point,

10 what information were you requesting about the monies?

11 A    Yeah.  I wanted to know how my brother's $200,000

12 investment monies were spent.

13      MR. GILL:  And then let's look at Page 2 at the top.

14 Q    Now then, you make an assertion with respect to the

15 annual reports.  What do you base that on?

16 A    Yeah.  Mike went in to file his reports on December

17 1, 2007, and they didn't hook up to any other things.  All

18 the addresses were different from his previous reports.

19 The agents were different.  The principals of the company

20 were different.  He was using three or four addresses.

21 One that was called SM Road in Luray, Virginia, that isn't

22 even a road.

23 Q    Okay.  I understand.

24 A    I'm sorry.

25 Q    Fair to say, you're frustrated, and convey to him in

1  this e-mail what you believed, is that correct?

2  A    That is correct.

3  Q    All right.  The final statement in that next

4  paragraph, *"I did not want to go pursue my brother's*

5  *investment through the government or possible legal*

6  *action."*  Was that your intention all along to try to

7  avoid having to go to the courts?

8  A    Oh, yes.  We wanted to save time and money.  We just

9  wanted the stock certificates for the estate.

10 Q    Now then, let's see, did he respond to this e-mail?

11 A    He -- let's see here.  Yes, he does.

12      MR. GILL:  Let's look at Page 1 of Exhibit 15.  Just

13 at the top.

14 Q    What representation did he make in response to your

15 request for shareholder rights and information about the

16 transferability of this stock?

17 A    Harris claims *"Our shares are non transferable."*

18 Q    And in connection to your request for all this

19 information we just saw in the e-mail below here, did he

20 provide any financial information you requested, including

21 how your brother's monies have been spent?

22 A    Never.

23 Q    If he had provided that information to you, what

24 would you have done with that information?

25 A    Do you mean the stock certificates, too?

1  Q    Stock certificates and also if he provided financial

2  information about the company and what had been done with

3  your brother's money.

4  A    Well, I would have -- then it would go into the

5  estate.  If he sent it to me, I send it to California.

6  From California it pours over to the trust.  From the

7  trust, it is then distributed to the beneficiaries.  But

8  we would have been happy to get the stock.

9  Q    How about if you had received financial information

10  about how your brother's money had been spent by the

11  company?

12  A    I would have shared it with my attorneys, and with

13  probably those other organizations, too.  You know, I

14  would have taken a look at it.  Seen what's going on in

15  his company.

16  Q    And to this day, have you ever received that

17  information from M.F. Harris Research or Michael Harris?

18  A    No.  Nothing.  Zero.  Never.

19  Q    Now after that e-mail, did you send another letter to

20  the defendant?

21  A    Yes.

22  Q    Take a look at Exhibit 16.  Is that an April 24,

23  2008, letter that you had sent to the defendant certified

24  and return receipt requested?

25  A    That is correct.

1      MR. GILL:  Your Honor, we move for admission of

2  Exhibit 16.

3      THE COURT:  Any objection, Mr. Klaiber?

4      MR. KLAIBER:  No objection, Your Honor.

5      THE COURT:  Be received.

6          (Government's Exhibit 16 is received.)

7      MR. GILL:  Now, let's look at Page 1.  Let's focus in

8  just on the upper portion.

9  Q    What was the date of this letter, and what address

10 did you choose to send this one to?

11 A    The date is April 24, 2008.  I sent it to that P.O.

12 Box because obviously he was receiving it.  So I stuck

13 with that address.

14 Q    Is that the same address that you had earlier on the

15 letters we showed the jury?

16 A    Yes.  Yes.

17     MR. GILL:  If we could, let's look at Page 4 of

18 Exhibit 16.  Let's zoom in on this.

19 Q    And what is this we're looking at, sir?

20 A    This is the return receipt that I received back

21 proving that Harris got it and received it and signed for

22 it.

23 Q    May 16, 2008?

24 A    That's correct.

25     MR. GILL:  Now, let's go back to Page 1.  Now, if we

1  could just zoom in.  I'll give the jury a moment to look

2  at this.

3  Q    All right, sir.  And describe for us, in this letter

4  you particularly ask that the stock certificates should be

5  made out to who?

6  A    The estate of Dr. Thomas Joseph Marosi.

7  Q    And was that basically your intention all along to

8  get the stock to the estate?

9  A    Yes.

10 Q    And let's just scroll down on this letter.  And we

11 don't need to review this again, but are you requesting

12 the same general information, including financial

13 information about the company, annual reports?

14 A    Yes, I am.

15 Q    Now, this last part right down here at the bottom.

16 What was that in relation to and did this letter include

17 reference to Steven Baughman?

18 A    Yes.

19 Q    You know, Harris promised that my brother, Bellato,

20 and Baughman would be the first ones over for this AIDS

21 treatment, and now I wanted to replace my brother and go

22 over there.  And I do.  I want Bellato and Baughman to be

23 the first two.  And in my previous letter I left Baughman

24 out.  I wasn't too happy with him.  But you know what,

25 this is what my brother wanted, these two fellows, and

1  myself.

2      MR. GILL:  Let's look at Page 2.  Let's look up at

3  the top.

4  Q    And is this how you left the letter?

5  A    I'm sorry?  How I left the letter?

6  Q    How you concluded the letter?

7  A    Yeah.  Exactly.  *"I look forward to great successes*

8  *with this AIDS cure procedure.  I want to get this*

9  *procedure to market as soon as possible."*

10 Q    Did you receive any response to that letter?

11 A    No.

12 Q    What was your next step in this process?

13 A    My next step is to go to my attorney in San Diego for

14 some help because she was the one probating the will.

15 Q    What did she do?

16 A    She sent Harris a letter basically requesting the

17 same information that we've all been requesting, or that

18 I've been requesting through all this time.

19 Q    Take a look at Exhibit 17.  Tell us if that is indeed

20 the letter sent by your attorney to Michael Harris, the

21 CEO of M.F. Harris Research, Incorporated?

22 A    That's it.  Yes.

23     MR. GILL:  Your Honor, we move for admission of

24 Exhibit 17.

25     THE COURT:  Any objection to 17?

1       MR. KLAIBER:  No, Your Honor.

2       THE COURT:  Be received.

3            (Government's Exhibit 17 is received.)

4       MR. GILL:  If we could please see Exhibit 17, Page 1.

5  Zoom in on the upper portion.  Thank you.

6  Q    And per the first paragraph, your lawyer is asking

7  for the same thing you've been asking for?

8  A    That's correct.

9       MR. GILL:  Scroll down.

10 Q    And your attorney talks about that, *"It should be*

11 *issued to 'John Marosi, Executor of the Will of Thomas*

12 *Marosi.'"*  Is that you in your executor capacity for your

13 brother?

14 A    Yes.

15 Q    And also is your attorney requesting financial

16 information about this company?

17 A    That's correct.

18 Q    Are you aware of whether there was a response to this

19 letter?

20 A    No response.

21 Q    What was the next step you took?

22 A    Hired an attorney in North Carolina.

23 Q    What did that attorney do for you?

24 A    He was able to get the stock certificates from

25 Harris.

1  Q    Was the lawsuit filed to get to that point?

2  A    Yes.  It was.  There was a motion filed.

3  Q    Tell us when that lawsuit was filed.

4  A    When was it filed?

5  Q    Yes, sir.

6  A    But this was probably at the -- I'm thinking the --

7  probably '09.  Probably the end of '08.  I'd have to

8  almost doublecheck my records when we first filed.

9  Q    Take a look in front of you at Exhibit 20.  And is

10 that the amended final order and opinion with respect to

11 that suit and the final order on issuance of the stock?

12 A    Yes.  That's correct.  It is.

13       MR. GILL:  Your Honor, we would move for admission of

14 Exhibit 20.

15       THE COURT:  Any objection, Mr. Klaiber?

16       MR. KLAIBER:  No objection.

17       THE COURT:  Exhibit 20 will be received.

18          (Government's Exhibit 20 is received.)

19 Q    Now then, up here at the top, the style of the case,

20 who brought this case, and who was it against?

21 A    "JOHN MAROSI, Executor of the Estate of THOMAS J.

22 MAROSI, MD, v. M.F. HARRIS RESEARCH, INC."

23 Q    What was your whole purpose in bringing this suit?

24 A    Simply to get the stock certificates from my

25 brother's $200,000 investment that he never received the

1  certificates for.  That was all it was about.

2      MR. GILL:  Page 2.  Let's look at the Procedural

3  History.  Focus in here on the middle.

4  Q    What was the date the suit was filed?

5  A    October 17, 2008.

6  Q    And then below that it talks about summary judgment?

7  A    That's correct.  That was correct.  And right about a

8  year later, October 30, 2009, nothing was contested on

9  their side.  The judge ordered for him to get the stocks

10  to me by early February 2010.

11      MR. GILL:  And on Page 3 at the bottom.

12  Q    These are the factual background in the order.  Does

13  that refer to your brother's stock that was at issue in

14  this very case?

15  A    Yes.

16      MR. GILL:  Page 4 up at the top.

17  Q    Does it represent that payment had been made, and the

18  estate or Dr. Marosi had not received the certificates?

19  A    That's correct.

20  Q    And per the court order, Page 6, let's focus in on

21  19.  What is it that the judge ordered?

22  A    *"No later than 5:00 p.m. on Monday, February 8, 2010,*

23  *Defendant forthwith shall issue to the Estate of Thomas*

24  *Marosi, M.D. stock certificates representing 200,000*

25  *shares of common stock."*

1  Q     Take a look at Exhibit 21.  Is that the stock

2  certificate that was issued?

3  A     Yes.

4        THE COURT:  Any objection to 21?

5        MR. KLAIBER:  No objection, Your Honor.

6        THE COURT:  Be received.

7            (Government's Exhibit 21 is received.)

8  Q     And if you can just take a look at that.  And that

9  certificate is made out to *The Estate of Thomas Marosi,*

10 *two hundred thousand."*

11 A     Two hundred thousand shares.  That's correct.

12 Q     And Page 2 of Exhibit 21.  It was issued to the

13 estate.  Was the date February 4, 2010?

14 A     That is correct.

15 Q     And I know you signed off on this November 2, 2010.

16 Is that after it went through all the legal passages to

17 get to you through the probate courts?

18 A     That's correct.

19 Q     And where did it end up, this stock, you personally

20 or the estate?

21 A     It's in the estate.  It's my brother's -- it's part

22 of my brother's estate.

23 Q     Since that time -- you're still serving in the

24 executor capacity for the estate?

25 A     Yes.

1  Q    Tell the jury, since receiving this stock

2  certificate, have you received any financial information

3  or annual reports, or anything as a shareholder?

4  A    Nothing.  Absolutely zero.  Not even when and where

5  the next shareholder meeting would take place.  Zero.

6       MR. GILL:  No further questions, Your Honor.  Thank

7  you.

8       THE COURT:  All right.

9       Mr. Klaiber, cross-examination.

10                    **CROSS-EXAMINATION**

11  BY MR. KLAIBER:

12  Q    Hello, Mr. Marosi.

13  A    Hello.

14  Q    My name is Nick Klaiber, and I represent Mr. Harris.

15       You testified your brother was an anesthesiologist,

16  correct?

17  A    Yes.

18  Q    And he was a smart man, wasn't he?

19  A    Yes.  Yes.

20  Q    He had a good deal of medical training, medical

21  school, residency, all that, correct?

22  A    He did.

23  Q    So he was pretty well positioned to evaluate the

24  science behind M.F. Harris Research, wasn't he?

25  A    Say that again.  I'm sorry.

1  Q    He was very well positioned to evaluate the science

2  behind M.F. Harris Research, wasn't he?

3  A    I -- I'd say he's not an expert in that field.

4  Q    But he did have medical training?

5  A    He had medical training as an anesthesiologist.

6  Correct.

7  Q    Okay.  And are you aware that Dr. Marosi had planned

8  to go back to San Diego and find more investors for M.F.

9  Harris Research?

10  A    No.

11  Q    Is it fair to say that you weren't privy to all the

12  communications between Mr. Harris and Dr. Marosi aside

13  from the documents that you found after your brother's

14  passing?

15  A    I would say that's fair.  Sure.

16  Q    Now, I believe you mentioned on direct that in

17  February of 2008 you sent a series of letters to various

18  state and federal agencies related to M.F. Harris

19  Research, is that correct?

20  A    That's correct.

21  Q    And you sent one to the California Department of

22  Corporations, North Carolina Attorney General's Office,

23  North Carolina Secretary of State.  They all essentially

24  said the same thing, right?

25  A    The letters?

1  Q     Yes.

2  A     Pretty much.  Yes.  Yeah.

3  Q     And in these letters, do you recall stating that

4  Dr. Marosi, quote, *"Liked the promises of Michael Harris*

5  *and his AIDS cure technology"*?

6  A     Yes.

7  Q     So, to these various agencies, your complaint against

8  Mr. Harris is you just believed that he wasn't being

9  truthful about the science and the technology, isn't that

10 right?

11 A     Say that again.  I'm sorry.

12 Q     Isn't your complaint to these various agencies that

13 you just believed -- you just believed that the -- that

14 Mr. Harris was not being truthful about the treatment that

15 he offered, isn't that correct?

16 A     Well, no, I wouldn't say that.  No.  No, because, I

17 mean, the treatment, it could be promising.  I mean, the

18 Phase I, we're looking for Phase II.  He's waiting for

19 some patent.  So, no, I think there's some promise there.

20 Q     In these letters, did you discuss any promises

21 Mr. Harris might have made about where your brother's

22 money was going?

23 A     Let me see.  *"About where his money was going."*

24 Q     What his money was to be used towards?

25 A     Please repeat that.

1   Q    In these letters that you sent to various agencies,

2   did you discuss any promises that Mr. Harris might have

3   made to your brother with regards to what his money was to

4   be used for?

5   A    I don't recall.

6   Q    Okay.  Do you recall on February 13, 2008, submitting

7   a complaint form to the North Carolina Securities

8   Division?

9   A    I do.

10       MR. KLAIBER:  Can you please pull up Defense Exhibit

11  27.

12       THE COURT:  Did you say 27?

13       MR. KLAIBER:  Exhibit 27, Your Honor.  Yes.

14       THE COURT:  All right.

15  Q    Do you recognize this document, Mr. Marosi?

16  A    Yeah.  Yes, I do.

17  Q    Is that the -- is that the complaint form that you

18  submitted to the securities division in February of 2008?

19  A    I believe that it is.

20       MR. KLAIBER:  Your Honor, at this time I'd like to

21  admit this.

22       THE COURT:  Any objection to that, Mr. Gill?

23       MR. GILL:  No, Your Honor.

24       THE COURT:  Be received.  You may publish it if you

25  wish.

1          (Defense Exhibit 27 is received.)

2      MR. KLAIBER:  Can you please go to Page 4 of the

3  exhibit.  Can you please focus in on question and answer

4  19.

5  Q    Now, the form asks, *"DID THE SELLER OMIT TO TELL YOU*

6  *INFORMATION THAT WOULD HAVE CHANGED YOUR DECISION TO*

7  *INVEST?  IF SO, WHAT WAS THAT INFORMATION."*  Does that

8  conform to what you see on the screen?

9  A    Yeah.  I see it on the screen.

10  Q    Okay.  Now, as you already testified, you weren't

11  privy to the conversations between Dr. Marosi and

12  Mr. Harris, correct?

13  A    Correct.

14  Q    And we're not talking about your decision to invest

15  in the company at all, correct?

16  A    Correct.

17  Q    And so you really can't say then what would have

18  changed your brother's decision to invest one way or the

19  other, correct?

20  A    Correct.

21  Q    Okay.  Can you please read your answer to the jury.

22  A    *"The company is a fraud + and has no intentions of*

23  *this AIDS cure – M. Harris is a con-artist."*

24  Q    So again, as of February 2008, you were convinced

25  that the treatment itself was a fraud, it was a scam?

1   A     Not the treatment because that's not in my field.

2   I'm not an expert in that.  I'm saying that Harris is a

3   fraud.  No question.

4   Q     You write, *"+ has no intentions of this AIDS cure."*

5   A     That was my -- that's what I believe.  That's

6   correct.

7   Q     Okay.  And again, when you reach out to the North

8   Carolina state government by way of this complaint form,

9   you don't bring up any promise that Mr. Harris may have

10  made to your brother regarding your brother's investment,

11  correct?

12  A     I -- I don't recall.

13  Q     Okay.  In fact, I want to go --

14      MR. KLAIBER:  Can you please focus in on question and

15  Answer 16.

16  Q     Answer 16 asks, *"WHAT WAS YOUR UNDERSTANDING ABOUT*

17  *HOW YOUR MONEY WAS SUPPOSED TO BE USED?"*  And can you

18  please tell the jury how you responded to that question.

19  A     Yeah.  I say, *"Stock investment plus first patient of*

20  *AIDS treatment.  3 patients overall."*

21  Q     And again, aside from the purported treatment promise

22  that you reference there, you don't mention any statements

23  Mr. Harris might have made to your brother about where his

24  investment was going, correct?

25  A     No.  It was an investment in that corporation making

1  him a shareholder.

2  Q    Okay.  Now, I believe you testified on direct that

3  you were leery of M.F. Harris Research pretty much from

4  the beginning, correct?

5  A    Yeah.  You know, I was a little leery.  Absolutely.

6  Q    In fact, isn't it true that even as early as May of

7  2007, you and Mr. Bellato were trading e-mails referencing

8  Deep Blue and the former M.F. Harris investors?

9  A    I was investigating what was going on.

10  Q    Even as early as May of 2007?

11  A    It could be.  I mean, I would have to go through my

12  files to be able to answer that.

13  Q    That's a full four months earlier than when you send

14  your very first letter to Mr. Harris in September of 2007,

15  correct?

16  A    If you're saying that I sent something in May of '07,

17  is that what I sent?

18  Q    That would have been several months before your very

19  first letter to Mr. Harris, correct?

20  A    But I don't know what I'm sending.  You're not

21  explaining to me what I sent.

22  Q    I asked you about the fact that you were conducting

23  an investigation already as of May of 2007.  I believe you

24  testified that that was possible.  Now I'm asking you,

25  that was several months earlier than your very first

1  letter to Mr. Harris in September of 2007, correct?

2  A    That would be correct.

3  Q    Okay.  Now, I believe you mentioned a -- I'm going to

4  skip around here.  There was litigation over a Golden

5  Globe.  And you mentioned it had been stolen from the

6  estate?

7  A    Yes.

8  Q    Is that right?

9  A    Yes.

10  Q    Now, in fact, the Golden Globe was in the possession

11  of Carroll Madden, isn't that correct?

12  A    Yes.  That's correct.

13  Q    And Carroll Madden was a friend of Dr. Marosi, wasn't

14  she?

15  A    Correct.

16  Q    And in that lawsuit, it was her contention that he

17  had given it to her as a gift, correct?

18  A    Her contention.

19  Q    Okay.  Now, I think we have talked a little bit about

20  how -- well, I'll move on.  You said you found a

21  subscription agreement after your brother's passing,

22  correct?

23  A    Correct.

24       MR. KLAIBER:  Can you please bring up Government's

25  Exhibit 7, please.  Thank you very much.

1    I'm sorry.  Government's Exhibit 6.  Thank you.

2    THE COURT:  What's the number of the exhibit?

3    MR. KLAIBER:  Government's Exhibit 6, Your Honor.

4    THE COURT:  Government's Exhibit 6.  Okay.

5    MR. KLAIBER:  Thank you.

6    Actually, I'm going to Government's Exhibit 7.  Thank

7 you.  Now I'm on Government's Exhibit 7.

8    THE COURT:  Okay.

9    MR. KLAIBER:  Thank you.

10 Q    I believe you testified on direct that this document

11 here entitled *"LABOR, HHS, EDUCATION AND RELATED AGENCIES"*

12 was one of the documents that you found after your

13 brother's passing, correct?

14 A    Correct.

15    MR. KLAIBER:  Can you please turn to the fourth page

16 of this document.  And if you can focus in on this area

17 right here.  That's perfect.

18 Q    This is Page 4 of the document that we were just

19 discussing.  Can you tell the jury what is listed as a

20 salary for the president and CEO of M.F. Harris Research

21 in this document?

22 A    It's listed as *"$100,000."*

23 Q    And what fringe benefits are listed as president and

24 CEO?  To the right.

25 A    It's *"$22,400."*

1  Q    Okay.  And you said that your brother received this

2  document as part of the information he received prior to

3  investing in M.F. Harris Research, isn't that correct?

4  A    Correct.

5  Q    Now, after your brother passed away, you mentioned

6  that you sent Mr. Harris a letter on September 13, 2007,

7  correct?

8  A    Correct.

9  Q    Okay.  And in that letter, you asked Mr. Harris to

10 issue a stock certificate, correct?

11 A    Correct.

12      MR. KLAIBER:  Can you please pull up Government's

13 Exhibit 13.  Thank you, ma'am.

14 Q    And this is that letter that we were just discussing,

15 correct?

16 A    Correct.

17 Q    And in this letter you say, *"I need to be issued*

18 *stock certificates for this purchase,"* correct?  The

19 second paragraph, second sentence.

20 A    Correct.  As his executor, I needed to get this. Yes,

21 I did need the stock certificate issued as soon as

22 possible.

23 Q    And then you sent a follow-up letter on

24 November 15th of 2007, which is Government's Exhibit 14,

25 correct?

1  A     Correct.

2  Q     And again it states that *"I need to be issued stock*

3  *certificates,"* right?

4  A     That's correct.

5  Q     Okay.  And at some point in 2008 you engage the law

6  firm of Abbene, Alcock & Liska to pursue Mr. Harris and

7  the stock certificates, correct?

8  A     Correct.

9  Q     And they sent out a letter in June of 2008, correct?

10 Do you recall that?

11 A     Yeah, June of 2008.  Okay.  Can I see that on the

12 screen?

13 Q     Yes.  Absolutely.

14       MR. KLAIBER:  Can you please go to Government's

15 Exhibit 17.  Thank you.  And if you can -- that's perfect.

16 Thank you.

17 Q     And is this that letter from your law firm?

18 A     Yes.

19 Q     Now, this letter requests that the certificate be

20 made out to *"John Marosi,"* that's you, *"Executor of the*

21 *Will of Thomas Marosi,"* correct?

22 A     That is correct.  Because, as I shared with you

23 before, it's a pour-over will.  It goes from the will,

24 then it pours over to the trust, then it's distributed.

25 This is lawyer jargon here.

1  Q     Oh.  Is Mr. Harris a lawyer?

2  A     Mr. Harris?

3  Q     Is Mr. Harris a lawyer as far as you know?

4  A     Not to my knowledge.  But I don't have any

5  information about that.

6  Q     Do you have any indication whether Mr. Harris

7  understands *"lawyer jargon,"* as you put it?

8  A     I had.

9        THE COURT:  I think that calls for speculation on his

10 part.  Objection's sustained.

11       MR. KLAIBER:  Understood.  I'll withdraw it.

12       THE COURT:  When you get to a convenient stopping

13 point, I'm going to give the jury their afternoon break.

14 So let me know when you reach a convenient point,

15 Mr. Klaiber.

16       MR. KLAIBER:  Okay.  Thank you very much, Your Honor.

17 I will.

18 Q     And sometime thereafter you engage a second law firm

19 to pursue Mr. Harris by the name of Murchison, Taylor &

20 Gibson, correct?

21 A     Correct.

22       MR. KLAIBER:  Ms. Bishop, can you please pull up

23 Defense Exhibit 26.

24       MR. GILL:  Your Honor, to move it along, we have no

25 objection.

1     THE COURT:  To 26?

2     MR. GILL:  Yes, sir.

3     THE COURT:  All right.  It will be received in

4 evidence.  And you may publish it if you wish.

5     MR. KLAIBER:  I'd like to do that.  Thank you.

6     (Defense's Exhibit 26 is received.)

7 Q    Do you recognize this letter, Mr. Marosi?

8 A    Yeah.  Yes.  It's a little hard for me to read here

9 but, yes.

10 Q    Okay.  And that's the letter that the second law firm

11 Murchison, Taylor and Gibson sent to Mr. Harris?

12 A    Right.  And they didn't know where to send it, so

13 they sent it to multiple addresses because they keep

14 changing every couple months.  But that's my lawyer

15 sending that.

16 Q    And again, this letter asks that the shares be made

17 out to *"John Marosi, Executor of the Will of Thomas*

18 *Marosi,"* correct?

19 A    Yes.

20     MR. KLAIBER:  Actually, Your Honor, this is a natural

21 kind of stopping point.

22     THE COURT:  Very well.

23     Ladies and gentlemen, at this point we're going to

24 take a 10 minute recess.  You're now excused for 10

25 minutes.

1    (The jury is no longer present in the courtroom.)

2    THE COURT:  We'll be in recess for 10 minutes.

3                    (Recess taken.)

4    THE COURT:  Ready for the jury?

5    MR. KLAIBER:  Yes, Your Honor.

6    MR. GILL:  Yes, Your Honor.

7    THE COURT:  Bring the jury in.

8         (The jury is present in the courtroom.)

9    THE COURT:  All right, Mr. Klaiber, you may continue.

10    MR. KLAIBER:  Thank you, Your Honor.

11 BY MR. KLAIBER:

12 Q    Mr. Marosi, one quick follow-up question going back

13 for just one minute about that Golden Globe.  Did you

14 report that Golden Globe stolen to any authorities?

15    THE COURT:  We're not going to try that case,

16 Mr. Klaiber.

17    MR. KLAIBER:  Okay.

18 Q    I'd like to go to back to the subscription agreement,

19 which is Government's Exhibit 6.

20    MR. KLAIBER:  Can you please focus it on Paragraph C

21 for a minute.  Thank you.

22 Q    Now, Mr. Marosi, this is the subscription agreement

23 that you found among your brother's things, correct?

24 A    Correct.

25 Q    Okay.  Paragraph C states, does it not, *"the*

1  *undersigned may not be able to sell or otherwise dispose*

2  *of the shares when the undersigned wishes to do so,"*

3  correct?

4  A    It does say that.

5  Q    And the undersigned in this case, just so we're

6  clear, is Dr. Marosi, your brother, correct?

7  A    That's correct.

8  Q    And Paragraph D states that the shares *are for the*

9  *undersigned's sole benefit and account,"* correct?

10 A    *"For the undersigned's sole benefit and account."*

11 That's what it says.  Correct.

12 Q    And eventually you do get the stock certificate

13 issued, correct?

14 A    Correct.

15     MR. KLAIBER:  And that's Government's Exhibit 21.

16 Thank you.  If you can kind of focus in on the language

17 right in here.

18 Q    And the stock certificate also says that it is

19 *"transferable only on the books of the Corporation,"*

20 correct?

21 A    That's what it says.

22 Q    Okay.  Meaning basically you can't go out and say,

23 here, the stock is yours now, and give it to somebody

24 else, correct?

25 A    I assume that's correct.

1    MR. GILL:  Your Honor, I object.  Calls for a legal

2  conclusion.

3    THE COURT:  I think the objection's sustained.

4  That's a very technical matter which I think is beyond his

5  kin, quite frankly.

6    MR. KLAIBER:  I understand, Your Honor.

7  Q    Now, Mr. Marosi you personally never signed a

8  non-disclosure agreement in favor of M.F. Harris Research,

9  did you?

10  A    Did I ever receive one?

11  Q    Did you ever sign a non-disclosure agreement?

12  A    No.

13  Q    Did you -- in all the various letters that you sent

14  Mr. Harris, did you ever offer to sign a non-disclosure

15  agreement?

16  A    With Harris?

17  Q    With Mr. Harris.  A non-disclosure agreement like the

18  one that your brother signed.

19  A    I'm sorry.  What are you asking me?

20  Q    In all the letters that you sent Mr. Harris, did you

21  ever offer to sign on your own behalf a non-disclosure

22  agreement like the one your brother signed?

23  A    First, I don't know if my brother ever signed one.

24  And, second, I did not.  No.

25  Q    Okay.

1  A    I don't believe my brother signed one.  That's just

2  my opinion, unless you have it as an exhibit.  I'd like to

3  look at it.

4  Q    So eventually you take Mr. Harris to court to obtain

5  the stock certificate, correct?

6  A    Yes.

7  Q    And in the end, you're -- the stock certificate is

8  issued to your brother's estate, and not to John Marosi as

9  executor of the estate of Thomas Marosi, correct?

10 A    Right.  He wrote it out to the estate of Thomas

11 Marosi.

12 Q    Right.  And you had a problem with that, didn't you,

13 that it was written out that way as opposed to John

14 Marosi, executor of the estate of Thomas Marosi?

15 A    I didn't have a problem with that.  That was all

16 legal jargon.  If it would go to that what you just said,

17 like I told you previously, it's going to go from the will

18 over to the trust and then be distributed to the

19 beneficiaries.

20      And let me say that the State of California valued

21 this stock at $200.  And a few hundred thousand dollars is

22 now $200.  That hurt.

23 Q    And your lawyers therefore told you that there was a

24 qualitative difference between having stock in John

25 Marosi, executor of the estate of Thomas Marosi, and the

1  estate of Thomas Marosi?

2  A    I don't know what you're asking.

3  Q    To your lawyers, there was a difference between

4  having the stock in your name as executor of the estate of

5  Thomas Marosi, and having it in the name of the estate of

6  Thomas Marosi, correct?

7  A    No.  I think they're both looking at it as different

8  things, and it's just legal jargon.  We just wanted the

9  stock.  In fact, we asked Harris to divide it for the

10  trust beneficiaries, and Judge Jolly said we're going to

11  let your Ohio trust people do that.  So they -- then I

12  thought it's going to take another five years to have

13  Harris chop this up in six ways that again is totally

14  worth $200.

15  Q    Now, Mr. Harris didn't know of the estate

16  ramifications of what you were talking about of chopping

17  things up into various pieces, or anything like that, did

18  he?

19       MR. GILL:  Object to speculation.

20       THE COURT:  The objection is overruled.

21       You can ask him whether or not he knew that.  Sure.

22  A    Say again, please.

23       THE COURT:  Excuse me.  I think you can ask him

24  whether or not he ever told Mr. Harris it had to be

25  divided six ways, otherwise he would have to speculate as

1  to what Mr. Harris knew.  So just rephrase your question.

2       MR. KLAIBER:  Okay.

3  Q    Did you ever explain to Mr. Harris that these -- that

4  the shares needed to be chopped up and the estate

5  ramifications of that?

6  A    I wouldn't because I could never get ahold of him.

7  You can't.  But according to my attorney in North

8  Carolina, they talked to Harris and his attorney to do --

9  if we could do it that way just to speed up this over

10  3-year process of simply getting stock certificates.  And

11  then I think the judge, Judge Jolly, said, no, we'll let

12  the trust divide that up.  And that's why I thought it

13  will be another five years.  You know, how are we going to

14  get Harris to do that?  Sue him again?

15  Q    Now, I want to go back and conclude with the various

16  February 2008 letters that you sent to those agencies.  In

17  those letters you reference Deep Blue, correct?

18  A    Do I?  And what exhibit is this?

19  Q    I'll bring it up.

20  A    Okay.

21       MR. KLAIBER:  Defense Exhibit 29, please.

22  Q    Is this one of the letters that you sent in early

23  February to various state agencies?

24  A    Yes.

25       MR. KLAIBER:  Can you go to Page 2 of the letter,

1  please.  And focus in on the paragraph.  Thank you.

2      THE COURT:  This letter is not in evidence, is it

3  Mr. Klaiber?  I don't see it.  Maybe it is.

4      MR. KLAIBER:  Oh.  Sorry, Your Honor.

5      THE COURT:  That's okay.  I just want to make sure

6  that --

7      MR. KLAIBER:  I believe I have not moved for it to be

8  offered into evidence yet.  I'd like to do so at this

9  time.

10      THE COURT:  Any objection, Mr. Gill?

11      MR. GILL:  No objection, Your Honor.

12      THE COURT:  Exhibit 29 will be received.

13      Go right ahead.  I'm sorry for interrupting you,

14  Mr. Klaiber.

15      MR. KLAIBER:  Thank you.

16          (Defense Exhibit 29 is received.)

17  Q   In this paragraph you note, *"There are conflicts with*

18  *former principal officers of M.F. Harris Research and a*

19  *company called Deep Blue Inc."*  Do you see that?

20  A   Yes.

21  Q   And you go on to reference ties between the officer

22  of the two companies, and you talk about Jeffrey Seto,

23  correct?

24  A   I do.

25  Q   And you say that he's the same patent attorney for

1  both companies?

2  A     That was what I believed.

3  Q     Okay.  And are you aware that Deep Blue is the

4  company run by former M.F. Harris Research officers who

5  broke off and began their own rival company to compete

6  with M.F. Harris Research?

7  A     I don't know that firsthand.  I'm really just kind of

8  getting this off the Internet searching what Deep Blue is.

9  Q     Through your own investigation?

10 A     Through only me.  We didn't want to waste anymore --

11 we didn't want to waste any money on Harris from the

12 estate because it was going to be worth $200.

13 Q     Okay.  Have you ever had contact with a group calling

14 itself The Magnificent Seven?

15 A     I've had an e-mail from -- I don't know if it's The

16 Magnificent Seven.  But I've had an e-mail from some

17 people that are either investors or in this company of

18 Harris, whoever it is.

19 Q     And they've called themselves The Magnificent Seven?

20 A     I have no idea.  I mean, they might have.  That kind

21 of makes -- I think I read an e-mail on that, or I

22 received one or something.  And they did.  I do remember

23 the term *"Magnificent Seven."*

24 Q     Okay.  And do you know if Matt Johnson is a member of

25 that group?  Whether Matt Johnson is a member of that

1  group?

2  A    Whether he's in The Magnificent Seven?

3  Q    Yes.

4  A    I have no idea who The Magnificent Seven are, but my

5  guess is Matt Johnson is involved.  And my hallucination

6  and thought process is Matt Johnson is an upset

7  shareholder, like I and the other people in our estate

8  are.  That's what I'm thinking.

9  Q    And Matt Johnson has contacted you about his

10  concerns?

11  A    I do not recall ever talking to Matt Johnson.  I

12  don't recall.  Now, I'm not saying -- I do not recall.

13  Are you saying that is a phone call?

14  Q    I'm not saying --

15  A    Or an e-mail?

16  Q    I'm not saying any particular thing about a phone

17  call or e-mail.  I'm just asking.

18  A    Oh.  Oh, you're guessing.

19  Q    I'm not guessing.  I'm asking you if you have ever

20  been contacted in any way by Matt Johnson.

21  A    I do not recall.  I would say no.

22  Q    Okay.  But you are aware that Matt Johnson had

23  concerns and had voiced those concerns to some people,

24  correct?

25  A    I believe that.  I mean, all these people -- I would

1  say, yeah.  I mean, it looks like everybody is upset.

2  Again, my hallucination is that he would be upset too, if

3  in fact he is a shareholder.  Do you know if he is?

4       MR. KLAIBER:  Thank you.  That's all I have.

5       THE COURT:  Redirect?

6       MR. GILL:  Yes, Your Honor.

7                    **REDIRECT EXAMINATION**

8  BY MR. GILL:

9  Q    Mr. Marosi, just three areas real quick.  Number one,

10 you made it real clear to the jury, what was your

11 interest?  Did you want the stock certificates in the

12 estate?

13 A    Yes.

14 Q    Regardless of whatever terms?

15 A    Whatever legal jargon all you lawyers come up with.

16 All I wanted was that certificate.  And you know what, it

17 took us over three years to do this, and it's worth $200.

18 What a waste of time and money for everybody.

19      THE COURT:  All right.  Next question.

20      MR. GILL:  Let's look at Exhibit 16.

21 Q    That is your April 24, 2008, letter.  Was this before

22 any of the lawyers got involved?

23 A    Before the lawyers got involved?

24 Q    April 24, 2008.

25 A    I would say yes.  I mean, it was -- I sent it out

1  before I went to ask for help from attorneys.

2  Q    Yes, sir.

3  A    But you know what, I always talked to my attorneys.

4  We came to the conclusion the stock was worthless.

5  Q    I understand.  Was this before you engaged any

6  lawyers to pursue the stock?  Is this when you were still

7  doing it yourself?

8  A    Correct.

9      MR. GILL:  And let's just scroll down, please.  Right

10  there in the middle.

11  Q    What did you ask the stock to be issued to?

12  A    The estate of Dr. Thomas Joseph Marosi.

13  Q    In the end, is that finally what you got almost two

14  years after that?

15  A    Yes.  To that -- yeah, it says the estate of -- I

16  don't know if they put doctor in there.

17  Q    Now, Mr. Klaiber asked you whether you ever signed a

18  non-disclosure agreement.  Let me ask you, did Michael

19  Harris at any time ask you to sign a non-disclosure

20  agreement?

21  A    No.  I've never talked to Michael Harris in my entire

22  life.  I didn't know who he was until today.

23  Q    Okay.  And if he had asked you to sign a

24  non-disclosure agreement to get your brother's shares,

25  would you have done it?

1  A    I would have given it to my attorneys and let them

2  make the decision.  I would have read it, and we would

3  have made a decision.  We would have made a decision.  I

4  wouldn't have -- I mean, my first thought is I wouldn't,

5  you know.

6       THE COURT:  All right.  Next question.

7       MR. GILL:  Now then, if we could switch over to

8  Defense Exhibit 27.  Let's look at Page 1 real quick.

9  Q    And this is the North Carolina Securities Division

10 Complaint Form that you filled out?

11 A    Yes.

12      MR. GILL:  Let's look at Page 7, please.

13 Q    What was the day that you filled this out?

14 A    February 13, 2008.

15 Q    Now, I know we described this for the jury at length.

16 Fair to say at that point you were very frustrated and

17 tried to get the shares and were not able to?

18 A    Correct.

19      MR. GILL:  And let's go to Page 4.

20 Q    And while we're pulling that up, tell the jury,

21 before your brother died were you in contact with him

22 about his investment, what he had done, and what he

23 understood that agreement to be?

24 A    Yes.  My brother and I had talked -- are you asking

25 prior to his death?

1  Q     Yes, sir.

2  A     About M.F. Harris?

3  Q     What he had invested in and what he understood was

4  going to happen for him and his friends?

5  A     Yep.

6  Q     Let's look at Answer 16.  I know you were not

7  present, sir, when your brother met with the defendant and

8  made his investment, so where did you get the information

9  that you put right there for Number 16?

10 A     From my brother.  I mean, this is, you know, he made

11 an investment and he wanted --

12       THE COURT:  Hold on a second.  Wait for the next

13 question.

14       Next question, Mr. Gill.

15 Q     Fair to say it was information that came from your

16 brother?  He had told you this before he died?

17 A     Yes.

18       MR. GILL:  No further questions.

19       THE COURT:  May Mr. Marosi be excused at this point,

20 Mr. Gill?

21       MR. GILL:  Yes, Your Honor.

22       THE COURT:  Mr. Klaiber?

23       MR. KLAIBER:  Yes, Your Honor.

24       THE COURT:  Mr. Marosi, you're excused and free to

25 go.  Thank you so much for your testimony.  We really

1  appreciate you coming in today to testify.

2      MR. MAROSI:  Thank you, sir.

3      THE COURT:  You're excused and free me go.

4                  **WITNESS STOOD ASIDE**

5      MR. NASEEM:  The United States calls Steve Weiner to

6  the stand.

7      THE COURT:  Steve Weiner.  All right, sir.

8      Mr. Weiner, if you would raise your right hand, sir,

9  place your left hand on the Bible, and face the Clerk of

10 the Court.

11     THE CLERK:  You do solemnly swear that the testimony

12 which you are about to give, in this case, before this

13 Court, shall be the truth, the whole truth, and nothing

14 but the truth, so help you God?

15     MR. WEINER:  I do.

16     THE COURT:  Have a seat on the witness stand, sir.

17         Whereupon, **Steven Weiner**, having been

18 duly sworn in, testifies as follows:

19                  **DIRECT EXAMINATION**

20 BY MR. NASEEM:

21 Q    Good afternoon, Mr. Weiner.

22 A    Good afternoon.

23 Q    Could you please state your name for the ladies and

24 gentlemen of the jury, please.

25 A    Steven Weiner.

1  Q    And, Mr. Weiner, what is it that you -- well, where

2  it that you reside first?

3  A    My legal address is Boca Raton, Florida.  XXX

4  Xxxxxxxxx Xxxxxxx Xxxx.  I'm currently in transition

5  between establishing residency in Florida from my old

6  residence in Hamilton, New Jersey.

7  Q    Now, Mr. Weiner, what is it that you do for a living,

8  sir?

9  A    I'm a CPA.

10  Q    And as a CPA, what primary thing do you do as an

11  accountant?

12  A    In my particular case, most of my work is tax work.

13  I'd say probably 85% to 90% of my work is tax-related

14  work.

15  Q    And does that include preparing tax returns?

16  A    Yes, it does.

17  Q    And does that include preparing tax returns for

18  individuals and corporations?

19  A    Yes, it does.

20  Q    Now, are you familiar with the defendant, Michael

21  Harris?

22  A    I know of him.  I never met him.

23  Q    How do you know of Michael Harris?

24  A    He was referred to me by an attorney named Rudy

25  Garcia Zamore, (phonetic) who was a client of mine.

1  Mr. Zamore approached me and indicated he had a client

2  that had several years of unfiled corporate tax returns,

3  and asked me if I would be interested in doing them.

4  Q    And did you follow-up and communicate with

5  Mr. Harris?

6  A    Yes, I did.

7  Q    So you have had contact with him?

8  A    But I never met him.  Correct.

9  Q    How did you communicate with Mr. Harris?

10 A    I communicated either by phone, probably some by fax,

11 and some by regular mail, and some by e-mail.

12 Q    Did the person that you communicated with over the

13 phone identify himself as Michael Harris?

14 A    Yes.

15 Q    The communications that you received by fax, did the

16 individual that sent those to you, did they communicate --

17 did that individual communicate to you as Michael Harris?

18 A    To the best of my recollection.  Yes.

19 Q    Now, in preparing corporate returns, and including --

20 well, let me ask you this.  What was the name of the

21 company that Michael Harris --

22 A    M.F. Harris Research, Inc.

23 Q    Okay.  And did you prepare corporate tax returns for

24 M.F. Harris Research, Incorporated?

25 A    Yes, I did.

1    Q    Now, in preparing the corporate tax returns, and

2    including the company's information, did you communicate

3    with anyone else other than Mr. Harris?

4    A    To the best of my recollection, no.

5    Q    As you sit here today, to the best of your knowledge,

6    who was the source from whom you obtained information to

7    file the income tax returns for M.F. Harris Research?

8    A    Michael Harris.

9    Q    Now, how many years have you been a CPA, sir?

10   A    Since 1981.

11   Q    In that time, have you become relatively familiar

12   with the requirements for filing corporate tax returns?

13   A    Yes, I have.

14   Q    Is the corporation required to file a tax return?

15   A    Yes, it is.

16   Q    Do they have to file a return regardless of whether

17   they made any money from their operation?

18   A    Yes, they do.

19   Q    Have you ever advised any client otherwise?

20   A    No.

21   Q    Did you ever advise Mr. Harris otherwise?

22   A    Absolutely not.

23   Q    Now, in preparing corporate taxes, what types of

24   documents do you review?

25   A    It can be either original source documents which

1  would be bank statements, check stubs, and canceled

2  checks.  Or it could be reports from a computer program

3  such as Quickbooks or Peach Tree.

4  Q    Now, in preparing the returns, will the returns

5  themselves reflect the information that you just talked

6  about?

7  A    Yes, they would.

8  Q    In the case of Mr. Harris, were you provided with

9  documents by Mr. Harris?

10  A    Yes, I was.

11  Q    Do you recall the specific documents that he provided

12  to you?

13  A    I do not recall specifically.  I believe, but I'm not

14  100% positive, that it was --

15        MR. WAGNER:  Objection, Your Honor.  If he doesn't

16  know what he was provided, we don't want this witness to

17  speculate.

18        THE COURT:  Would you repeat your question again for

19  me, please.

20        MR. NASEEM:  Do you recall the specific documents

21  that Mr. Harris provided to you?

22        THE COURT:  Objection is overruled to the form of

23  that question.

24        Go right ahead.

25  A    To the best of my recollection --

 1      MR. WAGNER:  It wasn't the form of the question, but

 2 he was testifying that he did not recall exactly what he

 3 relied upon.  That's what I'm objecting to, Judge.

 4      THE COURT:  All right.  Well, to the extent that he

 5 can't recall what he relied upon, anything he's basing an

 6 answer on, the objection is sustained.  I think he has

 7 rephrased the question and he's able to answer it based

 8 upon firsthand information.  And to the extent that he

 9 can, the objection is overruled.

10      So, go right ahead.  You may answer, Mr. Weiner.

11 Q    Do you need me to ask the question again?

12 A    Please.

13 Q    Do you recall the specific information that was

14 provided to you by Mr. Harris?

15 A    Yes.  To the best of my recollection --

16      MR. WAGNER:  Again, Judge, to the best of his

17 recollection.

18      THE COURT:  To the best of his recollection is

19 sufficient.  You can cross-examine on that.

20      Go right ahead.  You may respond, sir.

21 A    To the best of my recollection, it was Quick Book

22 reports.

23      THE COURT:  What reports, sir?

24      MR. WEINER:  Quick Book, which is a commercial

25 accounting program.

1          THE COURT:  Okay, sir.

2  Q    You sound as if your memory is a little bit hazy

3  about this.  Can you explain to the jury why that is?

4  A    Yes.  The returns were done in November of 2007.  The

5  statute of limitations for me to keep records is three

6  years.  You know, Mr. Harris was a client that was just

7  basically a one and done client, meaning that I did this

8  one job for him.  I never -- I never did any post returns

9  for him.  I never got any other work from him.  And it was

10 over five years ago.

11         And every three years I shred records as the statute

12 of limitations expires.  And in July of 2012, I shredded

13 records from -- you know, all the records that the statute

14 of limitations had expired on, and that included my

15 records from the preparation of Mr. Harris' returns.

16         MR. WAGNER:  Your Honor, may we approach?

17         THE COURT:  Yes, sir.

18  (Bench conference held outside the hearing of the jury.)

19         MR. WAGNER:  Your Honor, we would object to the

20 introduction of the tax returns through this witness.

21 What he's just testified to is that he doesn't have the

22 supporting documentation for those tax returns.  We

23 previously objected to this coming in in a motion in

24 limine, but Your Honor now, it appears, that they're

25 trying to put on evidence of tax fraud essentially, and

1  they just want to do it through the tax returns and the

2  recollection of this man.  He says he thinks it was

3  Quickbooks.  And he doesn't even have the computer records

4  of any Quickbooks.

5        THE COURT:  All right.  If he identifies the tax

6  return, and he testifies that he prepared it based upon

7  documents that were given to him and that is his work that

8  he prepared and that he filed and your client signed,

9  doesn't that go to the weight and not the admissibility?

10       MR. WAGNER:  Well, I think under 403 there's this

11  significant prejudice issue here because I don't have the

12  supporting documentation to cross-examine him with.  I

13  mean, it's highly, highly prejudicial here.

14       THE COURT:  I understand.  But it's your client's

15  return that he signed.

16       MR. WAGNER:  That may be true, Your Honor, but there

17  is no supporting documentation.

18       THE COURT:  I think it goes to the weight and not the

19  admissibility.  The objection's overruled.

20            (Bench conference concluded.)

21       THE COURT:  Go ahead, Mr. Naseem.

22       MR. NASEEM:  Will you give me just a moment?  I have

23  to find out where I was.  I apologize, sir.

24       THE COURT:  All right, sir.

25  Q    Now, Mr. Weiner, will a corporate tax return

1   adequately reflect what money is spent and received by a

2   corporation in a given year?

3   A    Yes, it will.

4   Q    Now, are corporate expenses categorized on those tax

5   returns for purposes of tax deductions?

6   A    Yes, they are.

7   Q    And did you prepare corporate tax returns for the

8   company, M.F.H. Research using that information for those

9   purposes?

10  A    Yes, I did.

11  Q    In the case of the information that's reported on an

12  income tax return, who is responsible for recording any

13  money coming into and going out of the corporation on the

14  returns to the IRS?

15  A    The responsibility is to the tax preparer.  In the

16  case of a corporation, the appropriate officer of the

17  corporation.

18  Q    And how do they certify that the information that

19  they provide to the IRS is in fact true and accurate?

20  A    They -- they really don't certify it per se.  They

21  give the information to the preparer.  The preparer is not

22  required to audit the information per se, but the preparer

23  is required to ask -- ask some due diligence, and ask

24  appropriate questions with the information provided.

25  Q    Well, let me ask a different question.  Is the tax

1   filer for the corporation, do they have to sign the

2   return?

3   A    Yes, they do.

4   Q    And why do they have to sign the return?

5   A    It's required by law.

6   Q    And in this case, who was responsible for insuring

7   that the categorization of expenses and money coming in

8   and spent on the tax return, whose responsibility was

9   that?

10  A    That's the responsibility of the taxpayer,

11  Mr. Harris.

12  Q    And in this case, the taxpayer, was it Mr. Harris or

13  was it the corporation?

14  A    It was the corporation.  Mr. Harris being the

15  appropriate official for the corporation.

16  Q    Okay.  To the best of your recollection, do the

17  corporate tax returns that you prepared for the company,

18  M.F. Harris Research, Incorporated, truly and accurately

19  reflect the information you were provided by Mr. Harris?

20  A    Yes, they do.

21  Q    Now, if you will take a look at there's a folder in

22  front of you.  It should be marked as Government's Exhibit

23  176.  And can you identify that document for the ladies

24  and gentlemen of the jury?

25  A    Yes, I can.

1  Q    Do you recognize it as a filed copy of a tax return

2  that you prepared?

3  A    Yes, I do.

4  Q    For what year is that?

5  A    Year 2003.

6       THE COURT:  2003?

7       MR. WEINER:  Yes.

8       MR. NASEEM:  Your Honor, at this time I'd move to

9  admit the document into evidence, sir.

10      THE COURT:  All right.  The document will be admitted

11 over the objection of the defendant for the reasons

12 previously stated.

13      MR. NASEEM:  Can we publish the document, please.

14      THE COURT:  Yes, sir.

15           (Government's Exhibit 176 is received.)

16      MR. NASEEM:  If we could focus in on the top part of

17 the return there, please.

18 Q    For what year is this tax return, sir?

19 A    2003.

20 Q    And looking at the information there, for whom is the

21 tax return being prepared?

22 A    The tax return is being prepared for M.F. Harris

23 Research, Inc.

24      MR. NASEEM:  And if we could zoom back out.  And

25 let's focus on the lower part there.

1  Q    Mr. Weiner, is that your signature there at the

2  bottom?

3  A    Yes, it is.

4  Q    And do you recognize that these tax returns were

5  signed by the CEO and president of M.F. Harris Research,

6  Incorporated?

7  A    Yes, I do.

8  Q    And who did you understand that to be?

9  A    Michael Harris.

10      MR. NASEEM:  Let's zoom back out.  And let's zoom

11  into the center section, please.

12  Q    Now, looking at the tax return for M.F. Harris

13  Research, 2003, where on the form would one look to

14  determine whether any officers or employees had been paid

15  or compensated in any way?

16  A    On Line 12.  Line 12 for officers.  Line 13 for other

17  employees.

18  Q    For the year of 2003, is there any -- can you tell

19  the ladies and gentlemen of the jury whether any income --

20  excuse me.  Whether any salary or wages were paid?

21  A    No.  Yes, I can tell the jury that no salary or wages

22  were paid.

23  Q    Excellent.  If you will go to Page 3 of that document

24  please, sir.

25      MR. NASEEM:  And if we could focus in on Schedule K.

1  It's the lower half.  Yes.  Thank you.

2  Q    Now, looking at Schedule K, can you provide a brief

3  explanation to the jury what the information on Schedule K

4  is conveying?

5  A    Schedule K are questions required to be answered as

6  part of the preparation of the tax return.  You know, they

7  talk about the nature of the business.  And it is a part

8  of the return where you have to disclose if any individual

9  owns more than 50% of the stock of the corporation.

10 Q    Now in this case, where would we have to look to

11 determine what the business of -- the business activity of

12 the corporation?

13 A    Line 2, Schedule K, 2 b and 2 c.

14 Q    Two b and 2 c.  And what is listed as -- or what do

15 you recall as the business of M.F. Harris Research,

16 Incorporated?

17 A    It was -- it was in the business of research.

18 Q    Now, you mentioned earlier -- you mentioned just now

19 that this schedule would also contain information about

20 any shareholder that owned more than 50% of the

21 corporation?

22 A    Correct.

23 Q    And where would that information be?

24 A    On Question Number 5.

25      MR. NASEEM:  Let's scroll down a little bit to 5.

1    Q      And in this case for the corporation, M.F. Harris

2    Research, Incorporated, does it reflect that there's an

3    individual that owns more than 50% of the corporation?

4    A      Yes, it does.

5    Q      And how much is owned by that individual?

6    A      Ninety-nine percent.

7    Q      And who do we determine -- how do we determine who

8    that individual is?

9    A      I was told at the time by Michael Harris that he

10   owned 99% of the stock.

11   Q      Let me ask a better question.  Where would we go on

12   the tax returns to determine who that person is?

13   A      There's a schedule -- there's a schedule on the last

14   page.  It's on Question 5 they ask that the schedule be

15   prepared, and there's a statement.  And it's the last page

16   of the tax return.

17          MR. NASEEM:  Could we go to the last page of the

18   document, please.

19   Q      And in this case, --

20          MR. NASEEM:  If we can blow that up for the jury,

21   please.

22   Q      And in this case, who is represented as being the 99%

23   shareholder in M.F. Harris Research, Incorporated?

24   A      Michael Harris.

25          MR. NASEEM:  If we can go to Page 4 of the return,

1  please.  And let's focus in on the top portion of Schedule

2  L, please.

3       THE COURT:  Schedule what?

4       MR. NASEEM:  Schedule L, Your Honor.

5  Q    Now, can you give the ladies and gentlemen a lay

6  person's explanation of what is being shown here in

7  Schedule L?

8  A    Okay.  Schedule L is -- this is called a balance

9  sheet.  And a balance sheet is basically a snapshot of the

10 financial condition of the corporation at any one given

11 time.  In this case, as of the end of the year -- the end

12 of the year of 2003.  And the top part shows total assets.

13 The bottom part shows liabilities and shareholder's

14 equity.

15 Q    Right now I want to just focus on Schedule L.  We'll

16 talk about the bottom part later.

17 A    This is all part of Schedule L.

18 Q    All right.  Now looking at Schedule L, can we focus

19 in on Paragraph 7.

20 A    Yes.

21      MR. NASEEM:  Give me just a moment.  We have to get

22 it up for the jury.

23 Q    Now, looking at Line Number 7.  Can you explain to

24 the ladies and gentlemen of the jury what Line Number 7

25 represents?

1  A    Line Number 7 represents loans that the corporation

2  would have made to shareholders, and it would represent

3  the balance on those loans as of the date of the balance

4  sheet.

5  Q    In the year 2003, are there any loans being --

6  represented as being made to any shareholder in M.F.

7  Harris Research?

8  A    No, there is not.

9  Q    Now, going to Line 12 -- excuse me.  Line 10.  I

10 apologize.  Line 10.  Can you give the ladies and

11 gentlemen an explanation of what is being categorized on

12 Line 10?

13 A    Yeah.  Line 10 is the accumulated total of tangible

14 assets that are purchased that are, what accountants call,

15 capitalized and those being expensed.  Meaning it gets

16 appreciated over a number of years.  So anything that is a

17 tangible asset such as a vehicle, a piece of equipment,

18 office building, office furniture, all goes on Line 10.

19 Q    Ten a and b?

20 A    No.  Ten a is the gross amount of -- the gross

21 purchase price of the assets.  And 10 b is the accumulated

22 depreciation, which is the portion of the cost of the

23 assets that has been written off or depreciated at any one

24 given time.

25 Q    And the ultimate value of the asset for the year, is

1  that -- would it be reflected in Line 10 b all the way to

2  the right column after depreciation?

3  A    Yes.  Yes.  Correct.  Yes.

4  Q    Now, looking at Line 12.  Can you identify that line

5  for the ladies and gentlemen of the jury, and explain what

6  is being reflected there?

7  A    Yeah.  Line 12 is land.  When a piece of real estate

8  is purchased, we are required to separate the land from

9  the building itself in that the building is depreciable

10 and land is not.  So the portion of any real estate

11 purchase that represents land is listed separately on Line

12 12.

13 Q    Now, scrolling back up to Line 7.  Now, how much

14 money is being represented by being loaned to shareholders

15 for the year 2003?

16 A    None.  Zero.

17 Q    And for the same year, Line 10, how many tangible

18 assets of the corporation are being reflected?

19 A    Zero.

20     MR. NASEEM:  Now, let's zoom back out.  And let's go

21 to the middle portion titled *Liabilities and Shareholders*

22 *Equity.*"

23 Q    Mr. Weiner, could you give the ladies and gentlemen

24 an explanation, a lay person's explanation, of what this

25 particular section here is capturing, Line 16 through 28?

1   A    Okay.  As it's titled, *"Liabilities and Shareholders*

2   *Equity,"* the liabilities are items that the company owes

3   out to other people, whether it be loans, trade, accounts

4   payable, or agreement letters and shareholders.  And

5   basically Line 16 through Line 21 represents liabilities.

6        Line 22 through Line 28 represents shareholders

7   equity.  Shareholders equity is a difference between the

8   assets that the company owns and the liabilities, which is

9   what they owe out.

10  Q    Now in this case, where would we have to look to

11  determine if money is coming -- or can we determine from

12  looking at this particular section whether stock has been

13  sold in the company?

14  A    Yes, we can.  And that would be reflected on Line 22.

15  Q    And for the year 2003 for the tax return in question

16  here for M.F. Harris Research, Incorporated, was there any

17  stock coming in for the year 2003?

18  A    There was not.

19  Q    And again, the stock coming in or capital being

20  sold -- excuse me.  The stock being sold and the capital

21  coming in, that would mean money coming into the company,

22  correct?

23  A    Correct.

24  Q    And who would that money be coming in from?

25  A    It would be coming in from the shareholders.

1   Q      Now, going to -- and you can set that aside, sir.

2   And let's move on to what's been marked as Government's

3   Exhibit 177.  And it should be in a folder there in front

4   of you.  Can you identify that document?

5   A      Yes.  That is the 2004 federal corporate income tax

6   return.

7   Q      And is that a document that you prepared on behalf of

8   the corporation, M.F. Harris Research, Incorporated?

9   A      Yes, it is.

10         MR. NASEEM:  Your Honor, at this time we have the

11  corporate tax returns from 2004 through 2006 remaining.

12  Q      At this time, I would like to ask the witness did you

13  prepare tax returns for all of those years, 2004 through

14  2006, for the corporation?

15  A      Yes, I did.

16         THE COURT:  And that would be 177, 178, and 179, is

17  that right, Mr. Naseem?

18         MR. NASEEM:  Yes, Your Honor.  And at this time, we'd

19  like to move to admit all three remaining tax returns.

20         MR. WAGNER:  Over our objection, Your Honor.

21         THE COURT:  Understood.

22         They'll be received over the objection of the defense

23  for the reasons previously stated by the Court at the

24  Bench.

25         All right.  Go ahead and proceed.

1          (Government's Exhibits 177 - 179 are received.)

2          MR. NASEEM:  Let's go ahead and publish Exhibit 177,

3   please.  And let's focus in on the top part.

4   Q    And, Mr. Weiner, do you recognize those as the

5   corporate tax returns for the 2004 calendar year?

6   A    Yes, I do.

7   Q    And for whom were those tax returns prepared?

8   A    M.F. Harris Research.

9          THE COURT:  Mr. Naseem, at this point you've gone

10  through a lot of the mechanics of this with him.  He's

11  explained it.  Maybe you can use a little bit of a summary

12  fashion if you don't mind.

13         MR. NASEEM:  Sure, Your Honor.

14  Q    Are those tax returns signed by the CEO and president

15  of M.F. Harris Research, Incorporated?

16  A    Yes, they are.

17         MR. NASEEM:  Now, zooming back out.  Going to Lines

18  12 and 13.

19  Q    Is there any salary reported for the tax year 2004

20  for the corporation?

21  A    No, there's not.

22  Q    Any compensation to officers for that year on Lines

23  12 and 13?

24  A    No, there's not.

25  Q    Turning to Page 3 of the document.  And -- excuse me.

1  Page 4.  I apologize.  And let's focus in on Schedule L.

2  Let's scroll down to line Number 7.  And in the tax year

3  for 2004, were there any loans made to shareholders?

4  A    No, there were not.

5  Q    And looking at Lines 10 a and b, what were the total

6  assets, tangible assets, office equipment, buildings,

7  thing of that nature, for the corporation for that year?

8  A    It's $8,332.

9  Q    And less depreciation, what was the total value?

10  A    It's $6,823.

11  Q    So that number, $6,823, that number would be

12  reflected --

13      MR. WAGNER:  I must object.  The indictment in this

14  case starts, I believe, in 2005, Judge, and we're going

15  over 2003 and 2004.  So I think there's a relevance issue

16  here.

17      MR. NASEEM:  May I respond?

18      THE COURT:  Sure.  Go right ahead.

19      MR. NASEEM:  The tax returns go directly to the

20  defendant's intent and knowledge with respect to

21  concealment in this case.  The United States has argued

22  that the defendant in this case misappropriated investor

23  money and then concealed those facts.

24      THE COURT:  All right.  The objection is overruled.

25  I think that in order to trace the assets of the

1    corporation you have to start at an earlier point.  So

2    without going into too many details on the record, the

3    objection is overruled.

4         Go right ahead.  You may respond, Mr. Weiner.

5         MR. NASEEM:  I'll ask the question again.

6         THE COURT:  All right.  Go ahead.

7    Q    What are the total value of the assets of the

8    corporation for the 2004 year less accumulated

9    depreciation?

10   A    It's $6,823.

11   Q    Let's look at Line 12.  What's the value of the land

12   owned by the company?

13   A    Zero.

14   Q    Let's scroll back down to liabilities and

15   shareholders equity.  Okay, looking at Line 22.  Again, we

16   talked about Line 22 reflecting the stock being sold by

17   the company that year and money coming in.  What is the

18   total amount of money coming in that year?

19   A    That's $142,500.

20   Q    And that would be through the sale of stock?

21   A    Correct.

22   Q    Let's set that aside, and let's move to Government's

23   Exhibit 178.  And do you recognize these as the corporate

24   returns for 2005?

25   A    Yes, I do.

1  Q     And then scrolling all the way down to the bottom.

2  Is that your signature that appears there on the bottom,

3  sir?

4  A     Yes, it is.

5  Q     And signed by the CEO of the corporation?

6  A     Yes.

7  Q     And who did you understand that to be?

8  A     Michael Harris.

9  Q     Looking to line -- still on the same page.  Sorry.

10 Looking on Line 12 of the corporate return for the year

11 2005, what is listed -- or how much money is being listed

12 as being paid to officers of the corporation and salaries

13 and wages to employees?

14 A     Zero.

15 Q     Let's go ahead and go to Page 4.  And let me know

16 when you're there, sir.

17 A     I'm there.

18 Q     Looking at Line 7, Mr. Weiner.  What is reflected as

19 the total amount of loan being made to shareholders of the

20 corporation for that year?

21 A     It's $61,230.

22 Q     Now, going to Line 10 a/b, what was the total value

23 of the net assets of the corporation for that year?

24 A     After depreciation?

25 Q     After depreciation.

1   A    For the year or cumulative?

2   Q    Cumulative, sir.

3   A    It's $9,075.

4   Q    How much money -- can you determine how much money

5   was spent by the corporation in the year 2005 from that

6   line?

7   A    Yes.

8   Q    How would you determine that?

9   A    You would take -- you would take Line 10 a, Column

10  (a), and subtract that from the amount on Line 10 a,

11  Column (c).

12  Q    And what two numbers would those be?

13  A    That would be $13,920 minus the $8,333.

14  Q    And you are a much better person at math than I am,

15  but what does that come out to?

16  A    That would amount to $5,687. I believe.

17  Q    And that would reflect -- again, what would that

18  reflect?

19  A    That would reflect current year purchases.  In this

20  case, 2005 purchases of tangible assets.

21  Q    And again tangible assets being buildings, office

22  equipment?

23  A    That's office equipment, furniture, equipment, et

24  cetera.

25  Q    Looking at Line 12.  What is the total value of land

1  listed as being owned by the corporation?

2  A     Zero.

3  Q     Let's scroll back down to the section titled,

4  *"Liabilities and Shareholders Equity."*  Looking at

5  Line 22, can you tell the ladies and gentlemen of the jury

6  how much the total amount of stock sold in the corporation

7  was up to at that point in 2005?

8  A     That's $373,700.

9  Q     Now, how do we determine the amount of stock sold for

10 the year of 2005?  Just in the year of 2005.

11 A     Okay.  Line 22 b, it would be Line 22 b, Column (d),

12 minus the amount on Line 22 b, Column (b).

13 Q     So, the $353,000 minus $142,500?

14 A     Correct.

15 Q     And what does that total come out to, sir?

16 A     That's $211,200.

17 Q     So, for that year, $211,200 in stock is being

18 reflected as sold in the corporation?

19 A     Correct.

20 Q     For 2005?

21 A     Correct.

22 Q     Let's go to what has been marked as Government's

23 Exhibit 179.  And again, sir, do you recognize those as a

24 tax return for the 2006 tax year?

25 A     Yes, I do.

1  Q    Okay.  Let's scroll to the bottom.  Is that your

2  signature that appears there on the bottom?

3  A    Yes, it is.

4  Q    And are those corporate returns signed by the CEO and

5  president of the corporation, Michael Harris?

6  A    Yes, it is.

7  Q    Okay.  Looking to Line 12.  For the tax year of 2006,

8  how much money is being reflected as being paid in

9  compensation to officers and in salaries to employees?

10  A    Zero.

11  Q    Zero dollars?

12  A    Correct.

13      MR. KLAIBER:  Can you zoom out.

14  Q    And let's go to Page 4 of the tax return, sir.  And

15  let's scroll down to Line 7.  Are you looking at Line 7,

16  sir?

17  A    Yes.

18  Q    The total amount there reflected is $62,784?

19  A    Correct.

20  Q    What can you -- does that represent the total amount

21  of money being loaned to the company in that year, 2006?

22  A    Actually, being loaned by the company, not to the

23  company.

24  Q    *"By the company."*  Okay.

25  A    To the shareholders.  No, not for 2006.  That's an

1  accumulative total.

2  Q    Okay.  And how do we come up with the number for the

3  total amount of money loaned to shareholders for the year

4  of 2006?

5  A    It would be Line 7, Column (d), minus Line 7, Column

6  (b).

7  Q    Okay.  And, again, you're the bean counter, so would

8  you please let the ladies and gentlemen of the jury know

9  what the total amount of money loaned to shareholders for

10  the year 2006 would be?

11  A    It would be $1,554.

12  Q    Going to Line 10 of the tax return, sir.  What is the

13  total value, net value, of the depreciated tangible

14  assets?  Again, buildings, office equipment, things of

15  that nature.

16  A    That's $6,055.

17  Q    Okay.  Was there an increase in the amount of money

18  spent by the corporation in 2006 for those tangible

19  assets?

20  A    No, there was not.

21  Q    If there had been a purchase of $200,000 on property

22  on a home with land, would that be reflected in that line?

23  A    If it was a corporate purchase it would be.

24  Q    All right.  And again, what's the total amount of

25  money being reflected as having been spent for the year of

1  2006 on those types of items?

2  A    None.

3  Q    And how did we derive that, sir?

4  A    On the fact that Line 10 a, Column (c), and Line 10

5  a, Column (a) are identical.

6  Q    They're identical.  So it's zero net increase on

7  expenditures for those kinds of things?

8  A    Correct.

9  Q    And for land on Line 12, how much is being reflected

10 is being spent by the corporation on land?

11 A    Zero.

12 Q    Okay.  Scrolling down to the next section, *"Liability*

13 *and Shareholders Equity."*  Looking at the tax return,

14 Line 22, sir.  And we've already established that Line 22

15 is where we looked to find out how much stock has been

16 sold by the corporation, and how much money has come into

17 the corporation through the sale of stock, correct?

18 A    Correct.

19 Q    For the -- what is the total amount of stock having

20 been sold by the corporation up to that point for 2006?

21 A    That would be $363,700.

22 Q    Now, how do we determine how much money has been

23 sold -- excuse me, how much stock has been sold and money

24 taken in through the sale of stock for the year of 2006?

25 A    It is the difference between Line 22 b, Column (d),

1  and Line 22 b, Column (b).

2  Q    So, the total amount then, and I can do this math,

3  would be $10,000 coming into the corporation for that

4  year, correct?

5  A    That is correct.

6  Q    Okay.  Is there anywhere reflected on this 2006 tax

7  return an investment of $200,000 -- $230,000 coming in

8  through the sale of stock for the year of 2006?

9  A    No.

10      MR. KLAIBER:  Your Honor, I believe those are all the

11  questions I have.  I pass the witness.

12      THE COURT:  All right, sir.

13      MR. NASEEM:  One more -- last question.  I apologize,

14  Your Honor.

15  Q    Did you prepare any other tax return for Mr. Harris?

16  A    No, I did not.

17      MR. NASEEM:  Thank you, Your Honor.

18      THE COURT:  All right.

19      Mr. Wagner.

20                    **CROSS-EXAMINATION**

21  BY MR. WAGNER:

22  Q    Good afternoon.

23  A    Good afternoon.

24  Q    I'm Rob Wagner, and I represent Mr. Harris.

25      So back about a year ago, the files that form the

1  basis of these returns were burned, correct?

2  A    Correct.  As part of a -- as part of a general office

3  shredding that we do every three years.

4  Q    Shredding?

5  A    Correct.

6  Q    And there are no computer records?

7  A    No.  These were all original.  These were all

8  original source documents.

9  Q    Now, you say it was Quickbooks?

10  A    I believe so.  As I said, to the best of my

11  recollection.

12  Q    Quickbooks is a computer program, isn't it?

13  A    It is a program.  Correct.

14  Q    That could have been transferred to you by computer,

15  couldn't it?

16  A    It was not.  I was only, you know -- I was not given

17  any computer files.  As a matter of practice, I do not --

18  I do not have client's computer files on my own computer

19  as a security issue.

20  Q    Now, you mentioned a guy named Ray Garcia Zamore?

21  A    Rudy.

22  Q    Rudy.  I'm sorry.  All right.  And he -- you said he

23  referred Mr. Harris to you?

24  A    Correct.

25  Q    And how do you know that if the files were purged?

1  A     How do I know the files were purged?

2  Q     No.  How do you know that he referred Mr. Harris to

3  you if the files were purged?

4  A     Because that I have a recollection of.

5  Q     So you have an independent recollection of that?

6  A     Actually, that the -- that Mr. Harris was referred to

7  me by Mr. Zamore.

8  Q     All right.  And do you know an attorney named John

9  Wax?

10 A     Do not.

11 Q     Okay.  And is it possible that Mr. Zamore would have

12 provided you with some information regarding Mr. Harris?

13 A     Other than just general information as to what kind

14 of -- you know, what the company did, no.  To the best of

15 my recollection, no.

16 Q     But you can't be sure?

17 A     Correct.

18 Q     And Mr. Zamore is an attorney, correct?

19 A     Correct.

20 Q     An attorney working for Mr. Harris, correct?

21 A     Correct.

22 Q     Now, you talked about different types of documents

23 that you would review for the corporate return?

24 A     Correct.

25 Q     You talked about original source documents, right?

1  A     Correct.

2  Q     And you have no independent recollection of any

3  independent source documents that you reviewed?

4  A     No.

5  Q     Is it possible that you did?

6  A     I'm sorry?

7  Q     That you reviewed original source documents from

8  Mr. Harris?

9  A     It is possible.  Yes.

10 Q     And bank statements?

11 A     It is possible.  Yes.

12 Q     And canceled checks?

13 A     It's possible.  Yes.

14 Q     And do you recall how many times you spoke with

15 Mr. Harris about the preparation of this return?

16 A     Not exact amounts.  But it was probably less than

17 five.

18 Q     Do you know how he provided you with what you think

19 is Quickbooks that you used to prepare the return?

20 A     I believe he mailed me the reports.

21 Q     But you don't --

22 A     I honestly don't recall.  I do not have a

23 recollection.  Again, it was over five years ago.

24 Q     And do you recall if there was any back and forth

25 between you and Mr. Harris about the preparation of these

1  returns?

2  A    There could very easily have been just some specific

3  questions.

4  Q    I mean, this was four years ago, correct?

5  A    Correct.

6  Q    And for tax year 2003 there was nothing reported?

7  A    Correct.  Because 2003 was only a tax return for

8  eight days.  The corporation was formed on December 23,

9  2003, so it was really only -- it was a return for the --

10  you know, the return was filed because, as I stated

11  before, I believe you always file a corporate tax return

12  even if there's no activity.

13  Q    And you know that because of looking back at the tax

14  return, right?

15  A    Correct.

16  Q    You don't have any independent recollection of the

17  2003 information?

18  A    Correct.

19  Q    You have no independent recollection of the source

20  documents that you looked at for the 2003 returns,

21  correct?

22  A    Correct.

23  Q    And he was a one-time client, right?

24  A    That's correct.

25  Q    And so you had no other point of reference in order

1  to refer to to remember what you did with his taxes,

2  correct?

3  A     Correct.

4        MR. WAGNER:  That's all the questions I have, Judge.

5        THE COURT:  All right.

6        Any redirect?

7        MR. NASEEM:  Very briefly, Your Honor.

8                    **REDIRECT EXAMINATION**

9  BY MR. NASEEM:

10 Q     Mr. Weiner, if you could pull up Exhibit 179, and

11 let's focus in on the first page of the tax return, and

12 let's look at the center section.  How much income is

13 being reported as coming into the – excuse me.  Let's

14 scroll down a little bit more into the corporation for the

15 year 2006.

16 A     How much in gross receipts?

17 Q     Yes.

18 A     That's $109 in the form of interest income.

19 Q     Any other money?

20 A     No.

21 Q     So, no revenue being made by the company?

22 A     No.

23       MR. NASEEM:  Thank you.

24       THE COURT:  May Mr. Weiner be excused, gentlemen?

25       MR. NASEEM:  Yes, Your Honor.

1        MR. WAGNER:  Yes, Your Honor.

2        THE COURT:  Mr. Weiner, you're excused and free to

3   go.  Thank you for coming in today, sir.  We appreciate

4   your testimony.

5        MR. WEINER:  Thank you.

6                    **WITNESS STOOD ASIDE**

7        MR. NASEEM:  I'm sorry, Your Honor.  Next is Wendy

8   Thrane for the United States.

9        THE COURT:  Wendy Thrane.  Okay, sir.

10       Ms. Thrane, if you would raise your right hand, place

11  your left hand on the Bible, and face the Clerk of the

12  Court.

13       THE CLERK:  You do solemnly swear that the testimony

14  which you are about to give, in this case, before this

15  Court, shall be the truth, the whole truth, and nothing

16  but the truth, so help you God?

17       MS. THRANE:  I do.

18       THE COURT:  Have a seat on the witness stand, ma'am.

19       All right, Mr. Naseem, you may inquire.

20       Whereupon, **Wendy A. Thrane**, having been

21  duly sworn in, testifies as follows:

22                  **DIRECT EXAMINATION**

23  BY MR. NASEEM:

24  Q    Good afternoon, Ms. Thrane.

25  A    Good afternoon.

1  Q    Could you state your full name for the ladies and

2  gentlemen of the jury, please.

3  A    Wendy Ann Thrane.

4  Q    Ms. Thrane, what is it -- well, let me ask you this.

5  Where do you live?

6  A    Front Royal, Virginia.

7  Q    What is it that you do for a living, ma'am?

8  A    I'm a realtor.

9  Q    Okay.  What real estate brokerage firm are you

10 associated with?

11 A    Weichert Realtors.

12 Q    Where is Weichert Realtors located?

13 A    Front Royal, Virginia.

14 Q    Are you familiar with the defendant, Michael Harris?

15 A    Yes, sir.

16 Q    And do you recognize Mr. Harris in the courtroom

17 today?

18 A    Yes.

19 Q    Could you identify him for the ladies and gentlemen

20 of the jury?

21 A    Right there.

22      THE COURT:  The record will reflect that Ms. Thrane

23 has identified Mr. Harris.

24 Q    Do you recall when it was that you first met

25 Mr. Harris, and what the circumstances were around that

1  meeting?

2  A    It was -- I have in my notes, 9/1 of '06.  He called

3  in off a sign on a property in Luray.

4  Q    And by 9/1 of '06, you mean September 1st of 2006?

5  A    Correct.

6  Q    Okay.  And the property, was he interested in

7  purchasing that property?

8  A    Yes.

9  Q    Now, if you look at what has been marked as

10 Government's Exhibit 140 there in front of you.  Should be

11 two photographs.  And take a look at both of those, and

12 tell me if you can identify either one of them?

13     THE COURT:  Are both exhibits 140?

14     MR. NASEEM:  Yes, 140, Your Honor.

15 A    Yes.  This is the house.  And I don't recall the

16 barn.

17 Q    So you recall one of the photographs, but not the

18 other one?

19 A    Yes.  Well, I recognize the house.

20     THE COURT:  Any objection to the house photograph,

21 Mr. Wagner?

22     MR. WAGNER:  No objection.

23     THE COURT:  All right.

24     MR. NASEEM:  Move to have the photograph of the home

25 admitted into evidence.

1    THE COURT:  The photograph of the home will come into

2  evidence.

3        (Government's Exhibit 140 is received.)

4  Q    So, you don't recognize the first picture, but you

5  recognize the second picture?

6    MR. KLAIBER:  Can we pull that up for the ladies and

7  gentlemen of the jury.

8  A    Yes.

9  Q    And do you recognize that as the home that you showed

10  to Michael Harris?

11  A    Yes.

12  Q    Now, around September 1st of 2006, did you take

13  Mr. Harris to the property?

14  A    I met him at the property.

15  Q    You met him at the property.  In your discussions

16  with Mr. Harris, did he mention to you anything about what

17  he did for a living?

18  A    I believe he told me he was a scientist.  A

19  researcher.

20  Q    Did he mention anything about where he was living at

21  the present time?

22  A    I don't remember.  I believe he came from North

23  Carolina.

24  Q    Did he mention to you why he was buying a home?

25  A    He was interested in this house because it was close

1   to where his family lived.  He was boarding horses, so he

2   was interested in a place for his horses.  He had a

3   girlfriend that just had a baby, and he wanted to have a

4   home for the family.

5   Q    Okay.  Now, you visited the property.  Can you tell

6   the ladies and gentlemen of the jury what kind of

7   condition the property was in at the time it was being

8   sold in September of 2006?

9   A    I would say it was in poor condition.  Fair to poor.

10  Q    Did Mr. Harris mention anything to you about what he

11  was going to do with the property in terms of fixing it

12  up?

13  A    Yes.

14  Q    What did he say?

15  A    He -- well, he planned on going in and renovating it.

16  There was a lot of peeling paint, things of that nature.

17  Old flooring.  He was going to go in and fix up the house.

18  I know he talked about doing -- there was like a deck on

19  the rear that kind of went into a mountainside.  He was

20  going do something with that.  And then he was going to do

21  work with like the barn.  And there was an outbuilding

22  there as far as his horses, and things of that nature.

23  Q    Okay.  Did he mention that he was going to have

24  assistance in doing that?

25  A    Yes.

1  Q    And whom did he say was going to assist him in making

2  those renovations?

3  A    There was a gentleman by the name of Luther who was

4  -- he had found him.  He specialized in redoing historic

5  homes, or older homes.  And then he had -- I don't know if

6  he told me who the other people were that were going to do

7  the garages and the outer building.

8  Q    What did he represent about the nature of the quality

9  of individuals that were going to be renovating the house?

10 A    That they were good.  Very good.

11 Q    Was there anything that stuck out in your mind

12 regarding the quality as Mr. Harris represented to you?

13 A    I'm not sure I understand your question.

14 Q    What did he represent -- you mentioned the name

15 Luther.  What did he mention about Luther?  Did he mention

16 anything specifically about Luther?

17 A    That he specialized in -- he worked like in D.C.

18 doing, you know, older buildings, historical.  I guess

19 historical types.

20 Q    So did you get the impression that it was a big deal?

21 A    Well, I remember because I was impressed with, you

22 know, --

23 Q    Okay.  How many times did Mr. Harris visit -- well,

24 did Mr. Harris ultimately purchase that property?

25 A    Yes.

1    Q    How many times did you take Mr. Harris to the

2    property to view the property?

3    A    We met initially, and then, I mean, as far as I

4    remember, the day that we were going to do the home

5    inspection I went there.  Mr. Harris came with the home

6    inspector.  The home inspector said he was going to be

7    there all day.  So probably eight or nine hours.  So, I

8    called the listing agent, and he said it was fine.  *"Let*

9    *him do the inspection."*  And then I left.

10   Q    So around -- I'm sorry.  Were you finished?

11   A    I was trying to recall.

12   Q    Let me ask you --

13   A    I mean, that's what I remember.

14   Q    So, around September 1st of 2006 you take him to see

15   the house?

16   A    Uh-huh.

17   Q    Some days pass.  A home inspector goes in.

18   A    Actually, we wrote the contract first.

19   Q    You wrote the contract first.  So he decided to

20   purchase the home before the inspector even looked at it?

21   A    Yes.  Once you're under contract, then you can do the

22   inspection.

23   Q    Okay.  Did Mr. Harris engage in much negotiation with

24   you in terms of entering into that sales contract, if you

25   recall?

1   A    What I had down was that he talked about the price.

2   I don't know if there was -- there had been another lower

3   offer made on the property.  Basically, the people selling

4   the property were not negotiating.  So, there was some

5   lapse from one of those contracts, but we believe he was

6   considering what price he wanted to pay for the property.

7   Q    Do you recall what the list price of the property

8   was?

9   A    It was $190,000, $195,000.

10  Q    Well, why don't we do this.  Why don't we take a look

11  at what's been marked as Government's Exhibit 141.

12  A    Okay.

13  Q    And do you recognize that set of documents there?

14  A    Yes.

15  Q    Can you identify that set of documents for the ladies

16  and gentlemen of the jury, please.

17  A    It's a sales contract.

18  Q    Okay.  And is that the same sales contract for the

19  home in Luray, Virginia that you sold to Michael Harris?

20  A    Yes.

21       THE COURT:  Any objection, Mr. Wagner?

22       MR. WAGNER:  No, Your Honor.

23       THE COURT:  Be received.

24            (Government's Exhibit 141 is received.)

25  Q    Turning to --

1    MR. WAGNER:  Well, subject to the previous objection

2  I believe on the mortgage.

3    THE COURT:  Yes, sir.  I'm sorry.  Subject to that

4  objection.  Right.

5  Q    Can we go to the second page of the document, please.

6  A    Uh-huh.

7    MR. KLAIBER:  And let's zoom in on the top page of

8  the document.

9  Q    And looking at the document, Ms. Thrane, do you

10  recall when it was that you entered into this particular

11  contract with Mr. Harris?

12  A    Yep.  September 11th.

13  Q    Of what year?

14  A    It was 2006.

15  Q    And based on -- and the contract before you, who's

16  listed as the purchaser of the contract -- or the

17  property?  I'm sorry.

18  A    Michael Harris.

19  Q    What is the address of the property?

20  A    XXXX Xxxxxxxx Road, Luray, Virginia.

21  Q    Now, let's scroll all the way down.  Now, does

22  looking at that portion of the document refresh your

23  recollection as to the price of the home?

24  A    Yes.

25  Q    And how much was the home being listed for?  How much

1  did it sell for?

2  A    Okay.  Well, we had it under contract after

3  negotiations at $190,000, but we ended up closing it at

4  $185,000.

5  Q    And do you have a specific recollection of closing it

6  at $185,000?

7  A    Well, I have the addendum.

8       MR. KLAIBER:  Okay.  Let's take a look at Page Number

9  4 of that same exhibit.  And briefly could we go back to

10  the first page.  I'm sorry.  Let's scroll down to that

11  bottom portion one more time.

12  Q    How much money -- looking at the bottom portion of

13  that document, how much money did Michael Harris represent

14  that he would individually be bringing to the table as a

15  down payment?

16  A    One hundred fifteen thousand.

17  Q    And this was on September 11, 2006, correct?

18  A    Yes.

19  Q    Okay.  Now, turning to Page 4 of the document.

20       MR. KLAIBER:  If we could publish that page.  And if

21  we could scroll down to I guess Paragraphs 18 and 19.

22  Q    Okay.  Looking at that document, can you tell us what

23  the settlement date was?

24  A    September 27, 2006, or as soon as possible.

25  Q    To the best of your recollection, did the property

1  close on September 27, 2006?

2  A    No.

3  Q    And can you explain to the ladies and gentlemen of

4  the jury why that was?

5  A    We had -- there was issues with the home inspection,

6  so we wrote up an addendum asking for the seller to

7  repair/replace certain items.  So there was some

8  negotiations there.  Michael had started with -- I don't

9  recall who was going to do his loan.  There was some delay

10  there.  That didn't work out.  And then he ended up going

11  with a different lender which was later in the process

12  which caused us delay in settlement.

13  Q    Do you recall when the property actually did close?

14  A    It was the day before Thanksgiving.

15  Q    Which --

16  A    I don't remember the exact date, but I remember it

17  was the day before Thanksgiving.

18  Q    The day before Thanksgiving would have fallen in

19  November of 2006?

20  A    Yes.

21  Q    And who was the title agent for the property?

22  A    It was Patty Dean with Rels Title.

23        MR. NASEEM:  And going to the 12th page of the

24  document.  And scrolling down there to the bottom.  I

25  apologize.  I made a mistake.  It's the sixth page.  Sixth

1  page of the document.  And let's focus in on the center

2  portion there with the signature.

3  Q    Do you recognize Mr. Harris' signature on that

4  document?

5  A    Yes.

6  Q    And what is the date that he signed that document?

7  A    On 9/11/2006.

8  Q    And by that document what was he agreeing to?

9  A    To purchase the home.

10      MR. NASEEM:  If I could just consult with my notes

11  for just a second, Your Honor?

12      THE COURT:  All right, sir.

13      MR. NASEEM:  Your Honor, I pass the witness.

14      THE COURT:  All right.

15      Mr. Wagner.

16      MR. WAGNER:  No questions, Your Honor.

17      THE COURT:  All right.

18      May Ms. Thrane be excused?

19      MR. NASEEM:  Yes, Your Honor.

20      THE COURT:  Ms. Thrane, you're excused and free to

21  go, ma'am.  Thank you very much for coming.  We appreciate

22  your time today.

23      MS. THRANE:  Okay.  You're welcome.

24                    **WITNESS STOOD ASIDE**

25      MR. NASEEM:  Your Honor, the United States calls

1    Sandra Raynor to the stand.

2         THE COURT:  Okay.  All right.

3         Ms. Raynor, if you would raise your right hand, place

4    your left hand on the Bible, and face the Clerk of the

5    Court.

6         THE CLERK:  You do solemnly swear that the testimony

7    which you are about to give, in this case, before this

8    Court, shall be the truth, the whole truth, and nothing

9    but the truth, so help you God?

10        MS. RAYNOR:  I do.

11        THE COURT:  Have a seat on the witness stand,

12   Ms. Raynor.

13        Go right ahead, Mr. Naseem.

14        Whereupon, **Sandra Raynor**, having been

15   duly sworn in, testifies as follows:

16                   **DIRECT EXAMINATION**

17   BY MR. NASEEM:

18   Q    Good afternoon.  Well, I guess it's evening.  Good

19   evening, Ms. Raynor.

20   A    Good evening.

21   Q    Could you state your name for the ladies and

22   gentlemen of the jury.

23   A    Sandra Raynor.

24   Q    Ms. Raynor, where is it that you reside?

25   A    I reside in Winchester, Virginia.

1  Q    How long have you resided in Winchester?

2  A    I have lived in Winchester for about a year.  And

3  prior to that, in Frederick County.  Same county.

4  Q    What is it that you do for a living?

5  A    I manage a real estate settlement company called Rels

6  Title, and I'm also a licensed title insurance underwriter

7  for them.

8  Q    So, you're a licensed title insurance underwriter,

9  and are you also a settlement agent?

10  A    I am.  A manager, settlement agent.  Every role.

11  Post-closer.

12  Q    How long have you been employed in that capacity?

13  A    For 14 years.

14  Q    And with Rels Title?

15  A    With Rels.  Yes.

16  Q    Are you familiar with the defendant, Michael Harris?

17  A    Not personally, but through my course of -- my

18  employees.

19  Q    Through -- was he a client of your firms?

20  A    He was a customer.

21  Q    And what services did your firm provide to

22  Mr. Harris?

23  A    We performed a real estate settlement for him, which

24  included title search of property as well as working with

25  his lender to perform the settlement.  So go over his

1  closing documents and have him sign his loan papers.  And

2  once that's completed, then having the documents recorded

3  and the disbursement transaction.

4  Q    And we're going to get into that a little later.

5  A    Okay.

6  Q    Can you give the ladies and gentlemen a brief

7  explanation of first what it is a title agent does.

8  A    A title agent's role is to review all of the

9  documentation provided from a title search which is

10 performed by our abstractor.  We review that

11 documentation, and from that create what we call a

12 commitment or a title insurance binder which is our

13 commitment to insure the home owner if they choose to

14 purchase their own title insurance, and the lender that

15 there -- the property has clear title.  And from the

16 search, we set forth a series of requirements that we have

17 to meet in order to be able to insure the property.  And

18 we also outline any exceptions that might pertain to the

19 particular property.

20 Q    And all the documents that are associated with that

21 transaction, are they kept in a file?

22 A    They are.  Yes.

23 Q    Now, can you explain for the ladies and gentlemen of

24 the jury what a settlement agent is and what a settlement

25 agent does?

1  A    The settlement agent is the individual who's going to

2  sit down at the closing table with the customer and review

3  all of their documents.  Those documents --

4      MR. WAGNER:  Objection, Your Honor.  I don't think we

5  need this from the documents.

6      THE COURT:  I'm actually inclined to agree.  I think

7  you're getting into more detail than these folks really

8  need.  So, why don't you just move on through it.  These

9  are all fine experienced folks.

10     MR. NASEEM:  Okay, Your Honor.  I just wanted to lay

11  a foundation for the witness to be able to speak about the

12  documents.

13     THE COURT:  That's fine.  But only lay what is

14  necessary.

15     MR. NASEEM:  All right.

16  Q    Now, there's a set of documents there in front of

17  you.  And could you look at what's in the folder marked

18  Government's Exhibit 142.

19  A    Yes.

20  Q    Okay.  Can you identify that set of documents?

21  A    This first document is a loan application.  Or 1003

22  is what we call it.

23  Q    A loan application.  Well, let me ask you this.  Do

24  you recognize this document as the document associated

25  with Mr. Harris' file?

1   A      I do.

2   Q      And in your capacity at Rels Title, are you a record

3   custodian?

4   A      I am.

5   Q      And do you recognize the set of documents here as

6   true and accurate copies of documents maintained at Rels

7   Title?

8   A      I do.

9          MR. NASEEM:  Your Honor, at this time --

10  Q      And do they pertain to the purchase of a home in

11  Luray, Virginia for Michael Harris?

12  A      They do.

13         THE COURT:  They'll be received over your objection

14  for reasons previously stated, Mr. Wagner.

15         MR. WAGNER:  Thank you.

16             (Government's Exhibit 142 is received.)

17         MR. NASEEM:  Let's go ahead and publish that exhibit

18  for the ladies and gentlemen of the jury.

19  Q      All right.  And let's focus in on the top portion

20  there, first section.

21  A      Okay.

22  Q      And what is the address of the home for which --

23  well, what is it we're looking at here first?

24  A      We're looking at the top section of the loan

25  application.

1  Q    And the loan application is part of the file?

2  A    It is.

3  Q    Now, looking at the loan application at the top

4  portion there, where is the address for the property for

5  which the loan is being sought?

6  A    The address is in the box designated *"Subject*

7  *Property Address."*

8  Q    Okay.  And in the top left corner there an amount is

9  written.

10 A    Yes.

11 Q    What is that amount there reflecting?

12 A    *"$100,000 if possible"* is the amount that the

13 individual is seeking to borrow.

14 Q    Now, the amount, that $100,000, is the amount that

15 this individual is seeking to borrow.  And looking at the

16 bottom of the document there of that section it says,

17 *"Sources of down payment."*

18 A    Yes.

19 Q    Can you explain to the ladies and gentlemen of the

20 jury what this particular line is reflecting?

21      MR. WAGNER:  I think it speaks for itself, Your

22 Honor.

23      THE COURT:  No.  You can go ahead and walk through

24 this, but I want you to do it briefly.  If you promise me

25 that, I'll let you do that.

1          MR. NASEEM:  Yes, Your Honor.

2          THE COURT:  All right.  Let's go.

3     A     It's exactly what it says.  The source of down

4     payment is indicated here that it will come from *"Funds*

5     *from stock sale."*

6     Q     And is that being represented by the applicant of the

7     application?

8     A     It is.

9     Q     And who is that?

10    A     The applicant is Michael F. Harris.

11         MR. NASEEM:  Okay.  And scrolling down to the bottom

12    of that document.  Does the -- I'm sorry.  Let's go ahead

13    and go to the second page of this document, and let's

14    focus in on the top part of that document there, the top

15    section.

16    Q     Looking at the top section there, there's an amount

17    written there –

18    A     Uh-huh.

19    Q     – of $12,500.  Can you explain what that amount is

20    representing to the lender in this case?

21    A     That represents the borrower's monthly income.

22    Q     Okay.  And scrolling down to the center section of

23    the same document.

24    A     Uh-huh.

25    Q     Okay.  There's some information listed there.

1     MR. NASEEM:  If you scroll up a little bit.

2  Q    Can you explain to the ladies and gentlemen what is

3  being reflected there?

4  A    On the left-hand side of the assets are the borrower.

5  It's $500.  It says *"Realtor,"* which in my profession

6  would be the earnest money deposit.

7  Q    And underneath that it lists, *"Wachovia 10,000."*

8  What does that represent?

9  A    A bank account that has $10,000 in it.

10 Q    And who is representing -- and whose funds are being

11 represented there as being in that bank account?

12 A    The borrower's.

13 Q    And the borrower in this case was?

14 A    Michael Harris.

15 Q    Now, scrolling down to next line there.  It lists,

16 *"Bank of America $180,000 and $233,000."*  Can you explain

17 those two amounts?

18 A    In looking at it the way it's written, it appears

19 that in the Bank of America there's $180,000, but there's

20 a line drawn to *"M.F. Harris Research,"* which would make

21 me believe that that's --

22    MR. WAGNER:  Objection to what it makes her believe

23 Judge.

24    THE COURT:  Objection's sustained.  Rephrase your

25 question for a more precise answer.

1  Q     What do those funds -- or who is representing in this

2  document those funds belong to?  Let me ask the question a

3  little differently.  That's a bad question.

4        Ms. Thrane, {sic} the amount of $180,000 and $233,000

5  reflected on the loan application, what is Michael Harris

6  representing about --

7  A     Those are his assets.

8        MR. WAGNER:  Objection, Your Honor, unless she knows.

9        THE COURT:  Objection sustained, again.

10       When you look at this application here, this

11 particular entry, can you determine exactly what that

12 represents to you as a real estate settlement agent?

13       MS. RAYNOR:  The $233,000 would be a representation

14 of funds that belonged to the applicant, Michael F.

15 Harris.

16       THE COURT:  Thank you.

17 Q     And the $180,000?

18 A     According to what I'm looking at, those funds belong

19 to M.F. Harris Research.

20 Q     Okay.  Turning to the second page of the document.

21 A     Uh-huh.  Or third page?

22 Q     Third page.  I'm sorry.  And we'll scroll to the

23 center section of that document, please.  Looking at Line

24 L, who was the applicant representing that would occupy

25 the property?

1  A    The applicant.

2  Q    And in this case it's Michael Harris?

3  A    Michael F. Harris.

4  Q    And scrolling down to the bottom.  Is that where the

5  signature would go?

6  A    It is.

7  Q    All right.  Now, turning to the next page of the

8  document.

9  A    Uh-huh.

10 Q    And let's focus on the top part of the document.  Can

11 you identify this document for the ladies and gentlemen of

12 the jury?  What are they looking at here?

13 A    This is a HUD-1 settlement statement.

14 Q    Okay.  And can you briefly explain what is being

15 shown on this HUD-1?

16 A    The HUD-1 settlement statement is a reflection of the

17 transaction as according to debits and credits.

18 Q    Okay.  And does it reflect the sale of the home?

19 A    It does.

20 Q    And in this document, looking at what is on the

21 screen there, what is -- based on your experience, what is

22 the contract sale price for the home?

23 A    $185,000.

24 Q    Okay.  And what is the gross amount, total amount,

25 that the property in this case was being purchased for?

1  Or what was the gross amount of money that Michael Harris

2  had to bring to the table based on this document?

3  A    The amount of money that he had to bring to the table

4  was $90,461.93.

5  Q    And is that reflected there all the way at the bottom

6  of that document?

7  A    Yes, sir.

8  Q    And the total price again -- the total amount due for

9  the sale of the property was $90,461?

10 A    And 93 cents.

11 Q    Okay.  Just to reflect one more time, $90,461, that

12 money was to come from whom?

13 A    From the applicant, Michael Harris -- or the

14 purchaser.

15     MR. NASEEM:  Okay.  Now, let's turn to Page 7 of that

16 same set of documents.  And let's focus in on the first

17 three paragraphs.

18 Q    Can you describe what it is we're looking at here?

19 A    This is our conveyance deed.  This is the deed that's

20 going to transfer the property from Virginia Business

21 Enterprises, L.L.C. to Michael Harris.

22 Q    And would this be the property located in Luray,

23 Virginia on Xxxxxxxx Road?

24 A    It is.

25 Q    And turning to the last page of that document.

1  That's Page 13.  I apologize.  Is that the last page?  And

2  let's focus in on that real quick.  And can you identify

3  what that is?

4  A    This is a plat drawing of the subject property.

5  Q    And what is the total amount of acres that are going

6  along with that property?

7  A    It's 2.6693.

8  Q    Okay.  Now, as part of the file, would any

9  payments -- would any payments made by the defendant be

10 reflected in the file in terms of checks?

11 A    Absolutely.

12 Q    Looking at what's been marked as Government's Exhibit

13 143.  And do you recognize that document there, the first

14 page?

15 A    I do.

16 Q    What is that document?

17 A    These are copies of the source funds.  Funds to fund

18 our transaction.

19 Q    And looking at the second page of that document.  Do

20 you recognize those as the back of the -- well, what are

21 the source funds?  I'm sorry.

22 A    Any and all funds that we had to collect as a part of

23 this transaction.

24 Q    And were these checks provided by the buyer in this

25 case, Michael Harris?

1    A     They are.

2    Q     And turning to the second page.  Are those the backs

3    of the checks?

4    A     They are.

5    Q     And the third and fourth page -- or the third page.

6    Can you identify that document?

7    A     Page 3 is a home owners insurance binder.

8    Q     And can you briefly explain what that is?

9    A     That's the home owner's insurance company agreement

10   to provide insurance for this property like buyer

11   insurance, flood insurance.  That type of insurance.  Not

12   title insurance.

13   Q     And the last page of that document?

14   A     This is a copy of the checks to pay for the home

15   owner's insurance.

16   Q     And were these all part of the file for Michael

17   Harris?

18   A     Yes.

19         MR. NASEEM:  At this time, I'd like to admit the

20   document into evidence, Your Honor.

21         THE COURT:  Any objection to 143?

22         MR. WAGNER:  No, Your Honor.

23         THE COURT:  It will be received.  You may publish it

24   if you wish.

25              (Government's Exhibit 143 is received.)

1    Q    Okay.  Let's focus in on the top most check there.

2    A    Okay.

3    Q    Can you represent -- are you able to tell the ladies

4    and gentlemen of the jury what that particular check is

5    for?

6    A    Yes.  This is a check for $85,000 payable to Rels

7    Title remitted by Michael F. Harris.  And this is a

8    portion of the funds due from Mr. Harris towards the

9    purchase of the property.

10   Q    And would that reflect the down payment of the

11   home -- payment for the -- the funds for the down payment?

12   Excuse me.

13   A    Yes.  A portion of them.

14   Q    And if you would scroll down.  And that second check

15   there.  Can you explain what that is?

16   A    Yes.  This is a check drawn from B B & T for $5,000

17   payable to Rels Title, remitted by Michael F. Harris.

18   This would be another portion towards the funds due from

19   Mr. Harris for the purchase of the property.

20   Q    And the check is being made to Rels Title.  Would

21   that be for the purchase of the title insurance and the

22   settlement fees associated with the closing?

23   A    It's a combination of everything combined.

24        MR. NASEEM:  And let's scroll to the left, and let's

25   zoom out.  And can we rotate the document?

1  Q    And looking at this check here as well, would those

2  also be funds being paid towards the purchase of the

3  property due from the purchaser, Michael Harris?

4  A    They would complete the total amount due.

5  Q    And the amount is $461.93?

6  A    Yes.  Payable to Rels.

7  Q    And turning to the third page of that set of

8  documents.

9       MR. NASEEM:  Let's focus in on the top half there.

10 Q    Can you -- again, this is the insurance.  Can you

11 identify this as the insurance binder?

12 A    Uh-huh.

13 Q    And who is the insured in the case?

14 A    The insured is Michael Harris.

15 Q    And scrolling down to the bottom there.  Is that --

16 is that the address of the property that's being insured,

17 XXXX Xxxxxxxx Road, Luray, Virginia?

18 A    It is.

19 Q    And going to the last and final page of that document

20 there before you.

21 A    Uh-huh.

22 Q    And do those represent funds paid on behalf of --

23 well, for the particular insurance binder?

24 A    Yes.  This is the check to Virginia Farm Bureau for

25 $813.  And it notes insurance.

1  Q     And is that check -- was that check provided by the

2  purchaser of the property in this case, Michael Harris?

3  A     It was provided by the purchaser.

4       MR. NASEEM:  Your Honor, let me consult with my -- no

5  further questions of this witness.

6       THE COURT:  Thank you.

7       Mr. Wagner.

8       MR. WAGNER:  No questions.

9       THE COURT:  All right.

10      Ms. Raynor, you may step down.  Thank you very much

11 for your testimony.

12                    **WITNESS STOOD ASIDE**

13      MR. GILL:  Your Honor, we call Myranda Caudill.

14      THE COURT:  I assume this will be a relatively short

15 witness?

16      MR. GILL:  Your Honor, it will probably last about 40

17 minutes direct.

18      THE COURT:  Well, I'm not going to put the jury

19 through that.

20      Does anyone particularly want to sit here tonight to

21 hear this?

22      I think it's unanimous.  We're going to do it

23 tomorrow morning.

24      Ladies and gentlemen, at this point we're going to

25 recess until tomorrow morning at 9:00.  Is that still

1  suitable to everybody?

2      Same comments I had last night.  No conversations

3  among yourselves, friends, family members.  Avoid all

4  media coverage of this case.  Get a good night's sleep.

5  We'll see you back here tomorrow morning at 9:00.  We'll

6  keep plugging along.

7      (The jury is no longer present in the courtroom.)

8      THE COURT:  Mr. Gill, what time tomorrow do you

9  expect to wrap your case up?

10      MR. GILL:  Your Honor, it will be close.  I don't

11  believe that we'll be able to completely finish.  I think

12  we'll have one more witness left after tomorrow.  That

13  will be the financial analyst.  She'll probably take

14  about, with cross-examination, two to three hours –

15      THE COURT:  All right.

16      MR. GILL:  – on Thursday morning.  But we're doing

17  good.

18      THE COURT:  All right.

19      Mr. Wagner, I'm not going to hold you to the time

20  frame, but just for my planning, how long do you think

21  your case will last?

22      MR. WAGNER:  It's hard to say, Judge.  I would say

23  the rest of the day on Thursday.

24      THE COURT:  All right.  That's fine.  I respect that.

25      Anything further before we recess until tomorrow

1  morning?

2       MR. GILL:  No, Your Honor.

3       THE COURT:  Mr. Wagner?

4       MR. WAGNER:  No, Your Honor.

5       THE COURT:  See you tomorrow morning at 9:00.

6       We'll stand in recess.

7            (The proceeding concluded at 5:20 p.m.)

8

9                 REPORTER'S CERTIFICATE

10           I, Krista M. Liscio, OCR, RMR, Notary
   Public in and for the Commonwealth of Virginia at
11  large, and whose commission expires March 31, 2016,
   Notary Registration Number 149462, do hereby certify
12  that the pages contained herein accurately reflect
   the notes taken by me, to the best of my ability, in
13  the above-styled action.
         Given under my hand this 30th day of July, 2013.

14

15  _____
                        Krista M. Liscio, RMR
16                      Official Court Reporter

17

18

19

20

21

22

23

24

25